**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **1:18-cr-11** |
| **v.** | ) | |
| | ) | **Judge Mattice/Steger** |
| **JERRY WAYNE WILKERSON,** | ) | |
| **MICHAEL CHATFIELD,** | ) | |
| **KASEY NICHOLSON,** | ) | |
| **BILLY HINDMON, and** | ) | |
| **JAYSON MONTGOMERY** | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and hereby offer this response to the defendants' motion to dismiss. The defendants have filed a motion to dismiss the indictment and an accompanying memorandum. (R. 175, Motion and Incorporate Memorandum in Support of Motion to Dismiss.) The United States opposes the motion.

The defendants' motion misapprehends the applicable standards for dismissal of a criminal case. Many of their arguments—which relate, for example, to competing standards of care, patients' "freedom of choice," and whether certain claims were subject to payment—are evidentiary matters for a jury's consideration. Other arguments—e.g., concerning what the government must affirmatively plead in an indictment—are simply legally incorrect.

This Court's Grand Jury found probable cause to believe that each of the above-named defendants has committed various federal crimes. It returned an indictment that informs the defendants of the charges against them and protects them against double jeopardy. The Third

Superseding Indictment (the "Indictment") is therefore sufficient, and a trial on the merits is warranted. The Court should deny the defendant's motion.

## BACKGROUND

### I.      Factual Background

The Indictment states that the defendants conspired, and aided and abetted each other in substantive counts, in violating the mail fraud, wire fraud, and health care fraud statutes, the anti-remuneration provisions of Title 42, and other crimes. (R. 131, Third Superseding Indictment.) The scheme to defraud included defrauding private insurance companies (e.g., Blue Cross Blue Shield of Tennessee), and government run insurance programs (e.g., Tricare).

The proof will show that the defendants, led by Jerry Wayne Wilkerson, targeted "patients" or customers with certain types of insurance—insurance that would pay for compounded medications. As noted in the Indictment, the customers included, among others, family members, friends, acquaintances, and co-workers of the defendants. Some of the defendants signed up for compounded medications in their own names and received commissions on those medications. After the defendants would sign up customers for the compounded medications, the pharmacies would ultimately fill the prescription, bill the insurance company, and the pharmacy would be paid by the insurance company (generally Express Scripts or another similar business). Once paid, the pharmacies would then pay a commission to Wilkerson, who then in turn, based upon a "commission report" kept by the pharmacy and forwarded to Wilkerson (Wilkerson also created and kept his own commission reports), who would then pay three of the other four defendants in this case. The last defendant, Jayson Montgomery, was downlinked from defendant Billy Hindmon. Hindmon would pay Montgomery from his (Hindmon's) share, which was received from Wilkerson.

2

Each of the defendants was a "marketer" for the compounded medications. The defendants would approach a prospective customer, explain that they were marketing the compounded medications, inquire about the type of insurance the person had, and then attempt to recruit the person to order a prescription. The defendants generally had a prepared order form for the transaction. The order form went through several changes during the course of the scheme, but generally it involved pain cream, creams to treat skin conditions such as psoriasis or eczema, anti-aging creams, scar creams, and other creams to treat maladies such as "stretch marks." The customers were not told how much the creams cost. If the customer agreed to sign up for the medications, generally he or she was told that a health care professional (either a doctor or nurse practitioner) would call the customer to complete the prescription. (Some customers never received a call from a health care professional.) Additionally, the customers were offered a fee for a study or survey. The fee generally would be in the $100 range, and sometimes customers were told that they would receive the survey fee for each medication they ordered.

Occasionally, a customer would be approached about becoming a "sales representative" for the compounded medications. When that happened, one of the defendants would tell the customer that he or she could make a commission off any creams/medications they sold. These customers who became sales reps were also encouraged to form an LLC for the enterprise. Many of them did.

Usually, the medications were provided in the form of a cream which was provided in a non-descript plastic bottle. Other medications included "wellness" pills, which were compounded by the pharmacies.

