**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **1:18-cr-11** |
| **v.** | ) | |
| | ) | **Judge Mattice/Steger** |
| **JERRY WAYNE WILKERSON,** | ) | |
| **MICHAEL CHATFIELD,** | ) | |
| **KASEY NICHOLSON,** | ) | |
| **BILLY HINDMON, and** | ) | |
| **JAYSON MONTGOMERY** | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION (AND AMENDED MOTION) IN LIMINE TO PROHIBIT TESTIMONY REGARDING TELEMEDICINE

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and hereby offer this response to defendants' Motion in Limine regarding telemedicine. (R. 161.) The United States opposes the motion.

### Background

An essential part of the scheme to defraud in this case involved employing doctors and nurse practitioners to write prescriptions for customers who were obtaining high-priced compounded medications through the defendants. Defendant Wilkerson owned/managed Karma Wellness. Through this business he employed the health care professionals who authorized the prescriptions. Included among those were Dr. Suzy Vergot and Nurse Practitioners Candace Michelle Craven and Toni Dobson. The victims in this case—the private insurance companies or Tricare—were unaware that defendant Wilkerson employed the health care professionals who were authorizing the prescriptions.

After being approached by the defendants/marketers, and after the customers agreed to sign up for the medications, many of the customers were told that "the doctor" would call them. That

is indeed what happened. The defendants would send the pre-printed prescription/order form to Karma Wellness, one of the health care professionals employed by Wilkerson would review the form, and then that doctor/NP would call the customer. The customers never went to their own physician regarding the ordering of the medications. Worse, in the Tricare context, the military personnel never consulted a military health care professional (which could be done at no cost to them) regarding the ordering of the medications.

Additionally, the relationship between the health care practitioners and the customers was otherwise suspect. The consultations generally occurred over the telephone and without any in-person contact between the health care professional and the customer. The types of creams/medications which could be ordered included skin conditions (anti-aging, warts, scars, stretch marks, eczema, psoriasis, acne). These skin conditions made up the bulk of the options for the customer. Other types of medications/creams were listed for pain, prescription vitamins, or migraine treatments. After a cursory "telemedicine" consultation with the customer,[1] the health care professional would then send the prescription to the pharmacy to be filled. After receipt of the prescription, the pharmacy would then fill the prescription, send the bill to the insurance company, receive reimbursement from the insurance company (or Tricare), then send Wilkerson his portion of the payment (which was generally 35 to 40% of the amount billed). Wilkerson would then send each marketer his or her share from the amount he received from the pharmacy (usually ½ of what Wilkerson received). The amount of money charged to the insurance company for each prescription varied. However, many of the prescriptions would be billed at approximately $10,000 per prescription, and sometimes higher. Some of the prescriptions were reimbursed at close to

---

[1] Many of the customers interviewed do not remember receiving a call from the health care professional. Some remember being called by "someone," but they could not remember if it was the health care professional or an employee at a pharmacy. Also, many of the people who received creams never spoke with a health care professional: these customers just gave their insurance information to the defendants and then received the creams.

$15,000. Also, the defendants/marketers would recommend that many customers order more than one cream/medication. Furthermore, when agreeing to order the compounded drugs, the customers were often told that there would be no cost to them. There were instances where the defendants paid the co-payment to the insurance company, or where the pharmacy itself would waive the co-pay. It was not unusual for one customer to have his/her insurance billed for over $100,000 for the medications. The defendants or the pharmacies would ensure that the co-pay was covered (or waived). Finally, many of the customers were offered an inducement to order the creams; they were told that they would be participating in a study and would receive a payment for the study. Generally, the study fee paid to the customers amounted to around $100. Sometimes, the study fee was paid for each prescription. Other customers were just given large sums of money after they ordered the creams.

## ARGUMENT

### I. Evidence regarding the defendants' use of telemedicine is relevant, probative, and admissible

The scheme to defraud in this case involved, among other things, the defendants recruiting customers (with qualifying insurance) to order creams for which there was no real medical necessity and for which there was no real examination via a valid doctor/patient relationship. The "examination" of the customer was conducted by a health care professional employed by defendant Wilkerson. Obviously, employing the person who should act as a gatekeeper for the necessity of the medications is fraught with peril. In this case, the health care professionals had an obvious conflict: they were being paid to authorize ("sign off on") topical creams which greatly and unjustly enriched Wilkerson and the other defendants. The telemedicine examinations were perfunctory. More importantly, the defendants provided pre-printed order/prescription forms to the customers and the customers chose which medications they wanted to order, or sometimes the

3

defendants suggested which medications to order. The customers were not seeking the medications when the defendants approached them. The defendants were seeking the customers and the payday which resulted from recruiting the customer.

It is certainly relevant that the health care professionals who were "reviewing" and authorizing the prescriptions were employed by Wilkerson. It is also highly relevant that they were conducting these examinations over the telephone. The examinations were cursory: many customers do not remember being called by the doctor/NP, and the customers who recall being contacted remember the conversation as being brief. There was no pre-existing relationship between the doctor/NP and the customer. The sole purpose of the telemedicine "examination" was not to determine if the prescription was needed, appropriate, and safe for the patient. Rather, the "examination" was merely to rubber stamp a product order designed to generate a fraudulent windfall for the defendants. The telemedicine used by the defendants provided legitimacy to the scheme and allowed the defendants to bilk private insurance and Tricare out of millions of dollars.

