UNITED STATES DISTRICT COURT
EASTERN DISTRICT of TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:18-cr-11 |
| JERRY WAYNE WILKERSON, | ) | Judge Mattice |
| MICHAEL CHATFIELD, | ) | |
| KASEY NICHOLSON, | ) | |
| BILLY HINDMON, and | ) | |
| JAYSON MONTGOMERY | ) | |

## SUPPLEMENTAL BRIEF BY THE UNITED STATES SUPPORTING THE ADMISSIBILITY OF DAWN MONTGOMERY'S TESTIMONY

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and submit this brief in support of Ms. Montgomery's testimony. Called by the United States, Dawn Montgomery testified in the trial of this case on September 18, 2019. Ms. Montgomery is the mother of the defendant Jayson Montgomery. She testified to her son's involvement in the fraud and to his position in the conspiracy, to how he had involved her in the conspiracy and how she had involved two of her coworkers, and to the actions Jayson Montgomery took to assist co-defendant Billy Hindmon in paying the co-payments for Maria Valedez. She also identified a text message that her son had sent to her upon reading a transcript of her grand jury testimony. Several times throughout Ms. Montgomery's time on the stand, the defendants objected to the admissibility of something in her testimony. However, nothing testified to by Ms. Montgomery is inadmissible, and the Court should deny the defendants' objections.

*Outline of Ms. Montgomery's Testimony*

Dawn Montgomery collects past-due debt for Community Health Systems and has worked at either doctor's offices or insurance companies for at least twenty years. (R. 277, Tr. Trial at 1443-44.) Her son is the defendant Jayson Montgomery.[1] (*Id*. at 1444.) In May 2014, Jayson began working for Billy Hindmon selling topical creams and other medications. (*Id*. at 1445.) After confirming that her insurance would pay the high cost of the creams that he was selling, Jayson invited his mother to order creams for her and for her grandchildren.[2] (*Id*. at 1445-47.) She agreed to the order, induced by his promise to pay her "a couple hundred dollars." (*Id*. at 1447.) On direct examination, Ms. Montgomery could not recall whether she had talked to a medical professional before receiving the creams but, following a refresh of her recollection, agreed that she had not. (*Id*. at 1448, 1506.) She did recall completing a form, which she identified and the Court admitted as Exhibit 179. (*Id*. at 1448-50.)

Ms. Montgomery also included her coworkers in Jayson's offer. (*Id*. at 1452.) But after Ms. Montgomery and her coworkers—Maria Valadez and Araceli Quezada—had ordered the creams, their insurance companies sought to collect on a co-pay for the creams. (*Id*. at 1450, 1454.) For Ms. Valadez, her copay amounted to $1,450.00. (*Id*. at 1511.) Ms. Valadez complained to Ms. Montgomery. Ms. Montgomery called Jayson, who agreed to meet with Ms. Valadez and Ms. Quezada to resolve their issue with the copays. (*Id*. at 1455-56, 1508.) Jayson and Hindmon came to Ms. Montgomery's office and met with Ms. Valadez—Ms. Montgomery's direct supervisor—and Ms. Quezada in a courtyard at their place of employment. (*Id*. at 1457.) Following the meeting, Jayson and Hindmon left the courtyard, drove away, then came back after

---

[1] For clarity, this Brief will identify the defendant as "Jayson" and the witness as "Ms. Montgomery" or Jayson's mother.

[2] The grandchildren are not Jayson's but belong to Ms. Montgomery's daughter. (R. 277, Tr. Trial at 1446.) Jayson would be an uncle to these children.

having obtained money orders for Ms. Valadez and Ms. Quezada to pay what the insurance company had charged for the creams. (*Id*. at 1458.) Likewise, Jayson funded his mother's payment to the insurance company. (*Id*. at 1450.)

Jayson also tried to get his mother to join the scheme, but she declined, understanding the scheme to be "like a pyramid plan." (*Id*. at 1460.) By her assessment, Jayson was at the bottom of the pyramid, Hindmon was in the middle, and "Wayne" was at the top. (*Id*. at 1460-61.) Ms. Montgomery did not get involved in the conspiracy beyond what she described above. (*Id*.)

Later, the conspiracy expanded to include Tricare customers. (*Id*. at 1461.) Having experience in both doctor's offices and with insurance companies, Ms. Montgomery warned Jayson that the government insurance was different, that Jayson needed to be sure that his scheme was legal. (*Id*. 1462.) Jayson assured his mother that Hindmon and he had consulted with an attorney, but, out of concern, she persisted, wanting Jayson to confirm to her that he had fully explained the scheme to the attorney. (*Id*.)

