```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF TENNESSEE

 3                         AT CHATTANOOGA
     ----------------------------------------------------------
 4                                    :
     UNITED STATES OF AMERICA,        :
 5                                    :
             Plaintiff,               :
 6   -versus-                         :           CR-1-18-11
                                      :
 7   JERRY WAYNE WILKERSON,           :
     MICHAEL CHATFIELD, KASEY         :
 8   NICHOLSON, BILLY HINDMON and     :
     JAYSON MONTGOMERY,               :
 9                                    :
             Defendants.              :
10   ----------------------------------------------------------
                                     Chattanooga, Tennessee
11                                   October 3, 2019
             BEFORE:  THE HONORABLE HARRY S. MATTICE, JR.,
12                    UNITED STATES DISTRICT JUDGE
     APPEARANCES:
13
             FOR THE PLAINTIFF:
14
             PERRY H. PIPER, and
15           FRANKLIN PEARSON CLARK
             Assistant United States Attorneys
16           1110 Market Street, Suite 301
             Chattanooga, Tennessee 37402
17

18           FOR THE DEFENDANT WILKERSON:

19           MARK STEPHEN THOMAS, of
             Thomas Health Law Group, PA
20           5200 SW 91st Terrace, Suite 101-B
             Gainesville, Florida 32608
21                             -and-
             SETH A. SCHWARTZ, of
22           Schwartz Law Group
             10365 Hood Road South, Number 104
23           Jacksonville, Florida 32257

24                        BENCH TRIAL
                   TESTIMONY OF STEVEN McCALL
25
```

```
 1
 2          FOR THE DEFENDANT MICHAEL CHATFIELD:

 3          DAVID M. ELDRIDGE, and
            ZACHARY R. WALDEN, of
 4          Eldridge & Blakney PC
            400 West Church Avenue, Suite 101
 5          Knoxville, Tennessee 37902

 6          FOR THE DEFENDANT KASEY NICHOLSON:

 7          BRIAN O'SHAUGHNESSY, of
            O'Shaughnessy & Carter
 8          735 Broad Street, Suite 1000
            Chattanooga, Tennessee 37402
 9

10          FOR THE DEFENDANT BILLY HINDMON:

11          GIANNA MAIO, and
            JACKSON WHETSEL, of
12          Federal Defender Services of Eastern Tennessee
            One Central Plaza, Suite 600
13          835 Georgia Avenue
            Chattanooga, Tennessee 37402
14

15          FOR THE DEFENDANT JAYSON MONTGOMERY:

16          R. DEE HOBBS, of
            Hamilton County Attorneys Office
17          204 County Courthouse
            625 Georgia Avenue
18          Chattanooga, Tennessee 37402

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

<pre>
 1
 2                      INDEX OF PROCEEDINGS

 3   STEVEN McCALL,
                Direct Examination By Mr. Clark          5
 4              Cross-Examination By Mr. Schwartz        36
                Cross-Examination By Mr. Walden          88
 5              Cross-Examination By Ms. Maio           103
                Redirect Examination By Mr. Clark       113
 6

 7                     GOVERNMENT'S EXHIBITS

 8   No.                 Description                    Page

 9    727     CVS Caremark Paid Claim Report for        12
              Willow Pharmacy
10
      728     CVS Caremark Paid Claim Report for        21
11            Central Rexall

12    729     CVS Caremark Paid Claim Report for        22
              Soothe Pharmacy
13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

UNITED STATES DISTRICT COURT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

```
 1

 2

 3              THE COURT:  Call your next witness.

 4              MR. CLARK:  Call Steve McCall, Your Honor.

 5              THE COURT:  Okay.  Mr. McCall, come on up here to

 6  the witness stand, please.  And I'm going to ask you to step

 7  up into the witness box, but before you sit down, stop, raise

 8  your right hand, and Ms. Capetz will swear you in.

 9              (Witness sworn.)

10              THE COURT:  Have a seat.

11              THE WITNESS:  Thank you.

12              THE COURT:  If you'd like some water, there should

13  be some there in the pitcher with cups.  I'm going to ask you

14  to speak into the microphone, because this room has terrible

15  acoustics and it's hard to hear even though short distance.

16  And once he's settled, you can proceed, Mr. Clark.

17              MR. CLARK:  Thank you, Your Honor.

18                          STEVEN McCALL,

19  called as a witness at the instance of the U.S. Government,

20  being first duly sworn, was examined and testified as

21  follows:

22                       DIRECT EXAMINATION

23  BY MR. CLARK:

24  Q        Good morning, sir.

25  A        Good morning.
```

UNITED STATES DISTRICT COURT

```
 1   Q          Would you state your name for us, please?

 2   A          Steven Dane McCall.

 3   Q          Would you spell, well, I guess Steven and as well as

 4   McCall for the court reporter since I think there is probably

 5   variations of how to spell both of those.

 6   A          Steven is S-t-e-v-e-n.  And McCall, M-c-C-a-l-l.  Is

 7   this too loud?

 8   Q          No, sir.  You're fine.  You're fine.  If it's too

 9   loud, I promise we'll give you the sign.  Mr. McCall, where do

10   you work, sir?

11   A          I work for CVS Caremark which is a division of CVS

12   Health over in Scottsdale, Arizona.

13   Q          What is it that you do for CVS Caremark in

14   Scottsdale, Arizona?

15   A          Currently, I'm vice-president of network services.

16   Previously, when I originally was contacted by your office, I

17   was director of pharmacy performance, what that basically

18   means is that I have the audit department that is looking at

19   claims retrospectively.

20   Q          Sir, how long have you been with CVS Caremark?

21   A          It's approximately 11 to 12 years at this point.

22   Q          And in the position that you had before you became

23   the vice-president of network services, how long were you in

24   that position?

25   A          I believe I took over as the director 2011, 2012, in
```

1  that range.

2  Q        Can you tell the Court what you did in your position

3  as director?

4  A        Sure.  So, I basically was directing the audit

5  activities.  So, we have what's called a daily review, which

6  is when the claim is adjudicated, it goes through the system,

7  we have a group of technicians that look at the claim, and

8  they're looking just for basically fat finger errors, the tech

9  mistyping.  And I also had the investigative team, which has

10 six investigative auditors that are looking at claims

11 retrospectively reaching out to doctors, checking copays,

12 different things like that.  I had the on-site audit team

13 which was at that time, I want to say about 12 to 14 people

14 all around the country going into pharmacies, traveling 40

15 weeks per year.  I had the post audit team which looked at the

16 documentation for those two processes coming back.  And I had

17 the analytics team looking to where we need to go ahead and

18 extend our efforts.  And I also believe we also had one person

19 doing subpoena responses.

20 Q        Before you worked for CVS Caremark, I believe you

21 had some training as a pharmacist as well.  Is that correct?

22 A        Yes.  I've been a registered pharmacist since 1995.

23 Q        What do you do now as vice-president of network

24 services?

25 A        I have a lot of other duties as assigned, but I have

1    my previous role, so I have the audit department.  In

2    addition, I now have a performance network group, a larger

3    analytics group that does different things.  And I also have

4    the pharmacy enrollment group that allows pharmacies coming

5    into the network.

6    Q        Can you tell us what CVS Caremark is and what it

7    does?

8    A        Sure.  So, overarching for the company, CVS Health

9    has a lot of different branches.  There is the CVS retail

10   pharmacies, which I believe you may see around here.  There is

11   the Minute Clinic, which is kind of the nurse practitioner,

12   doc in a box.  And the division I work for is CVS Caremark.

13   We're a pharmacy benefits manager.  Basically, what we do is

14   we help insurance plans go ahead and set up prescription

15   benefits where they may not have the expertise to do that.  We

16   also have an adjudication system, basically, a big football

17   field type of servers in our office over in Scottsdale,

18   Arizona where the claim comes in and in about a second goes

19   back to the pharmacy saying, you know, what's happened with

20   that claim.

21          THE COURT:  And, by the way, maybe, you know, since

22   I'm the tryer of fact, I should go ahead and make this

23   disclosure.  For a number of years, I think that my personal

24   health insurance was, of course, with the federal government,

25   I do -- my pharmacy benefit is through CVS Caremark.  And I'll

1    just say, I mean, for my, yes, some prescriptions I get

2    directly from my local CVS pharmacy.  But, particularly, if

3    it's a repeat prescription, I found it more cost effective to

4    order through what I think of as the mail order part of it,

5    where they usually give me like, you know, a 90-day renewable

6    supply and I get it that way.

7            And I've had various experiences including, you

8    know, occasional rejections of my claim, but more often, hey,

9    you need a prior authorization for that, all of that.  So, not

10   that -- that's neither here nor there, but, I mean, I have

11   some familiarity from an insured, you know, standpoint, about

12   how some of this works.  Okay.

13           MR. CLARK:  Thank you, Your Honor.

14           THE WITNESS:  I do appreciate your business, also.

15           THE COURT:  Okay.  By the way, I don't personally, I

16   have no personal interest in that.  My insurer, I think it

17   Blue Cross Blue Shield --

18           THE WITNESS:  Yes.

19           THE COURT:  -- contracts with you.

20           THE WITNESS:  Absolutely.

21   BY MR. CLARK:

22   Q       I trust you'll take that feedback with you back to

23   Scottsdale, Arizona, make use of it.

24   A       I know the guys that do the insurance company, I

25   will take it back to them.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 9 of 117  PageID #:
3743

1   Q        Well, what type of company or person would look to
2   hire CVS Caremark?
3   A        We call them plan sponsors.  What most people think
4   of is insurance companies.  So, we have big insurance
5   companies like Aetna who do health insurance through various
6   work places.  We do Blue Cross Blue Shield.  We also do
7   Medicare Part D and also manage Medicaid at the various state
8   levels.
9   Q        Why would an insurance company want to hire a
10  company like CVS Caremark, what do you do for them that they
11  cannot do for themselves?
12  A        We have specific experience in pharmacy.  In
13  addition, we bring a lot of economies of scale and scope to
14  the table.  So, where an individual insurance company may, you
15  know, like a Toyota plant out here may negotiate with maybe
16  10, 15 pharmacies that are right around the factory and get a
17  certain price.  When I'm negotiating, I'm negotiating for
18  66,000 pharmacies and 4,000 insurance plans, so the price we
19  get is usually quite a bit better than an insurance plan can
20  do on their own.
21  Q        I understand.  Now, so CVS Caremark is what's
22  referred to as a PBM?
23  A        That's correct.
24  Q        And what is a PBM, what does the acronym stand for?
25  A        It stands for pharmacy benefits manager.

1  Q        Okay.  Now, sir, pursuant to an investigative

2  request from the United States Food and Drug Administration,

3  did you provide information to the government with respect to

4  claims that CVS Caremark paid to certain pharmacies for

5  compounded topical creams that were prescriptions that were

6  written by nurse practitioner Candace Craven, Dr. Susy Vergot

7  and nurse practitioner Toni Dobson?

8  A        Yes, we did.

9  Q        And you provided that information to the United

10 States?

11 A        That is correct, yes.

12 Q        I'm going to show you on your screen Exhibit 727.

13 I'm probably going to have to zoom in for you to be able to

14 identify it.  Can you tell us what this is?

15 A        That's a claims profile that would have been pulled

16 by employee Mike Dillabough for Willow Pharmacy over in

17 Madisonville, Louisiana.

18 Q        Okay.  And in laymen's terms tell us what the

19 document, what the entries on this document represent.

20 A        Sure.  So, as you go across the column headers, it

21 show us the status, whether it's paid or not, how much the

22 pharmacy paid, how much the member was required to pay, and

23 the client -- it's like watching my wife.  Slow down -- the

24 name of the patient, how much Caremark paid to that pharmacy,

25 the prescription number, and the prescriber's last name.

```
 1   Q         Okay.  And with respect to Willow Pharmacy, all of
 2   the prescribers or names appear to be the same.  Is that
 3   correct?
 4   A         It appears to be underneath the prescriber last name
 5   of Craven.
 6   Q         And just so we're clear, all of these entries on
 7   Exhibit 727, these are just claims that were paid by CVS
 8   Caremark.  Is that correct?
 9   A         That's correct.
10   Q         You would not have in your system access to any
11   information with respect to claims paid by other PBMs, such as
12   possibly Express Scripts or Tricare or any other entity.  Is
13   that correct?
14   A         Very little.  Only if there is a history load that
15   comes in, and they wouldn't appear on a paid claim report like
16   this.
17   Q         Okay.  These are documents that were kept in the
18   ordinary course of business at CVS Caremark and then turned
19   over to the United States Attorney's Office.  Is that correct?
20   A         Yes.  Every night our system downloads these for our
21   warehouse for use for this.
22             MR. CLARK:  Your Honor, I tender Exhibit 727 into
23   evidence as an exhibit to his testimony.
24             THE COURT:  Without objection, admitted.
25             (Government's Exhibit 727 was received into
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 12 of 117   PageID #: 3746

1          evidence.)

2              MR. ELDRIDGE:  Your Honor, may we approach?

3              THE COURT:  Yeah.  Do we need to ask the witness to

4      step out or what?

5              MR. WALDEN:  I don't think so, Your Honor.  Our

6      objection is that the dates -- it's not visible on the ELMO.

7      Mr. Clark, do you care to move it so I can see the top left

8      corner of that document?

9              THE COURT:  Why don't you just show it to him and

10     see.

11             MR. WALDEN:  Our objection is that the exhibit

12     includes claims by Michelle Craven as a prescriber through

13     March 1st of 2015.  And that is after Ms. Craven exited

14     working for Mr. Wilkerson at Karma and when she began working

15     for Jimmy Collins, which is a separate case.

16             THE COURT:  Okay.  All right.  So, here's the way

17     that I'm interpreting your objection is it's outside of the

18     scope of the charged conspiracy in this case.  But I think

19     that the government has maintained that they are not conceding

20     that there was not some interrelationship between the charged

21     conspiracy in this case and what I'm going to refer to as the

22     so-called Jimmy Collins' conspiracy that actually was charged

23     in the Southern District of California.  Is that the

24     government's position?

25             MR. CLARK:  Your Honor, maybe to more specifically

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 13 of 117  PageID #: 3747

1    address the objection.  I think that once this is introduced,

2    I don't want to speak from a document not in evidence yet, I

3    think it will become apparent that all of these prescriptions

4    on here were filled in the year 2014.  So, while the date

5    range in which the search was run might include 2015 --

6             THE COURT:  Then that may obviate the entire

7    objection?

8             MR. WALDEN:  Absolutely.

9             MR. ELDRIDGE:  Thank you, Your Honor.

10            THE COURT:  Let's see if we can do that then.

11            MR. CLARK:  Your Honor, I would offer 727 into

12   evidence.  I believe the authenticity of this has already been

13   stipulated to previously.

14            THE COURT:  Yes.  I think authenticity -- the

15   objection is as to relevance.  Okay.  Right?

16            MR. WALDEN:  Yes, Your Honor.

17            THE COURT:  If there is an objection.

18            MR. WALDEN:  If those claims are for 2014, there is

19   not an objection.

20            THE COURT:  I understand that's Mr. Clark's

21   representation.  I don't know that's been established through

22   the proof yet, so.

23            MR. CLARK:  I would offer it as an exhibit, Your

24   Honor, into evidence.

25            THE COURT:  It's conditionally admitted assuming we

UNITED STATES DISTRICT COURT

1    can, you know, clear this up.

2              MR. ELDRIDGE:  Excuse me, Mr. Clark.  Were all of

3    those Craven?

4              MR. CLARK:  They are.

5              THE COURT:  Why don't you show it to your counsel, I

6    mean, opponent there.

7              MR. ELDRIDGE:  I'm sure I've seen it.

8              MR. CLARK:  727.

9              MS. MAIO:  727?

10             MR. CLARK:  727.  Your Honor, may I provide the

11   witness with a paper copy of the --

12             THE COURT:  Why don't you give it to Ms. Capetz,

13   she'll give it to him.

14             MR. CLARK:  Thank you.  It may be easier than

15   reading it off of the screen.

16             THE WITNESS:  Thank you, ma'am.  I don't know.  I'm

17   pretty old at this point.

18   BY MR. CLARK:

19   Q        Sir, do you see the field which appears to be the

20   fill date for these prescriptions?

21   A        Yes, sir, I do.

22   Q        Would you take a minute and look through these, look

23   through the fill date field for all of these prescriptions,

24   and can you tell us what year all of these prescriptions were

25   filled in, sir?

 1            (Brief pause.)

 2   A        They were filled in 2014.

 3            MR. CLARK:  Thank you.

 4            MR. WALDEN:  I'll withdraw my objection, Your Honor.

 5            THE COURT:  Okay.

 6   BY MR. CLARK:

 7   Q        And can you go to the last page of that, sir?  I'll

 8   put it on -- I may be able to help you out more by zooming in

 9   here.