The amount of money charged to the insurance company for each prescription varied. However, many of the prescriptions would be billed at $10,000 per order, and sometimes higher.

3

Some of the prescriptions were reimbursed at close to $15,000. Furthermore, when agreeing to order the compounded drugs, the customers were told that there would be no cost to them. There were instances where the defendants paid the co-payment to the insurance company, or where the pharmacy itself would waive the co-pay. It was not unusual for one customer to have his/her insurance billed for over $100,000 for the medications. The total amount of money billed through four pharmacies (Willow, Central Rexall, Florida Pharmacy Solutions or FPS, and Soothe), based upon prescriptions for which the five defendants are responsible, exceeded $30 million. Roughly half of this amount was billed to private insurance companies, the other half was billed to Tricare.

Defendant Wilkerson also operated Karma Wellness ("Karma"), a business in Hamilton County. Through Karma, Wilkerson employed doctors and nurse practitioners. Some of the health care practitioners employed by Karma were Dr. Suzy Vergot, and nurse practitioners Candace "Michelle" Craven and Toni Dobson. Dr. Vergot and Ms. Craven have pleaded guilty to a Health Care Fraud conspiracy in the Southern District of California regarding a Tricare scheme much the same as the scheme in this case.[1] Ms. Dobson has not been charged.

The relationship between the health care practitioners and the customers was suspect. The consultations generally occurred over the telephone and without any in-person contact between the health care professional and the customer.[2] After a cursory "tele-medicine" consultation, the

---

[1] Dr. Vergot, through negotiations with her counsel and the undersigned, agreed to plead guilty plea to a wire fraud count in this case. However, the amount of loss in the San Diego case is approximately $60 million. After consultation with AUSA Mark Pletcher in San Diego, counsel for the government agreed that Dr. Vergot relinquished control and agreed that she could be charged with the health care fraud scheme there. The two defendants charged in San Diego are Jimmy and Ashley Collins. They operated out of the EDTN, but they targeted military personnel in San Diego. Ms. Craven will not be charged here because she has pleaded guilty there. A third person, Dr. Carl Linblad, also from the EDTN, also pleaded guilty in San Diego to conspiracy to commit health care fraud. Dr. Linblad's involvement in this case would have been minimal.

[2] There may have been instances wherein the doctor met with a patient. For example, when the defendants order medications for themselves, they may have met in person with the doctor.

4

health care professional would then send the prescription to the pharmacy to be filled. After receipt of the prescription, the pharmacy would then fill the prescription, send the bill to the insurance company, receive reimbursement from the insurance company (or Tricare), then send Wilkerson his portion of the payment (which was generally 35 to 40% of the amount billed). In turn, Wilkerson would pay his "downlinks": Chatfield, Nicholson and Hindmon. Generally, Chatfield, Nicholson and Hindmon made 50% of the amount billed under their name and sent to Wilkerson, which would represent approximately 17.5 to 20% of the total amount billed to the insurance company. Defendant Montgomery was downlinked from Hindmon. Wilkerson and Hindmon each took their share of what Montgomery was able to sell.

In making payments, the pharmacies would list them as commissions. However, the commissions paid to Wilkerson, and in turn to others, amounted to a prohibited illegal remuneration under the Anti-Kickback statute with respect to the Tricare claims. In the case of private insurance, the payment would not be per se illegal, but it would certainly be evidence of the scheme and conspiracy to defraud.

Other proof would show that the defendants sought the assistance of an insider at a pharmacy in order to backdate prescriptions sent to Blue Cross/Blue Shield (thereby circumventing the deadline by which BCBS would no longer fill compounded prescriptions), that they employed the services of a pharmacist at a pharmacy as a consultant who helped the defendants push through the prescriptions, and sometimes signed up customers without their knowledge that they would be receiving the medications.

---

Also, it's possible that defendant Chatfield's wife may have met in person with the doctor. On the great majority of occasions, the prescription was consummated over the phone.