In addition to employing the health care professionals who signed the prescriptions, Wilkerson controlled, or conspired with, other entities in the equation: he paid the other defendants'/marketers' out of the fee he received from the pharmacies; he had an inside source at one of the pharmacies who was assisting him in the scheme; many of the customers were paid a "study" fee for ordering the creams; some customers later became marketers and made their own money off commissions. The only entity Wilkerson and the other defendants did not control was the target of the fraud, the insurance companies. All of the actions listed above were important for the scheme to succeed. However, the use of health care professionals, willing to do the bidding of the defendants, was vital to the scheme and attempted to add an element of legitimacy to it.

4

Evidence is "relevant" if it "has a tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. The use of health care professionals to approve the prescriptions, with no real doctor/patient relationship, and while approving the prescriptions over the phone, is most assuredly relevant to the presentation of his entire scheme. It is relevant to the charged fraud, highly probative of the scope and significance of the charged fraud, and should be admitted.

The defendants suggest

Any assertion by the Government in this case that any prescriptions written by physicians or nurse practitioners for the compounded medications pursuant to non-compliant telemedicine encounters in no manner proves or disproves any element of any of the numerous charged crimes in the Indictment.

(R. 161, PageID# 769.) The defendants misapprehend the nature of a *scheme* to defraud. The actions of the health care professionals could have been completely legitimate. However, they still furthered the scheme to defraud. It need not be criminal, per se, to use telemedicine, but it was certainly part of the scheme. The defendants also suggest that "[t]he Government's allegation that the employment of physicians and nurse practitioners per se eliminates their professional ability to properly diagnose and treat patients…." is "without factual basis." (R. 161, PageID# 772.) First, the government does not allege that using conflicted health care providers is per se illegal; it was, however, an integral part of the scheme and conspiracy. The fact that the Wilkerson employed the doctors/NPs is also not "irrelevant" as the defendants suggest. Removing an independent medical professional from the prescribing process, and instead hiring health care professionals who act as a rubber stamp for medications that have already been chosen by the customer or the marketers/defendants, is quite relevant. 401 (classifying as "relevant" all evidence that has "any tendency" to make a "fact . . . of consequence . . . more probable or less probable than it would be without the evidence"). The standard for admission of testimony on the basis of

5

relevance is a low one; the burden of establishing this threshold relevancy requirement is minimal. *United States v. Moore*, 837 F.2d 1091, 1988 WL 5087(6th Cir. 1988); Fed. R. Evid. 401 (classifying as "relevant" all evidence that has "any tendency" to make a "fact . . . of consequence . . . more probable or less probable than it would be without the evidence"). This evidence is more than slight; it far exceeds the "minimal" evidentiary threshold.

In addition to being cost effective for the defendants, the use of telemedicine helped the scheme to succeed because there would be minimal intrusion on the customers. The customers were initially unaware of the scheme to defraud (some later made great sums from it). Using telemedicine to write the scripts made the process less cumbersome for the customers. As the customers were a conduit to the scheme to defraud, it was in the defendants' interest to ensure that they were not encumbered in any way. As has been noted, the customers were generally told that they would not suffer and out-of-pocket expenses. Additionally, they were told that a doctor *would call them*. Accordingly, the customer had minimal involvement in the process and there was no impediment to him/her ordering and receiving the medications.

## II.    Evidence regarding co-payments is not unduly prejudicial

The probative value of the use of telemedicine is strong. It shows the full nature of the scheme and the intent to defraud that the United States must prove beyond a reasonable doubt. The defendants that they did not have control "over [the] medical professionals' practice of medicine," and to suggest otherwise "would be unfairly prejudicial towards the Defendants, and would confuse the jury as to what conduct is fraud—the fraud alleged in the Indictment or the fraud alleged in the non-defendants' practice of medicine." The evidence regarding telemedicine is directly probative of the defendants' intent and motive. "[E]vidence that undermines one's defense by virtue of its 'legitimate probative force' does not unfairly prejudice the defendant."

Case 1:18-cr-00011-HSM-CHS   Document 186   Filed 06/27/19   Page 6 of 7   PageID #: 953

*United States v. Censke*, 449 F. App'x 456, 467 (6th Cir. 2011) (quoting *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988)). The effect of the evidence must not simply be prejudicial, but it must be "unfairly" so: "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *United States v. Ray*, 549 F. App'x 428, 434 (6th Cir. 2013) (citing *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). As has been shown above, the use of telemedicine in this case was an integral part of the conspiracy and the scheme to defraud.

## Conclusion

For the reasons set forth above, the defendants' motion in limine to prohibit testimony regarding the use of telemedicine should be denied.

<div style="margin-left: 50%;">

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By:    *s/Perry H. Piper*
PERRY H. PIPER, BPR # 013384
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Perry.Piper@usdoj.gov


*s/Franklin P. Clark*
FRANKLIN P. CLARK
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Frank.Clark@usdoj.gov

</div>

7