Finally, Ms. Montgomery testified to the grand jury during the investigation of this case. (*Id*. at 1504-05.) Following his review of the transcript, Jayson texted his mother, making a broad statement about the scope of the conspiracy and chastising her for her allocation of culpability to the coconspirators. (*Id*. at 1463, Exhibit 37.)

*Jayson's statements to Ms. Montgomery are admissible as an admission by a party opponent.*

During Ms. Montgomery's testimony, counsel for the United States asked, "And did you and Jayson have a conversation about your insurance? Do you recall this?" (R. 277, Tr. Trial at 1445.) Counsel for the defendant Michael Chatfield objected to this question. (*Id*.) Ms. Montgomery confirmed that she and Jayson had discussed insurance and added that he had offered to pay her one hundred dollars per person who ordered the creams. (*Id*. at 1446-47.) She described

an issue with the copays (she had received a notice to pay the copay after Valadez received her notice) and how Jayson informed her to ignore the copay, thus relieving her from making the payment. (*Id*. at 1450.)

Both the insurance provider and the reimbursement of the copays are central to the fraud in this case. Only certain insurance providers offered coverage for the creams marketed by the defendants. And, just as the defendants were reaping the benefits of the extreme amounts paid by the insurance providers—amounts that the defendants took care not to disclose to their unsuspecting customers—so were the insurance providers passing along high copays to their insureds. Covering the costs of the copays allowed the defendant's scheme to continue without complaint from the customers who agreed to order creams, or from the insurance companies who were being bilked out of large sums.

Thus, Jayson's interest in Ms. Montgomery's insurance provider, his offer to pay her to order the creams, and his later statement to her to ignore her copay are admissions to his involvement in the conspiracy. His acknowledgement of these steps familiar to the conspiracy is admissible under Federal Rule of Evidence Rule 801(d)(2)(A) as an admission made or adopted by a defendant and offered against that defendant; such admissions are not hearsay. *United States v. Haun*, 90 F.3d 1096, 1102 (6th Cir. 1996); *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir. 1993) ("an admission by a party-opponent is not hearsay but admissible evidence"). The statements by Ms. Montgomery are admissible under two exceptions: 1) as a statement of a conspirator during and in furtherance of the conspiracy; or 2) the statements made by his mother are "not admitted to show the truth of the matters asserted, but to provide context for [Jayson's] admissions." *See United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004); *United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999). Under the second scenario, "the existence of a conspiracy

would be immaterial." *United States v. Samuels*, No. 18-2193 (6th Cir. Jul. 18, 2019), *available at* 2019 U.S. App. LEXIS 21253 and 2019 WL 3228337. Moreover, Chatfield's clear lack of involvement in the statements made by Jayson to his mother does not bear on the question of admissibility of those statements. The Court should overrule any objection to this testimony.

In trying to recruit his mother to join the conspiracy, Jayson explained the structure of the conspiracy—defendant Wilkerson at the top, Hindmon in the middle, and Jayson at the bottom. (*Id*. at 1460-61.) These statements, along with Jayson's questioning of his mother, are statements of a coconspirator admissible against all of the defendants pursuant to Federal Rules of Evidence Rule 801(d)(2)(E). To admit the statements of a co-conspirator under Rule 801(d)(2)(E), a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy. *United States v. Warman*, 578 F.3d 320, 346 (6th Cir. 2009); *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999). The United States need prove these elements by a preponderance. *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). The testimony presented to date supports a finding by the Court that a conspiracy existed and that Jayson was a member of that conspiracy; the testimony presented here is consistent with both findings. In this case, Jayson's statements were in furtherance of conspiracy because they were made with intent to promote the conspiracy's objectives—obtaining customers with the correct insurance to order creams and other medications—and were likewise committed to hiding the fraud by offering cash to cover copays generated by the unsuspecting order of expensive creams. *See United States v. Martinez*, 430 F.3d 317, 327-28 (6th Cir. 2005); *United States v. Monus*, 128 F.3d 376, 392-93 (6th Cir. 1997). Statements that "identify participants and their roles in the conspiracy" also qualify as statements

made in furtherance of the conspiracy. *Monus*, 128 F.3d at 393; *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994).