10   A        Thank you.

11   Q        Can you tell us from this column here on the last

12   page of Exhibit 727 in the year 2014, how much was paid by CVS

13   Caremark for compounded topical cream prescriptions only at

14   Willow Pharmacy that were written by Candace Craven?

15   A        2.98 million dollars.

16   Q        Okay.  Now, there is several different numbers here,

17   the 2.98 is a pharmacy total reimbursement amount?

18   A        Correct.

19   Q        There is a number beside that, 2.953, what does that

20   number represent?

21   A        That represents how much my clients reimbursed me

22   for those claims, so CVS paid more to the pharmacies than our

23   clients paid to us.

24            THE COURT:  You mean in premiums or in --

25            THE WITNESS:  In reimbursement.  So, what we do is

                    UNITED STATES DISTRICT COURT

1    we pay the pharmacy based upon our contracted rate with the

2    pharmacy, and then we negotiate the rate with the clients.

3              THE COURT:  I see.

4              THE WITNESS:  Yes.

5              THE COURT:  So, okay.  So, I think I understand.

6    And I presume this happens occasionally, but if it happened

7    100 percent of the time, that's an unsustainable business

8    model.  Right?

9              THE WITNESS:  Absolutely.

10             THE COURT:  All right.  Go ahead.

11   BY MR. CLARK:

12   Q        While we're on it, you say monies that your clients

13   paid, that's the insurance companies are paying?

14   A        That's correct.

15   Q        Let me -- just kind of on a granular, little more

16   granular level, let's talk about how this works.  This is the

17   amount 2.98 that is paid to the pharmacy by CVS Caremark?

18   A        That's correct.

19   Q        This is the amount that the insurance companies

20   paid.  How does it work, does the insurance company pay the

21   money directly to the pharmacy after you approve the claim or

22   do you pay the money once the claim is approved, then you're

23   reimbursed by the insurance company?

24   A        I pay the money based upon prompt pay laws so it's

25   anywhere within 10 to 30 days, usually closer to about 14 that

1   we have to get a check to the client or to the pharmacy.  And

2   in exchange within about 30 days those plan sponsors bring the

3   money back to us.  So, that 2.98 million flows out first, then

4   within about 30 days they go ahead and make us whole or close

5   to it in this case.

6   Q        Roughly how many claims for prescription drugs come

7   into CVS Caremark on any given day?

8   A        It was about two million claims a day.  It may be a

9   little bit higher at this point.

10  Q        When you say it was, is that back in the 2014/2015?

11  A        Correct.

12  Q        It may be more than that now?

13  A        We were about 80 million lives that we were covering

14  at the time and I think we may be at 100 or 120 million now.

15  Q        So, it is safe to assume then there is not an

16  individual who looks and signs off physically on every single

17  prescription as it comes in?

18  A        That's true.  It goes into an electronic system and

19  in less than a second goes back to the pharmacy.

20  Q        Are there things that the electronic system is

21  programmed to look for before it sends a message back to the

22  pharmacy?

23  A        Yeah.

24  Q        Can you tell the judge what those things are?

25  A        Yes, sir.  Our computer system actually goes through

1    an electronic checklist.  So, look at the member, so when you

2    submit your claims to the insurance company, it will say, is

3    the, is the judge covered, yes, no.  Is the doctor, are they

4    debarred from submitting claims, yes, no.  Is the drug

5    covered.  Is the quantity covered.  Is it within the

6    parameters of the plan per day supply.  And then we actually

7    send back, if any of those things fail, we'll send back

8    something to the pharmacy saying it didn't work, it rejected,

9    this is what you need to go ahead and do to fix.

10           THE COURT:  And is the computer, I mean, I just use

11   my own personal knowledge, I've got notices sometimes say,

12   hey, you got to get a prior authorization, it looks like a

13   computer-generated thing.

14           THE WITNESS:  Yes, it is.

15           THE COURT:  That's one, that's one of the

16   parameters, too?

17           THE WITNESS:  It is.  And if it actually goes

18   through all of those checks and it's okay, it goes back to the

19   pharmacy and says charge the member $100, charge the member 10

20   bucks, whatever it is.

21   BY MR. CLARK:

22   Q        Those are what we call -- do you call those hard

23   stops if any of those are no?

24   A        Yeah, we would call it a hard reject.

25   Q        Hard reject.  Okay.  In other words, if the member

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 19 of 117   PageID #: 3753

```
 1    is not a covered entity, there is no gray area, the answer is
 2    no, the claim is not getting paid?
 3    A         That's correct.
 4    Q         And that's immediately communicated to the pharmacy?
 5    A         Yes.  I believe it's usually less than a second.
 6    Q         And other than the criteria that you have told us
 7    about, everything else is looked at after the fact if it's
 8    looked at at all.  Is that correct?
 9    A         Correct.  Yes.  We have an audit department that
10    looks at things retrospectively.
11    Q         So, from the standpoint of an audit or from the
12    audit department, the PBM, is it a forward looking or backward
13    looking system?
14    A         It's retrospective reviews for the audit process.
15    The rejects are concurrent.
16    Q         I'm going to show you on the screen 728.  And I can
17    pass you a hard copy if that would help.
18    A         This one should be okay.
19    Q         Okay.  Ms. Capetz, pass him a hard copy.  Let him
20    flip through it real quick.  Can you look at the date range in
21    here and tell us what year in which all of these prescriptions
22    were filled, please?
23    A         They're for 2014.
24    Q         And can you tell us the pharmacy that this is for?
25    A         Central Rexall Drugs.  And that's the NCPDP, which
```

1    is our code number for them.

2    Q        Is this a listing of all of the claims that were

3    paid by CVS Caremark to Central Rexall Drugs for compounded

4    topical cream prescriptions that were written by Candace

5    Craven, Susy Vergot, and Toni Dobson?

6    A        Yes.

7             MR. CLARK:  Your Honor, I'd offer Exhibit 728 into

8    evidence as an exhibit to his testimony.

9             THE COURT:  Without objection, admitted.

10            (Government's Exhibit 728 was received into

11            evidence.)

12            MR. CLARK:  Thank you.

13   BY MR. CLARK:

14   Q        Flip to the last page.  Can you tell us how much

15   money was paid in 2014 by CVS Caremark to Central Rexall for

16   compounded prescriptions, topical cream prescriptions written

17   by Toni Dobson, Candace Craven, and Susy Vergot?

18   A        It was 1.92 million dollars that we paid the

19   pharmacy and our plan sponsors reimbursed us 1.893 million.

20   Q        Let me show you Exhibit 729.

21            MR. WALDEN:  The previous exhibit was 728?

22            MR. CLARK:  Yes, sir, Mr. Walden.

23   BY MR. CLARK:

24   Q        By now I think you recognize the type of document.

25   Can you tell us what pharmacy this relates to?

1    A          Soothe Compounding Pharmacy in Bradenton, Florida.

2    Q          I can pass you a hard copy if that will help.  It's

3    one page.  I'm going to call your attention to the date that

4    these prescriptions were filled.  Can you tell us in which

5    year all of these prescriptions were filled?

6    A          They were filled in 2014.

7    Q          And is this a listing of all of the prescriptions

8    that were filled and reimbursed at Soothe Compounding Pharmacy

9    by CVS Caremark?

10   A          Yes, sir.

11   Q          Written all by Candace Craven.  Is that correct?

12   A          That's correct.

13   Q          And the total amount that was paid to this one

14   pharmacy?

15   A          Is $142,000 and our clients reimbursed us 140,124.

16   Q          Making you seasick, I apologize for that.

17   A          It's getting close.

18              MR. CLARK:  I offer Exhibit 727 into evidence.

19              THE COURT:  Without objection, admitted.

20              MR. CLARK:  Thank you.  I believe I said 727.  It's

21   729.  Thank you.

22              THE COURT:  Admitted.

23              (Government's Exhibit 729 was received into

24              evidence.)

25   BY MR. CLARK:

UNITED STATES DISTRICT COURT

1    Q        Sir, how long did you state you've been working at

2    CVS Caremark?

3    A        I started working at CVS Caremark in 2008.

4    Q        Certainly, do you have knowledge of CVS Caremark's

5    practices and their policies and procedures with respect to

6    which claims they will pay, which claims they will not pay, as

7    well as things that matter and are material to CVS Caremark

8    when making that decision?

9    A        Yes, I do.

10   Q        Sir, if CVS Caremark had known that customers were

11   not paying a copayment, would that have been a material fact

12   that CVS Caremark would have considered?

13   A        Yes, we would have.

14   Q        Explain to the judge from CVS Caremark's perspective

15   the purpose and the rationale behind requiring customers and

16   by customers I mean the person who's obtaining the drug,

17   paying even a small copay?

18   A        Sure.  I'll probably call it customers, patients if

19   that's okay, it's just better for me.  So, when insurance

20   companies set up how they're going to have the coverage, they

21   determine that they want the member to go ahead and have skin

22   in the game so to speak.

23            THE COURT:  Say that again.

24            THE WITNESS:  Skin in the game.

25            THE COURT:  Yeah.  Yeah.

```
 1              THE WITNESS:  So --

 2              THE COURT:  I've used that term before in the course

 3      of this trial myself.

 4              MR. WHETSEL:  Your Honor, I just want to note an

 5      objection for the record.  Same objection we had yesterday

 6      just before Mr. Gogue got on the stand.  We consider this

 7      expert testimony.  So, we object.  Same, just note for the

 8      record, same objection.

 9              THE COURT:  Okay.  Well, and I tell you what.  I

10      think what I'm going to do, my ruling with respect to

11      Mr. Gogue was that since this individual does have personal

12      knowledge, I'm going to let him go into this, you know.  And,

13      I mean, what he just testified to about the concept of copays,

14      skin in the game, I mean, you know, tell you the truth, I made

15      the exact same observation the other day and, you know, I

16      think I understand how this works.  I mean, I think I bored

17      everybody referring to the concept of moral hazard and all of

18      that.  I mean, so, but your objection is noted.  So, I do get

19      it.  Although, I do have a question, you know.  And I hate to

20      put my personal -- I've noticed that within the past year or

21      two, I happen to take a statin from time to time, they give it

22      to me free.  And, I mean, I presume the there must be a

23      consensus in the medical community that statins are good for

24      you, you know, and we want you to take them.  Is that what

25      that's all about?
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 24 of 117   PageID #: 3758

1              THE WITNESS:  Absolutely.

2              THE COURT:  Okay.  We don't have to go into my

3      personal thing, but, I mean --

4              MR. HOBBS:  I may have some follow-up questions,

5      Your Honor.

6              THE COURT:  Yeah.  Well, I think that there must be

7      a consensus, let's not go into this, that they want us to take

8      statins.  They must be good for us.

9              THE WITNESS:  Well, Your Honor, it actually goes

10     straight into the course of what we're talking about.  So,

11     when we put someone on formulary, the plan sponsor, so in this

12     case, for you, it would be the federal employees program would

13     say, you know, what's good for the member, what are we trying

14     to accomplish.  For you, they want to have a healthy career,

15     not many health issues coming up.

16             THE COURT:  They assume if I take a statin that's

17     going to -- they're going to make money on that because it's

18     going to forestall me having to take something more expensive

19     down the road.  Right?

20             THE WITNESS:  Or hospitalization.  Bingo.  So, for

21     some things, maintenance meds, there is a zero-dollar copay.

22     It's a societal benefit.  It's a benefit to the insurance plan

23     to pay it.  Where we get to some of the clinically

24     questionable drugs, such as compounds, what the plan sponsors

25     have done, insurance plans have moved the copay up to where it

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 25 of 117  PageID #: 3759

1    may be 100 bucks, 1,000 bucks, so that member really needs

2    that medication before they're really willing to plunk down

3    their money.  If they're not willing to pay their part, then

4    the plan shouldn't pay theirs.

5           THE COURT:  Okay.  I get it.  And, again, what led

6    me into this, and I'm not trying to, but, I mean, it's okay,

7    but there are certain, you know, there are certain

8    circumstances in which an insurer or pharmacy is willing to

9    forgo the skin in the game because they say we're glad you're

10   taking this.  Right?

11          THE WITNESS:  Absolutely.

12          THE COURT:  All right.  All right.  Let's move on,

13   yeah.

14   BY MR. CLARK:

15   Q       And, again, not only dealing with the issue of

16   copayments and whether CVS Caremark considers it material that

17   a copay is not required, what about a scenario in which a

18   marketer of a particular compounded cream or any drug is

19   agreeing to pay the copay for the person receiving the drug.

20   Would CVS Caremark like to know that and consider that

21   material?

22   A       Yes, we would.

23   Q       And why is that, sir?

24   A       It's, again, we need the skin in the game for the

25   member.  Our contract actually requires the copay to be paid

1    by the eligible person, which is that patient getting the

2    medication themselves.  If a marketer or someone that's

3    uninvolved with that is paying that money, it's encouraging

4    the member to get drugs that they may not ordinarily have to

5    have the need for.

6    Q        Would CVS Caremark consider it material if a drug

7    was being marketed to a customer as being part of a study?

8    A        Yes.

9    Q        Why?

10   A        Normally, if you have a study, where it's going, it

11   would depend upon the type of study.  Most of the studies,

12   such as an FDA study where we're going through drug approval,

13   new indications and such, there is no cost to the member for

14   that medication at all, but it's underneath the auspices of a

15   different thing.  With the studies that we've seen through

16   retail pharmacies, we've seen them more to be scams and

17   schemes in order to get the members to take the medication.

18   So, in those cases, frequently, we would view it as waiving

19   that amount for the member as well.

20   Q        Is it material to CVS Caremark if the marketer who

21   is promoting the drug is employing and paying the medical

22   providers such as the doctor or the nurse practitioner who is

23   prescribing the drug?

24   A        Yes.

25   Q        What does CVS Caremark do in those instances?

1    A        In those cases we would probably invalidate the

2    claim and take the money back from the pharmacy, very likely

3    would throw the pharmacy out of the network.  The way that I

4    view it as a pharmacist is that the marketer is actually

5    practicing medicine, deciding what to go ahead and get that

6    member --

7            MS. MAIO:  Your Honor, I'm sorry to interrupt his

8    testimony, but what I understood Mr. McCall to just begin

9    testifying to is that how he views things as a pharmacist, not

10   in his current role.  I understand the Court's ruling

11   regarding materiality --

12           THE COURT:  All right.

13           MS. MAIO:  -- but I think we've moved to new

14   territory in terms of potential expert testimony in his role

15   as a pharmacist, and I would object to that.

16           MR. CLARK:  I believe the question is what does CVS

17   Caremark do in those instances, and that's what he's

18   testifying to.

19           MS. MAIO:  But, Your Honor, what he -- what I heard

20   him say was that in my view as a pharmacist.  And I think that

21   that's entering into expert testimony here.

22           THE COURT:  Yeah.  Okay.  Let's try to stick to, for

23   lack of a better way to put it, how the financial aspects of

24   the reimbursement system goes.  And, of course, I'm the one

25   that led us out into -- but let's forget about all of that.

1    BY MR. CLARK:

2    Q        Let me ask it this way, Your Honor.  Would CVS

3    Caremark consider it material and does CVS Caremark consider

4    it a material fact --

5             THE COURT:  And when you say "material," you're

6    referring to from a financial or business standpoint.  Right?

7             MR. CLARK:  Yes, sir.  Whether it would have

8    affected their decision as to pay or not pay the claim had

9    they --

10            THE COURT:  Yes.  I'm going to call that a financial

11   decision.

12            MR. CLARK:  Yes.

13            THE WITNESS:  Yes, we do.

14   BY MR. CLARK:

15   Q        And this is, again, a scenario where the marketer or

16   someone involved in the marketing apparatus is employing the

17   nurse practitioner or the physician who is signing the

18   prescription for the medication.  Would CVS Caremark consider

19   that material?

20   A        Yes, we would.

21   Q        Not would, does CVS Caremark consider that material?

22   A        Yes, we do.

23   Q        And would CVS Caremark consider it material if CVS

24   Caremark had known that the marketers had arranged for their

25   doctors that they were employing or their nurse practitioners

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 29 of 117   PageID #: 3763

1    that they were employing to call the customers to arrange for

2    the prescription after the contact had been made by the

3    marketer with the customers?

4    A        Yes, we would.

5    Q        And why is that, sir?

6    A        Because that's the marketer practicing medicine.

7    It's putting the cart before the horse.  The marketer is the

8    one that's driving the prescription based upon not being a

9    prescriber, they are corrupting that doctor/patient

10   relationship.

11   Q        Would CVS Caremark consider it material if you had

12   known that the marketers had an agreement, a financial

13   agreement, with the particular compounding pharmacy?

14   A        Yes, we would.

15   Q        Why?

16   A        It's the same reason.  It's corrupting the

17   doctor/patient, pharmacist/patient relationship.  It's causing

18   medication to be dispensed that should not otherwise be

19   dispensed.

20   Q        Would it, would CVS Caremark consider it material if

21   CVS Caremark had known that marketers were being paid

22   commissions for creams that were being prescribed for them, by

23   "them," I mean the marketer?

24   A        Yes, we would.

25   Q        And why is that?

1   A          Again, it's putting into the financial picture a

2   dispensing of a medication that should not otherwise be done

3   because there is a financial incentive versus a doctor/patient

4   relationship.

5   Q          If CVS Caremark knew that the marketers were

6   recommending and in some instances deciding which types of

7   creams a patient would receive, would CVS Caremark consider

8   that material?

9   A          Yes, we would.

10  Q          I suspect that's self evident, but tell us why for

11  the record.

12  A          Not only is it corrupting the doctor/patient

13  relationship, it's looking to see what's going to be

14  reimbursed best to be dispensed versus what's best for that

15  member.

16  Q          If CVS Caremark had known that marketers had input

17  into a compounded formula, would CVS Caremark consider that

18  material?

19  A          Yes.

20  Q          Why?

21  A          Same reason.  The financial incentive to dispense

22  the most expensive one is driven by dollars versus the needs

23  of the patient.

24  Q          Would CVS Caremark consider it material if CVS

25  Caremark had known or been made aware that the marketers were

1    directing the prescriptions to specific compounding

2    pharmacies?

3    A        Yes.

4    Q        And, again, why?

5    A        Same reason.  It's going to be the doctor/patient

6    relationship is being broken by that marketer to dispense it

7    through that pharmacy.  We want an independent pharmacy to be

8    involved with the act so they give the most cost efficient

9    dispensing for our plan sponsor rather than what's going to

10   make them the most money.

11   Q        Based upon your job at CVS Caremark, not your

12   previous career as a pharmacist, but on the hat that you wear

13   now and have worn for the last several years, are you familiar

14   with what a compounded medication is?

15   A        Yes, I am.

16   Q        And are you familiar based upon your job where you

17   work now with what circumstances compounded medications are

18   designed for?

19   A        Yes, I am.

20   Q        Can you tell us that, please?

21   A        Yeah.  A compounded prescription is a specific

22   formula for a specific member.  Most common is a member can't

23   take a specific commercially available one because like a food

24   dye allergy so they go ahead and customize it for that

25   specific member.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 32 of 117  PageID #: 3766