5

## II. Procedural Background

The factual background, *supra*, is precisely that: the circumstances and conduct leading to the defendants' Indictment. It is part of what the Government expects the proof will show at trial.

For the present purposes, however, it is enough to note that, over the course of its investigation, the Grand Jury heard evidence concerning the above facts and other matters. On consideration of those facts, it returned a 34-page indictment, charging the defendants with multiple crimes supported by a recitation of the events and transactions giving rise to them. (R. 131.)

## ARGUMENT

## I. Defendants' motions should be denied because the indictment properly alleges criminal offenses.

The Grand Jury's Indictment in this case spells out the charges levied against each defendant. It tracks the language of the pertinent statutes. It identifies the essential facts supporting those charges, such that, taken as true, the Government's allegations meet the elements of each offense. It is therefore not subject to dismissal.

It appears the defendants misapprehend the standard for dismissal of an indictment.[3] "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is

---

[3] Although not explicit, the defendants appear to conflate the rationale of civil dismissal under Fed. R. Civ. P. 12(b)(6) with the dismissal of a criminal indictment. For example, the defendants reference dismissal upon a failure "to state a cause of action," citing *United States v. Abboud*, 438 F.3d 554, 566 (6th Cir. 2006). (R. 175 at 3.) But the portion of *Abboud* to which the defendants cite deals with the waiver of a claim of multiplicity in a criminal indictment, not dismissal of a criminal charge for failure to state a cause of action. It is no matter. Under any standard, the Indictment clearly spells out the charges against the defendant and the conduct giving rise to those charges. While the defendants have a right not to accede to those charges, they may not leverage their disagreement to force this Court to discard the conclusion of the

6

enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1); *see also Hamling v. United States*, 418 U.S. 87, 117 (1974). An indictment is constitutionally sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. In particular, the indictment must: (1) set out all of the elements of the charged offense and must give notice to the defendant of the charges he faces, and (2) be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts. *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005).

It is well accepted that grand jury indictments are presumed to be valid. *See, e.g., United States v. Toatley*, 2 F. App'x 438, 442 (6th Cir. 2001). Indeed, "[a]n indictment is to be construed liberally in favor of its sufficiency." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).

The defendants ultimately argue that that "the Indictment is subject to dismissal because: a) none of the alleged acts or failures to act by the defendants constitute a violation of any of the statutes cited in the Indictment; b) even if all the allegations are taken as true, they are legally immaterial; and c) there is no showing that the defendants were in legal control of the circumstances." (R. 175, PageID #: 849-50.) These arguments wrongly presuppose that the United States must now make to the Court some preliminary evidentiary "showing" that a crime has been committed, but that hurdle has been cleared. The Grand Jury heard the evidence and

---

Grand Jury: probable cause exists to believe that these defendants committed the crimes with which they are charged.

determined that there was probable cause to believe the defendants committed the crimes specified.

The defendants were charged with Conspiracy to Commit Health Care Fraud, Mail Fraud, Wire Fraud, substantive Health Care Fraud, payment and receipt of illegal remunerations, money laundering, aggravated identity theft, and a conspiracy under Title 18, United States Code, Section 371. (R. 131, Third Superseding Indictment.) A scheme to defraud requires "sufficient evidence of several misrepresentations," and "includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Rathburn*, No. 18-1652, 2019 WL 2025229, at *4 (6th Cir. May 8, 2019) (citing U*nited States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)). A scheme to defraud is not measured by a "technical standard," but rather is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Id*. (citing *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)).

Contrary to the defendants' assertions, a misrepresentation can be made through omissions or through circumstances "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Birnie*, 193 F. App'x 528, 536 (6th Cir. 2006) (citing *United States v. Hathaway*, 798 F.2d 902, 908 (6th Cir. 1986)). Deception is not necessarily confined to a direct misstatement of fact. *Id*. (citing *United States v. Lichota*, 351 F.2d 81, 91 (6th Cir.1965)). Under the Sixth Circuit's pattern instructions

> (B) The term "false or fraudulent pretenses, representations or promises" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth. They include actual, direct false statements as well as half-truths and the knowing concealment of material facts.