> *Ms. Montgomery's recitation of her recruiting coworkers for*
> *Jayson and their reaction to the insurance billing is foundation,*
> *necessary evidence to explain Jayson's actions.*

Jayson asked Ms. Montgomery to recruit others for his "clinical trial." (*Id*. at 1447.) She invited two coworkers to order creams, and the coworkers agreed. (*Id*. at 1452.) In addition, one of the coworkers asked whether she could add additional persons to her order. (*Id*.) Counsel for Chatfield, Nicholson, Hindmon, and Jayson objected to Ms. Montgomery's testimony to her coworker's agreement and to the request to add additional customers. (*Id*.) The United States observed that Ms. Montgomery's testimony on this point was redundant to Ms. Valadez's earlier testimony and tailored the questions that followed to avoid any objection (even though the statements by Ms. Montgomery would have been admissible). (*Id*. at 1452-55.) Thus, Ms. Montgomery testified to one coworker (Valadez) bringing completed forms to her—Ms. Montgomery—and that both coworkers ordered creams. (*Id*. at 1452-54.)

The Court could find that Ms. Montgomery's statements were made in furtherance of the conspiracy and rightly fall within 801(d)(2)(E), the co-conspirator statement exception which is not hearsay. Indeed, it was advantageous, even essential, that Jayson and others recruit individuals who would in turn recruit others in order for the "pyramid" to succeed.

In the alternative, evidence that is "provided merely by way of background" or is offered only to "explain[] how certain events came to pass" is not offered for the truth of the matter asserted. *United States v. Warman*, 578 F.3d 320, 346 (6th Cir. 2009) (alteration in original). Ms. Montgomery described a situation involving copays that led Jayson to take action to cover the copays, which is an essential aspect of disguising the scheme to defraud. She provided background for the situation, and Hindmon and Jayson responded by providing money orders to Maria Valadez

to complete and for Hindmon to send to Willow Pharmacy. That Ms. Montgomery recruited the customers who were later angry about the resulting insurance copays is necessary to the foundation of Jayson's response.

Ms. Montgomery provided foundation for the issues with the copays. She explained that a pharmacy had billed one of the coworkers—Ms. Valadez—copayments for the creams and that Ms. Valadez was mad. (*Id*. at 1454, 1491.) In response to Ms. Valadez's complaint—and, more to the point, because Ms. Valadez is Ms. Montgomery's boss—Ms. Montgomery called Jayson, who offered to come to Ms. Montgomery's office to address the problem. (*Id*. at 1455-56, 1494.) Hindmon also came to the office. (*Id*. at 1456.) Ms. Montgomery described the meeting between Ms. Quezada, Ms. Valadez, Hindmon, and Jayson. (*Id*. at 1457.) Immediately after the meeting, Hindmon and Jayson left to obtain money orders to fulfill the copayments owed by Ms. Montgomery's coworkers. (*Id*. at 1458.) Hindmon and Jayson gave the money orders to the coworkers. (*Id*.)

Ms. Montgomery's limited involvement in the conspiracy led to her coworkers' complaints that Jayson's cream orders led to an unexpected expense. Her description of this involvement was necessary background to explain Jayson's later efforts to disguise the payments to the insurance companies as coming from the customers, rather than the conspiracy. Without the background, the Court, as the trier of fact, would not have understood the significance of Hindmon and Jayson paying for Ms. Quezada's and Ms. Valadez's copays.

*The text message that Jayson sent his mother is an admission admissible against all defendants.*

Finally, Ms. Montgomery testified that Jayson sent her a text message following his review of her grand jury testimony. (R. 277, Tr. Trial at 1463.) The text stated, "So I just read your GJ testimony. I really wish you would have put more of the responsibility on [Hindmon]." (*Id*. at

1463, Exhibit 37.) The lengthy text continues, with Jayson asserting that her testimony "is more than likely going to be the thing that gets me found guilty and sent away." Jayson concluded the text, "So thanks for making me sound like someone who'd been doing this for way longer than a week or two."

Again, counsel for Chatfield objected, claiming that the text message is not admissible under Federal Rules of Evidence Rule 801(d)(2)(E), as the conspiracy ended prior to Jayson sending the text. (*Id*. at 1463-64.) Counsel for Nicholson joined in the objection. (*Id*. at 1474.)

The text represents an admission by Jayson to his involvement in the conspiracy and to his culpability for that involvement.[3] As explained above, such admissions are not hearsay when offered against the defendant.

As to Chatfield's assertions that the text statements are coconspirator statements, "a defendant's own statements are admissions wholly apart from the coconspirator exception and as such are admissible as nonhearsay." *United States v. Reed*, 726 F.2d 570, 580 (9th Cir. 1984).

Counsel for Hindmon objected on FRE Rule 403 balancing. (*Id*. at 1464-65, 1471.) However, the "unfair prejudice" against which Rule 403 is directed does not refer to damage done to defendant's case by the legitimate probative force of the evidence. *United States v. Schrock*, 855 F.2d 327 (6th Cir. 1988).