```
 1   Q           With that in mind, would CVS Caremark consider it
 2   material if CVS Caremark had known that compounded
 3   prescriptions for compounded medications were being written by
 4   means of a preprinted form with simply a box to check on the
 5   left side?
 6   A           Yes, we would.
 7   Q           Can you tell us why, please?
 8   A           Because it's no longer for that specific patient,
 9   it's now giving a formula based upon a set set of
10   circumstances for that member versus the individual
11   prescription.  It's no longer customized for the member.
12   Q           If multiple members of a family are receiving the
13   same prescription for the same compound formula on the same
14   day, would CVS Caremark consider that a specific formula for
15   the specific unique needs of a specific individual?
16   A           It would be doubtful we would.  It's a huge red flag
17   if you see the same recipe being used for multiple family
18   members.
19   Q           So, CVS Caremark would undoubtedly then consider
20   that material as well?
21   A           Yes, we would.
22               THE COURT:  Well, yeah it could, but, I mean, you
23   know, when you say for a family, I mean, I can imagine that
24   there could be a specific genetic predisposition within a
25   family unit, that everybody is allergic to the same thing, so,
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 33 of 117   PageID #: 3767

1   I mean, okay.

2   BY MR. CLARK:

3   Q        So, there may -- to the Judge's point, there may be

4   a situation where that might not necessarily be indicative of

5   anything.  You can imagine a scenario?

6            THE COURT:  He described it as a red flag.

7            THE WITNESS:  Yeah.  The judge was right.  A

8   specific family could be allergic to the same dye.

9   BY MR. CLARK:

10  Q        If you had known that in several instances that the

11  customer or the patient had no real pre-existing need for the

12  medication, would CVS Caremark consider that material?

13  A        Yes, we would.

14  Q        If you had known that in instances that the

15  customer, the patient was approached by the marketers and not

16  the other way around regarding ordering of compounded

17  medications, would CVS Caremark consider that material?

18  A        We would consider that material.

19  Q        Why?

20  A        Because, again, you're not driving for treatment of

21  a specific patient need.  You're having a marketer go ahead

22  and sell something for a profit mode of which destroys the

23  doctor/patient relationship.

24  Q        Would CVS Caremark have considered it material if

25  patients or customers had been offered money in exchange for

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 34 of 117  PageID #: 3768

1   ordering a compounded medication?

2   A        Yes, we would.

3   Q        And why is that?

4   A        Again, the member is -- the doctor/patient

5   relationship is only for specific condition for that member to

6   treat it for a legitimate medical purpose, that destroys that

7   legitimate medical purpose.

8           MR. CLARK:  May I have just a moment, Your Honor?

9           THE COURT:  Yes.

10          (Brief pause.)

11          MR. CLARK:  Your Honor, that's all of the questions

12  I have.  Thank you, Mr. McCall.

13          THE COURT:  Cross-examination?

14          MR. SCHWARTZ:  Can I take a five-minute recess?

15          THE COURT:  Yeah.  I tell you what, let's go ahead

16  and take about a 10 of 15-minute recess.  Counsel, I just want

17  to remind everybody I've got to cut this off at 11:45 today

18  for a lunch break that will go to 1:30.  Let's go ahead and

19  take a 10 or 15 --

20          MR. PIPER:  Judge, may I say that when we come back

21  at 1:30 because I'm fairly confident the cross-examination is

22  not going to be finished, if we could, we would like for

23  Mr. McCall to be our last witness today.

24          THE COURT:  That's fine.

25          MR. PIPER:  Okay.

1         THE COURT:  That's fine.  I mean, but I've just got

2    to take that lunch break today, so.

3         MR. PIPER:  Thank you, Judge.

4         THE COURT:  Okay.  We'll be in recess until

5    11:00 a.m.

6         (Short recess.)

7         THE COURT:  Okay.  Mr. Schwartz, do you want to

8    conduct cross-examination?

9         MR. SCHWARTZ:  Yes, sir.

10        THE COURT:  And, of course, Mr. McCall, I'll remind

11   you you're still under oath.

12        THE WITNESS:  Yes, sir.

13                          CROSS-EXAMINATION

14   BY MR. SCHWARTZ:

15   Q        Hi, Mr. McCall.  My name is Seth Schwartz and I

16   represent a gentleman named Wayne Wilkerson.  I've got some

17   questions for you.  All right.  You indicated a variety of

18   things you believe would be material to CVS and paying

19   clients, right, so, one of them you said, and if I say

20   anything incorrect, just correct me, please.

21   A        Sure.

22   Q        One of them you said was that a marketer marketing

23   creams to prospective patients would violate the

24   doctor/patient relationship.  Right?

25   A        Correct.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 36 of 117  PageID #: 3770

1   Q        All right.  And then you said that -- what were some

2   of the other ones that you said were material so I don't mess

3   this up?

4   A        I can try to recall some of them.  So, the doctor

5   being hired by the marketer to go ahead and push creams would

6   also be one of the things.  I believe there were some others.

7   I can't recall them off of the top of my head, you know.

8            THE COURT:  Mr. Schwartz, I heard what he say and I

9   couldn't catalog them all then, but let me just -- can I give

10  you and everybody in the courtroom my interpretation of what

11  Mr. McCall -- and let me take it to sort of another level of

12  abstraction.  I think that what I understood Mr. McCall to be

13  saying in terms of what is material to CVS and he phrased it,

14  you're correct, in terms of the doctor/patient relationship.

15  But what I am surmising is, you know, yeah, and we in America

16  we say that's a very important relationship, we don't want to

17  disturb it, but here's what I sort of am reading into what he

18  said.

19           As an economic business model for the insurance

20  industry, okay, part of its underwriting or a big part of its

21  underwriting decisions are based upon the integrity of certain

22  gatekeepers within the process doing what we expect them to

23  do, but, particularly, them being disinterested from a

24  financial standpoint.  And the underlying assumption, I

25  believe, is that, you know, we are assuming, we hope it's a

1    good assumption, that doctors are going to do the right thing

2    and they are going to act in a disinterested manner in making

3    their medical judgments.  And we as a financial institution,

4    an underwriter, so to speak, are going to depend upon that.

5    And if it doesn't work, it throws out of kilter some of these

6    carefully calibrated assumptions about how the marketplace is

7    acting.

8            That's what I -- that's my takeaway from

9    Mr. McCall's testimony.  And, basically, I think what he was

10   saying is if we have financially interested actors operating

11   within the system, we've got to be skeptical of that, because,

12   basically, it throws off the economics of our underwriting.

13   That's -- okay.  Excuse me for saying that, but that's my

14   takeaway about what I heard Mr. McCall, you know.  And I

15   agree, you know, Mr. Clark didn't particularly ask the

16   questions like that, he didn't answer them like that, but

17   that's my takeaway sitting here right now.  Okay.

18           MR. SCHWARTZ:  And that's my understanding, too, and

19   some of my questions are related to that.

20           THE COURT:  Okay.

21           THE WITNESS:  Although way more eloquent than I

22   would have said it.

23           THE COURT:  I get that a lot, you know, in my

24   current position, not before or after my current position.

25

1  BY MR. SCHWARTZ:

2  Q        All right.  So, the issues with marketers is

3  something that CVS was concerned about, predicated a lot on

4  what the judge was saying, it may imbalance the financial --

5           THE COURT:  Incentive.

6  BY MR. SCHWARTZ:

7  Q        Of CVS.  Right?

8  A        Yes, sir.

9  Q        I'm going to show you a CVS Caremark manual from

10 2013, the manual that was in force when all of these

11 claims were --

12          THE COURT:  Give that to Ms. Capetz and she'll pass

13 it up.

14 BY MR. SCHWARTZ:

15 Q        And I want you to show me where it specifically said

16 that a pharmacy can't use a marketer?

17          THE COURT:  Well, now, this may take awhile.  I

18 don't know whether it's in there or not, but I think it's only

19 fair if we're going to ask him that question to give him

20 sufficient time.  Now, one thing, one way we could do that is

21 just go ahead and take half an hour early our break, and come

22 back at 1:30 and continue.  But, I mean, if you need to get

23 this question out right now, I mean, giving him that, I

24 mean --

25          MR. SCHWARTZ:  I can do it on the back side of my

1    questions so I don't slow it down.  You can hold on to that.

2              THE COURT:  I don't think he's going to be able to

3    review that volume of material right now.

4              MR. SCHWARTZ:  That's fine.  That's fair.

5    BY MR. SCHWARTZ:

6    Q        All right.  So, CVS has clinics in a lot of their

7    locations.  Right?

8    A        We have them in some.  I think about 10 percent of

9    the locations.

10   Q        And you have, what, 8,000 locations nationwide?

11   A        I'll take your word for it.

12   Q        Something like that.  Right?  You're saying about

13   10 percent is what you assume, so about 800 locations of the

14   CVS building whether it's a freestanding building or they're

15   renting a place, inside of there, there is a clinic that is

16   staffed by a doctor.  Right?

17   A        Usually a nurse practitioner, but, yes.

18   Q        Nurse practitioner.  And the nurse practitioner has

19   to have, in most states has to have a doctor, either an MD or

20   DO supervising them as a medical director.  Right?

21   A        I don't think that's the case anymore.  It's state

22   by state whether they're independent or dependent

23   practitioners.

24   Q        Who pays the nurse practitioner?

25   A        CVS Health does.

1    Q        CVS Health. And then that nurse practitioner will

2    see people in a clinic within the same building as CVS retail

3    operations and CVS's pharmacy. Right?

4    A        That's true.

5    Q        All right. And that nurse practitioner then will

6    also write prescriptions for people that need them that in

7    turn literally can be filled steps away from where that nurse

8    practitioner is sitting with the patient. Right?

9    A        Yes. That's true.

10    Q        And how is that not interfering with the

11    doctor/patient relationship when, in fact, CVS is employing

12    that nurse practitioner that is seeing patients and that is

13    then able to go steps away to fill that prescription?

14    A        Sure. I can answer that. So, it's -- whenever you

15    go to a Minute Clinic that nurse practitioner will ask you

16    where you want to fill your prescription. With kids, I'm very

17    susceptible to pink eye. I actually had to go to a Minute

18    Clinic when I was out of town and I got pink eye. The nurse

19    practitioner wrote a script for a, I think it was

20    Moxifloxicin. I'm sorry. So, she wrote the prescription and

21    then she said do you want it to go CVS, do you want it to go

22    any other location. So, there is that where there is the

23    independent, where you can have them send the prescription to

24    any other location.

25        I walked over to the CVS because my insurance

Case 1:18-cr-00011-HSM-CHS Document 334 Filed 11/01/19 Page 41 of 117 PageID #: 3775

1    requires me to go to those locations, too.  So, I got over

2    there, and the copay was astronomical, it was 100 bucks, CVS

3    Caremark is on a high deductible plan.  So, I asked the

4    pharmacist, I said, hey, this is, this is crazy for a little

5    pink eye, I can't pay 100 bucks.  So, they actually called

6    back to the nurse practitioner and said, hey, there is the

7    patient balking at the copayments, what do you want to do?  So

8    she changed it over to Tobramycin, and I think I paid three

9    dollars then.

10            THE COURT:  Okay.  And that's an explanation.  Look,

11   I think that what Mr. Schwartz is getting at, and I'll try not

12   to -- if I'm going to try your case for you, I'll try not to

13   lose it, Mr. Schwartz.

14            MR. SCHWARTZ:  Yes, sir.

15            THE COURT:  I think that what he's going to try to

16   get at is that there are various mechanisms within the

17   existing system that could throw out of kilter this, what I

18   referred to as this sort of delicate balance to try to keep

19   intact the normal financial incentives, and one way, look, is

20   for CVS or Caremark to employ practitioners, because, to put

21   it bluntly, CVS and Caremark make money, the more

22   prescriptions that they can sell the more money they make,

23   and, therefore, how could it be that CVS Caremark will also

24   employ people who are the so-called gatekeepers, I mean.  Is

25   that a bad question?

UNITED STATES DISTRICT COURT

1        MR. SCHWARTZ:  No.  Yeah.  You're doing a good job,

2   Judge.  That's exactly where I'm at because he testifies --

3        THE COURT:  I bet your client is not going to pay me

4   a penny for that.  Go ahead.

5        MR. SCHWARTZ:  He testified that if a marketer is

6   employing a physician or the pharmacy has something to do with

7   it, it's wrong, yet, they do it.

8        THE COURT:  I think it's a fair question.

9        MR. SCHWARTZ:  So, to use your analogy --

10        THE COURT:  You told me -- what he described is how

11   he personally intervened to --

12        MR. SCHWARTZ:  Yes.

13        THE COURT:  -- try to throw that balance back into

14   kilter, but I'm not sure that answers the question of, well,

15   wait a minute now.  Yeah.  I mean, if everybody was as

16   responsible as he was, or as economically, you know, tuned

17   into this, it might work, but it could throw it out of kilter

18   so.

19        MR. SCHWARTZ:  Yes.

20   BY MR. SCHWARTZ:

21   Q        So, to use your story, and I appreciate that story,

22   so, the nurse practitioner, the first thing she --

23        MR. CLARK:  If Your Honor, please, I hate to

24   interrupt, but there has been a question on the table and

25   Mr. McCall has been waiting for an opportunity to weigh --

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 43 of 117  PageID #:
3777

1          THE COURT:  Part of it is my fault, I kept talking.

2    Go ahead and ask the last question again.

3    BY MR. SCHWARTZ:

4    Q          Are you finished with your answer from the prior

5    question?

6    A          I can't --

7          THE COURT:  Can't even remember now.  Right?

8          THE WITNESS:  That's the point.  And I appreciate

9    you calling me cheap.  I think that's how the system works is

10   me being cheap as a consumer.

11         THE COURT:  Well, but, I mean, that's part of the

12   economic -- we assume that as part of the free market system.

13   Right?

14   BY MR. SCHWARTZ:

15   Q          So, in your story, you said that the nurse

16   practitioner suggested CVS first.  Right?

17   A          No.  She asked if I wanted to go to CVS.  So, she

18   asked me a question about where I wanted it to be sent.  The

19   other things that go into it, though, is that nurse

20   practitioner is prescribing from a cost effective therapy.