(C) An act is "knowingly" done if done voluntarily and intentionally, and not because of mistake or some other innocent reason.
(D) A misrepresentation or concealment is "material" if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension.

Sixth Circuit Pattern Instruction 10.01.

For each offense, the Indictment tracks the language of the statute. It sets out the fraud the defendants perpetrated on their victims, and each count is substantiated by "specific allegations" that fairly inform defendants of the charges against which they must defend. *See Anderson,* 605 F.3d at 411 ("Given these specific allegations, [the defendant] was fairly informed of the charged against which she had to defend."). The indictment also includes the relevant time periods for each count. *Anderson*, 605 F.3d at 411 ("The indictment also included the relevant time period and the specific event that triggered the charge . . . [t]he second requirement of *Hamling* is thus met."). The defendants are on notice as to the charges against them—a fact made obvious by their 29-page motion asserting a number of offense-specific defenses and claims. They are also aware of the charges such that they are protected from double jeopardy. The defendant's Motion is meritless and should be denied on this basis alone.

## II.     **Defendants' motions should be denied because they raise disputed questions of fact to be decided by the jury.**

In their Motion, the defendants repeatedly couch various specious factual claims as "matter[s] of law." (*See, e.g.,* R. 175 at PageID #: 9-10) (citing findings from another court's order on a civil preliminary injunction for a factual proposition in this case that it was "solely the health plans' decision to include these specific medications on their formularies" and "it was solely the prescribing physicians' responsibility to properly ensure medical necessity . . ."). By their own characterization, the defendants' motion is predicated on a number of factual assertions

that are, at best, in dispute (at worst, they are incorrect). This is an alternative basis for denying their motion.

A motion to dismiss should not be granted when the parties dispute relevant questions of fact. *United States v. Huff*, Case No. 3:10–CR–73, 2011 WL 2414553 at *21 (E.D. Tenn., June 10, 2011) (citing *United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992)). Defendants' motions are premised substantially on disputed questions of fact. In *their* words, the Indictment alleges they: a) marketed compounded pharmaceuticals to physicians and patients on behalf of pharmacies; b) the patients' physicians wrote prescriptions for the patients; c) the medications were on the patients' insurance plans' formularies, at the plans' pre-set rates of reimbursement; d) the pharmacies compounded and dispensed the medications to the patients based on the physicians' prescriptions; e) the patients received the medications; f) the pharmacies billed the patients' insurance plans and were paid the pre-set rates of reimbursement for the medications; g) multiple patients in turn became marketers in the same manner as the defendants; and, h) the defendants were paid by the pharmacies a portion of the insurance reimbursement as a sales commission for their marketing. (R. 175, Joint Motion, PageID# 848.)

Additionally, in the defendants' words, the Indictment also alleges: a) the physicians' prescribing was for patients with no pre-existing medical condition or medical necessity for the medications; b) the patients did not consent to receive the medications; c) the defendants misled some patients as to their insurance plans' copayments for the medications; d) the defendants reimbursed some patients for their medication copayments; e) the defendants failed to disclose to the patients the cost of the prescriptions to be paid by the patients' insurance plans to the pharmacies; f) the defendants provided financial inducements to some patients in exchange for the patients themselves becoming sales representatives; g) the defendants employed medical

professionals who prescribed compounded pharmaceuticals to some patients; h) those employed medical professionals failed to properly examine and treat some patients prior to prescribing; i) the pharmacies paid sales commissions to the defendants; and, j) the defendants targeted specific insurance plans and specific medications based upon those plans' medication coverage and reimbursement.

These are factual assertions. They are apparently disputed. Dismissal is not appropriate.