Counsel for Hindmon also objected on *Bruton* grounds. (*Id*. at 1471-72.)

---

[3] The middle part of Jayson's text message is self-serving hearsay. "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements." *Williamson v. United States*, 512 U.S. 594, 600 (1994). The Court should be cognizant to distinguish between those statements that are actually self-inculpatory, and those that "merely attempt[] to shift blame or curry favor." *Id*. at 603. With candor, the United States presented Jayson's complete text message to his mother and did not seek to redact the inadmissible hearsay present in that message. Nevertheless, the Court should take notice of the self-serving portion of the Jayson's statement and consider his effort to shift blame accordingly.

Next, *Bruton* applies only to testimonial statements. "Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements." *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) (citing cases); s*ee also*, *United States v. Brown*, 441 F.3d 1330, 1360 (11th Cir. 2006) (private telephone conversation between mother and son was not testimonial for purposes of *Crawford*); *United States v. Joseph*, 530 F. App'x 911, 924 (11th Cir. 2013) (text message was part of private conversation and was not testimonial under *Crawford*).

Jayson's text message is a statement against his interest. Fed. R. Evid. 804(b)(3).

> For a statement to be admitted under the hearsay exception for statements against penal interest set forth in Rule 804(b)(3), [(i)] the declarant must be unavailable, [(ii)] the statements must, "from the perspective of the average, reasonable person," be adverse to the declarant's penal interest, and [(iii)] corroborating circumstances must "truly establish the trustworthiness of the statement."

*Johnson*, 581 F.3d at 326 (6th Cir. 2009) (quoting *United States v. Tocco*, 200 F.3d 401, 414 (6th Cir. 2000)); *see also Williamson v. United States*, 512 U.S. 594, 603-04 (1994) (discussing requirements for admission of evidence under Rule 804(b)(3)). Jayson's statement, while somewhat self-serving, identifies his presence at the event and underscores the purpose of it (paying the co-pays for Maria Valadez). Furthermore, Jayson's statement to his mother that he was "new to the cream business" at the time of the money order event (June 2014) is a further admission in that his participation in the scheme continued for months afterward.

Even though *Crawford* appears to allow that statements to family members are nontestimonial, *Crawford*, 541 U.S. at 51 ("an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"), the Sixth Circuit has held that statements meant to curry favor or shift blame are testimonial—*United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005) (describing

statements as nontestimonial where the "statements were not made to the police or in the course of an official investigation . . . [nor in an attempt] to curry favor or shift the blame . . . ."). The statements by Jayson do attempt to shift blame to Hindmon; however, they were not an attempt to curry favor with his mother. In fact, Jayson was criticizing his mother for "making him look guilty."

In addition, "*Bruton* was not concerned with bench trials." *Rogers v. McMackin*, 884 F.2d 252, 253 (6th Cir. 1989); *see id*. at 255 (recognizing "at least three courts of appeals subsequently held *Bruton* to be inapplicable to bench trials")[4]; *Johnson v. Tennis*, 549 F.3d 296, 298 (3d Cir. 2008) ("By its own terms, *Bruton* applies to jury trials only")[5].

Finally, Jayson's text message is a statement against his interest. Fed. R. Evid. 804(b)(3).

> For a statement to be admitted under the hearsay exception for statements against penal interest set forth in Rule 804(b)(3), [(i)] the declarant must be unavailable, [(ii)] the statements must, "from the perspective of the average, reasonable person," be adverse to the declarant's penal interest, and [(iii)] corroborating circumstances must "truly establish the trustworthiness of the statement."

*United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009), quoting *United States v. Tocco*, 200 F.3d 401, 414 (6th Cir. 2000); *see also Williamson v. United States*, 512 U.S. 594, 603-04 (1994) (discussing requirements for admission of evidence under Rule 804(b)(3)).

Here, the text message declarant is not available, as Jayson would certainly invoke his Fifth Amendment privilege against self-incrimination if called to testify by the government. *Johnson*, 581 F.3d at 327; *United States v. Arthur*, 949 F.2d 211, 216 (6th Cir. 1991); *United States v.*

---

[4] To wit: *United States ex rel. Faulisi v. Pinkney*, 611 F.2d 176, 178 (7th Cir. 1979) (*Bruton* "simply inapplicable in the case of a bench trial"); *United States v. Castro*, 413 F.2d 891, 894-95 & n. 7 (1st Cir. 1969) ("A jury may have difficulty in disregarding extrajudicial statements implicating a defendant. We will not presume that a judge suffers from the same disability. Indeed, the presumption is to the contrary."); *Cockrell v. Oberhauser*, 413 F.2d 256, 258 (9th Cir. 1969) (same).