21   One of the other things that goes into it, why the plan

22   sponsors -- I believe my medical insurance is through Aetna,

23   and it's before we had the companies joined.  So, from Aetna's

24   point of view, they want to hire the cheapest person in order

25   to go ahead and do that.  So, it goes to the low cost

```
 1    provider.  My primary care is much more expensive.  It comes
 2    there.  And then I have the choice based upon economic models
 3    whether I want to go to CVS for convenience, whether I want to
 4    go to another one.  But, ultimately, I'm also going to have
 5    that pharmacy whether it comes from my primary care doctor or
 6    from that Minute Clinic that goes ahead and sends it.  They're
 7    disinterested.  They're going to go ahead and make roughly the
 8    same amount on any prescription that comes through based upon
 9    their margin.
10    Q        But the point is the person is inside the walls of
11    CVS, steps away from the pharmacy.  And the point is that to
12    have the person go into the CVS so that they do fill the
13    prescription there regardless of what the practitioner is
14    asking.  Right?  Isn't that really the financial model?
15    A        No.  I don't think I would agree with that.  I think
16    we are setting up, not us because it's the other side of the
17    company, they're setting up a convenience factor for the
18    person to go in for a lower cost of therapy than a normal
19    doctor, but that practitioner is going to prescribe according
20    to their professional judgment that's not colored by financial
21    arrangements.
22             THE COURT:  Does -- let me -- does CVS pay the
23    salary of the nurse practitioner?
24             THE WITNESS:  They get paid a salary, correct.
25             THE COURT:  Okay.  And okay.  And let me -- and if
```

UNITED STATES DISTRICT COURT

1    CVS makes more profit, they could perhaps be more generous

2    with the amount of salary they pay.  Incorrect or correct?

3            THE WITNESS:  It could be.  I don't have any view

4    into the salary of the nurse practitioners.

5    BY MR. SCHWARTZ:

6    Q       CVS is selling it as convenience, but those Minute

7    Clinics are literally next to where the pharmacy drop-off for

8    the prescriptions are.  They're always in the back of the

9    store right by the pharmacy.  Right?

10   A       They're in the store.  I don't know if they're right

11   next to it.  They're in the store, so it's close proximity.

12   Q       And, in fact, if CVS was in the game of providing

13   these Minute Clinics, there is nothing stopping CVS from

14   having separate locations away from their pharmacies, not in

15   the same building, you could have a location a mile away and

16   it could be called CVS Minute Clinic there.  Right?

17   A       They could.

18   Q       All right.  But they chose not to.  They chose to

19   put it in a location literally steps away from the pharmacy

20   for convenience.  Correct?

21   A       For convenience of the patient.  I'm sure there is

22   financial because they've already paid for the building, too.

23   Q       And the convenience of the patients and how that is

24   sold is come see our doctor and have your prescription filled,

25   whether you specifically say it or it just puts them in a

1    position where they literally walk out of one door, walk four

2    or five steps over and say, here, Mr. Pharmacist, can you fill

3    this for me.  Isn't that the game?

4    A          No, I don't think it's a game.  I think it's a cost

5    effective channel to fill it at any pharmacy that you want,

6    but here's a nurse practitioner that you can get in just by

7    walking into the clinic.

8    Q          And you can do that at any walk-in clinic anywhere

9    as long as there is nobody in front of you, you can walk in or

10   you can walk in and wait.  There is tons of different walk-in

11   clinics all over the country?

12   A          Yeah.  I think Price has them.  Kroger, Wal-Mart,

13   and I think Walgreens also has them.

14   Q          Exactly.  And all of these locations are doing this

15   to maximize the revenue that is coming in from that client.

16   The client is already in that location, they always have a

17   pharmacy available and they can fill a prescription.  Isn't

18   that true?

19   A          I would say it's true that the majority of those

20   probably would go to the pharmacy, so, yeah.

21   Q          Okay.  And it's not like you're putting Minute

22   Clinics in Foot Lockers, right, without a pharmacy?

23   A          I doubt we would do that.

24   Q          Okay.

25   A          And by "we," not CVS Caremark, CVS Health.  Yes.

1    Q         I understand.  And they are different companies.

2    Right?

3    A         They are.

4    Q         Technically even though they're all called CVS,

5    they're all, all of these companies are separate and apart?

6    A         Yes.

7    Q         All right.  Now, you were a pharmacist or you are a

8    pharmacist?

9    A         I am.

10   Q         Okay.  And when a pharmacist fills prescriptions,

11   you look at the entire prescription.  Right?

12   A         We look at the entire prescription, the entire

13   patient.

14   Q         And when you do that, you also see where the patient

15   lives based upon what the address is.  Right?  It's on some of

16   these scripts.

17   A         Yeah.  You're required to get the demographics

18   including the address.

19   Q         And so, in this case that we're talking about, you

20   talked about Willow Pharmacy and Central Rexall and Soothe.

21   Those pharmacists would have been able to see that the number

22   of prescriptions that were being written were being written by

23   the same provider.  Correct?

24   A         Yes.

25   Q         And they would have been able to see that the

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 48 of 117  PageID #: 3782

1    individuals that were receiving these prescriptions were in

2    different parts of the country?

3    A        Yes.

4    Q        And if the pharmacist sees that, then the pharmacy

5    is also going to know that.  Right?

6    A        Presumably it's the pharmacist making the decision

7    on those.

8    Q        And so, when claims are made, they have to be made

9    by the pharmacy.  Right?

10   A        Correct.  It's submitted through the pharmacy in to

11   our adjudication engine.

12   Q        And then the pharmacy is who receives the

13   reimbursement or the value of whatever the script was that

14   they wrote.  Right?

15   A        Are you asking where we send the payment to?

16   Q        Yeah.

17   A        We send it to the pharmacy.

18   Q        And nobody else can make a claim to CVS Caremark for

19   a prescription benefit aside from a pharmacy.  Right?

20   A        Not totally true.  If a member is at a place, they

21   don't have their card, they could --

22   Q        Out of network?

23   A        -- call it, or they could also do a paper claim.

24   Q        But it would have to be the member, if the claim was

25   not paid and they paid full price for it, to ask for a

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 49 of 117   PageID #:
3783

1    reimbursement.  Correct?

2    A          Correct.  The check would go to the member.

3    Q          Or a pharmacy asking for reimbursement for filling a

4    prescription.  Right?

5    A          Correct.

6    Q          Nobody else can, aside from those two entities,

7    nobody else can make a claim for a prescription to be

8    reimbursed.  Right?

9    A          Other than a few rare examples like a physician

10   dispenser, that's correct.

11   Q          So, a marketer can't call up and say, hey, I want to

12   be paid directly for these things.  Right?

13   A          They could call.  We wouldn't pay them.

14   Q          Okay.  Matter of fact, you wouldn't even talk to

15   them about the claim because of HIPAA laws.  Right?

16   A          Correct.

17   Q          So, any discussion about those claims has to also be

18   with anybody that is connected to it, either potentially the

19   patient, the pharmacy, or maybe even the doctor.  Right?

20   A          Yes.

21   Q          And that's because of things in your contract as

22   well as privacy laws?

23   A          Right.  We're only contracting with the pharmacy, we

24   don't talk to third parties generally.

25   Q          What are your administrative remedies pursuant to

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 50 of 117   PageID #:
3784

1    your contracts with the pharmacies?

2    A        We can -- correct me if I'm answering a different

3    question, but we can charge back the claim if it's incorrect.

4    We can terminate the contract with the provider, throw them

5    out of the network.  We can also assess compliance fees if

6    they're being non-compliant.  We can require them to do

7    corrective actions plans.

8    Q        All right.  You can also go a step further and you

9    can file a claim against them in arbitration.  Right?

10   A        Yes.

11   Q        And, in fact, the arbitration is held where the

12   headquarters is in Scottsdale, Arizona.  Right?

13   A        Yes.  We are required to be in Arizona for an

14   arbitration.

15   Q        So, regardless of where the pharmacy is, or the

16   claimant is, your contract requires arbitration in your

17   backyard in Scottsdale, Arizona.  Right?

18   A        Correct.

19   Q        Now, in this case, you talked about three

20   pharmacies, again, Central Rexall, Willow, and Soothe.  Of the

21   claims that the government put up on the screen, the total

22   claims, how many, how much of that has been clawed back?

23   A        I don't know that.

24   Q        Has any administrative review been conducted of

25   those pharmacies based upon those claims?

1    A        I don't know if it's based upon those specific

2    claims, but we threw Soothe out of the network, and then we

3    had, we came close to having issues with them when they had

4    cancel, I think that they were trying to submit another few

5    million dollars worth of paper claims coming in.  I believe

6    that the other location, at least Central Rexall from my

7    memory we had an audit on.  And I believe that -- what was the

8    other?

9             THE COURT:  Willow.

10            THE WITNESS:  Willow, yes, I believe we had an audit

11   on them as well.

12   BY MR. SCHWARTZ:

13   Q        And do you have the numbers or strike that.  Do you

14   know what the audit showed you?

15   A        I don't know the results of those.

16   Q        Do you know if any monies were clawed back?

17   A        From some of the pharmacies, I know we clawed back

18   money from at least Soothe, at top of mind, because it was

19   such a hassle at the time.

20   Q        Do you know how much?

21   A        It was substantial.  I don't know the exact figure.

22   Q        During our break, can you find that out, or is that

23   kind of too far out of your scope?

24   A        I probably could.  I'd have to go back to the hotel,

25   get my laptop out and do all of that.

1    Q          But you knew that you were testifying about this

2    case today.  Right?

3    A          Correct.

4    Q          And you knew were testifying about Willow and Soothe

5    and Central Rexall.  Right?

6    A          I knew I was going to be asked to discuss

7    materiality of these cases, yes.

8    Q          And based upon what you thought was material and

9    potentially problems with these claims, you must have figured

10   that, well, I need -- I should know what my company has done

11   about it.  Right?

12   A          I knew that we had audits on those, but when I was

13   getting ready for this, I was mainly asked about what our

14   policies were.

15   Q          To your knowledge, is Central Rexall still a member

16   or network or -- strike that.  You said that you threw Soothe

17   out of the network.  What does that mean?

18   A          We terminated their contract for violations.  I

19   believe that one they weren't collecting copays or something

20   along those lines, so they were terminated.

21   Q          That means that CVS will no longer reimburse Soothe

22   for prescriptions that members have with certain insurance

23   companies?

24   A          Correct.

25   Q          So, you indicated Soothe was bounced out of the

```
 1   network.  But to your knowledge is Willow still in the

 2   network?

 3   A        I think Willow is out of the network.  I'm just

 4   going on memory.  I thought they went out of business.

 5            THE COURT:  Out or in?

 6            THE WITNESS:  They're out.

 7            THE COURT:  They're out now.  Okay.

 8            THE WITNESS:  Yeah.  I think Central Rexall is out

 9   as well, but I heard they went out of business.

10   BY MR. SCHWARTZ:

11   Q        You're not sure, you're thinking at this point?

12   A        I think -- I know Central Rexall is out.  I don't

13   know specifically Willow, but I believe that Willow is out as

14   well.  That's more thinking versus knowing.

15   Q        And that's something you can verify?

16   A        Yes.

17   Q        Okay.  You indicated that you are required,

18   personally required to go to CVS pharmacies to fill your

19   prescriptions?

20   A        Through our insurance, yes.

21   Q        And why is that?

22   A        That's the way they set up our health plan.

23   Q        And are your deductibles or copayments any different

24   than if you didn't work for CVS or had to use CVS?

25   A        More likely they're higher.  We have a high
```

UNITED STATES DISTRICT COURT

1   deductible plan, so I believe that the first 1500 or $2,000

2   are on me.

3   Q        All right.  And if you go to a different pharmacy,

4   does your deductible change if you don't use CVS, not

5   deductible, strike that, your copays?  I'm sorry.  I'm getting

6   the two confused.

7   A        If I go to a pharmacy other than CVS, I think the

8   entire cost is on me, and then it doesn't go to buy down the

9   deductible or pay down the deductible.

10  Q        Just to be clear.  If you fill a prescription at CVS

11  then the deductible or strike that the copayment is a set

12  amount, and that goes towards your annual deductible?

13  A        If I go to CVS, the entire amount of the claim until

14  I hit that deductible is going to be on me, after that, it's

15  the cost of the copayment would be whatever our arrangement

16  is.  I can't remember if it's 20 percent or $20.

17  Q        Okay.  But if you go to a non-CVS pharmacy, somebody

18  that is not CVS, then you got to pay the entire amount of

19  whatever the prescription is?

20  A        Correct.  And it does not appear on my deductible as

21  having been paid towards it.

22  Q        You lose two benefits.  You lose the prescription

23  benefit plan paying for your script, and then you don't even

24  get credit towards your deductible?

25  A        That's correct.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 55 of 117  PageID #: 3789

1 Q        How is that not CVS controlling where you fill your

2 scripts?

3 A        It's my insurance company deciding what my benefit

4 is for their financial, so it --

5         THE COURT:  I mean, okay, let's say, though, that's,

6 okay, an economic dislocation of the supply and demand system,

7 but, I mean, I mean, a lot of big companies do that, you know.

8 I mean, I think that people that work, for instance, Ford

9 Motor Company, they get discounts on Ford cars, I mean, you

10 know, so, yeah, it's a dislocation of the overall, but, I

11 mean, it's pretty widely used in America, you know, I think.

12         MR. SCHWARTZ:  Sure.  But the flip side is that he's

13 saying or he testified that if a doctor or a marketer suggests

14 a certain pharmacy, then that's material, and they're covering

15 or they're not going to cover, yet, the entire company can say

16 if you don't use our pharmacy --

17         THE COURT:  I know.  Okay.  So, you're suggesting

18 that, okay, so you're suggesting that by doing this, CVS

19 Caremark may itself be engaging in economic dislocations?

20         MR. SCHWARTZ:  Essentially, there is no distinction

21 between the two --

22         THE COURT:  Yeah.  So, what's new?  I mean, that's

23 what people do in a free market.  They attempt to create

24 dislocations.  I mean, in itself, it's not illegal.  It's

25 just -- it depends upon what the observations I made before

1     about the underwriting system are, it's based upon certain

2     very broad assumptions that may or may not, you know, play out

3     in every case, but, so, okay.  I think I get the point that

4     you're trying to make.

5              MR. SCHWARTZ:  I just want the Court to be clear

6     that on one side they're saying that you can't adjust anything

7     or suggest anything and on the other side they're saying we're

8     stuck.

9              THE COURT:  I see what you're saying.  But, I mean,

10    that's, I think, a false choice in that we do not live in a

11    perfect world of any sort, including a perfectly rational

12    economic world.  Right?

13             MR. SCHWARTZ:  Sure.

14             THE COURT:  So.

15    BY MR. SCHWARTZ:

16    Q        You had testified about paying for somebody else's

17    copays, if it's not the -- tell me if I'm misstating you.  I'm

18    not trying to.  You basically said that the individual whose

19    prescription it is has to pick up the script and pay the

20    copay?

21    A        The eligible person.

22    Q        Eligible person.  Okay.  So, if -- so, are you

23    saying that if somebody picks up a prescription, pays a copay

24    for a friend as a favor that that's not allowed?

25    A        No.  For the eligible person, if it's a family

1   member, if it's something like that, that would be allowed.

2   In the case of a friend, we would presume that there is some

3   other type of arrangement, someone is going to pick up dinner,

4   someone is going to pick up the prescription.  So, I don't

5   think that necessarily we would come down on that.  It's the

6   interested third party where we start having concerns.

7   Q        How about charities?

8   A        Charities at times can be allowed.

9   Q        Do you know if that's in your manual?

10  A        With charities?  No.  We actually follow what CMS

11  does.  CMS allows -- there is a specific term that Medicare

12  uses for those types of organizations, so we follow their lead

13  on that one.

14           THE COURT:  Potentially yet another economic

15  dislocation.  And, I mean, I know of no single document that

16  is as full of economic dislocation as the United States Tax

17  Code.  Right?  I mean, that's how the world works.  Well, I

18  mean, that's just true, I mean.

19           MR. SCHWARTZ:  Yeah.  It's part of capitalism and a

20  free market system.

21           THE COURT:  Yes.  Yes.  Yes.  So, I mean, is it

22  perfect, no.

23           MR. SCHWARTZ:  I agree.

24  BY MR. SCHWARTZ:

25  Q        And at what point do you initiate clawbacks if

1    you're dealing with, let's say, copay issues?

2    A          At the conclusion of an audit.  Is that what you're

3    asking?

4    Q          But if five percent of the audited claims, you know,

5    have copay problems, what are you going to do at that point?

6    A          We are going to charge back those five percent of

7    those claims --

8    Q          Five percent?

9    A          -- and then look at other administrative remedies

10   for the pharmacy.

11   Q          You're not going to take everything back.  Right?

12   A          I'm not following you.  You mean everything on those

13   five percent of the claims?

14   Q          No.  I'm saying if five percent of the claims are

15   problematic, you're going to focus on those five percent,

16   you're going to leave the other 95 percent alone?