Notably, not all of the allegations the defendants recite are contained in the Indictment. For example, the government has not alleged that the defendants were marketing the compounded medications *to* doctors.[4] The doctors/NPs employed by defendant Wilkerson were an integral part of the scheme, however. The defendants claim the indictment states that the *patients' physicians* wrote prescriptions for the patients. The government does not use the word "patient" as the people ordering the creams were not really *patients* in the traditional sense. Instead, the government prefers *customers*; the customers, who had a certain type of insurance which would cover the cost of the medications, were targeted by the defendants/marketers. The customers did not seek the medications; the defendants sought out the customers. The doctor or NP would then call the customer after the marketer sent the "order form" or "prescription form" to the doctor or NP (which would include contact information for the customer). The order form was pre-printed and it contained a limited number of creams/medications which the customer could order. Generally in consultation with the marketers/defendants, the customer indicated which medications to order. Before the form was sent to the prescriber, either the customer or defendant/marketer would check boxes for the types of medications to be ordered. The

_____

[4] The government is aware that in the beginning, Wilkerson may have tried to market the creams to doctors not under his control. When that plan proved less than fruitful, Wilkerson "changed his business model" wherein he employed the doctors/NPs, and where the defendants/marketers directly approached the customer in order to convince them to sign up for the creams.

11

medications that were ordered contained certain ingredients, e.g., fluticasone, which would drive the price of the prescription. On some occasions, after insurance companies began to review the practice of authorizing payment for compounded medications, the defendants, with the help of an insider at a pharmacy, would change the formula (e.g., lower the percentage of fluticasone) so the insurance company would authorize payment.

The defendants maintain a different understanding of the term "patients' physicians." The doctors/NPs who were authorizing the prescriptions were employed by Wilkerson. The patients, if they were consulted by the doctor or NP, were contacted by telephone, not in person. Virtually all of the patients had no previous relationship with the prescriber (with the exception of the defendants who ordered their own medications). Wilkerson was paying the full salary of the prescribers; the customers never paid for an "office visit" or a "consultation" with the prescriber.

The defendants misapprehend the nature of a scheme to defraud. Federal law makes it a crime for individuals, "in connection with the delivery of or payment for health care benefits, items, or services," to "knowingly and willfully execute[ ] ... a scheme or artifice" "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises" money or property from such program. *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 852 (2019)(citing 18 U.S.C. § 1347). Accordingly, the government must "prove that the [] defendants: (1) created 'a scheme or artifice to defraud' a health care program, (2) implemented the plan, and (3) acted with 'intent to defraud.'" *Id.* (citing *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009).

Just as in *Bertram*, the "three-part test distract[s] more than they inform…, which comes down to the meaning of 'defraud' and whether the defendants satisfied it." In *Bertram*, the

12

defendants started a new business, fell behind on the testing of urine samples, and ultimately tested urine samples which were 10 months old.  *Id*. at 747.  They then submitted claims to, and were reimbursed by, Medicare for the old samples they tested.  "If the defendants requests for payment for urinalysis tests on samples from seven to ten months old amounted to fraud, it becomes much easier to conclude that they created a fraudulent health care benefits scheme, implemented it, and did so knowingly."  *Id.* at 748.  The panel found that "any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth" amounted to fraud.  *Id*.  Those statements could "include actual, direct false statements as well as half-truths and the knowing concealment of material facts." *Id*.  Fraud includes omitting critical "qualifying information" or "omitting information that revealed the impropriety" of the action.  *Id*. at 749.

In the instant case, the defendants argue that they did not provide any material misrepresentations therefore they could have committed no fraud.  First, as noted above, the defendants did on occasion make material representations.  More importantly, the defendants used false and fraudulent pretenses, including concealment, to make the scheme succeed.

All of the defendants' actions show facts containing fraudulent activity; the defendants used false and fraudulent pretenses to carry out the scheme.  These are material matters which should be submitted to the jury.  Indeed, there was no real need for the medications, there was no real doctor/patient relationship, and the entire premise of the scheme was to defraud the insurance companies.  Of the five entities involved—doctors/NPs, marketers, pharmacies, customers, and insurance providers—Wilkerson controlled, in some manner, four of them.  He employed the doctors/NPs, he paid the marketers (and made money himself off the commissions), he conspired with the pharmacies, and on at least one occasion, directly paid a

13

pharmacist at Willow Pharmacy to provide "consultation," and he or the co-defendants paid the customers for a "study" or "evaluation" fee (and the defendants either paid the co-pays or the co-pays were "waived" by the pharmacy). The other four named defendants participated in the scheme, and as a result, garnered a large financial award.