[5] Citing *Castro*, *Cockrell*, *Faulisi*, and *McMackin—see*, *supra*, n.3—and *United States v. Cardenas*, 9 F.3d 1139, 1154-55 (5th Cir. 1993), and 21A Charles A. Wright & Kenneth W. Graham Jr., Federal Practice & Procedure § 5064.2, at 290 & n.5 (2d ed. 2005 & Supp. 2007).

*Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986) ("A witness is not available for full and effective cross-examination when he or she refuses to testify. . . . This is equally true whether the refusal to testify is predicated on privilege . . . "). As Jayson would invoke,[6] he is not a witness available to the United States.

In the statement, Jayson admits that he was involved in the conspiracy. That factor is sufficient for a finding that the text message is adverse to his penal interest. He further admits to his involvement in Ms. Montgomery's coworkers obtaining creams. Regarding this second factor, the Supreme Court has explained that "whether a statement is self-inculpatory or not can only be determined by viewing it in context." *Williamson*, 512 U.S. at 603. In the context of Ms. Montgomery's testimony and in the context of the evidence, as presented thus far, Jayson's text message is inculpatory.

Finally, in assessing the third factor—the trustworthiness of the statement—the Court must not focus "on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are corroborating circumstances which clearly indicate the trustworthiness of the statement itself." *Johnson*, 581 F.3d at 327 (quotation marks and citation omitted). In making this determination, the Court need not "be completely convinced as a prerequisite to admission that the . . . statements are true. Rather, [it] need only find that sufficient corroborating circumstances exist which indicate the statement's trustworthiness." *United States v. Price*, 134 F.3d 340, 347 (6th Cir. 1998).

A statement admitted as against interest is not just admissible against the declarant. *See, e.g., Johnson*, 581 F.3d at 327 (statement by O'Reilly admissible against Johnson); *Williamson*,

---

[6] "In order for a declarant to be unavailable due to the assertion of a privilege, Rule 804(a) requires a 'ruling of the court' to exempt the declarant from testifying." *United States v. Ocampo*, 402 F. App'x 90, 99 (6th Cir. 2010), *quoting* Fed. R. Evid. 804(a)(1).

512 U.S. at 603 ("[A] declarant's squarely self-inculpatory confession—'yes, I killed X'—will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory."); *see also id.* ("[B]y showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well.").

Finally, with respect to the text message, it is true that the statement must be made "during the course and in furtherance of the conspiracy." As counsel for Wilkerson noted (Mr. Schwartz), the text by Jayson was sent in 2019; the conspiracy end date in the indictment is 2016. When an arrest terminates the conspiracy, post-arrest statements of any kind, including those made to prevent detection or punishment for the terminated conspiracy, are inadmissible under 801(d)(2)(E) because they were not made during the conspiracy. *See Krulewitch v. United States*, 336 U.S. 440, 442–43, 69 S.Ct. 716 (1949) (postarrest statements are inadmissible when central aim of conspiracy was foiled by arrest). But "a conspiracy does not end simply because one conspirator has been arrested," and "a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy." *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997). When a conspiracy is ongoing, statements that relate to "avoiding detection by law enforcement personnel" can be in furtherance of the conspiracy. *United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1306, 200 L. Ed. 2d 505 (2018), reh'g denied, 138 S. Ct. 2670, 201 L. Ed. 2d 1066 (2018) (citing *United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995)); see also *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988) ("[C]oncealment of the crime done in furtherance of the main criminal objectives of the conspiracy falls within the coconspirator exception."). While the conspiracy may not have been "ongoing" here, the text message by Jayson was an attempt to conceal his activity in the involvement by

attempting to persuade his mother that he had not been fully involved in the incident. Of course, at the time Jayson sent the text, he would have known that his mother was under a compulsion order to testify.

WHEREFORE, Ms. Montgomery's testimony is fully admissible, and the Court should deny any objection seeking the exclusion of evidence presented by and through her.

Respectfully submitted,

| | | | |
|---|---|---|---|
| | J. DOUGLAS OVERBEY<br>United States Attorney | | J. DOUGLAS OVERBEY<br>United States Attorney |
| By: | s/ Perry H. Piper<br>Perry H. Piper<br>Assistant United States Attorney<br>1110 Market Street, Suite 515<br>Chattanooga, Tennessee 37402<br>(423) 752-5140 | By: | s/ Franklin P. Clark<br>Franklin P. Clark<br>Assistant United States Attorney<br>1110 Market Street, Suite 515<br>Chattanooga, Tennessee 37402<br>(423) 752-5140 |