17   A          Correct.  As you mentioned we do arbitrations, so we

18   don't extrapolate.  We show one-on-one that this claim had the

19   issues, so we're charging back the money for this claim.  If

20   we couldn't prove it on the other one, we don't charge it

21   back.  That's what you're asking.  Right?

22   Q          Yes, sir.

23   A          All right.

24   Q          And you've never clawed any money back from a

25   marketing group.  Right?

```
1    A          Correct.  I don't have a contract with marketers.

2    Q          Now, what caps do you have in place with compounds

3    as far as at what point does CVS Caremark require an override,

4    reason to override the amount of the claim that CVS is going

5    to pay the pharmacy?

6    A          That is set by the individual insurance companies.

7    Q          And in this case, what were the caps?

8    A          We represent 4,000 insurance companies.  I couldn't

9    tell you off of the top of my head.  Some Medicaids will cap

10   it out where they say anything above $100, we have to go ahead

11   and prior approve.  It's all based upon whichever those 4,000

12   plans sets up their benefit.

13   Q          All right.  And you are aware what Medicare does?

14   A          Yes.  Medicare has a weird arrangement.  It's called

15   the doughnut hole arrangement.  You probably don't want to

16   hear me talk about it.  But bulk chemicals, back in 2007, they

17   said no bulk chemicals at all, which is primarily what these

18   locations were doing.

19   Q          So, those were set and at least some of the plans

20   that you're aware, you're just not aware of all of the other

21   ones.  Right?

22   A          Right.  It's the commercials and the Medicaids that

23   tend to put caps.  Medicare doesn't allow caps to be placed on

24   it for high dollars.

25              THE COURT:  I have heard of the doughnut hole.  And
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 60 of 117   PageID #: 3794

1    I've never understood what it referred to.  I guess we don't

2    have to get into that now.

3    BY MR. SCHWARTZ:

4    Q        Now, you had testified something about compounds are

5    clinically questionable so they're looked at more carefully?

6    A        I don't think I said that they were clinically

7    questionable.  I think what I said is that when the recipe is

8    exactly the same, it's a red flag.  It starts making us wonder

9    if it's legitimate.

10   Q        And how long does it take you to wonder if something

11   is legitimate, like when these claims are coming across?

12   A        So, when the claims come across, we have a specific

13   daily review team, which is looking to make sure that -- I

14   don't have the recipes with me -- but that they were billed

15   correctly.  So, that the pharmacy entered it correctly.  If

16   the doctor writes a certain percent, did the pharmacy

17   calculate it out, because there is a lot of calculations that

18   have to go into that.  So, that is done in a retrospective

19   basis.  We get a claims file every morning.  And then it

20   starts looking over the next three days as to whether the

21   correctness of that claim.  For the investigations and the

22   on-sites those are retrospective.  We start looking, the

23   profiles are generally at least one month in arrears and the

24   profiles go from one month all of the way out to 12 months,

25   sometimes go a little bit deeper if there is concerns there.

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 61 of 117   PageID #: 3795

1   Q        So, you said within a couple of days you have got

2   groups looking at these claims to try to figure out whether

3   they are legit or not.  Right?

4   A        They're looking at them to make sure it was

5   calculated correctly.  The daily review, they're looking for

6   what we would call fat finger errors.  Technician mistypes it

7   or miscalculates it.  So, those are more for just the

8   correctness on the individual basis.  The teams that are

9   looking in arrears are looking for profiles.

10  Q        We'll talk about the arrears teams later.  So,

11  you've got individuals that are looking to calculate if it was

12  done correctly.  Talking about financially or if the

13  prescription was written correctly or what exactly are they

14  looking at, what numbers?

15  A        They're looking to see that the pharmacy did the

16  calculations from the doctor's prescription, correctly entered

17  it.  It's more mechanics, so we have, we employ one of the

18  foremost knowledgeable people on compounds in the country.

19  She used to be the SME for Walgreens.  So, she has a team that

20  looks to make sure that the technician or the pharmacist

21  didn't screw up when they're entering it into the prescription

22  computer.

23  Q        All right.  And that's because that's related to

24  what the payout is that CVS has to pay the pharmacy.  Right?

25  A        That and patient safety.

1    Q        All right.  So, within a day to three days, you've

2    got people looking at all of these compound drugs?

3    A        Correct.

4    Q        All right.  So, in fact, CVS did review these

5    compound medication claims within days of them being made.

6    True?

7    A        For accuracy, yes.

8    Q        Okay.  And in reviewing them for accuracy, you're

9    also going to determine what the cost of those compound

10   medications were?

11   A        Yes.  It would calculate that it was paid correctly

12   according to how it was entered.  Is that your question?

13   Q        Yes, sir.

14   A        Yes.

15   Q        All right.  So, and just to be clear.  That was done

16   you said one to three days with one of the foremost experts on

17   compounds that CVS employs now?

18   A        Correct.

19   Q        And at that time or even six, eight months later,

20   CVS didn't do anything to stop the pharmacies from doing what

21   they were doing.  Correct?

22   A        I don't know if I understand the question.

23   Q        Sure.  The claims are made.  They're reviewed by

24   your team, including the foremost expert on compounds.  Fast

25   forward eight months, claims are still being made.  And at no

```
 1    point, did CVS stop any of that.  The reason that those claims
 2    were made is because CVS was like, hey, get on it?
 3    A         I definitely wouldn't put it that way.  So, during
 4    this entire process as we start seeing the claims get more and
 5    more expensive, we were also talking to plan sponsors.  We
 6    have a whole number of pharmacists that are assigned to the
 7    plan sponsors to advise them.  We started having plans quickly
 8    put edits in place, but not all of them did so, some of them
 9    only wanted to do it on a yearly basis when the insurance
10    policies renewed, other ones like union groups aren't able to
11    do it because they feel that that's part of opening up the
12    entire negotiation.  So, we had plan sponsors doing it, but at
13    different cadences.
14    Q         And at no point did CVS pick up the phone and call
15    the pharmacy and say, hey, what's all of this about, like this
16    seems to be expensive, isn't there a cheaper way for you to do
17    the same thing?
18    A         I think that we did audit the pharmacies, go ahead
19    and look at their practices.
20    Q         But that was way down range.  I'm talking about
21    within that first couple of months when you're seeing these
22    things come across daily?
23    A         I don't know.  Typically, we would not call the
24    pharmacy and say, hey, is there a cheaper way that you can do
25    it.  What our role is to make sure that they were paid
```

correctly and then when we're looking in arrears, we're

looking at the whole profile, does it make sense.

Q        Why wouldn't you call a pharmacy and make a

suggestion about maybe you can do something a little bit more

inexpensive?

A        Because that pharmacist and the doctor have the

requirement to go ahead and do cost efficient therapy for

their patients.

THE COURT:  I think let's go ahead and cut off now.

MR. SCHWARTZ:  Yes, sir.

THE COURT:  I'm going to advise you, Mr. McCall, I

think it would be unwise for you to talk about your testimony

with anybody during this lunch break.

THE WITNESS:  Sure.

THE COURT:  Having said that, Mr. Schwartz, tell --

what do you think is reasonable to ask Mr. McCall to check on

over the break between now and 1:30.  I'm not sure he's

required to do anything.  But, I mean, what do you think he

would be -- what would be reasonable to ask him to do over the

break?  Now, you've given him a huge document there to look

at, you know.  I don't know what he's -- I'm not going to tell

him what to do, but, I mean, it's --

MR. SCHWARTZ:  Sure.

THE COURT:  It appears to be in excess of a 100-page

document.  Now, what do you want for him to look for in there?

1          MR. SCHWARTZ:  He had testified to a variety of

2    things that were material dealing with marketers.  It's our

3    position that there is nothing in the contract about

4    marketers.

5          THE COURT:  So, you want -- okay.  The factors that

6    he may have testified to that is material to Caremark in terms

7    of whether -- raises a red flag so to speak about, you know,

8    whether we want to -- you want him to point to that in this

9    document?

10         MR. SCHWARTZ:  If he can.

11         THE COURT:  If it's there.

12         MR. SCHWARTZ:  But straight forward, more

13   importantly is information about the audit process and the

14   clawback amounts from the pharmacies that --

15         THE COURT:  I don't know that that's --

16         MR. SCHWARTZ:  That's not in there.

17         THE COURT:  That's in his computer back at the

18   hotel, and I have no idea where his hotel is or whether it's

19   reasonable to ask him to go back there.  I don't know.

20         MR. SCHWARTZ:  I'm not going to ask him to go back

21   to his hotel, but maybe he can make a phone call to his office

22   and they would have the same information.  If you can't, you

23   can't, but.

24         THE WITNESS:  Could I ask for some scrap paper or

25   can I write on this?

UNITED STATES DISTRICT COURT

```
 1              MR. SCHWARTZ:  I can give you some paper.

 2              THE WITNESS:  Thank you.

 3              MR. SCHWARTZ:  My co-counsel --

 4              THE COURT:  That is an exhibit, if you've got a

 5    legal pad or something.  Does the government have a legal pad

 6    he can write on?

 7              MR. SCHWARTZ:  My co-counsel has advised that these

 8    issues may or may not be on Page 39 if he wants to start

 9    there.  It's got a full index in the front.  It's the manual.

10              THE COURT:  But your co-counsel thinks there is

11    something --

12              MR. SCHWARTZ:  Page 39 is where this stuff is

13    apparently.

14              THE COURT:  What else?  Anything else?

15              MR. SCHWARTZ:  That's it.

16              THE COURT:  Those are the only two things.  All

17    right.  I'm sure he'll do the best he can.  I do think it

18    would probably be unwise to discuss this with any of the

19    lawyers in the case over the lunch break.

20              All right.  If that's it then, let's be in recess

21    until 1:30 p.m.  And, Mr. Schwartz, you'll continue your

22    cross-examination at that point?

23              MR. SCHWARTZ:  Yes, sir.  Thank you, Judge.

24              (Luncheon recess.)

25              THE COURT:  Okay.  Are we ready to resume, Mr.
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 67 of 117   PageID #: 3801

1    Schwartz, your cross-examination?

2              MR. SCHWARTZ:  Yes, sir.

3              THE COURT:  Okay.  Of course, I remind you,

4    Mr. McCall, you're still under oath witness.

5              THE WITNESS:  Yes, sir.

6    BY MR. SCHWARTZ:

7    Q         Mr. McCall, before the break, I had asked you a

8    handful of questions and gave you a pretty big manual, and

9    then I also asked to see if you could get information on any

10   type of the audits on the three pharmacies.  Were you able to

11   get that information?

12   A         I was able to do my best.  The writing is a little

13   faded, so I did my best reading this.

14   Q         What about the audit information from the

15   pharmacies?

16   A         Yes.  I actually went back to my hotel and pulled

17   them up on my computer.

18   Q         Okay.  And what did you discover about the

19   pharmacies' audits?

20   A         The pharmacies first.  Okay.

21   Q         Yes.

22   A         So, Soothe Pharmacy, the one over in Florida, it was

23   terminated for audit terms.  So, basically, the audit resulted

24   in their removal from the network.  And Central Rexall was

25   terminated for going out of business.  And that was pursuant

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 68 of 117  PageID #:
3802

```
 1   while an audit was underway.  And Willow Pharmacy was termed
 2   for audit reasons as well.
 3   Q        How much was clawed back from each of those?
 4   A        I wouldn't say clawed back.  The audit chargeback
 5   for Soothe Pharmacy was about $668,000.  The audit chargeback
 6   for Central Rexall was -- the 2016 audit was 1.2 million.
 7   There was a '14 audit that was $3600 due to Louisiana law
 8   which I can explain, if you want, and then Willow Pharmacy was
 9   approximately $567,000.
10            THE COURT:  When you say not -- you wouldn't exactly
11   say clawed back, what do you mean, do you mean that's what was
12   requested back but not necessarily received or what?
13            THE WITNESS:  No.  Clawbacks is a little bit
14   different.  What I view a clawback would be, I pay you $10 and
15   pull back $4, whereas, a discrepancy in audit chargeback would
16   be more you shouldn't have been paid this anyway if you had
17   submitted this according to the contract.
18            THE COURT:  Okay.  Thanks.
19   BY MR. SCHWARTZ:
20   Q        So, just to be clear.  Soothe, what did you term it,
21   audit what?
22   A        Yeah.  The audit termination.
23   Q        Okay.  And that was a $668,000 discrepancy?
24   A        Correct.
25   Q        Okay.  I just want to make sure I'm using the right
```

1    terms.  I don't want to get that confused.

2    A        Yeah.

3    Q        And then Central in 2014 there was $3600 recovered

4    from an audit?

5    A        Correct, due to the Louisiana law.

6    Q        Okay.  And then in 2016, 1.2 million dollars?

7    A        Correct.

8    Q        Due to an audit?

9    A        Yes.

10   Q        Okay.  All right.  Then for Willow, when was that,

11   there was $567,000 recovered or discrepancies with the audit

12   that were recovered, I guess?

13   A        Right.

14   Q        What year was that?

15   A        The audit was conducted, I believe, in '15,

16   comprised of '14 claims and the termination was in September

17   of 2015.

18   Q        Okay.  So, Willow was a 2015 audit of '14 claims for

19   a total of $567,000?

20   A        Correct.

21   Q        All right.  How many claims with Central, do you

22   have that information?

23   A        Central claims?  I didn't write down the number of

24   claims that were in that audit, no.

25   Q        And then Soothe?

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 70 of 117   PageID #: 3804

1    A          Soothe, I did not write down the number.  I did

2    write down that the primary was lack of copayment collection

3    using a sham coupon.

4    Q          So, Soothe is using a coupon.  For copays?

5    A          All three were.

6    Q          All right.  Do you know if those numbers were

7    100 percent compounds or was it other medication that they

8    were filling also?

9    A          For Soothe, I believe it was close to 100 percent

10   compounds.  For Central Rexall it was -- there were some

11   Lidocaine that was thrown into the second audit as well, and

12   Willow was primarily compounds.

13   Q          Okay.  All right.  I appreciate you getting that

14   information.  I didn't mean to make it difficult for you, sir.

15   So, thank you.  All right.  So, now, the next series of

16   questions I have dealt with what was in the manual.

17   A          Right.

18   Q          Did you have an opportunity to review that?

19   A          I did the best I could with the faded copy, yes.

20   Q          Okay.  And so, what's it say about marketers being

21   hired by pharmacies?

22   A          Sure.  So, the page that your co-counsel directed me

23   to, Page 39, was the incorrect page.  That was actually the

24   audit section which is how we're going to review the claims

25   after they're submitted, but there is nothing explicit on

```
 1    marketers, however, under the professional judgment section on

 2    Page 12, there is a section that says professional judgment

 3    and contact -- conduct.  All pharmacy services must be

 4    provided under direct supervision of a licensed pharmacist,

 5    and in accordance with the prescriber directions and

 6    applicable law.  Provider must at all time exercise

 7    professional judgment providing pharmacy services to an

 8    eligible person, provider may refuse to provide pharmacy

 9    services to an eligible person based upon a professional

10    judgment.  The preceding notwithstanding non adherence to any

11    of the provisions and terms of provider agreement will be a

12    breach of the provider agreement with Caremark unless

13    otherwise covered by applicable law.  So the standard of

14    practice is to not use basically bounty hunter marketers where

15    they're getting paid by prescription, that would seem to

16    violate the professional judgment section.

17    Q        Can I approach and get that page?

18             THE COURT:  Yeah.

19             MR. SCHWARTZ:  He was reading a little bit quickly.

20    I just want to be able to read it real quick.  He was reading

21    it fast, the page.

22             THE COURT:  His notes.

23             MR. SCHWARTZ:  This is one of the pages from the

24    contract.

25             THE COURT:  That's what he was reading from in the
```

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 72 of 117   PageID #: 3806

```
 1   manual.  I see.  All right.  Go ahead.
 2            MR. SCHWARTZ:  He was reading quickly so I couldn't
 3   follow the whole thing.
 4   BY MR. SCHWARTZ:
 5   Q        Okay.  I'm going to go ahead and post this.
 6   A        It's blank over here.
 7            MR. SCHWARTZ:  It apparently takes a minute.
 8            THE CLERK:  It should be there.
 9   BY MR. SCHWARTZ:
10   Q        User error.  All right.  It says, all pharmacy
11   services must be provided by or under the direct supervision
12   of a licensed pharmacist and in accordance with the prescriber
13   directions and applicable law.  Provider must at all times
14   exercise professional judgment in providing pharmacy services
15   to an eligible person.
16   A        That's the section right there.
17   Q        Okay.  Provider may refuse to provide pharmacy
18   services to an eligible person based upon that professional
19   judgment.
20            THE CLERK:  Seth, it's right here as well.
21            MR. SCHWARTZ:  Thanks.
22   BY MR. SCHWARTZ:
23   Q        The preceding not withstanding non-adherence to any
24   of the provisions and terms of the provider agreement will be
25   a breach of provider agreement with Caremark, otherwise
```

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 73 of 117  PageID #: 3807

1  governed by applicable law.  So, primarily you're saying if

2  they fail to follow this, it's a breach of the contract with

3  Caremark and you can either file lawsuits or arbitration or

4  start the clawback process or whatever.  Correct?