The customers were never out any money; the defendants paid the fees for the "study," and they occasionally paid the co-pay. On the rare occasion where customers might have paid the co-pay, the defendants paid other sums to those customers which far exceeded the amount of the co-pay. For example, Amanda Morgan Booker claimed that she and her husband, Keitha Booker, paid the co-pays for their creams (which amounted to around $1000). However, Wilkerson paid them over $100,000 to participate in the scheme by signing up co-workers and family members of Mr. Booker. Or, on the occasions that the pharmacy "waived" the co-pay, it is not enough for the defendants to claim that the actions by the pharmacies was not their responsibility. The defendants/marketers knew, in the great majority of cases, that the customers would not be paying a co-pay. While it may be true that the defendants had no duty to speak directly to the insurance companies, they were aware that the pharmacies were waiving the co-pay, and in essence the defendants conspired with pharmacies who would have concealed to the insurance companies that the customers were not paying the co-pay. See, *United States v. Carman*, 186 F. Supp. 3d 657, 662 (E.D. Ky. 2016), *aff'd sub nom. United States v. Maddux*, 917 F.3d 437 (6th Cir. 2019).

On other occasions, the defendants provided money orders to the customers to pay for the co-pays. The paying of the co-pays, the waiving of the co-pays, and the paying of a fee to the customers for the "study," all show concealment and raise disputed questions of fact. These payments were not revealed to the insurance providers. Had the insurance companies known

that the defendants were paying co-pays, or the pharmacies were waiving them, and that the defendants were paying customers to order the creams, the insurers would not have paid the high cost of the medications. *United States v. Mays*, 69 F.3d 116, 119 (6th Cir. 1995) (Noting that defendants "created a false paper trail to conceal" evidence in concluding that "evidence of intent . . . was overwhelming."); *United States v. Ellis*, 326 F.3d 550, 554 (4th Cir. 2003) (holding that attempts to conceal evidence showed specific intent to defraud).

The proof will also show that some defendants were aware that the pharmacies were "back dating" prescriptions. BCBS of Tennessee announced that they would stop honoring prescriptions for compounded creams/medications effective June 1, 2014. Defendant Chatfield, in text messages with Kirtis Green, discussed the scheme whereby Willow Pharmacy would back date the prescription (before June 1, 2014) in order for BCBS to honor the prescription. Such an action is an outright material misrepresentation.

Also, with respect to Chatfield, there is evidence that customers ordered creams for family members who had no knowledge that the creams were being ordered. Specifically, Chatfield recruited Noah Bowling as a customer. Noah and his brother, Luke (one of the Bowling brothers knew Chatfield from high school), signed up for creams using their BCBS insurance (they were on their parents' insurance plan). While Chatfield was recruiting them, he also encouraged them to sign up their parents and sister (who were not present) for various creams, telling them they would make more money if they signed up more people. Noah Bowling complied and signed his parents' and sister's names to the order forms. Noah put his brother's address for shipping on the forms for his parents and sister. Those creams were delivered to Luke Bowling's residence in Chattanooga. The parents, Hal and Susanne Bowling, and their sister, sixteen-year-old Emma Bowling, were not aware that creams had been ordered

in their names until much later. Emma Bowling, without her knowledge, had creams ordered for, among other things, stretch marks and anti-aging. Noah and Luke each received a $1000 payment from Chatfield. On June 2, 2014, Chatfield sent a text message to Kirtis Green stating "Can you get kristy to see if they filled the 25 creams for 5 Bowling family members?" BCBS was billed for roughly $236,000 for the creams ordered for all five Bowlings. Under the commission structure as the government understands it (17.5% each), Wilkerson and Chatfield would have made approximately $40,000 each for the creams ordered for just that one family. There are other incidents involving concealment and/or misrepresentation involving all of the defendants.