5  A          Correct.

6  Q          And then it says, all pharmacy services must be

7  provided by or under the direct supervision of a licensed

8  pharmacist and in accordance with prescriber directions and

9  applicable law.  All right.  So, now, a pharmacy service would

10  be somebody filling a prescription.  Right?

11  A          Correct.

12  Q          Somebody putting multiple items together to create a

13  compound or something like that?

14  A          Yeah, the physical dispensing.

15  Q          And then possibly even checking somebody out and

16  recovering the monies from them and giving them the script in

17  a bag.  Is that --

18  A          Collecting copayment, yes, that would be another

19  part of it.

20  Q          Okay.  How is marketing a pharmacy service?

21  A          So, marketing, if you are doing product selection

22  within your marketing, that is explicitly reserved for the

23  pharmacist or for the doctor.  So, if you have a third party

24  who's basically practicing medicine without a license, it

25  invalidates the entire process.

1    Q      How would a third party practice medicine without a

2    license in the context like this with marketers?

3    A      Yeah.  Absolutely.  So, if they were to select the

4    formula, if they were to recommend a formula, if they were to

5    contact a member and say, hey, what's wrong with you.  Let me

6    get in touch with a doctor that I know.  All of those things

7    would be included within pharmacy services.

8    Q      Now, you have zero facts that you know of that says

9    that the marketers in this case recommended or created

10   formulas.  Right?

11   A      That's true.  I'm going based upon the questions

12   that were asked of me earlier.

13   Q      Sure.  And, in fact, as a pharmacist, you know that

14   messing with a formula can really cause damage, you can kill

15   somebody.  Right?

16   A      Oh, yeah.  There have been people that have been

17   killed by these very compounds.

18   Q      Okay.  And so, I want to show you just a

19   prescription.  And, furthermore, the reimbursement rates for

20   certain drugs that are used in a compound, those are not

21   publicly available.  Right?

22   A      I'm not following the question.

23   Q      So, for instance, if you look at this, just look at

24   this part here where it says scar and care management gels?

25   A      Yeah.

```
 1    Q         So, I can't even pronounce these word, but the
 2    Fluticasone I think everybody has pronounced once, I think I
 3    got that one, but the rest of them, as far as what these
 4    different drugs pay when you put them together in a compound,
 5    that's something that CVS has internally, but you don't share
 6    that information with the public.  Right?
 7    A         With the general public, no, but we actually get a
 8    file that is supplied to us by Wolters Kluwer.
 9              THE COURT:  By who?
10              THE WITNESS:  Wolters Kluwer.  They're a data
11    company.  So, a drug manufacturer publishes the average
12    wholesale price to them.  They load it in their system and
13    then that is what causes the claim to price out in our system.
14              THE COURT:  Okay.
15    Q         And so --
16              THE COURT:  Is that, is that what may have been
17    referred to earlier in this trial as the average wholesale
18    price?
19              THE WITNESS:  That's the price that's given, it's
20    called average wholesale price or AWP.
21              THE COURT:  Okay.  Go ahead.
22    BY MR. SCHWARTZ:
23    Q         And that's something that a pharmacist understands
24    and possibly a doctor understands what these drugs are and how
25    they interact.  Right?
```

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 76 of 117  PageID #: 3810

1   A          Sure.

2   Q          All right.  And as a marketer, if I found out that

3   Bu --

4   A          Bupivacaine.

5   Q          Okay.  If that was paying out a great rate, and I

6   thought, well, why does it say one percent, let me add these

7   up, okay, there is 10 percent in that thing, let's make it

8   90 percent.  That would be a problem, wouldn't it?

9   A          You would probably kill the patient, right.

10  Q          And the pharmacist would catch that.  Right?

11  A          I would hope so.

12  Q          And if the pharmacist didn't catch it, hopefully,

13  CVS when they review the claims the next day with that great

14  compound group would catch it and say, wait a minute, this is

15  an error.  Right?

16  A          We would hope so.  There is no systemic way in

17  compounds to put safety controls on that percent, but, yes.

18  Q          That's one of the reasons you have people to review

19  to make sure that you're not, one, overpaying for something or

20  that there is not an error where something as you said that

21  has been fat fingered in, it should have been 1.2 percent

22  instead of 12 percent?

23  A          Right.  Patient safety is one of the things they

24  look at.

25  Q          Were there any other areas of the manual that you

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 77 of 117  PageID #: 3811

1    identified related to my question?

2    A        I was going to look up eligible person because it is

3    cited multiple times for copayments, but that section was not

4    in the exhibit.

5    Q        But that's the only -- so, based upon what you have

6    and what you reviewed, this is what you were able to come up

7    with?

8    A        Correct.

9    Q        Okay.  But the term marketer or marketing isn't

10   contained in that manual.  Right?

11   A        It's not in this manual, no.

12   Q        Do you know if it has been added to future manuals?

13   A        Something similar.  So, in the manual that came out

14   on 1/1 of '15 or became effective on 1/1/15 explains that you

15   can't outsource any part of the compound process so that would

16   have been prohibited as of 1/1/15.

17   Q        Okay.

18   A        Explicitly prohibited.

19   Q        And that's something that goes to your pharmacies.

20   Right?

21   A        Yes.  It goes to every contracted pharmacy plus our

22   chain headquarters as well.

23   Q        That's not something that you publish online on

24   CVS.com.  Right?

25   A        No, it's not.

1    Q        And you'll agree that there is a lot of information

2    in that manual.  Right?

3    A        As I learned over lunchtime, yes.

4    Q        Okay.  And so, back in 2014, when the majority of

5    this was going on, CVS didn't have any standard operating

6    procedures for marketers.  Right?

7    A        There was nothing explicit except that would be a

8    violation of the professional judgment section.

9    Q        Okay.  Now, there really is no difference between a

10   marketer going up to somebody and saying, hey, you should try

11   this compound or you should try these things, if they work for

12   you for or if you need them and watching TV at night and

13   seeing all of the drug advertisements that are coming across

14   that are directed to certain types of patients that say ask

15   your doctor about whatever the drug is.  Right?

16   A        I would disagree with that statement.

17   Q        Why?

18   A        The ones asking you to have a professional

19   interaction and to use Your Honor's words a disinterested

20   party.  So go into my doctor and saying, hey, I do get

21   migraines, what about this Sumatriptan prescription, would

22   this help me versus someone saying, hey, I've got something

23   that's great, let me go ahead and hook you up a with guy.

24   That's way different in my mind.

25   Q        But when the patient goes in they can still talk to

1    the doctor.  Right?

2    A         For both things, if they're actually physically

3    seeing a doctor, they can talk to him about it.

4    Q         And the point of the advertising is to get the

5    patient to ask about something that may benefit them.

6    Correct?

7    A         Yes.

8    Q         And, in fact, there are a number of drugs typically

9    that will treat any aliment aside from some super high

10   technical things that are just limited with certain types of

11   diseases or such.  Right?

12   A         What was the question?

13   Q         Sure.  With a vast majority of medical complaints,

14   there are a number of different drugs that will treat each

15   medical issue?

16   A         I'm following you, yes.

17   Q         And so, if a patient sees an advertisement and says,

18   hey, I want to go with Levitra, for instance, not this other

19   stuff, and they ask for Levitra.

20   A         They could ask for Levitra, yes.

21   Q         And the doctor can write for that.  Right?

22   A         They could write for it.  They would look in the

23   chart, is there anything that would be cheaper, is there

24   anything that would be dangerous, yes.

25   Q         Okay.  And, in fact, physicians are not required to

```
1    write whatever is cheaper.  Correct?
2    A          That is correct.
3    Q          That may be something that you would like them to
4    see and do because it saves money, but they're not required to
5    do that.  Right?
6    A          They're not required to do that, that is correct.
7    Q          And legally you can't require them to do that.
8    Correct?
9    A          I'm sorry.  I'm not a lawyer.
10   Q          Now, when you, not you directly, CVS, when CVS
11   performed the audits on Willow, Central Rexall and Soothe,
12   they would have sent some type of matrix or some type of
13   spreadsheet.  Right?
14   A          You mean like a listing of the claims that they were
15   going to look at?
16   Q          Yes.
17   A          Yes.
18   Q          And it would be each claim and then -- so, it had
19   the prescription numbers, the date that it was filled,
20   information about the claims, the value of the claim, you
21   know, who prescribed it, the members name, like all of those
22   things.  Right?
23   A          I don't believe so.  I think it's the prescription
24   number, the date of fill, and it could list the medication
25   name, but it doesn't give -- because of HIPAA, we use the
```

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 81 of 117  PageID #: 3815

1    minimal amount necessary so the pharmacy can pull the hard

2    copy for it.

3    Q          I want to show you a document.  Let's see if maybe

4    this will help refresh your recollection on what an audit is

5    produced by CVS.  This has nothing to do with this case

6    specifically, so don't worry.

7    A          Okay.

8    Q          All right.  And I'm not going to ask you to testify

9    from that document at all, it literally has nothing to do with

10   this case, but if you can take a look at it, see if that helps

11   refresh your memory about what information is produced in an

12   audit for CVS?

13   A          So, this is the last part of the audit.  So, there

14   is different things.  So, when we send out a list to the

15   pharmacy, it's actually a checklist.  And there is usually

16   little boxes next to it that say, okay, here's prescription,

17   for instance, this one, 0106492, date of fill, 9/26, so that

18   the pharmacy can go ahead and pull it.  This is what goes back

19   to the pharmacy once the audit, the initial stages have done.

20   So, it's little bit different phase versus when you said up

21   front.

22   Q          Okay.  I apologize for that.  So, but at some point

23   that document goes back.  It gives as much information as

24   possible.  Right?

25   A          It gives the information that the pharmacy needs in

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 82 of 117  PageID #:
3816

1    order to respond to the audit, yeah.

2    Q        Okay.  And, in fact, at the end of each column it

3    says what the issues are?

4    A        Correct.

5             MR. SCHWARTZ:  Sorry, Judge.  I can't remember what

6    I went over and I don't want to ask the same questions twice.

7             THE COURT:  That's all right.

8    BY MR. SCHWARTZ:

9    Q        Do you know what a gag clause is?

10   A        Yes.

11            THE COURT:  A what?

12            MR. SCHWARTZ:  Gag clause.

13            THE COURT:  Gag clause?

14            MR. SCHWARTZ:  Yes.

15   BY MR. SCHWARTZ:

16   Q        What is it?

17   A        In my mind it's a confidentiality provision.

18   Q        And what is it supposed to keep confidential?

19   A        Depends upon what the gag clause was with respect

20   to.

21   Q        What about the cost of prescription medications if

22   paid by cash versus through the insurance?

23   A        I believe that the pharmacy is not able to go ahead

24   and tell them what Caremark paid them, however, that same

25   member would be able to look up on their EOB and see what

1    their plan sponsor paid.

2    Q        And, in fact, the pharmacy is not able to tell the

3    patient or the person asking for the prescription if they paid

4    cash it would be cheaper or a different price than if they

5    paid through their insurance.  Right?

6    A        Under our contract it's not the case.  I believe

7    that's Express Scripts and Optum had that contract.

8    Q        Okay.

9    A        And with this page, please don't lose that.  I don't

10   need to make the 5:00 news for PHI being out.

11           MR. SCHWARTZ:  Don't worry.  It's not going

12   anywhere.

13           If I can have a minute, Judge.

14           (Brief pause.)

15   BY MR. SCHWARTZ:

16   Q        My co-counsel just told me that actually you

17   conducted that audit.

18           THE COURT:  Did what?

19   A        Was it First Coast?

20   Q        Yeah.

21   A        I saw my name in two of the audit files, too, when

22   they came up on the Central Rexall, and the other one, I saw

23   my name in, and it was like, oh, that was me.

24           MR. SCHWARTZ:  And in that -- well, strike that.

25   That's all I have.  If I can have the document back?

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 84 of 117  PageID #: 3818

1          THE WITNESS:  Yes, please.

2          THE COURT:  Is that all?

3          MR. SCHWARTZ:  Yes, sir.

4          THE COURT:  Let me ask one question before you

5   leave, Mr. Schwartz, because I want to give you an opportunity

6   to follow up.  I was thinking we've referred a lot to these

7   television ads that we all see.  It seems to me that the

8   difference between those ads and what is alleged to have

9   happened here is that at the end of those ads, the

10  pharmaceutical companies are clearly advertising the product,

11  they're saying ask your doctor.  Here, the allegation is that

12  the health care professional was for a lack of better word a

13  captive of the marketers.  Okay.  So, I mean, I see that as a

14  pretty significant difference as I've pondered it.  The

15  reason -- if you want to follow-up with the witness or

16  something or even respond to what I've said --

17          MR. SCHWARTZ:  Sure.  I can ask the witness a quick

18  question about that.  Based upon the research we've done there

19  is nothing prohibited legally by doing that, but --

20          THE COURT:  By having a captive health care

21  provider?

22          MR. SCHWARTZ:  Well, it's that the marketers have

23  made a physician available, but they don't have to use that

24  physician.  There is no requirement that if I'm a marketer,

25  and I'm talking to you and I'm like, hey, Judge, I've seen

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 85 of 117  PageID #: 3819

1    that your back is hurt, I've got a pain cream, I've got a

2    doctor you can talk to.  You can say I've got my own doctor.

3    And, in fact, I believe in this case --

4            THE COURT:  What would happen, what do you think, I

5    mean, it's speculation, I'm not aware of a single case that

6    that happened, but what would have happened if one of, if a

7    marketer said here's and the prospective patient said, hey,

8    I'm going to take this to my doctor, see what they say.  What

9    would have happened?

10           MR. SCHWARTZ:  I believe that they'll be some

11   testimony on that because that's how it started as such --

12           THE COURT:  If there is going to be -- good.  Okay.

13   Thanks.  All right.

14           MR. SCHWARTZ:  I believe so.

15   BY MR. SCHWARTZ:

16   Q      But I do have a follow-up.  So, as to what the judge

17   was saying --

18           MR. CLARK:  I believe that Mr. McCall was signaling

19   he'd like to respond.

20           THE COURT:  Okay.  Well --

21           THE WITNESS:  I was just going to agree with you.

22   It seems like that in that case where the marketer has his

23   guy, you're usurping the doctor/patient relationship, which

24   once you break that, everything else is kind of out the door.

25

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 86 of 117  PageID #: 3820

1    BY MR. SCHWARTZ:

2    Q        All right.  But there is no requirement that that

3    person see the doctor that is suggested.  Right?

4    A        I don't know the facts of this case, if they're

5    required to see that doctor, I think any patient can go see

6    any doctor they want.

7    Q        Sure.  And really there is no difference if that

8    advertisement is run and a person that goes into a Minute

9    Clinic to talk to one of your nurse practitioners and says,

10   hey, I'm interested in this, and then it's filled literally

11   steps away from the same pharmacy.  Right?

12   A        Yeah.  I think that would still fall within the

13   doctor/patient relationship, you know, they're just asking the

14   nurse practitioner, which when I say doctor/patient

15   relationship that means nurse practitioners, PAs as well.

16           THE COURT:  What would happen if pharmaceutical

17   company ad said call Dr. Such-and-Such at this phone number.

18   I suspect that's illegal.  I mean, you know, now lawyers do it

19   all of the time.  Lawyers do it all of the time, but I don't

20   know that I've ever seen pharmaceutical company advertising

21   for you go see our doctor at this number, but at any rate.

22           THE WITNESS:  In Medicare usually it's called

23   steering.  You're not allowed to do that.  And a lot of the

24   state laws do that, too.

25           THE COURT:  Okay.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 87 of 117  PageID #: 3821

1    BY MR. SCHWARTZ:

2    Q          With who, Medicare?

3    A          Medicare.  And like my home state of Arizona where I

4    practiced before I went over to Caremark, we have a rule that

5    you can't steer, to the point where you can't even with a

6    prescription pad, you can't give your pharmacy name on there

7    to a doctor because that's directing the patient.

8    Q          There is state by state guidelines.  Right?

9    A          Yes.

10   Q          It's not a federal guideline unless it deals with

11   Medicare?

12              THE COURT:  I think that may be a significant

13   difference here.  I'm just making an observation, because,

14   again, and I'm not saying this in jest, lawyers do it all of

15   the time.  And I think that there must be a judgment

16   somewhere, you know, a policy judgment, have you been injured

17   by asbestos, have you been in a car wreck, call lawyer John

18   Smith at this number and we're going to fix you right up, so,

19   okay.  All right.