However, as discussed above, these matters are not suitable for disposition at this stage. The arguments the defendants raise necessarily hinge on facts they dispute. The United States will present its proof at trial. If, at the close of the Government's proof, the defendants still believe that the Government has not "made a showing" as to an essential element of its case, there are procedural vehicles by which they may raise that argument. Pretrial dismissal of an indictment is not one of them.

### III.  Defendants' duties, or lack thereof

In their motion to dismiss, the defendants state that the duties to report, or the obligations to take certain actions, belonged to other parties or entities, therefore the defendants could not have committed any crimes. For example, the defendants claim that "whether [] the medications were prescribed pursuant to pre-existing conditions or medical necessity is the sole responsibility and authority of the patients' physicians and not the defendants because non-physicians such as the defendants cannot as a matter of law write prescriptions…." Or, "whether [] the patients received accurate and complete information as to copayments is solely the responsibility and

authority of the dispensing pharmacies and not the defendants…." Or, "the legal duty to collect copayments is solely that of the pharmacies" and not the defendants. (R. 175, 850-51.)

Setting aside that the defendants' claims are, at least in part, factually based, they are wrong. For purposes of sustaining a fraud conviction, it does not matter who made the misrepresentation or concealment; what matters is that each defendant participated in a scheme to defraud in which someone misrepresented, omitted, or concealed a material fact. *United States v. Birnie*, 193 F. App'x 528, 536 (6th Cir. 2006) (We find that the evidence need only show that each defendant participated in a scheme to defraud that involved a misrepresentation of material fact). Stated another way, there is no requirement that any named defendant commit an overt act which is a crime, rather it is enough that one of the conspirators/co-defendants developed a scheme, the defendants joined, and participated in, the scheme/conspiracy, and that an overt act was committed in furtherance of it. *Id.* The overt act itself "need not be [] a crime," but could be completely innocent activity. *United States v. Bradley*, 917 F.3d 493 (6th Cir. 2019) (citing *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99 (1942)). All of the defendants were aware of the scheme, and all of them participated in it. That others may have committed fraudulent acts, upon which the defendants relied and enriched themselves, is no defense. *United States v. Bertram*, 900 F.3d 743, 751 (6th Cir. 2018), cert. denied, 139 S. Ct. 852, 202 L. Ed. 2d 582 (2019) (even though defendants did not directly submit the relevant claims, however, makes no difference because they directed others to submit the claims.).

The defendants' claims about their obligations, the relationship among the participants, and the purpose and manner of payments are factual questions, and dismissal is not appropriate.

17

**IV. Defendants' lack of control**

The defendants claim that they lacked sufficient control of the "patient stream," the prescriptions issued by doctors, and the pharmacies who filled the prescriptions. (R. 175, 864-66.) These are facts which must be decided by the jury. Of course, the defendants need not be in control of these factors, they must merely participate in a scheme to defraud where these factors are present. Defendants cite to a number of cases, *see, e.g.*, *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280 (M.D. Fla. 2009)(a civil qui tam action), regarding attenuation and the lack of liability on their part. Again, these arguments sound more in civil liability than criminal.

**V. Sufficiency of the illegal remuneration counts**

The defendants also suggest that they cannot be found culpable for the illegal remuneration provisions in the Indictment. (R. 175, PageID# 866.) They claim "because the Indictment does not, and cannot, allege the defendants stopped physician and patient 'freedom of choice' of pharmacy, thereby effectively controlling the compounded medications' prescribing pattern, the Indictment does not plead a cause of action under 42 USC § 1320a-7b(b)(1) and (2) and therefore Counts 141 through 167 must be dismissed under Rule 12(b)(1), Fed.R.Crim.P." (*Id.*) Assuming arguendo that this is the correct standard (and the government does not suggest that it is), the defendants were responsible for directing the customers to the health care providers. In fact, the health care providers would call the customers, not vice-versa. The amount of control exhibited by the defendants is another part of the scheme to defraud, does not suggest "attenuation," and is a question for the jury.