20              MR. SCHWARTZ:  Thank you.

21              THE WITNESS:  Thank you.

22              THE COURT:  Who else wants to cross-examine this

23   witness?  Mr. Walden.

24              MR. WALDEN:  Yes, Your Honor.

25                             CROSS-EXAMINATION

BY MR. WALDEN:

Q        Good afternoon, Mr. McCall.  My name is Zack Walden.
I represent Michael Chatfield in this case.  And despite the
large stack of papers I walked up here with, I don't think
this is going to take nearly as long as that would indicate.
You mentioned a gatekeeper at a few different points or
perhaps we have and you agreed with it.  The gatekeepers that
we've been referring to, you would agree that one of those
gatekeepers would be a health care provider?

A        Like a doctor, yes, and a pharmacist.

Q        Or nurse --

A        Nurse practitioners or PA as well.

Q        And then the pharmacy would be the other gatekeeper.

A        The pharmacist would be the gatekeeper.

Q        The pharmacist?

A        Yes.

Q        Thank you.

         THE COURT:  They have by definition, both of those,
all of those professionals have to be licensed by a state,
and, therefore, they are subject to regulation and rules set
by each individual state.  Right?

         MR. WALDEN:  That's my belief.

         THE COURT:  Just like any other professional?

         THE WITNESS:  Yes, the pharmacist also if they fill
a prescription that's dangerous, they also have liability for

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 89 of 117   PageID #: 3823

1    doing that.

2    BY MR. WALDEN:

3    Q        Thank you.  We talked a little bit about

4    confidential and proprietary information.  The manual that Mr.

5    Schwartz shared with you, that is proprietary information from

6    CVS Caremark.  Correct?

7    A        That is correct.

8    Q        The formulary would also be proprietary.  Right?

9    A        I don't know if the formulary is.  So, most of the

10   insurance companies, like state of Tennessee, FAP, they post

11   their formulary on line that says what's covered.  And they

12   might even post it in the tiers, so I don't know if that would

13   be proprietary and confidential, although, they probably put

14   it behind like a website just for the members.

15   Q        Okay.  There was something that you told Mr.

16   Schwartz that I found interesting.  You said that the pharmacy

17   cannot tell a patient what Caremark paid for their

18   prescription.  Is that correct?

19   A        That is correct.

20   Q        And you told Mr. Clark, was it Mr. Clark, it's been

21   a long morning, you told Mr. Clark all of the things that you

22   believe to be material or at least many things.  You would not

23   expect a patient to know what Caremark is going to pay for a

24   prescription when they get prescribed medication.  Is that

25   correct?

1    A          That is correct.

2            THE COURT:  Can I stop you there?  Because --

3            MR. WALDEN:  Yes.

4            THE COURT:  -- based upon my experience, and as I

5    said earlier, I do use CVS.  And I have had the experience, I

6    bet you pretty much everyone has, of going into CVS and then

7    them telling me how much I owe for the prescription,

8    obviously.  Okay.

9            THE WITNESS:  Yes.

10           THE COURT:  And I can't remember of them ever

11   telling me, come to think of it, what my insurance paid.  But,

12   you know, I guess I could give some rough surmise about what

13   that might be because I've had the experience also of CVS

14   physicians, and I'm very grateful for this, saying you got to

15   pay this much for it after your insurance.  And I say that's

16   too much, I'm not going to pay that.  They'll say, hey, let us

17   look for a coupon for you.  So, I guess, the rules are, they

18   can't tell me how much my insurance has paid, but they can

19   give me information that might permit me to make a pretty

20   educated guess about what my insurance, I mean, is that the

21   way it works?

22           THE WITNESS:  Yeah.  They actually have an ethical

23   obligation to get you in something cost effective.

24           THE COURT:  Okay.  I guess the only thing I'm

25   pointing out, you can sort of in a rough way, you can sort of

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 91 of 117  PageID #: 3825

1    back end into the information that apparently they are legally

2    prohibited from providing.

3              THE WITNESS:  And in the documents that I was shown

4    earlier, you could see that like where it was 2.9 million and

5    Caremark actually paid $40,000 more, we don't want that to get

6    out because we don't want Express Scripts to know how much we

7    charge pharmacies −−

8              THE COURT:  As a matter of competitive advantage?

9              THE WITNESS:  Exactly.  Whereas, the patient can see

10   what FEP paid if they go on the explanation of benefits.

11   BY MR. WALDEN:

12   Q         And I understand.  To the judge's point, is what

13   Judge Mattice just described to you, is that sometimes known

14   as the cash option?

15   A         No.  That would not be the cash option.  That would

16   be finding a coupon, which is something that's allowed in the

17   commercial space to offset the patient pay amount.

18   Q         So, what Judge Mattice is proposing, the amount that

19   he would end up paying would still be the amount after the

20   coupon not the amount necessarily that Caremark has paid?

21   A         Correct.

22   Q         So, before anyone ever gets to the pharmacy, when

23   they are prescribed a medication by a health care provider,

24   they typically would not know how much Caremark is going to

25   pay for that medication?

1    A          At the time this was taking place, yes.  There is

2    different options today.

3    Q          Okay.  And the price that I'm referring to, you said

4    earlier that you, and I'll use the global, you being CVS

5    Caremark, you actually negotiate those prices with the

6    pharmacy.  Correct?

7    A          Correct.  AWP price and the amount off that AWP

8    that's taken.

9    Q          I believe you talked earlier that there was a

10   concern that marketers would be acting for the purpose of a

11   profit.  Is that correct?

12   A          Correct.

13   Q          CVS Caremark acts for the purpose of a profit as

14   well.  Right?

15   A          That is correct.

16   Q          Matter of fact, I had the opportunity to read a

17   resume.  Do you remember providing a resume to the government?

18   A          I believe it was two years ago, yes.

19   Q          Well, perhaps it's an old resume.  At many points in

20   your resume, you actually -- you have a list of

21   accomplishments.  Right?

22   A          Correct.

23   Q          As many of us put in resumes.  Many of your

24   accomplishments would include initiatives that you took to

25   minimize expenses for CVS Caremark.  Right?

1    A        Yes, sir.

2    Q        And for savings to your clients?

3    A        Yes.

4    Q        Those clients are insurance companies?

5    A        Correct.

6    Q        Insurance carriers.  What is the proper term?

7    A        Plan sponsors.

8    Q        Plan sponsors.  Okay.  So, profitability is also

9    something that's important to you as well as the plan

10   sponsors?

11   A        Plan sponsors don't really care if we make a profit.

12   I think from CVS Caremark we want to make a profit, a

13   reasonable profit.  The plan sponsor is more interested in the

14   other statement where we save them money.

15   Q        Perfect.  Thank you.

16            THE COURT:  Say that again.  Say it one more time.

17            THE WITNESS:  The plan sponsors don't care if CVS

18   Caremark makes a profit at all.

19            THE COURT:  They want to pay as little as possible?

20            THE WITNESS:  Bingo.  Yeah.  Exactly.  And get cost

21   effective care.

22            THE COURT:  Like any other economic transaction.  I

23   mean, the purchaser is always going to want to pay as little

24   as possible.  Possibly -- well, sometimes within the bounds of

25   the law and sometimes not.  Right?  I mean --

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 94 of 117  PageID #: 3828

1       MR. WALDEN:  Yes, Your Honor.

2       THE COURT:  Basic economics.  For instance, I guess

3  what's on my mind, theoretically, Judge Mattice may be in New

4  York City with his wife.  And he may go out on the street and

5  know that his wife wants a Louis Vuitton handbag.  He goes

6  over to the Louis Vuitton store on Fifth Avenue.  No.  But

7  walks back through Times Square and on the sidewalk of Times

8  Square, lo and behold, Louis Vuitton handbag for 10 bucks.

9  Now we're talking.  Now, if Judge Mattice theoretically were

10 to buy that, he could have just committed a crime, so this is

11 why this is all theoretical, you know --

12      MR. WALDEN:  Do we need to have a quick recess for

13 Mr. Piper to prepare --

14      THE COURT:  You mean to have the transcript

15 expunged?  I said this is all theoretical.

16      MR. WALDEN:  We'll get an immunity letter I'm sure

17 from Mr. Piper.

18      THE COURT:  I was just exploring the boundaries of

19 economic theory.

20 BY MR. WALDEN:

21 Q       And I think Judge Mattice has a good point, though,

22 it would also be important to CVS Caremark to operate within

23 the bounds of the law.  Right?

24 A       Yes, we do.

25 Q       And you, CVS Caremark, and to a larger extent CVS

1    Health is a very complex corporation?

2    A        Yes.

3    Q        It's a multi-billion dollar company.  Fair to say?

4    A        I believe so, yes.

5             THE COURT:  It was pretty high up in the Fortune

6    500.

7             THE WITNESS:  I think we're number three after we

8    merged with Aetna.

9             THE COURT:  Number three?

10            THE WITNESS:  Yeah.

11            THE COURT:  Whoa.  Very big.

12            MR. WALDEN:  Number three on the Fortune 500.

13            THE COURT:  Fortune 500.  Yeah.  That's pretty big.

14   BY MR. WALDEN:

15   Q        And you have numerous government contracts with

16   Medicare and Medicaid and the like.  Right?

17   A        Yeah, Medicare, Medicaid, ERISA eligibles, and we

18   also cover quite a few state government, like the employee

19   plans.

20   Q        So, compliance is something that is probable a major

21   facet of CVS operations.  Correct?

22   A        Major facet of our operations and a major time

23   killer for myself, yes.

24   Q        So, I'm imagining you have huge compliance teams?

25   A        We do.  And lots of learnings that we have to do on

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 96 of 117   PageID #: 3830

1    a regular basis.

2    Q          A lot of learnings and probably lots of lawyers?

3    A          Some would say too many.

4    Q          There is no such thing as too many lawyers,

5    Mr. McCall.  And on occasion, sometimes even with all of your

6    trainings, even with all of your too many lawyers, sometimes

7    compliance mistakes are still made, aren't they?

8    A          Absolutely.

9    Q          Because health care law is incredibly complex.

10   Right?

11   A          Yes.

12   Q          And health care compliance is extremely complex.

13   Right?

14   A          It is.

15   Q          And even if you're trying your hardest, if CVS

16   Health is trying its hardest to do things the right way,

17   sometimes the mistakes are still made.  Right?

18   A          I would agree.

19   Q          You talked about the audits of Soothe, Central

20   Rexall and Willow Pharmacy.  Right?

21   A          Correct.

22   Q          I believe that Mr. Schwartz asked you to look into

23   that.  You don't know that those audits were based upon the

24   claims made in this particular case.  Right?

25   A          Actually, I do.  At least one of the pharmacies, I

1    believe it was Willow Pharmacy, the auditor called out

2    specifically Craven and -- Nurse Practitioner Craven and why

3    they were prescribing so many prescriptions for a family nurse

4    practitioner.  So, I know like at least some of the audits

5    they were with those claims.

6    Q        And you all took a civil remedy in that situation.

7    Correct?

8    A        Meaning did we do an administrative thing under our

9    contract?

10   Q        You canceled the contract?

11   A        Yes.  Yes.

12   Q        And that was not the case for Soothe and Central

13   Rexall?

14   A        Soothe was terminated for audit, also.  Central

15   Rexall after a number of delays from their attorney, we were

16   preparing to close out that audit for 1.2 million, and they

17   closed shop.

18   Q        They went out of business.  And you said all of

19   those audits were based off of using sham coupons?

20   A        Yes.  There was a company that was referenced

21   specifically first in Soothe called Trust Coupons by

22   Affordable Medication Solutions, the owner of that was a focus

23   of ours, Jay Wiley, and I believe he just pled guilty to

24   facilitating compound fraud.

25   Q        Okay.  Great.  Thank you.  I believe you said

1   earlier that your clients are the -- I've forgotten --

2   A          Plan sponsors.

3   Q          Plan sponsors.  Thank you.  And I believe in your

4   direct testimony, you said that these plan sponsors hire CVS

5   Caremark to rely upon their expertise.  Right?

6   A          That is correct.

7   Q          And that would be your duty to advise them about the

8   pharmacy benefit management process.  Right?

9   A          Yes.  Different groups within Caremark would advise

10  on different parts of the benefits.

11  Q          And I am sorry I guess when I say you, I mean CVS

12  Caremark.  Today you're CVS Caremark, congratulations, you're

13  a multi billion dollar company.

14  A          I understand you all is all you all in this case.

15             THE COURT:  And they give it all to you.  Right?

16             THE WITNESS:  Mrs. McCall gets those 10-dollar

17  purses.

18             THE COURT:  Yeah.  Right.

19  BY MR. WALDEN:

20  Q          As part of the advice that CVS Caremark would give,

21  that would include giving advice about different edits that

22  you can put in place into the system.  Correct?

23  A          That is correct.

24  Q          And CVS Caremark was fully capable of putting edits

25  relating to compound claims in 2014.  Right?

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 99 of 117   PageID #: 3833

1    A        We were fully capable of advising clients and plan

2    sponsors to put those in.  We actually need the plan sponsors

3    to do it for themselves or tell us to do it.  We can't take

4    independent action.

5    Q        Okay.  Great.  Thank you.  Then I want to talk just

6    a little bit about the claim itself.  Would you agree that the

7    claim submitted -- first of all, claims are submitted

8    electronically as you previously said?

9    A        Correct.

10   Q        And it goes to that football field of computers.

11   And that claim is almost instantly adjudicated.  Right?

12   A        Correct.

13   Q        And that means it's approved or denied?

14   A        Uh-huh.

15            THE COURT:  And it can be appealed if the computer

16   gets it wrong.  Right?  By the --

17            THE WITNESS:  Yeah.  I've been told the computer

18   doesn't get it wrong, but there is different reject codes that

19   come back.  And so, the pharmacy has the chance to cure that

20   reject.  You get the wrong number ID, you fix it, and it will

21   go through.

22   BY MR. WALDEN:

23   Q        The claim that is submitted by the provider, the

24   provider being the pharmacy, constitutes a representation by

25   the provider to Caremark.  Is that correct?

UNITED STATES DISTRICT COURT

1  A        That is correct.

2  Q        And that's in fact how CVS Caremark chooses to view

3  it.  Right?

4  A        Yes.

5  Q        I believe if you look closely in that manual and I

6  won't ask you to, but that language may be found in there.

7  A        Yes.

8  Q        So, the only representation that is made to Caremark

9  when a claim is adjudicated is the information that is

10  contained in the claim?

11  A        Yes.  And that computer transmission is all that

12  comes in.

13  Q        Information would be the name of the health care

14  provider?  Health care provider's name would be part of that

15  claim?

16  A        The identifier, the NCPDP number, and then we would

17  match it up to the name.

18  Q        So, that's a health care providers provider number?

19  A        Yes.

20  Q        Which is an identification number as well as the

21  name or perhaps identification number of an eligible person?

22  A        That's correct.

23  Q        Which is your patient.  Not your patient, but a

24  patient?

25  A        My patient.

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 101 of 117  PageID #: 3835

1    Q        And it would include the name of the drug?

2    A        Yes.  It's the NDC code, which would correlate over

3    to the drug, the product, and the package size.

4    Q        And that claim is submitted before a patient pays a

5    copay.  Right?

6    A        Correct.

7    Q        So, it does not contain information about who is

8    paying a copay?

9    A        It does not.

10   Q        It does not contain information about how a patient

11   found a health care provider?

12   A        It does not.

13   Q        And it does not make a representation about how the

14   product could have been marketed to the patient?

15   A        It does not.

16   Q        And it does not make a representation if that

17   patient himself or herself is, in fact, a marketer?

18   A        It does not.

19   Q        And it does not contain a representation that a

20   particular prescription was recommended to someone by a

21   marketer?

22   A        It does not.

23   Q        For a compound claim, which I believe is what we're

24   talking about today, it would not contain information about

25   who created the formula.  Right?

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 102 of 117  PageID #: 3836

1   A        No, it would not.

2   Q        It would not contain information if that formula was

3   on a preprinted pad?

4   A        No, it does not.

5   Q        It would not indicate why the patient needs the

6   medication such as a diagnosis?

7   A        For the most part, it's an optional field for the

8   person to put in.  On certain medications, it's required to go

9   through, but for compounds, generally, it's not.  I'm trying

10  to be precise not pedantic, I apologize.

11          MR. WALDEN:  Perfect.  I appreciate it.  Precision

12  is good.  Just a moment, Your Honor.

13          (Brief pause.)