18

## VI.  Sufficiency of the fraud and money laundering counts

The defendants claim in the fraud counts that they did not mail or wire themselves, nor has the government proven that they caused such occurrences to take place.  The Indictment is plain: it states that the defendants "transmitted and caused to be transmitted" the wire communications, and that the defendants "knowingly caused" to be delivered in mailings.  The Grand Jury heard proof on these issues; the Grand Jury has found there is probable cause.  The defendants read into the statute an element of "reason to know."  (R. 175, PageID# 867.)  No such element is warranted.  The defendants can litigate these issues at trial, but they cannot claim that the defendants should be exonerated when the plain language of the indictment addresses the issues raised.  The "intent" of the defendants will be an issue at trial.  The Court will give a very detailed instruction to the jury regarding the government's burden of proof with respect to their intent.  This issue is not ripe for adjudication.

With respect to the money laundering allegations, the defendants are correct that the government must prove an underlying (predicate) offense on which to base the money laundering charges.  However, the Grand Jury has found that the underlying fraud charges are valid, the defendants had the intent to commit those crimes, and the money laundering charges are based upon those.

## VII.  Commercial health care fraud and illegal remuneration under Tricare

The defendants argue that "the Indictment fails to allege or show any fact, in any manner, how the defendants misrepresented anything or misled anyone in order to deceive, the Health Care Fraud counts fail as a matter of law."  Again, the Indictment sets forth a scheme to defraud involving wherein "the defendants used materially false pretenses, representations, and misstatements to obtain fraudulently inflated financial compensation from health insurance

19

providers or TRICARE for the topical creams and medications." Those matters are set out in later counts and are shown through the Rule 16 discovery and other items provided to the defendants.

With respect to the Tricare counts, the defendants claim "the government would still have to demonstrate the defendants' bad knowledge and intent." Again, intent is an issue which will be inquired in at trial. The defendants cite a host of civil cases addressing civil liability under the Anti-Kickback statute. Again, these cases are inapposite and do not apply in this scheme to defraud. With respect to the remuneration counts, the Indictment states generally that the defendants

> did knowingly and willfully offer to pay and did pay remuneration directly and indirectly, overtly and covertly, in cash and in kind to others, to induce them to refer individuals to health care professionals and compounding pharmacies for the furnishing and arranging for the furnishing of prescription compounded drugs, payment for which was made in whole and in part under a Federal health care program.

Similar language is contained in the receipt of illegal remuneration counts. The other items the defendants claim that the government must show are not a defense at this stage. The defendants can attempt to establish at trial their lack of intent, lack of knowledge, etc., but their position as to what the government must show underscores why a trial on the merits is appropriate.

## VIII.  The scheme to defraud counts

Finally, the defendants state that the wire and mail fraud counts, as well as the money laundering counts, are lacking in that the "Indictment in this case fails to identify a single instance where the defendants made a misrepresentation of material fact to a health insurance plan or anyone else." The defendants cite a host of cases involving civil liability. Again, the government has covered this issue elsewhere in this memorandum and will not plow that ground

again. The indictment sufficiently alleges a scheme to defraud, including the appropriate mens

rea, the Grand Jury found that the indictment was sufficient and based upon probable cause, and

the Court should not disturb that finding at this stage.

## CONCLUSION

Based upon the foregoing, the United States respectfully requests that defendants motion

to dismiss the indictment be denied in its entirety.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney


*s/Perry H. Piper*
Perry H. Piper, BPR # 013384
Assistant U.S. Attorney
1110 Market Street, Ste. 515
Chattanooga, Tennessee 37402
(423) 752-5140
Perry.Piper@usdoj.gov


*s/Franklin P. Clark*
FRANKLIN P. CLARK
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee  37402
(423) 752-5140
Frank.Clark@usdoj.gov