14          MR. WALDEN:  That's all of the questions I have,

15  Your Honor.  Thank you, Mr. McCall.

16          THE WITNESS:  Thank you.

17          THE COURT:  Other cross-examination?

18          MS. MAIO:  Just a few questions.

19          THE COURT:  Ms. Maio.

20                       CROSS-EXAMINATION

21  BY MS. MAIO:

22  Q        Good afternoon, Mr. McCall.  My name is Gianna Maio

23  and I represent Billy Hindmon.  And I'm bringing the manual

24  back to the podium, unfortunately, I may have just a couple of

25  questions for you.

```
1    A          I may need you to blow it up on the screen if you

2    do.

3    Q          Absolutely.  I will.  I believe you testified on

4    direct that CVS Caremark processes approximately two million

5    claims per day?

6    A          Back in when this took place, yes.

7    Q          Okay.  And I know that you went quickly through the

8    number of audit teams that you are responsible for

9    supervising.  And can you tell me, at least give me a ballpark

10   on how many auditors you have monitoring those two million

11   claims?

12   A          So, we have approximately six to seven investigators

13   today and it was probably about five at the time.  On-site

14   auditors, I want to say maybe 10 or 12.  And then the daily

15   review team, probably 35, 37, plus the associated managers

16   that are directly over the teams.

17   Q          Okay.  So, I'm going to say ballpark you had about

18   50 individuals, give or take a few?

19   A          That were direct auditors underneath the direct

20   teams it was about 80.

21   Q          Supervising two million claims per day?

22   A          That's correct.

23   Q          Now, I know that you said that you had a chance to

24   review the provider manual.  And, again, this is -- I

25   understand that you are responsible or partner with
```

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 104 of 117  PageID #: 3838

1    approximately is it 8,000 plan sponsors?

2    A          About 4,000.

3    Q          4,000.  I'm sorry.  But the network provider manual

4    is intended to provide pretty generic information that should

5    be broadly applicable to most providers, would it not?

6    A          I would say it's a pretty good instruction book of

7    pharmacies how to act, behave, and submit claims.

8    Q          And back in -- I know that you say that there was

9    that change as of January 1 of 2015 to the network provider

10   manual, which added, I guess it was a specific prohibition for

11   marketing compounds.  Is that a fair summary of what you

12   testified?

13   A          It was requiring the pharmacist to use professional

14   judgment appropriately.

15   Q          Okay.  So, there was no blanket ban even with the

16   January of 2015 change on marketing -- on network providers

17   marketing -- hiring marketers for compounded creams?

18   A          On 1/1/15.  Is that what you're referring to?

19   Q          I thought that you were saying the change happened

20   on 1/1/15.  Do I have that date wrong?

21              THE COURT:  What did you say?  What was the date?

22              MS. MAIO:  January 1 of 2015.

23              THE COURT:  That was what I understood him to talk

24   about, to say.

25              THE WITNESS:  Yeah.  That's when we clarified it to

Case 1:18-cr-00011-HSM-CHS   Document 334   Filed 11/01/19   Page 105 of 117   PageID #: 3839

```
1   say no part of any compound prescription could be outsourced.
2   BY MS. MAIO:
3   Q        Okay.  And that if they, if a provider were to
4   employ a marketer for a compounding medication or compounded
5   medication rather, they were required to use their
6   professional judgment in doing so?
7   A        Yeah, for every claim, they're required to use their
8   professional judgment.
9   Q        Okay.  So, and there are multiple references in this
10  manual to network providers engaging in marketing, are there
11  not?
12  A        I don't believe so.  I don't know.  At lunchtime, I
13  wasn't looking specifically for that.
14  Q        Okay.  Well, let me turn to -- my page numbers may
15  be off.
16           THE COURT:  While you're looking for that, let me
17  ask him a question, Ms. Maio.  I'm struck by the reference to
18  the date January of 2015 for this reason, because of other
19  testimony that I've heard in this trial.  It's my
20  understanding that in, actually, about January of 2015,
21  government representatives, along with representatives of the
22  pharmaceutical company may have begun to come to grips that
23  we've got a real problem regarding compounding pharmacies and
24  the way that, you know, and there was some tightening up
25  overall of at least government rules and maybe private
```

UNITED STATES DISTRICT COURT

1  industry rules regarding compounding.  I guess, all I'm

2  asking, is that January, 2015 just a coincidence or was this

3  part of some broader -- and I don't want you to explain what

4  the broad -- I'm using a date to say, you know, I bet this is

5  part of a broader effort.

6          THE WITNESS:  Yes.  So, there was a shift in the

7  standard that you submit a claim, and it was in 2011 and 2012.

8  And before we used to basically compounds be submitted for the

9  most expensive ingredients.  So, say you have a chicken pot

10 pie, you are expensing the cost of the chicken that goes into

11 that.  When that shifted over in 2012, that's when all of a

12 sudden you get paid for the eggs, the flour, the chicken,

13 everything in that.  And then we saw a -- I would say it's a

14 scheme, an abuse scheme, that were happening between

15 pharmacies, manufacturers, such as like Freedom

16 Pharmaceuticals where they started to, the pharmacies were

17 actually asking them to raise the price, raise that AWP price

18 so that they would make more.  And so, I would say, my hair

19 started falling out quicker in 2012.  We only release manuals

20 on a certain cadence.  So, by the time we hit 2015/1/1, we had

21 been fighting this for about three years.

22          THE COURT:  Okay.

23 BY MS. MAIO:

24 Q        So a follow-up question on the change in 2011, my

25 understanding is that there was a shift not only in billing

1    based upon the most expensive ingredient, but also my

2    understanding is that the scope was broadened in the sense

3    that for compounded drugs, you could bill or potentially bill

4    for up to 10 or 12 ingredients which would also greatly

5    increase the price of the compounded medication.  Is that --

6    A         It actually wasn't expected to greatly increase the

7    cost of the compound prescriptions, it was designed so that we

8    would have more safety so we could run what we call drug

9    utilization review or DUR checks to see if there is a drug

10   drug interaction.  So, it was designed for that, but the

11   unintended consequence was it seems that we got into this

12   whole scheme of abuse.

13   Q         Okay.  But I want to make sure that I understand.

14   That part of that change in the law in 2011 led to certain

15   components of compounded drugs, for example, we've used the

16   example of Gabapentin in prior witness testimony.

17   A         Yes.

18   Q         And my understanding is that after the 2011 change

19   in the law, there were specific ingredients, such as

20   Gabapentin, that saw a 5,000 percent increase based upon the

21   change in the law?

22   A         I would say it was due to the change in the law,

23   yes.

24   Q         And there were other ingredients that had 1,000

25   percent increases, astronomical degrees of price increase.

1    Right?

2    A        I would agree with that.

3    Q        Okay.  And going back to my question about

4    marketing, let's just stay on a generic level rather than

5    looking at the page specific references.  I think you would

6    agree with me that in 2014, the language allowed for network

7    providers to engage in marketing as long as they followed

8    their professional judgment?

9    A        Yes.  As long as they weren't interfering with that

10   doctor/patient relationship.  Like if you had a marketer that

11   went to a doctor and said, hey, we have a compound pharmacy,

12   here's our phone and address, if you want to send someone our

13   way.  That would be, that would have been allowed.

14   Q        Okay.  And there is also mention in the manual,

15   there is reference to preprinted prescription forms, is there

16   not?  Preprinted pads?

17   A        If you can put that on the screen, I'd appreciate

18   it.  We have so many different versions of the manual.

19   Q        Let me just ask you generically because I know you

20   said that was a concern with respect to materiality.  And I'll

21   show you one specific reference.  This is on Page 20 of the

22   manual.

23           MR. CLARK:  Can I look at that?

24           (Brief pause.)

25

1   BY MS. MAIO:

2   Q        Sorry, I'm using the wrong version.  Let me just ask

3   you generically.  My understanding is that preprinted

4   prescription forms are generally an issue when there is a

5   controlled substance that's included on that preprinted form.

6   Is that fair?

7   A        I don't think I would say that.  I would say that --

8   so, preprinted prescription pads are okay in the course of,

9   normally where you would see them would be oncology, someone

10  gets cancer and they have basically three or four medications

11  that I have to give, two cancer drugs, then a rescue, and then

12  maybe some hydration as well.  So, that's where preprinted

13  pads are really a safety issue for the patient to help them to

14  prevent for unintended consequences.  There is specific state

15  laws that makes having controlled substances on one of those,

16  like Florida, becomes an issue.  I would deem it more a red

17  flag for us than an outright prohibition.

18  Q        Okay.  And I think that you testified on direct that

19  some of the issues that we discussed with respect to alleged

20  materiality in this particular case would cause concern

21  because of the fact that there is a potential that some of

22  these actions may prioritize profit over patient care?

23  A        I agree.

24  Q        And, also, I think that you said that there are

25  ethical obligations that the providers, in particular, have to

Case 1:18-cr-00011-HSM-CHS  Document 334  Filed 11/01/19  Page 110 of 117  PageID #: 3844

```
 1    ensure that they're being cost effective or as cost effective

 2    as possible with what the patients are being charged?

 3    A        That's correct.

 4    Q        Now, I believe you said earlier that your company,

 5    CVS Caremark, is third on the Fortune 500 list?

 6    A        That's my understanding.

 7    Q        Your profits last year were around 195 billion

 8    dollars with a B.  Is that right?

 9    A        I could not attest to that.  I can tell you it

10    didn't end up in my paycheck.

11    Q        Okay.

12             THE COURT:  We can check that out.  I may can take

13    judicial notice.  It probably says in the latest edition to

14    the Fortune 500.

15             MS. MAIO:  If I may have just a moment, Your Honor.

16             (Brief pause.)

17             MS. MAIO:  I don't have any further questions, Your

18    Honor.

19             THE COURT:  Other cross-examination of this witness?

20    If not, redirect, Mr. Clark?

21             MR. CLARK:  Your Honor, can we take a brief recess

22    before?

23             THE COURT:  Yeah.  How much time do you need?

24             MR. CLARK:  Ten minutes.

25             THE COURT:  Let's take 15.
```

UNITED STATES DISTRICT COURT

 1              MR. CLARK:  Thank you.

 2              THE COURT:  We'll come back in session at 2:45.

 3              (Short recess.)

 4              THE COURT:  All right.  Cross-examination, Mr.

 5      Clark?

 6              MS. MAIO:  Your Honor, if I may.

 7              THE COURT:  Oh, okay.

 8              MS. MAIO:  There was one follow-up question that I

 9      just wanted to ask.

10              THE COURT:  All right.  Go ahead.

11              MS. MAIO:  Thank you.

12      BY MS. MAIO:

13      Q       I know you said you reviewed and personally audited

14      some of the claims that are at issue in this case from 2014?

15      A       I was involved with the audit.  I did not personally

16      audit.

17      Q       Okay.  So, you're probably aware of the fact there

18      were no new prescriptions submitted by any of the defendants

19      here after December 9 of 2014?

20      A       I was not aware of that.

21      Q       Okay.  But, again, the change to the provider manual

22      that we discussed with respect to marketing occurred on

23      January 1 of 2015.  Correct?

24      A       Yeah.  That's when it became effective.

25              MS. MAIO:  Thank you.  No further questions.

1              THE WITNESS:  Sure.

2              THE COURT:  Mr. Clark.

3                        REDIRECT EXAMINATION

4    BY MR. CLARK:

5    Q         Mr. McCall, you were asked by Mr. Schwartz who was

6    the first of these attorneys that questioned you, I think you

7    have no evidence in the case that a marketer was recommending

8    a particular drug or deciding a particular drug that a person

9    would get.  Do you recall that question?

10   A         Barely, yes.

11   Q         Let me show you one example from Exhibit 2105, which

12   has been previously been introduced into evidence.  And I'll

13   represent to you it's been testified to that this is e-mail

14   correspondence, text message correspondence from one marketer

15   to an individual working under him.  I'll ask you to follow

16   along with me.  The text says, "okay, so Baylee and Skylar are

17   11 so pharmacy won't let us use more than one cream of

18   Fluticasone because it's too much for a child.  So I'll add

19   Skylar, Baylee and Avery a wellness tablet (19,000 in revenue)

20   and Valerie a wound and something else she wants which will be

21   around 22K total for those two."  Let me ask you, Mr. McCall,

22   who's making the decision as to what drug Baylee, Skylar and

23   Avery are going to get?

24             MR. WALDEN:  Your Honor, I'm going to have to

25   object.  He has no knowledge about who sent this text message.

1      THE COURT:  I was wondering, too.  The question was

2  did he -- as I understand, he had, I don't know if the word

3  personal was used, but he answered he doesn't have any

4  personal knowledge.  Okay.  So, if he's seen this before,

5  that's fine.

6  BY MR. CLARK:

7  Q      Have you ever seen this before?

8  A      I have not.  I wish I had.

9      MR. CLARK:  This is in evidence, Your Honor, it's

10 Exhibit 2105.

11     THE COURT:  Okay.

12 BY MR. CLARK:

13 Q      I'll ask that you read this.  And from the context

14 of that one text message, which I'm representing to you has

15 been testified to that this text message was sent by a

16 marketer in this case, who's making the decision, is it the

17 person sending this text message or is it a doctor?

18     MR. WALDEN:  Your Honor, I'm going to renew my

19 objection briefly.  He said he has no personal knowledge of

20 this text message.  He relied solely upon what Mr. Clark has

21 suggested to him that the text message is.  I think what the

22 government may be doing is showing him a fact and asking him

23 to express an opinion on it based upon his expertise, which

24 would --

25     THE COURT:  Could be that or maybe they're trying to

UNITED STATES DISTRICT COURT

 1   make him a corporate representative of CVS Caremark.

 2              MR. CLARK:  A 12(b)(6) witness so to speak.

 3              THE COURT:  That's a civil term.

 4              MR. CLARK:  Your Honor, it was --

 5              THE COURT:  Is he attributed with all of the

 6   information within the purview of CVS Caremark?

 7              MR. CLARK:  Your Honor, I don't believe he is for

 8   purposes of today.  But what I'm simply asking him is if he

 9   can read and from this text message, tell us as a lay person

10   if it's his opinion, or if it's obvious from the face of the

11   text message if the sender of this text message is the person

12   who's making the decision about the drugs an individual person

13   is going to get as opposed to a doctor or nurse practitioner.

14              MR. O'SHAUGHNESSY:  Your Honor, I don't want to

15   interrupt you.

16              THE COURT:  I mean, I'm just trying to figure --

17              MR. O'SHAUGHNESSY:  I think this is without

18   hardly -- well, not hardly, there is no context for this

19   witness to be able to understand this.  I'm familiar with the

20   facts and I can kind of remember some of this --

21              MR. CLARK:  Your Honor, the implication was made on

22   cross-examination that this did not happen.  The question and

23   I wrote it down, I believe it was word for word, because Mr.

24   Schwartz said, now, you testified that it would be material if

25   there was evidence that this happened, and then he told him,

```
1      but you have no evidence in this case that a marketer
2      recommended a product.
3                  MR. WALDEN:  Your Honor --
4                  MR. O'SHAUGHNESSY:  I'm not finished with my
5      objection.
6                  MR. CLARK:  I'm simply showing him this and asking
7      him if it's apparent that that's exactly what --
8                  THE COURT:  Here's the reason I'm, Mr. McCall, that
9      I'm permitting him to testify.  Because he does have certain
10     knowledge regarding how CVS Caremark handled matters such as
11     this, such as this.  And he is aware that this case involves
12     some such, you know, prescriptions or requests for that.
13     Correct?  But whether he has such granular information
14     regarding specific prescriptions, I've not heard yet.  And, I
15     mean, that's what I interpreted Mr. Schwartz was asking.  I
16     mean, am I --
17                 MR. CLARK:  I'm just trying to on recross rebut what
18     I believe was a false inference that was drawn from this
19     witness, which was that that did not happen by presenting
20     evidence which we contend shows that it did happen.
21                 THE COURT:  Who would draw an inference like that?
22                 MR. CLARK:  I don't know who would draw it.  I think
23     that that was clearly the inference in the question which was
24     that that did not happen in this case and, therefore --
25                 THE COURT:  Who draws inferences in this trial?
```

1      MR. CLARK:  That would be the finder of fact, Your

2 Honor.  And that was my point in all of this --

3      THE COURT:  In light of that, isn't it sort of a

4 foolish question?

5      MR. CLARK:  I would not hope not, sir, but, Your

6 Honor, I will withdraw it.

7      THE COURT:  I think you should.

8      MR. CLARK:  Thank you, Your Honor.  Mr. McCall,

9 thank you.  That's all of questions I have, Your Honor.

10     THE COURT:  May this witness step down and may this

11 witness be excused?  You're excused, Mr. McCall.  Thank you

12 very much.

13     THE WITNESS:  Thank you, sir.

14     (Witness excused.)

15

16     I, Shannan Andrews, do hereby certify that I

17 reported in machine shorthand the proceedings in the

18 above-styled cause held October 3, 2019, and that this

19 transcript is an accurate record of said proceedings.

20

21                    s/Shannan Andrews
                       Shannan Andrews
22                     Official Court Reporter

23

24

25

UNITED STATES DISTRICT COURT