## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **1:18-cr-11** |
| **v.** | ) | |
| | ) | **Judge Mattice/Steger** |
| **JERRY WAYNE WILKERSON,** | ) | |
| **MICHAEL CHATFIELD,** | ) | |
| **KASEY NICHOLSON,** | ) | |
| **BILLY HINDMON, and** | ) | |
| **JAYSON MONTGOMERY** | ) | |

## GOVERNMENT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and hereby offer these findings of fact and conclusions of law.

All defendants were named in Count One of the Third Superseding Indictment (hereinafter "Indictment"), conspiracy to commit health care fraud. The remaining counts (2 through 177) included a variety of offenses in which each defendant was individually named. Defendants Hindmon and Montgomery are the only two defendants named in Count 178, a conspiracy count charged under 18 U.S.C. § 371, alleging a money laundering conspiracy.

Trial in this matter began on September 11, 2019. Proof ended on November 14, 2019. The government called 36 witnesses in its case-in-chief. The defendants called six witnesses in their cases-in-chief. (Only defendants Chatfield and Wilkerson called witnesses.)

## FINDINGS OF FACT

### I.    The Conspiracy to Commit Health Care Fraud

Count One of the Indictment states that the defendants conspired, with others known and unknown, to defraud health insurance providers and government funded insurance by marketing

topical creams and other medications to individuals with reimbursable prescription drug coverage plans that paid for the creams and medications. The proof at trial showed that the conspiracy was led by Wayne Wilkerson. Three other defendants were on the next level down: Michael Chatfield, Kasey Nicholson and Billy Hindmon. The last-named defendant, Jayson Montgomery, was downlinked from Hindmon and was two levels below Wilkerson.

The proof at trial showed what the government has offered in previous written submissions. In total, insurance companies and Tricare paid a total of roughly $35,000,000 for the compounded medications in this conspiracy. Private insurance paid roughly $22,000,000 for prescriptions written by Candace Michele Craven, Toni Dobson, and Suzy Vergot as part of the scheme. (Exhibit 730.) Of this number for private insurance, Craven was responsible for roughly $21,000,000. Likewise, Tricare was billed roughly $13,800,000 for prescriptions written by Craven, Dobson, and Vergot as part of the scheme. Wilkerson (through Top Tier) made roughly $13,000,000 in commissions from the four pharmacies: Willow, Central Rexall, Florida Pharmacy Solution and Soothe. (Exhibit 716.) This number did not include the commission paid by Hamilton County Schools on the $954,000 that was billed to them (Wilkerson made roughly $400,000 in commissions on that scheme). Chatfield made $5,400,000 through Top Shelf. This number included the sale of Chatfield's "book of business" for $1,500,000 to Jimmy Collins (Rx Press). (Exhibit 716.) Nicholson's commissions were $938,740, of which she paid $204,000 to Matthew Perkins. (Exhibit 716.) Hindmon's commissions were $1,031,296. Jayson Montgomery's commissions were $337,068.17. (Exhibit 716.)

Of the five entities involved—marketers, health care professionals (doctors and nurse practitioners), customers (or "patients"), pharmacies, and insurance companies—defendant Wilkerson controlled, or acted in concert with, four of them. The only entities which were not

involved in the scheme were the private insurance companies (and the pharmacy benefits managers), and Tricare.

Each of the defendants was a "marketer" for the compounded medications. The defendants, and their downlinks, would approach a prospective customer, explain that they were marketing the compounded medications, inquire about the type of insurance the person had, and then attempt to recruit the person to order a prescription. The defendants generally had a prepared order form for the transaction. The order form went through several changes during the course of the scheme, but generally it involved pain cream, creams to treat skin conditions such as psoriasis or eczema, anti-aging creams, scar creams, wound management gel, wellness pills, and other creams to treat maladies such as stretch marks. The customers were generally informed that there would be no cost to them and were not told how much the creams cost their insurance provider. If the customer agreed to sign up for the medications, generally he or she was told that a health care professional (either a doctor or nurse practitioner) would call the customer to complete the prescription. (Some customers never received a call from a health care professional.) Additionally, as an inducement to order, some customers were offered an inducement disguised as a fee for a non-existent study or survey. The inducement generally would be in the $100 range, although some were paid more. Many customers also made a commission from their own creams. (See, Matthew Perkins, Josh Linz, Ryan McGowan.)

Occasionally, a customer would be approached about becoming a "sales representative" for the compounded medications. When that happened, one of the defendants would tell the customer that he or she could make a commission from any creams/medications they sold. These customers who became sales reps were frequently encouraged to form an LLC for the enterprise.

3

Many of them did; sometimes a defendant would pay, or otherwise arrange, for the LLC to be formed.

Usually, the medications came in the form of a cream which was provided in a non-descript plastic bottle. Many witnesses testified that the medications were either poorly labeled or looked "sketchy." (See, e.g., Striker, PageID# 5290; Callaway, PageID# 5778.)

The amount of money charged to the insurance company for each prescription varied. However, many of the prescriptions billed at $10,000 per prescription, and sometimes higher. Some of the prescriptions reimbursed at close to $15,000. There were instances where the defendants paid the co-payment to the pharmacy, or where the pharmacy itself would waive the co-pay. It was not unusual for one customer to have his/her insurance billed for over $100,000 for the medications, and in many cases much more. For example, Hamilton County Schools (through BCBS as a third party administrator) was billed approximately $800,000 for Keitha Booker and his daughter, Sydney Snyder, for compounded creams they ordered through Wilkerson. Through Josh Linz (a medically retired Marine) and his roommate, Wesley Daniel, defendants Wilkerson and Hindmon caused Tricare to be billed $770,000 for medications. Defendants Wilkerson, Chatfield and Nicholson each ordered medications in their own names and each received a commission on their own medications.

At first, Wilkerson and others used Candace "Michele" Craven, a nurse practitioner at Balanced Life, to write prescriptions. Wilkerson had no ownership interest in Balanced Life, nor was he an employee there: he was a sales rep who frequently called on Craven to write scripts for him. In July 2014, Wilkerson opened Karma Wellness ("Karma"), a business in Hamilton County which helped to facilitate the scheme. Karma's main business was beauty enhancement procedures such as Juvederm and Botox injections; however, it also served as a forum for writing

4

and faxing compounded cream prescriptions. (Craven, PageID# 2805.) Through Karma, Wilkerson employed doctors and nurse practitioners. Some of the health care professionals employed by Karma were Dr. Suzy Vergot and nurse practitioner Craven. Part of Ms. Craven's duties at Karma included the aforementioned beauty regimen treatments. However, about one-half of Craven's time was spent signing prescriptions for the compounded creams that Wilkerson and the others were marketing.

The relationship between the health care professionals and the customers was suspect. Consultations, when they actually happened, occurred over the telephone and without any in-person contact between the health care professional and the customer. (On rare occasions, a patient would come to Balanced Life to see Craven for a prescription. She estimated this occurred on "three or four" occasions.) (Craven, PageID# 2813.) After a cursory "tele-medicine" consultation, prescriptions were sent to the pharmacy to be filled. After receipt, the pharmacy filled the prescription, sent the bill to the insurance company, received reimbursement from the insurance company (or Tricare), then sent Wilkerson his commission (generally 35 to 40% of the amount paid by insurance). In turn, Wilkerson, through his company Top Tier, LLC, paid commissions to his "downlinks": Chatfield, Nicholson and Hindmon. Generally, Chatfield, Nicholson and Hindmon made 50% of the commission sent to Wilkerson, which represented approximately 17.5 to 20% of the total amount paid by the insurance company. Defendant Montgomery was downlinked from Hindmon and generally made 50% of Hindmon's commissions on the prescriptions Montgomery generated. Wilkerson and Hindmon each took their share of what Montgomery produced.

In making payments to the defendants, the pharmacies listed them as commissions. However, the commissions paid to Wilkerson, and in turn to his downlinks, amounted to a

5

prohibited illegal remuneration under the Anti-Kickback statute with respect to the Tricare claims. In the case of private insurance, the payment was not be per se illegal, but was certainly evidence of the scheme and conspiracy to defraud.

Other proof showed that the defendants paid for the assistance of an insider at Willow Pharmacy, Jared Schwab, in order to manipulate the formulas of the medications and to backdate or otherwise alter prescriptions sent to Blue Cross/Blue Shield (thereby circumventing the deadline by which BC/BS would no longer fill compounded prescriptions). Chatfield, with the assistance of others, signed up customers without their knowledge that they would be receiving the medications. These unwitting customers included his in-laws, George and Debbie Foster, his cousin, Matt Chatfield, and members of the Bowling family (Hal, Susanne and Emma).

## II. Proof Regarding Wayne Wilkerson

The proof at trial showed that Wilkerson was the leader of the conspiracy. Numerous witnesses testified that Wilkerson was at the top of the chain or the "pyramid." (See, e.g., Dawn Montgomery, PageID # 5086-87; Adam Staten, PageID # 4077.) Additionally, documentary evidence revealed that Wilkerson was the head of the scheme. (Kriplean, PageID# 6404-05, text exchange between Kirtis Green and Chatfield regarding Wilkerson sending their commissions.) In Exhibit 1908, an email dated January 9, 2015, to Chatfield, Nicholson, Hindmon and others, Wilkerson stated "Good News, guys!! This confirms what we already were anticipating. Tricare voted to continue covering compounding without a PA [prior authorization]. It's money making time. Saddle up." (Srock, PageID# 6190-91.) Counsel for the government doubts that the defendants are contesting Wilkerson was at the top of the organizational structure for Top Tier, LLC, therefore counsel will not address this issue further. Many of the exhibits admitted at trial also reveal that Wilkerson received commission payments from the pharmacies and, in turn, paid

out to the co-defendants (with the exception of Montgomery) their commissions on the medications.

### Candace Michele Craven

Before Wilkerson opened Karma, he and others had prescriptions signed through Craven at Balanced Life Medical. Wilkerson had no ownership interest or employment relationship with Balanced Life. (Craven, PageID #2784, 2788.) At Wilkerson's urging, Craven signed prescriptions for compounded medications without seeing the patients. (*Id.* at 2794-96.) While employed at Balanced Life, Craven was paid approximately $5,000 by Wilkerson for signing these prescriptions without seeing the patients. (*Id.* at 2799-2800.) Craven estimated that she signed prescriptions without seeing patients on ten occasions and there were multiple scripts on each occasion. (*Id.* at 2795-96.)

Later, Craven went to work for Wilkerson at Karma in July 2014. (Craven, PageID #2804.) A signature stamp was made for Craven. (*Id.* and 2801.) When she went to Karma one day, she observed Kirtis Green and another individual stamping prescriptions using her signature stamp. Concerned, Craven called Wilkerson; he told her "It's okay. Everything's under control." (*Id.* at 2804.)

The main ingredient of the pain cream, one of the regular medications that was prescribed and filled, was either "lidocaine or butacaine," which is a numbing agent. (Craven, PageID# 2820-21.) According to Craven, over the counter Salonpas patches or ointments also contained 4% lidocaine; a tube of Salonpas costs under $10. (*Id.* at 2820-21.) Craven had no input into the formula for the medications she was prescribing. (*Id.* at 2822.) Craven stated that prescribing for patients solicited directly by markets was unusual; the only time she ever engaged in that

practice (prescribing for patients directly solicited by a marketer) was for patients Wayne Wilkerson and his associates recruited. (*Id.* at 2821-22.)

Hunter Magnuson

Hunter Magnuson was also employed at Balanced Life in 2014, "working the front desk, answering the phones, verifying insurance…faxing prescriptions, scanning things." (Magnuson, PageID# 4524-25, 4528.) Magnuson corroborated some of Craven's testimony. Wilkerson and Kirtis Green frequently came to Balanced Life to see Craven, even though they were not employees at Balanced Life. (*Id.* at 4529, 4547.) After visiting with Craven, Wilkerson and Green would either drop off prescriptions with Magnuson to be faxed, or the prescriptions would be brought up to her by someone else to be faxed. (*Id.* at 4531.) Magnuson faxed to the pharmacy, which she recalled as "Willow," a stack of prescriptions that would be an inch to an inch and a half thick. (*Id.* at 4531-33.) This same scenario repeated itself numerous times. (*Id.* at 4534.) Magnuson recalled that some of the prescriptions were signed and others were stamped. (*Id.* at 4535-36.) Occasionally, Wilkerson brought stamped prescriptions to Magnuson without seeing Craven first. (*Id.* at 4539-41.) After Craven left her employment at Balanced Life, Magnuson never saw Wilkerson or Green come to that business with prescriptions. (*Id.* at 4546-47.)

Heather Fryar

Heather Fryar, who worked as a receptionist at Karma for Wilkerson (Fryar, PageID # 4617), was told by Wilkerson to affix Craven's signature using a stamp to a stack of prescriptions. (*Id.* at 4599-4600, 4639-40.) When Fryar questioned Wilkerson why she was affixing Craven's signature using the stamp to the prescriptions, he replied that it was her "job" to do so. (*Id.* at 4599.) In addition to being a receptionist at Karma, Fryar also marketed creams

(through Chatfield) to one person, Michael Sellers, who was covered by Tricare. (*Id.* at 4606.) From that venture, she was paid $33,000 in commissions by Chatfield for approximately 30 minutes of work. (*Id.* at 4606, 4618-19, 4627.) In addition to Chatfield being a marketer for creams, Fryar knew that Hindmon and Nicholson also marketed compounded medications. (*Id.* at # 4606.)

Kim Terry

Kim Terry was compelled to testify pursuant to this Court's Order. Terry was, and is, married to James "Rich" Terry, Wilkerson's cousin. (Terry, PageID# 4373-75.) Terry and her husband, Rich, received "Wayne's commission" on creams they ordered for themselves, Terry's mother and father, sister and brother-in-law, and one co-worker, Mike Smith. (*Id.* at 4394-95.) Kim and Rich Terry received roughly $120,000 to $130,000 in commissions from Wilkerson for the medications they ordered for themselves and for others. (*Id.* at 4396-4400.) The Terrys paid $5,000 to her parents and $5,000 to her sister and brother-in-law, Dawn and Nelson Steele. (*Id.* at 4395-96; Exhibit 337, Check to Dawn Steele from Terry Transport.) Mike Smith received $2,500 from Rich Terry for the creams he ordered. (*Id.* at 4395.) Shortly before Wilkerson paid Rich Terry $93,649 in a commission payment, Rich Terry opened a bank account in the name of "Terry Transport" to which that wire transfer was made from Top Tier. (*Id.* at 4391-92; Exhibit 306.)

Dawn and Nelson Steele

Dawn Steele, sister to Kim Terry, stated she ordered four creams from Kim Terry to "help [Wayne Wilkerson] get his company going and to get the creams on the market." (D. Steele, PageID# 4327-28.) Of the creams she ordered, she had no need for two of them. (*Id.* at

9

4327.) She did not believe the creams were effective. (*Id.* at 4328.) Dawn received a check for $5,000 from Terry Transport, LLC, for ordering the creams. (*Id.* at 4330-31.)

Nelson Steele believed that they were ordering creams as part of a clinical trial and they would be compensated for that. (N. Steele, PageID# 4354-55.) Nelson ordered four creams, none of which he needed. (*Id.* at 4356-58.) From the few times he used them he did not "find them to be effective." (*Id.* at 4359.) Nelson Steele never spoke to Candace Craven regarding the creams. (*Id.* at 4357-58.) Kim Terry and her husband Rich were upset with the Steeles because they had spoken to the government without having a lawyer present, and she suggested to the Steeles that they should consult with "one of Wayne's attorneys." (*Id.* at 4361-63.)

<u>Josh Linz</u>

Josh Linz, a seven year USMC veteran, had been friends with Wilkerson since they were teenagers. (Linz, PageID# 5700.) Linz was also friends with Billy Hindmon, having met him at The Rush gym in 2008. (*Id.* at 5700-01.) At some point in 2014, Wilkerson and Kirtis Green took Linz to a medical clinic (Balanced Life) so Linz could be prescribed some topical creams. (*Id.* at 5701-02.) At that time, Linz was medically retired from the Marine Corps and had Tricare insurance. (*Id.* at 5703.) Linz ordered medications and was paid for doing so, first as a downlink under Wilkerson, then under Hindmon, then ultimately again under Wilkerson. (*Id.* at 5705, 5709-11, 5715-16, 5732.) Linz created an LLC, AFA Consulting, at the suggestion of Wilkerson, "to receive payment for myself for the topical creams." (*Id.* at 5710-11.) Linz recruited his roommate, Wes Daniel, another medically retired Marine, to order the creams, for which Linz was paid a commission. (*Id.* at 5712-13.) Linz received commission payments from Wilkerson until August 2015. (*Id.* at 5718.) Linz received "around $99,000" in commissions for his own creams and those of his roommate, Wes Daniel. (*Id.* at 5720, 5733-34.) The Tricare

claims data showed that roughly $770,000 was paid by Tricare for Linz and Wes Daniel, with roughly $330,000 of that attributable to medications ordered for Linz. (See, Exhibits 213 and 1904, $244,442.75, paid for Linz through Florida Pharmacy Solutions; Exhibit 229, $83,689.81 paid for Linz through Willow; Exhibit 227, $443,484.74, paid for Wes Daniel through FPS).

<u>Matthew Perkins</u>

Matthew Perkins was a sailor aboard the U.S.S. George H.W. Bush, an aircraft carrier. He first became involved in the cream business through Kasey Nicholson in approximately October 2014 (and was downlinked from her). (Perkins, PageID# 2687.) Perkins was aware that Nicholson was working for Wilkerson. (Perkins, PageID# 2671.) Perkins had some personal contact with Wilkerson regarding the scheme. Wilkerson and Nicholson both informed Perkins the pharmacies "just put the most expensive ingredients in the medications" to "make more money by selling more expensive stuff." (Perkins, PageID# 2750-51—Perkins agreeing with Court's questioning).

At some point after the Tricare prescriptions dried up, Wilkerson contacted Perkins and told him that "the insurance for Hamilton County Schools was billing out for the topical creams…similar to Tricare." (Perkins, PageID# 2716-17; 2749-50.) Wilkerson informed Perkins that he had made or billed roughly a million dollars from the Hamilton County Schools. (*Id.* at 2717.) Wilkerson also claimed that he had made roughly $7,000,000 in the scheme in the entire scheme. (*Id.* at 2717.)

<u>Ryan McGowan</u>

Ryan McGowan was an accountant working at Komatsu when he became involved in the scheme through Michael Chatfield. At some point, McGowan received a phone call from Chatfield telling him that he needed to make a co-pay. (McGowan, PageID# 5910.) Chatfield

told McGowan that "Wayne" would pay it. (*Id.* at 5911.) McGowan contacted Chatfield who told him that "Wayne" would meet him at the Post Office in Red Bank to bring him money for the co-payments. (*Id.* at 5913.) Wilkerson met McGowan in the parking lot at the Post Office, gave him $2,000 in cash, and McGowan went inside, purchased money orders in the amounts needed for the co-pays, then mailed the co-pays to the pharmacy. (*Id.* at 5913-5917.) McGowan provided the receipts from the transaction (which he saved). (*Id.* at 5918; Exhibit 4.) While being questioned on cross-examination, McGowan identified Wilkerson as the person who brought him the cash for the money orders. (*Id.* at 5931, and again on redirect at PageID# 5940-42.) McGowan also stated that the money given to him by Wilkerson was not a "third party co-pay" as suggested by counsel for Wilkerson. (*Id.* at 5940.)

Amanda Morgan Booker

Amanda Morgan Booker, wife of Keitha Booker, was an esthetician at Karma, Wilkerson's spa. (Booker, PageID# 5791-92.) After a conversation with Heather Wyatt Fryar, Ms. Booker (through Fryar) reached out to Chatfield to sell creams for him. (*Id.* at 5796-97.) Chatfield informed Booker that not all insurance companies were covering the creams, but that Tricare was. Booker eventually realized that her cousin, Josh Morgan, had Tricare insurance as he was in the Marine Corps. (*Id.* at 5798, 5801.) She connected Josh with Chatfield and he quickly became a "rep." (*Id.* at 5802.) As a result of bringing her cousin into the fold, Chatfield first paid Booker $23,800 in commissions in December 2014. (*Id.* at 5804.) Booker estimated that she worked thirty minutes to make the $23,800 commission. (*Id.* at 5805.) A month later, on January 15, 2015, Chatfield wrote another check to Booker for $16,800, for which she did not do "anything on top of what [she] had already done." (*Id.* at 5806-07.) When Chatfield gave

Booker the second check, he informed her (in the P.F. Changs parking lot) that she would no longer be getting commissions. (*Id.* at 5808-09.)

Months later, Wilkerson approached Booker and informed her that "a lot of Hamilton County insurance was covering for teachers and asked me to have a conversation with my husband if he would be interested in bringing people on to get the creams." (Booker, PageID# 5810.) Booker's husband, Keitha Booker, was the dean of students at Tyner High School. (*Id.* at 5809-10.) Keitha Booker was the marketer for the creams; Wilkerson paid Amanda Booker for Keitha's marketing. (*Id.* at 5874-76.) Wilkerson told Ms. Booker that she would be compensated for the teachers Keitha Booker signed up. (*Id.* at 5811-12.) Wilkerson suggested to Ms. Booker that she create an LLC to receive the wire transfers; Wilkerson went through a lawyer to do that for her. (*Id.* at 5812-13.) On October 26, 2015, Ms. Booker received a wire transfer in the amount of $19,000; the reason she was paid was because her husband had received prescriptions and brought "on a couple of people." (*Id.* at 5815.) She received several payments from Wilkerson, again for "Keitha bringing on people and getting the pharmaceutical creams." (*Id.* at 5816-19.) She believed that some portion of the $135,000 received from Wilkerson was from a genetic testing business (starting in 2016 only), not the topical creams, although the greater percentage was "definitely for [the] creams." (*Id.* at 5823-25, 5826.) None of the $66,000 paid to Booker in 2015 was for genetic testing, in other words, it was all "Keitha's cream money." (*Id.* at 5828-29.)

Hamilton County Schools paid $954,273.64 based upon the creams marketed to teachers by Wilkerson through Keitha Booker. (Exhibit 726.) Of that figure, $397,760.58, was billed based upon the creams ordered under Keitha Booker's name. (Exhibit 703.) Likewise, $427,768.19 was paid by Hamilton County Schools for Sydney Snyder's creams. (Exhibit 705.)

13

Snyder is the daughter of Keitha Booker. Hamilton County Schools, as part of Hamilton County Government, is self-insured. (Torrance, PageID# 5969.)

Text Messages and Emails

In an email dated May 5, 2014, Wilkerson wrote to Chatfield, Nicholson and Hindmon "Here you go guys. Start adding up commission. Also, I need you all to follow up on scripts that still need Ins info. We need to get these to bill out ASAP and Willow will back date them for the month of April." (Exhibit 502.) In an email dated May 20, 2014, Wilkerson informed Chatfield, Nicholson, Hindmon and Kirtis Green of the new commission structure with Willow Pharmacy. (Exhibit 529.)

Text messages between Green and Wilkerson show some of the internal workings of the conspiracy. (Exhibit 528A.) Green informed Wilkerson that he was "at walmart waiting on Jeanette," the receptionist for Dr. Cheryl Haag who had been assisting Green in faxing prescriptions to Willow Pharmacy. Wilkerson replied, "Fuck that HO." Green countered, "No shit. I'm done after this batch, if it doesn't go through by 12 I'm giving these all to Michelle." (Kriplean, PageID# 6444; Exhibit 528A at p. 222.) "Michelle" is Candace Michele Craven, the nurse practitioner who was then employed at Balanced Life and who was signing prescriptions for Wilkerson and Green. Wilkerson replied, "I would, been nothing but trouble." (Kriplean, PageID# 6444; Exhibit 528A at p. 222.)

On May 17, 2014, Green and Wilkerson had the following exchange. Green stated, "This is where I want to be. Permanently." Wilkerson replied, "Bango. Then I'm sure I will too. We will just set up an online fax account and feed scripts to Michele constantly." Green said, "Perfect. She said she will sign 500 a time once karma opens." Wilkerson then added, "Ha ha. Perfect." (Kriplean, PageID# 6444; Exhibit 528A at p. 230.)

14

Later, on May 19, 2014, Wilkerson texted to Green, "Hey [I] forgot about what I had to pay for Michele and Jared and I am splitting that up between me, u and beaver. So it's 4k a piece. We can settle that up in florida." (Kriplean, PageID# 6445.) The proof at trial established that Chatfield's nickname was "Beaver." The proof also showed that "Jared" was Jared Schwab, a pharmacist at Willow Pharmacy where Wilkerson and others were getting their prescriptions filled in May 2014. Other evidence showed that Wilkerson deducted $4,000 from the May commission checks (written in June) to Green, Chatfield, Nicholson and Hindmon. (Kriplean, PageID# 6495, 6498, 6518, 6537, 6561; Exhibit 528A at p. 234; Exhibit 504.)

On June 3, 2014, shortly after BC/BS of Tennessee had ceased honoring compounding cream claims, Wilkerson texted to Green, "talked to Jared. He's gonna backdate the scripts from yesterday and Christy added some refills to May." (Kriplean, PageID# 6446; Exhibit 528A at p. 240.) On October 9, 2014, Wilkerson texted Green a link for a map of military bases for the purpose of arranging for military personnel and Tricare prescriptions. Green replied, "All I see is $$$." Wilkerson agreed, saying "Damn straight!!" (Kriplean, PageID# 6446; Exhibit 528A, last page.)

### III.    Proof Regarding Michael Chatfield

Michael Chatfield was the owner of Top Shelf, Inc., although he first began working under Wilkerson with Top Tier. Chatfield's gross receipts from the scheme were over $5,000,000, a number which included the sale of his business (for $1.5 million) to Jimmy Collins in or about February 2015. (Exhibit 716; Kriplean, PageID# 6479-80.) The proof at trial showed that Chatfield marketed the creams himself and had others marketing for him.

George Striker

George Striker was a downlink under Chatfield. He was employed at Charter Communications and first became involved in the scheme when he was approached by a co-worker, Jimmy Bettis, about ordering creams for himself. (Striker, PageID # 5276, 5282.) He ordered eczema, scar, stretch mark, and wound management cream, as well as wellness pills, for which he had no need. (*Id.* at 5297, 5300-02.) After he ordered creams for himself, he was approached by Chatfield to market creams for him. (*Id.*, Page ID# 5282.) Chatfield told him that his "role would be to approach people, to ask them to sign up for these creams, to participate in a study, and that they would be paid $100 per person that signed up." (*Id.* at 5283.) Striker was told by Chatfield that he (and others who ordered creams) would not be required to "pay anything out of pocket." (*Id.* at 5284.) Striker noted that he had "problems" with the creams in that they were not clearly labeled and it was difficult to determine "which ones were which." (*Id.* at 5289-91.) Chatfield informed Striker "what insurance companies were currently covering the creams." (*Id.* at 5291.) Even though there was never a "survey" done (as far as Striker knew), Chatfield provided Striker with a form for the customers to sign stating that they may be compensated for participating in the survey. (*Id.* at 5291-92.) The customers were in fact compensated by the marketers. (*Id.* at 5292.)

Striker signed up his wife, daughter, two step-children, and his ex-wife for the creams. (Striker, PageID# 5292-93, 5299-5300.) Striker's children did not need the creams or the wellness pills; the only purpose in ordering them was "revenue." (*Id.* at 5378.) He also signed up numerous other family members, including his father, uncle, cousins and their kids. (*Id.* at 5294-96.) Striker's 13 year old step-daughter, Baylee, had eczema and acne cream ordered for her; she never spoke to a doctor. (*Id.* at 5304-05.) Later, a scar cream was added for Baylee, as

"Michael made a joke or told me that every kid has scars from growing up and things like that, so, we just added the scar cream." (*Id.* at 5305-06.) Skylar, Striker's 11 year old step-son, had eczema cream, wart removal cream, and wellness pills ordered for him, even though he needed none of them. (*Id.* at 5306-07.) Chatfield informed Striker that they could not order a cream containing fluticasone for Skylar because of Skylar's age, therefore they "put him down for something else." (*Id.* at 5307-08.)

Text messages written in September 2014 (Exhibits 2102-2106), recovered from Striker's phone, revealed parts of the scheme. Chatfield informed Striker that the "wound creams" from FPS paid out "17 to 20K." (Striker, PageID# 5314; Exhibit 2102.) Chatfield informed Striker that Cigna Insurance was a "no go" because they imposed a $500 cap on compounds, an amount which did not provide for "much money after co pay." (Striker, PageID# 532; Exhibit 2103.) Striker questioned Chatfield about his commission. Chatfield replied "You'll have 7k again at central. You made 5 [because] brown family got reversed due to high co pays. I'll send them elsewhere for this month to help it go down. You'll have around 10k from fps and more that'll be on your October pay check." Discussing commissions from the various pharmacies, Chatfield informed Striker that "Your wife and kids have 35 Revenue each" at FPS. (Exhibit 2103.) Striker questioned the timing of his commission check so he could "know when to reimburse" his customers or "pay them for participating." (Exhibit 2103, pp. 4-5.) Striker, expressing concern for his cousin's finances, informed Chatfield "She's my cousin and they have a lot of bills on a teacher salary so I was just updating her. Nothing more. She is just one of the ones I hope keeps going thru for her purposes along with our income." Chatfield replied, "Gotcha, do you think she would be able to get another person or two from her work?" (Exhibit 2103, p. 5.) Chatfield informed Striker that he "made 17k total for August and as long as you don't lose

17

anyone and refills keep going (unless insurance cuts off some, I haven't heard of any more but I can't guarantee) you're over 21 k." (Exhibit 2103, p. 5.) After discussion regarding Striker's customers, Chatfield stated "Nice, at least we got hamby to get his wound and wellness come monday that's 20k in Revenue. Jeff will just have the Co pay issue one time and it'll go down just like yours and Jimmy and ericka and everyone else has." (Exhibit 2103, p. 6.)

Chatfield explained to Striker that the co-payment on some customers would be expensive in the beginning, but after a short period the co-pay would be "close to zero." Striker and Chatfield then agreed to submit that customer's prescriptions. (Exhibit 2104, p. 7.) Chatfield asked Striker if the "Walter family be okay with wellness tablets?" When Striker said they would, Chatfield replied, "Send all 4 of them wellness tablets. 25k in revenue extra." (Exhibit 2105, p. 10.) Striker asked Chatfield "Where is these large copay amounts (for Striker's customers) being paid out of?" Chatfield replied, "I'm giving you extra." (Exhibit 2105, p. 10.) Regarding Striker's commission, Chatfield informs him "Okay so Baylee and skylar are 11 so pharmacy won't let us use more than one cream of fluticasone be it's too much for a child. So I'll add Skylar, Baylee and Avery a wellness tablet (19k in revenue) and Valerie a wound and something else she wants which will be around 22k total for those 2. So a total of 40-42k revenue from your family at Central." (Exhibit 2105, p. 12.)

Chatfield and Striker discussed Striker's father, Joseph Striker, and what insurance he had. Striker informed Chatfield that his father had Tricare insurance for his prescriptions. Ultimately, Joseph Striker ordered creams through George Striker and Chatfield using Tricare. (Striker, PageID#: 5355-56.)

During a February 2015 in person meeting with Chatfield and Jimmy Collins, Striker surreptitiously recorded the conversation. (Striker, PageID# 5372; Exhibit 2112P, which

contains Exhibits 2112A through 2112O, including the corresponding transcripts that were generated to match the clipped part of the conversation; the parties discussed various aspects of the entire conversation and the snippets were the result of those conversations). Striker confirmed that they were paying $100 for the evaluation. (*Id.* at 5375-77, disputing Chatfield's claim that the payment amount for the evaluation was only $25 to $50.) Striker was questioning why the federal agents (who had visited Striker the day before) would be asking him questions. Chatfield told him that "they don't know you're selling," but if they asked, Chatfield told Striker that he did not "have to tell that." (*Id.* at 5379; Exhibit 2112A.) Chatfield informed Striker that they were "going to have an evaluation in next few days," illustrating that there had not been an actual evaluation procedure up to that point (which would have encompassed all of 2014 and the first month of 2015). (*Id.* at 5382-83.) In fact, Striker never took part in an evaluation and he was not aware that any people he signed up participated in one. (*Id.* at 5384.) This conversation occurred on February 10, 2015; Chatfield and Striker started marketing the creams in the spring of 2014. Chatfield explained to Striker and Collins why they did not have an evaluation procedure in place, and then stated that they could approach customers and say "hey, we got an approved an evaluation now. Go back out and fill it out." (*Id.* at 5388, "we would have to cover our butt to have them do an evaluation after the fact"; Exhibit 2112E; see also, PageID# 5399 and Exhibit 2112L, Chatfield stating "We don't have an actual evaluation from the patient.")

Striker questioned Chatfield regarding what he should say to law enforcement regarding who referred him for the creams. Chatfield responded "…say someone from work told you. Say 'I can't remember' say 'one of my customers told me' (IA). It's been months ago. I don't remember." (Striker, PageID# 5391; Exhibit 2112F.) Collins theorized that the agents were going to "work their selves through Willow. They're gonna find their golden goose." Chatfield

19

added "'Cause that's where the fraud happened." (*Id.* at 5392; Exhibit 2112F.) Recounting the conversation with Kriplean, Striker said he told Kriplean a lie: "initially, I said 'a customer, I think a customer of mine referred me, 'cause they saw my scars and said, you know, go see these people.'" Chatfield advised Striker to "stick to that answer since you said it to an agent already." (*Id.* at 5392; Exhibit 2112F.) Striker explained that Kriplean asked him if he knew "Michael Chatfield." Striker said "No…so I lied there to 'em." Chatfield responded, "Okay." (Exhibit 2112H.) Collins also added that Striker could say he didn't know "Michael's" last name, to which Chatfield chuckled. (*Id.* at 5395; Exhibit 2112I.)

Striker then asked about reimbursing customers for their co-pays. When questioned by Collins as to who had done that, Chatfield added "That's not--that's not how you word it, though." (Striker, PageID# 5396.) At some point, Chatfield suggested that it was the fault of Charter employees for not turning in an evaluation. (*Id.* at 5399-5400.) Chatfield coached Striker to say the payments were for an evaluation. Collins then theorized that if Striker sufficiently paid his customers for the evaluation then they would not turn on him when they spoke with law enforcement. (Exhibit 2112J.)

At some point in the conversation, Collins, with Chatfield present, asked Michele Craven to come into his office. Collins introduced Craven to Striker so "if [law enforcement] in the future asked me, have you ever met" (because Craven had written prescriptions for him), Striker could say that he met her. (Striker, PageID # 5400; Exhibit 2112N.)

Through Striker, Chatfield billed insurance companies (mostly private insurance but there were a few instances of Tricare being billed) over $7.6 million. (Striker, PageID# 5409-5410.) Striker's family alone received prescriptions which billed for $1.8 million. (*Id.* at 5409.) Striker made $354,000 as a marketing representative under Chatfield. (*Id.* at 5407-08; Exhibit 716.)

<u>Text Messages between Michael Chatfield and Kirtis Green</u>

On March 28, 2014, Chatfield, in an attempt to get immediate BC/BS coverage for his brother (Brandon Chatfield), texted Green and said "My brother is wanting to know if he called BCBS tomorrow and paid the insurance premium extra to be covered right away, would we be able to go to the doctors and it go through." (Kriplean, PageID# 6390-91; Exhibit 508, p. 635.) Green informed Chatfield that Brandon's new plan would not take effect for 30 days. (*Id.* at 6393.) Ultimately, Brandon Chatfield ordered creams through Michael, and the amount billed to the insurance company was over $100,000. (Exhibit 710.) The text messages also make clear that Diversified Printing, Chatfield's family business, printed the prescription pads used in the scheme. (*Id.* at 6395.)

In April 2014, Chatfield asked Green whether the creams for "Natalie's parents bill[ed] out last month [or] the beginning of this month?" (Kriplean, PageID# 6396; Exhibit 508, p. 640.) George and Debra Foster are Chatfield's in-laws; Natalie is Chatfield's wife. Chatfield informed Green that the pharmacy "missed one of my creams, I got 4 and I only see 3. Same for Amanda McGowan, missed her wound. Do I need to call about those Monday?" (*Id.* at 6399; Exhibit 508, p. 641.) Green replied, "No. They are on the non-filled list." (*Id.* at 6399; Exhibit 508, p. 641.)

On May 6, 2014, Chatfield and Green had the following text exchange. Chatfield said, "I'm showing 186,400 dollars commission. Thought it was higher, had to back out 39,000 of Natalies 480 and 32,000 of Ryans 480. Also those bcbs of ga I must have counted my chickens before they hatched lol oh well still good month." Green replied, "I agree brother!!! We still rocking!!" Chatfield continued, "Hell yeah, this month we are going to murder it lol I'm going to add some more creams for me too." (Kriplean, PageID# 6411-12; Exhibit 513.)

On May 26, 2014, Chatfield was discussing the prescriptions for some customers. He texted to Green, "For everyone else the big 5 right." Green replied, "Yes lol." (Kriplean, PageID# 6411-12; Exhibit 514.) On May 29, 2014, Chatfield texted to Green, "I'm having 16 script pads made up of the Karma Wellness Spa with the corrections that Jared told me to make. That includes giving .05 Fluticasone to antiaging and age spots. Jared said that was good and no reason we shouldn't have that." (*Id.* at 6420; Exhibit 515.) Chatfield continued, "Yeah, I figured that would be the best way to make money and we can ignore Billy's dermatologist, if she doesn't want Fluticasone, we will give her her own pad." Chatfield continued, "Jared knows his shit." (*Id.* at 6420-21; Exhibit 515.) Jared Schwab was the pharmacist at Willow, the pharmacy that Chatfield and the rest were using at the time; Jared was being paid by Wilkerson and others (including Chatfield) for "consulting" at the same time he was working at Willow. (*Id.* at 6421.) Discussing Jared's guidance, the amount of fluticasone in a prescription, and the cost, Chatfield texted, "And if antiaging bills out 2,000 and age spots 2500 or 7,000, I'll take the second all day." Green answered, "No shit I would prefer the larger number every time." Chatfield went on, "Yeah. It was billing out 4800 with .025 then when Billy changed it, it went down to 2000[,] now Jared said to go to .05 so it should be around 7,000. I have too many people getting those creams for them to be billing out at 2,000." (*Id.* at 6422; Exhibit 515.) Chatfield and Green discuss "Josh" Linz receiving money for ordering his creams, with Chatfield saying "Well you told me he's getting 2[] grand for every 4 or 5 creams so I thought wayne knew." (*Id.* at 6424; Exhibit 515.) The $2,000 figure being paid to Josh Linz for ordering his own creams was consistent with his testimony. (Linz, PageID# 5707, 6424.)

On May 30, 2014, Chatfield texted to Green, "Do you see all of those refills they are doing 10 days early for our Blue Cross Blue Shield people LOL." Green replied, "No, that's

awesome." Chatfield responded, "Yeah. Jared said he was going to put lost or stolen and override LOL. (Kriplean, PageID# 6426-27; Exhibit 516.) Blue Cross Blue Shield of Tennessee stopped payment on compounded creams effective June 2, 2014. (*Id.* at 6426.) Green then asked Chatfield, "Did you get her stamp ready?" Chatfield replied, "No I'm going there today to get her signature, we send it to our vendor and it takes four to five days for us to receive it back." (*Id.* at 6427; Exhibit 516.)

On June 2, 2014, Chatfield asked Green, "Can you get Kristy to see if they filled the 25 creams for five Bowling family members?" (Kriplean, PageID# 6431-32; Exhibit 518.) Green replied, "I'm waiting for Jared to come back tomorrow, he forwarded the e-mail to Christi that had all of the refills on it." (*Id.* at 6433.) On June 3, 2014, after the cutoff date from BC/BS of Tennessee, Chatfield asked, "Any word from our e-mails and refills?" Green replied, "Yes, both are solid. Jared is backdating and fixing today." (*Id.* at 6434; Exhibit 519.) Concerning the BC/BS cutoff, Chatfield stated to Green, "Well the majority of mine are Medco and Caremark, I was just hoping to get those last few snuck in [to BC/BS], so try and get the sales report tonight if you can." (*Id.* at 6434-35; Exhibit 519.)

On June 17, 2014, Green texted "Just a heads up if you have any for kids under 13 no Fluticasone scripts." Chatfield replied, "Even wound?" Green stated, "Yes, put wound on one of the parents. Eczema is okay though it has Fluticasone." Chatfield answered, "So max is four per person over 13. And must be two on two scripts, two Fluticasone scripts max." Green then stated "Yeah. And make sure to switch it up. Don't just use top four. I'm doing pain 2 for a lot of people at 18k scrip. I threw some nail, shingles, and acnes too. He just wants it to be more random. Do you know what everything bills out for approx[?]" After Green asked what the various creams were billing for, Chatfield replied, "Stretch 10, Scar 11, Wound 12-14, Acne –

6500, Psoriasis 5500, Wrinkle and age spots 4800." (Kriplean, PageID# 6437; Exhibit 520.)

Chatfield then added "Wrinkle and age spots should be more if he increases the fluticasone up to

.05 as it is on the script." (*Id.* at 6437; Exhibit 520.)

With respect to one of the medications, Chatfield said, "One of my patients' kids got a

burn from it. Luckily I knew him." Green replied, "Gotcha. LOL. No more 8K haha." Chatfield

then stated "nope, even Jared admitted he shouldn't have done that." (Kriplean, PageID# 6402;

Exhibit 508, p. 641.) Chatfield again discussed with Green the payouts on certain creams,

"Wellness is 6K," "antifungal is 13 and eczema is 10." (*Id.* at 6404; Exhibit 508, p. 646.)

Ryan McGowan

As noted above, Ryan McGowan was an accountant working at Komatsu when he

became involved in the scheme through Michael Chatfield. (McGowan, PageID# 5893-95.) He

made approximately $36,000 in commissions based upon his own creams and referrals on his

family members. (*Id.* at 5909; Exhibit 716.) Chatfield informed McGowan that there would be

no cost to him and no co-pay—that the co-pay would be made by a third party. (*Id.* at 5895.)

McGowan received no training other than Chatfield explaining the process to him. (*Id.* at 5896-

97.)

When McGowan ordered his creams he spoke to Craven over the phone; that

conversation lasted no more than a few minutes. (McGowan, # PageID# 5897.) McGowan

signed up for three medications: wellness, scar, and wound. (*Id.* at 5900-5901.) In addition to

himself, McGowan recruited eight or nine others, virtually all of whom were family members,

friends of family members, or co-workers. (*Id.* at 5898.) Automatic refills were designated for

most of the prescriptions. McGowan estimated that he invested "a couple of hours" (maybe

three) for the $36,000 he was paid. (*Id.* at 5909-10.) The total amount billed through McGowan

and his referrals was roughly $500,000.  (*Id.* at 5939.)  McGowan provided a bottle of the wellness pills to the government, although he was unsure what they were because they were not well marked.  (*Id.* at 5919-20.)

McGowan also testified regarding the payment of his co-pays by Chatfield and Wilkerson, recounted above, and the meeting that took place at the Red Bank post office. (McGowan, PageID# 5912-19.)  The government will rely on its previous recitation of those facts.

### Jim, Dena and Matt Chatfield

Michael Chatfield's aunt and uncle, Jim and Dena Chatfield, ordered creams for themselves and for Jim's son (Dena's stepson), Matt Chatfield.  Jim and Dena traveled to Cherokee, North Carolina for a brief vacation.  They met Jim's brother, Hal (father of Michael) and other family members there.  (J. Chatfield, Page ID# 4853-54.)  Michael Chatfield approached Jim to order the creams.  (*Id*. at 4857.)  Jim's son, Matt, was not present, although he was signed up for creams by Michael. (*Id*. at 4855.)  For the prescriptions ordered for Jim, Dena and Matt, the same cell phone number (Dena's) was used on the form.  (*Id.*, Page ID# 4856; Exhibits 119, 121, 122.)  Jim ordered creams for eczema, stretch marks and wound management, even though he had no need for those creams.  (*Id.*, Page ID# 4857-58.)  In fact, all three—Jim, Dena and Matt—ordered the same creams:  scar, eczema, stretch mark and wound management gel.  (*Id.*, Page ID# 4886.)  Jim could not recall speaking to a doctor or nurse practitioner prior to ordering the creams.  (*Id.*, Page ID# 4858-59.)  Jim and Dena each used the creams a few times but he could not "see a noticeable difference" so he "threw them away." (*Id.*, Page ID# 4859.)  After Jim received the creams, Chatfield sent him a check for $6200.  (*Id.*, Page ID# 4861; Exhibit 809.)  Fearing something was amiss, Jim took the money to his lawyer

and the lawyer deposited it into his escrow account. (*Id.*, Page ID# 4865-66.) As far as Jim was concerned, he had not done anything, other than given his insurance cards to his nephew (Michael Chatfield), to merit receiving the $6200. (*Id.*, Page ID# 4864, 4887-88, agreeing with the Court that this "was too much money for too little work.") Jim stated that if he had known at the time how much the creams cost he would not have ordered them. (*Id.*, Page ID# 4867.)

Dena Chatfield testified that she ordered four creams: scar, eczema, stretch mark and wound management (with five refills each) after speaking with Michael Chatfield at the Cherokee casino. (D. Chatfield, PageID# 4894-95.) She tried all of the creams except the eczema; she did not see any benefit from any of the creams that she used. (*Id.* at 4896.) Dena agreed with the Court that the cost of the creams "sort of shocked her" conscience especially because she "didn't really want them that much." (*Id.* at 4902-03.)

According to Michael Chatfield's May Commission report, insurance paid $115,589.88 on the compounded creams for Jim, Dena and Matt Chatfield. (Exhibit 402.)

<u>The Bowlings</u>

Noah Bowling and his brother, Luke, attended a CFC game at Finley Stadium in May 2014. At halftime, they went to the parking lot to meet Chatfield and his brother, Brandon Chatfield. (Bowling, PageID# 4446.) Noah and Luke had known Brandon from high school. (*Id.* at 4454.) Michael Chatfield offered them a "business opportunity, which was filling out this form with our insurance information, and that it was basically kind of like a survey type thing where we would get some creams to try, and we would be sent a survey, then we would be paid for that survey." (*Id.* at 4446-47.) No survey was ever conducted. (*Id.* at 4452.) All of the Bowlings had insurance under Susanne Bowling, who was Noah, Luke and Emma's mother. (*Id.* at 4448.) Noah ordered five creams for himself, the only one of which he may have had a need

for was the acne cream.  (*Id.* at 4450-51.)  Noah did not speak with a health care professional

after ordering the creams; he only remembered using one of the creams (acne) and did not

believe it worked any differently than his other medications in his acne regimen.  (*Id.* at 4451-

52.)  Luke also ordered five creams at the same time.  (*Id.* at 4453.)

After ordering for themselves, Michael Chatfield "explained that if we signed up more

people in our family that we would receive a larger sum of money."  (Bowling, PageID# 4453-

54.)  In Chatfield's presence, and with him observing, Noah and Luke signed up their parents

and their sister for five creams each.  (*Id.* at 4455-59, 4485.)  After completing the forms for

themselves and their family members, they gave the forms to either Michael or Brandon at

Finley Stadium.  (*Id.* at 4460, 4485.)  Hal, Susanne and Emma Bowling were not present at

Finley Stadium when this happened.  Michael Chatfield was "running the transaction."  (*Id.* at

4460.)  Noah and Luke each received $1,000 for ordering the creams.  (*Id.* at 4457.)

Hal, Susanne and Emma Bowling each testified.  Emma was 15 years old in May 2014.

None of them had any knowledge that Noah and Luke Bowling, and Michael Chatfield, ordered

creams in their names.  None of them needed the creams which were ordered for them, nor did

any of them speak to a health care professional regarding the creams.  (Bowling, PageID# 4501-

02, 4508, 4518-20.)  BC/BS of Tennessee paid roughly $150,000 total for the claims of Hal,

Susanne and Emma Bowling.  (Exhibits 207-209.)

George and Debra Foster

George and Debra Foster are the parents of Natalie Foster Chatfield, Michael Chatfield's

wife.  (D. Foster, PageID# 4244, 4284.)  Prior to the investigation of this case, Debra and George

enjoyed a good relationship with Natalie, but they are now estranged.  (*Id.* at 4244.)  Debra and

George did not order any creams from Michael Chatfield or Natalie, nor did either give

permission. (*Id.* at 4250, 4255, 4271.) Natalie's cell phone number was written on the order form and the creams were shipped to Michael's and Natalie's house. (*Id.* at 4249.) Debra never spoke to Candace Michele Craven. (*Id.* at 4250, 4271.) Debra admitted that she lied to Agent Kriplean the first time she spoke with him (stating that she had ordered the creams and had spoken to Craven) in order to protect Michael and Natalie. (*Id.* at 4256-59, 4280.) After lying initially, Debra immediately confessed to Kriplean that she had lied. (*Id.* at 4259, 4268-71.)

Likewise, George Foster did not order any creams, nor did he need any of the creams which were ordered in his name, nor had he spoken to Craven. (G. Foster, PageID# 4287-88.) George confirmed that Natalie's cell number was on the forms, that the first form had an incorrect date of birth for him (the second did not), and that Michael and Natalie lived at the address where the Foster's creams were shipped. (*Id.* at 4287-90.) The creams were in fact shipped to the Chatfield's residence in Ooltewah. (*Id.* at 4297-99; Kriplean, PageID# 6514-15.)

On cross-examination, George admitted that he had been paid to do accounting work for his son-in-law, Michael Chatfield. (G. Foster, PageID# 4297-99, 4306-07.) Counsel for Chatfield suggested that George received a check for $5,000 from Michael "in relation to [Debra's] communications" with Natalie (suggesting that George and Debra were paid to either order or market the creams). George replied defiantly, "That's ridiculous, no." (*Id.* at 4299.)

Approximately $129,000 was paid by BC/BS of Tennessee for George Foster, a like amount was paid for Debra Foster. The Foster's insurance also paid $108,184.25 for Natalie's creams. (Kriplean, PageID# 6531.) Agent Kriplean interviewed Michael and Natalie Chatfield before the trial (through an agreement between the parties); Chatfield admitted that he completed one of the order forms for George Foster and had completed parts of another for Debra Foster. (*Id.* at 6529-30; 6566-67.) At trial, Natalie admitted that she had completed portions of Debra

Foster's prescription form.  (N. Chatfield, PageID# 7318-19.)  Natalie also admitted that it was her cell number on the order forms for her parents.  She claimed that she gave the real number for her parents to Michele Craven in a "side message."  (*Id.* at 7320-21.)  Natalie was also paid $60,000 by Top Shelf/Michael Chatfield in 2014, but she did not know or understand why she would have been paid.  (*Id.* at 7322-25.)  Chatfield made over $14,000 in commissions on creams prescribed for his wife, Natalie.  (*Id.* at 7325.)

Josh Morgan

Former Marine Josh Morgan pleaded guilty to conspiracy to commit health care fraud in the Southern District of California. (Morgan, PageID# 5641, Exhibit 41.)  As he admitted on the stand, from November of 2014 until July of 2015, he paid his fellow Marines $300.00 a month in exchange for them signing up to receive creams they did not need, and allowing their Tricare insurance to be billed. (*Id.* at 5641, 5668, Exhibit 41.)  He first did this under the direction of Michael Chatfield, and then switched to working under Jimmy Collins once Chatfield sold his interest to Collins. (*Id.* at 5640-42, 5665.)

Morgan first heard about the creams through his cousin, Amanda Morgan Booker. (Morgan, PageID# 5644.)  He signed up to receive a pain cream, stretch mark cream, and wellness tablets, none of which he needed. (*Id.* at 5644-46, Exhibit 1309.)  He also received a scar cream, which could, in theory, be of some benefit to him, since he was then using a different scar cream. (*Id.* at 5648, Exhibit 1309.)  Admittedly, the reason he requested each of the creams was because of the $300 kickback he was promised. (*Id.* at 5645.)

Realizing the lucrative potential of this business, Morgan began contemplating signing up his fellow Marines. (Morgan, PageID# 5646.)  At this point, his cousin put him in contact with Michael Chatfield, thus removing herself as the "middleman," leaving Morgan to work directly

29

under Chatfield. (*Id.* at 5646-47.)  Chatfield instructed Morgan to offer the same $300 kickback

to other Marines that he himself had been promised. (*Id.* at 5648, 5651.)  Chatfield, in turn,

would pay Morgan a five percent commission on whatever Tricare paid for the creams. (*Id.* at

5648.)  Chatfield, fully aware that Morgan was targeting Tricare beneficiaries, instructed Morgan

not to spend time trying to sign up people covered by other insurers. (*Id.* at 5643.)  While

paperwork given out by Morgan to the Marines indicated that the creams were part of a study,

Morgan admitted there was no study, and the $300 payment was merely a kickback. (*Id.* at

5649.)

    After writing Morgan a check for $19,000 on December 12, 2014, Chatfield told Morgan

to form an LLC, which he did. (Morgan, PageID# 5649-50, 5658, Exhibit 810.)  Morgan formed

JM Elite, LLC, the sole purpose of which was to receive the money Chatfield was paying him as

commissions from the Tricare orders. (*Id.* at 5658.)  Morgan was paid a commission by Chatfield

every time a prescription refilled, and was even paid commissions on the prescriptions for his

own creams. (*Id.* at 5650, 5652-58, Exhibits 51, 52.)  By January 16, 2015, the commissions on

the Tricare orders solicited by Morgan totaled $314,000, for which he received a wire transfer

from Chatfield.  (*Id.* at 5659, Exhibit 8.)

    Later, Chatfield moved his marketing operation from under the direction of Wayne

Wilkerson to that of Jimmy Collins, explaining to Morgan that he was doing so because

Wilkerson was under investigation. (Morgan, PageID# 5661-64.)   Morgan was unconcerned

about who was in charge, as he was making lucrative sums of money. (*Id.* at 5664.)  Morgan's

affiliation with Chatfield ended shortly after the switch to Jimmy Collins, when Chatfield sold

his interests to Collins. (*Id.* at 5665.)  In all, Chatfield paid Morgan $333,000.00 in commissions

(for roughly two months of participation in the scheme), never once meeting Morgan in person. (*Id.* at 5664, Kriplean, PageID# 6480, Exhibits 8, 810.)

### IV. Proof Regarding Kasey Nicholson

<u>Sydney Patterson</u>

Sydney Patterson was a lifelong friend of Nicholson, having met her in sixth grade in McKenzie, Tennessee. (Patterson, PageID# 2759.) In 2014, Patterson was approached by Nicholson; Nicholson told her that "she was working as a sales representative for her boyfriend Wayne who had created a business selling compounding creams." (*Id.* at 2761.) Nicholson said that she "would give [Patterson] part of her commission" if Patterson "ordered some of those creams." (*Id.* at 2761.) Patterson agreed to order some creams and gave Nicholson her insurance information. (*Id.* at 2762.) Patterson ordered four creams: acne, stretch mark, wound management, and psoriasis. (*Id.* at 2762; Exhibit 133.) Concerning her order, Patterson did not realize that she had ordered a wound management gel. (*Id.* at 2762-63.) When she received the creams one bottle had exploded in the box. She used the other three creams for a couple of weeks, then stopped because she "didn't think they worked." (*Id.* at 2764.) Patterson placed her first order around May 12, 2014; even though she did not want to order more creams, Nicholson persuaded her to order more before the June 2, 2014, BC/BS cutoff for compounded creams. (*Id.* at 2765-66.) Patterson received modest compensation (and there was some question in her mind whether the payments were commissions or gifts) for her part in ordering the creams, including $1,000 from Nicholson which she used to go to Bonnaroo. (*Id.* at 2767-68, 2775-76.) She also received a birthday check in the amount of $1,000 from Nicholson. (*Id.* at 2767-68.)

<u>Matthew Perkins</u>

As noted above, Perkins was a sailor aboard the U.S.S. George H.W. Bush, an aircraft carrier. (Perkins, PageID# 2668-69.) He first became involved in the cream business through Kasey Nicholson in approximately October 2014; he was downlinked from her. Nicholson was friends with Perkins' wife, Michelle Perkins. (*Id.* at 2720.) Sometime in October 2014, when Perkins was underway on the Bush, Nicholson contacted Perkins to gauge his interest "to sign up for the medication to get money." (*Id.* at 2672, 2680.) Perkins agreed because he wanted "to make money." (*Id.* at 2672.) Perkins ordered medications for himself: wellness, scar and stretch mark, and later ordered a pain cream. (*Id.* at 2684-85.) The medications were not well marked or labeled so Perkins was not really sure what he received. (*Id.* at 2684-85.) Perkins used the pain cream, which contained a numbing agent; he thought it worked and likened it to "Icy Hot." (*Id.* at 2685.) Perkins was not aware how much the medications cost when he ordered them. (*Id.* at 2685.) He later learned how much the medications cost when he received his Explanation of Benefits from Tricare. (*Id.* at 2693-97; Exhibit 2502.) Perkins' Tricare was billed $67,000 for his medications for the month of December 2014. Michelle's (Perkin's wife) Tricare was billed a similar amount, around $60,000, for her creams. (*Id.* at 2697.) After Perkins received his EOB, he called Nicholson because he was "freaking out." Nicholson replied "that's how much the insurance company pays for the creams, that it's not a big deal." (*Id.*, Page ID# 2700.)

An examination of Exhibit 2502 (December EOB) reveals the outrageous cost of the medications: Tricare paid $6,038.20 for the wellness pills (and Perkins received two shipments of them in December 2014). The defendant's expert, Mark Newkirk, agreed that the ingredients in the wellness pills (Co Q-10, lipoic acid and Vitamin D3), could all be purchased at Walmart for "$10 to $20, $30 each." (Newkirk, PageID# 7544-45.) Of the other four creams that Perkins

received in December 2014, Tricare paid approximately $14,000 for each (none of them cost less than $13,898.00). Michelle disposed of her creams without using them. (Perkins, PageID# 2697-98.) Between November 4, 2014, and April 20, 2015, Tricare paid $236,325.00 for Matthew Perkins' compounded medications. (*Id.* at 2699; Exhibit 212.)

Initially, with respect to the sailors aboard the Bush, Nicholson informed Perkins that she "would pay [him] 4 to 5,000 a person [he] could get to sign up including [him]self, and then that dropped to roughly around a thousand a person." (Perkins, PageID# 2672-73.) Perkins ultimately was paid in commission form and he made approximately $200,000 from the scheme. (*Id.* at 2673.) Perkins recruited "fellow shipmates" on the Bush to sign up for the creams; he also signed up his wife (who was also enlisted in the Navy). (*Id.* at 2677-78.) As an inducement, Perkins paid some people fifty to a hundred dollars, others he "took out to drink some beers." (*Id.* at 2678-79.) Nicholson told Perkins "to do whatever I had to…to get people to sign up." (*Id.* at 2742.) Perkins was able to identify "about 30" sailors from the Bush and dependents who were downlinked from him. (*Id.* at 2679, 2734.) Nicholson told Perkins to suggest "scar, pain and wellness" compounded medications because they "paid the most." (*Id.* at 2680.) Because Perkins was assigned to the Command Master Chief aboard the Bush he had access to a ship to shore telephone. (*Id.* at 2682-83.) Perkins recounted a time when he signed up five or six people in one day and they were all in the CMC's office on the Bush passing the "phone around so everybody could speak" to the nurse practitioner. (*Id.* at 2751-52.)

At Nicholson's suggestion, Perkins formed an LLC. (Perkins, PageID# 2701.) She explained to him that he needed to form "an LLC because the bank wires were going to be so large and I was banking with Navy Federal, so it just wouldn't look good for, I guess, that large amount of money coming into an E4's bank account." (*Id.* at 2703.) Perkins received his wire

transfers into his LLC, Matthews Consulting, from KLN Consulting, Nicholson's LLC. For several months approximately $40,000 per month was deposited into Perkins' account from Nicholson's. (*Id.* at 2703-07.)

At some point, Nicholson told Perkins that she "paid somebody's insurance [] for the year and gave them $10,000 in cash," because she would "make that money back" on the commissions. (Perkins, PageID# 2719-20.) Nicholson contacted Perkins through Snapchat, a self-erasing social media platform, and told him not to speak to anybody in law enforcement. (*Id.* at 2720-21.)

On cross-examination, Perkins asserted that he was engaged in an unauthorized pyramid scheme by marketing the creams. (Perkins, PageID# 2730-31.) Perkins also stated that he thought things were legal in the beginning, but after that he knew it was fraud. (*Id.* at 2739-40, 2749-50.) When asked whether he wanted "to make sure that everything was being done correctly when the stuff was shipped" to his people, Perkins replied, "no." (*Id.* at 2745.) Perkins admitted that the venture was a fraud and he was in it to make money. (*Id.* at 2740.)

### V. Proof Regarding Billy Hindmon

<u>Adam Staten</u>

Adam Staten was interested in breaking into pharmaceutical sales. (Staten, PageID# 4076.) He had known Billy Hindmon previously, having worked with him at The Rush. (*Id.* at 4078.) Initially, Hindmon and Staten began by going "to doctors' offices…basically, trying to get them to write [prescriptions] topical creams." (*Id.* at 4079.) After making no money with this method, Wilkerson "hired [] a nurse" to write prescriptions in April 2014 (which the defendants refer to as "direct to patient marketing"). (*Id.* at 4079, 4172.) This method was "a lot easier" because they could "bypass the gatekeeper so to speak … because Wayne had that

34

nurse…." (*Id.* at 4081.)  After Wilkerson hired Craven, Staten was able to sign up about 20 people, from which he ultimately made approximately $100,000 in commissions on the creams. (*Id.* at 4081-82.)  Staten would inform his customers "that they would have to have insurance to be able to get the cream…[b]ecause the insurance would pay for the cream." (*Id.* at 4082.) Staten was aware that the cost of the creams was anywhere between $8,000 and $15,000 per bottle. (*Id.* at 4083.)  Staten made between 10-15% commission on the creams. (*Id.* at 4083.) Hindmon recommended to Staten that he form an LLC, assisted him in creating it, and it was later named DAS Marketing. (*Id.* at 4094-95, 4104.)  Staten contacted a friend of his, Carol Diamond, and she assisted him in marketing the creams in and around Chattanooga. (*Id.* at 4104-05.)  Later, Heather Burnette and others ordered creams through Diamond and Staten. (*Id.* at 4122-23.)

When Staten sought guidance from Hindmon regarding the medications, Hindmon responded in an email, "My intentions were to explain each ingredient in detail but time has not been on my side. I can still do that within the next few days. If you would like to research the ingredients and pass it along to your people, feel free to do so. If not, I'll try to have it done by the end of the week. Thanks, Billy." (Staten, PageID# 4109; Exhibit 2607.)

Hindmon emailed a document entitled "consent form" to Staten and others. (Staten, PageID# 4136-37; Exhibit 2614.) In that form, Hindmon explained that if the patient's insurance did not cover the cream, the patient had the option to pay "a discounted price for the cream," but if there was no insurance, there "will not be any revenue to cover their participation compensation or you[r] referral fee." (*Id.* at 4137-38; Exhibit 2614.)  Furthermore, Hindmon stated that if the co-pay was more than $15, and "[i]f the insurance company pays for the cream,

Willow Pharmacy will eat the rest because there will be enough to cover the cost." (*Id.* at 4138; Exhibit 2614.)

At some point, the scheme morphed from private insurance into Tricare. (*Id.* at 4085.) Staten approached Jillian Lynn, a lady who was married to a soldier and had Tricare, asked her to assist him in the cream sales, and that he would "pay her a referral bonus [of $300] for each person" she referred. (Staten, PageID# 4093.) Hindmon was aware that Staten was paying Lynn for the referrals and even loaned him money on one occasion so Staten could pay her. (*Id.* at 4093-94.) Of the money that Staten made in the scheme, most of it was attributable to Tricare, and the only connection he had in Tricare was Jillian Lynn. (*Id.* at 4090, 4110.)

At some point, one of the Tricare beneficiaries sought creams for their minor children. (Staten, PageID# 4188; Hindmon Exhibit 47.) Staten contacted Hindmon, Hindmon told Staten to "send them in" to see if Tricare would pay. (Staten, PageID# 4187-88, 4228-29, 4237-38.)

Rachel Franklin

Rachel Franklin, a friend of Adam Staten, signed up for the creams through him. He informed her that it would be "no cost to her." (Franklin, PageID# 4761-63.) She recalled ordering scar cream, to treat a scar from an injury she suffered as a child, but she did not know that four other creams were ordered for her: eczema, stretch mark, wart, and wound gel. (*Id.* at 4765.) Franklin had no need for the creams other than the scar cream (she never received the wound cream even though it was apparently ordered for her). (*Id.* at 4766-68, 4796.) She used the scar cream for about a week. She didn't believe it worked and she stopped using it because it was "greasy." She did not open the other creams she was sent. (*Id.* at 4789-90.) She never spoke with a doctor or nurse practitioner. (*Id.* at 4789.)

At some point Franklin called Staten, very angry/crying, stating that her "health savings account had been totally wiped out."  (Staten, PageID# 4125, 4128; Franklin, PageID# 4773.) Staten then called Hindmon, who told Staten "he'll get it fixed"; Hindmon would call "Wayne" and try to "get it fixed." (Staten, PageID# 4128-29.)  Ultimately, the money was returned to Franklin's HSA account.  (Staten, PageID# 4128-29; Franklin, PageID# 4774.)  At the same time, Franklin called Hindmon, who was very "short and abrupt," and Hindmon told Franklin he would get it resolved or he would pay her in cash.  (Franklin, PageID# 4774, 4799.)  Franklin also informed Hindmon that she had received creams she did not order.  (*Id.* at 4797.)

## VI.     Proof Regarding Jayson Montgomery

Jayson Montgomery fraudulently marketed topical creams under Billy Hindmon.  While the bulk of his participation in the scheme involved his targeting of service members with Tricare insurance, he also duped individuals with private insurance into ordering very expensive creams they did not particularly want or need.

Dawn Montgomery

Jayson Montgomery's mother, Dawn Montgomery, testified pursuant to a compulsion order signed by the Court granting her transactional immunity. (D. Montgomery, PageID# 5066-68, 5070, Exhibit 36.)  Dawn is also a bill collector, working with Maria Valadez.  (*Id.* at 5069, 5078.   She was aware that Jayson started working under Billy Hindmon selling creams in 2014. (*Id.* at 5071.)  Jayson was aware that she had Blue Cross insurance. (*Id.* at 5071-72.)  At the time, she had custody of several of her grandchildren, Jayson's nieces and nephews. (*Id.* at 5072.)

As far as she knew, she was the first person her son approached about ordering creams. 1445.  He told her she could get $200 or $300 for each cream she ordered herself. (D. Montgomery, PageID# 5073-74.) She agreed to allow creams to be ordered for herself and for

37

each of her grandchildren. (*Id.* at 5073.) There was no mention of her having to pay any money out of pocket, and once it became an issue, Jayson told her not to worry about the co-pay because she did not have to pay it. (*Id.* at 5076.) The only time she got a call from either a doctor or a pharmacy about those prescriptions was a call regarding a refill, with the person on the phone asking how the cream was working. (*Id.* at 5076.) She was paid in cash as promised for ordering the creams, but does not recall if it was exactly $200 or $300 per cream. (*Id.* at 5074.)

Jayson also told his mother that he would pay $100 to every person his mother could sign up to receive creams. (D. Montgomery, PageID# 5073.) She, in turn, asked Maria Valadez if she wanted to participate, passing along the promise of $100 per person. (*Id.* at 5078.) After signing up to receive creams, Maria informed her that she was getting bills from a pharmacy for unpaid co-payments. (*Id.* at 5080.) She reported this to Jayson, who showed up shortly thereafter, along with Billy Hindmon. (*Id.* at 5082-83.) After meeting with Maria, Jayson and Billy left, telling her they were going to get money orders. (*Id.* at 5084.) She then saw them return with the money orders, giving them to Maria and to Araceili Quezada, another co-worker who had agreed to order creams. (*Id.* at 5078, 5084.)

Based on her conversations with Jayson, Dawn's belief was that Billy was above Jayson in the marketing structure, and that Wayne was above Billy. (D. Montgomery, PageID# 5086-87.) She was asked by Jayson to serve as a marketing rep herself underneath him, but she declined. (*Id.* at 5086.) As she put it, "they were making a lot of money quickly," and she did not have a good feeling about it. (*Id.* at 5086.)

<u>Maria Valadez</u>

Maria Valadez learned about the opportunity to order creams, and make money in the process, from Dawn Montgomery, Jayson's mother. (Valadez, PageID# 4941.) Valadez and

38

Dawn were co-workers at Professional Account Services, a collections agency in Brentwood, Tennessee. (*Id.* at 4940-41.) After being led to believe that the program involved "clinical trials," Valadez signed up herself and six of her family members (her husband, children, and nephew living with her), and was promised a payment of $100.00 per person for doing so. (*Id.* at 4940-41, Exhibits 140, 142, 144, 145, 147, 148, 150, 152.) She never spoke with a doctor before receiving the creams. (*Id.* at 4946-48.)

The products ultimately arrived in the mail, and she never used any of the creams because of her concern that the "containers looked really weird." (Valadez, PageID# 4960-62.) Her nephew used some of the acne cream and it caused his face to break out. (*Id.* at 4961-62.) The products that she and her family members received were subsequently thrown in the trash. (*Id.* at 4961-62.)

After being told there was no out of pocket cost associated with these items, she later received an invoice from the pharmacy claiming that she and her family members owed $175.00 for co-payments. (Valadez, Page ID# 4961-63, Exhibit 7.) After she confronted Dawn Montgomery about the communication from the pharmacy, Jayson Montgomery, accompanied by Billy Hindmon, came to Valadez's place of employment. (*Id.* at 4967-68.) When Valadez complained to the two of them about the invoices, Hindmon gave her money orders in the amount of the co-payments to fill out, which she did. (*Id.* at 4969-70, Exhibit 5.) Being a bill collector herself, and being aware of the impact unpaid debts can have on one's credit, Valadez followed up to verify that the accounts with the pharmacy were paid in full. (*Id.* at 4970-71.) At some point in the conversation, Valadez complained that she had not received the money which was promised to her. (*Id.* at 4977.) Hindmon then reached into his pocket, pulled out some money, and gave her seven $100 bills. (*Id.* at 4977.)

Ms. Valadez's insurance company was billed over $230,000.00 for the prescription creams ordered for her and her family. (Valadez, PageID# 4972.) She would not have ordered these creams had she known that the insurance company would be required to pay such a large amount. (*Id.* at 4973.)

Zac Rice

Zac Rice, kicked out of the United States Army for his participation in this scheme, was approached by Montgomery at a bar in Clarksville, Tennessee. (Rice, PageID# 4653-54, 4656.) Realizing that Rice was in the Army, Montgomery struck up a conversation with Rice which eventually lead to Rice's ordering several topical creams. (*Id.* at 4656-57.) Rice ordered a scar cream and a pain management cream. (*Id.* at 4659-60, Exhibit 2309.) At the time, Rice signed a form stating that he was participating in a survey and may receive financial payment which is not conditioned upon providing a favorable evaluation, and he was expected to make a fair and honest evaluation. (*Id.* at 4658-59, Exhibit 2702.) He was never sent any such survey. (*Id.* at 4658-60.)

Even though he did not order or request wellness tablets, an order for those was placed for him as well. (Rice, PageID# 4659-61, Exhibit 2309.) Rice tried the tablets, noticing no effect. (*Id.* at 4660-61.) However, he continually received the unwanted wellness tablets, and called Montgomery to inform him of the mistake. (*Id.*) Montgomery's response was simply that the tablets were, "just part of the order," and the tablets kept coming "pretty frequently" in spite of Rice's protestations. (*Id.*) Unknown to Rice at the time, Tricare was billed for the capsules each and every time they were shipped. (*Id.*)

By now, Montgomery was aware that Rice was a staff sergeant, and that there were soldiers under his command. (Rice, PageID# 4657.) As such, Montgomery asked Rice to sign

40

other people up to receive creams as well. (*Id.* at 4662.) Montgomery, knowing that Rice was targeting individuals with Tricare, agreed to pay Rice a commission on the creams ordered by his subordinates. (*Id.* at 4662, 4748-49.) Spouses and other dependents of active duty military members were required to pay a copay for prescriptions, while active duty members themselves did not. (*Id.* at 4665-66.) To get around this, Montgomery instructed Rice to place the order under the service member's name, and then have the soldier give the product to the wife. (*Id.* at 4665-66.)

In all, Rice signed up 23 people, including 16 soldiers directly under his command, to allow their Tricare accounts to be billed for creams. (Rice, PageID# 4664-65, Exhibit 1905.) One of Rice's soldiers recruited two others to provide their Tricare information for the purchase of creams. (*Id.* at 4663-64.) In exchange for this, Montgomery, through his LLC, JCM Marketing, paid Rice in excess of $80,000.00. (*Id.* at 4678-79.) Prior to making most of the payments to Rice, Montgomery and Billy Hindmon instructed him to form an LLC, and even reimbursed him for the cost of doing so. (*Id.* at 4668-69.) While he was actively recruiting Tricare recipients, Montgomery, Hindmon, and Wayne Wilkerson, continued to pander to Rice, wining and dining him at various bars and restaurants, encouraging him to sign up even more service members. (*Id.* at 4674-78, Exhibit 24.)

As a result of Montgomery's targeting of Tricare beneficiaries through Zac Rice, Tricare paid $1,345,812.00 in fraudulent claims. (Rice, PageID# 4682, Exhibit 26.) Rice, booted from the Army as a result of his participation in this scheme, has entered into an administrative settlement agreement whereby he is responsible for paying back all $82,212.00 of the Tricare kickbacks paid to him by Montgomery. (*Id.* at 4654, 4682, Exhibit 26.)

<u>James Allen</u>

James Allen, still in the Army, was a soldier serving under Zac Rice at Fort Campbell, Kentucky in 2014. (Allen, PageID# 4821.) Allen was approached by Rice, his sergeant, and "forced" to agree to order creams. (*Id.* at 4821-22.) As Allen described it, Rice was his immediate supervisor, and based on his day to day conditions over which Rice had exclusive control, Allen did not believe he had the opportunity to decline. (*Id.* at 4822.)

Allen agreed to allow his Tricare insurance to be billed for a pain cream for himself (which he justified to himself because of pain from masonry work in the private sector), and for a stretch mark cream for his wife (which he could justify since she had recently lost weight from a pregnancy). (Allen, PageID# 4821-25.) Both were ordered in his name. (*Id.* at 4825.) While he did not request wellness tablets, they were also ordered in his name, even though he never received or used them. (*Id.* at 4824-25, Exhibit 1315.) He made it very clear that the written request for wellness tablets was not his handwriting and was not made by him. (*Id.* at 4828.) And even though he signed a form indicating he was participating in a study, he was never asked to evaluate any of the products. (*Id.* at 4828-29, Exhibit 2701.)

Furthermore, Allen is certain he never saw or spoke with Toni Dobson, the listed prescriber of his medications. (Allen, PageID# 4826, Exhibit 2701.) He only used the pain cream once, and stopped using it because it did not work. (*Id.* at 4829.) As he described it, over the counter Bengay worked just as well. (*Id.* at 4829.) It even smelled the same as Bengay. (*Id.* at 4830.)

He received no compensation for allowing his Tricare account to be billed for the products, agreeing to order them merely because he felt he had no choice but to appease his immediate superior in the military. (Allen, PageID# 4822, 4834.) At the time, he did not know

how much Tricare would be billed for the products ordered in his name, knowing only that he would not owe any out of pocket money himself. (*Id.* at 4827, 4830.)  Had he known that allowing his information to be used would result in Tricare's paying $37,760.52, he would never have agreed to request the creams. (*Id.* at 4830, Exhibit 218.)

<u>Nicholas Quincey</u>

Nicholas Quincey, an Army Humvee mechanic currently stationed at Fort Riley, Kansas, was approached by Zac Rice at Fort Campbell in 2014.  (Quincey, PageID# 5991, 5995.) Quincey knew Rice from having previously served with him when they were both stationed in Hawaii. (*Id.* at 5994-5995.) Quincey agreed to allow Rice to order pain cream, scar cream, and a wellness pill for him. (*Id.* at 5995-5996.) While Quincey was ultimately interested in them, the three particular products were initially suggested to him by Rice, who steered him to order these three instead of others. (*Id.* at 5998-5999.) As an active duty soldier, Quincey had Tricare insurance which was used for this purchase. (Exhibit 1512.)  He recalls receiving a call from an unknown individual regarding the prescriptions prior to receiving them, but it only lasted a minute or so. (*Id.* at 6001.)  He did not use the scar cream and wellness pills after initially determining that they made no difference, while he did believe that the pain cream was a better numbing agent than Icy Hot. (Quincey, PageID# 5995-5996.) He, likewise, was never asked to evaluate any of the products he received. (*Id.* at 6001.)

At Rice's suggestion, he also began signing up other soldiers to order creams. (Quincey, PageID# 5996-5997.)  In exchange for doing this, Rice paid him "a couple of thousand dollars" in cash. (*Id.* at 5997.  When he was encouraging others to use their Tricare insurance to order the creams and pills, he stressed that the products were free because of Tricare, and would not cost

the service member anything. (*Id.* at 6004. He primarily signed up people to receive the same three products; pain cream, scar cream, and wellness tablets. (*Id.* at 6004.)

Quincey also met Jayson Montgomery at a bar in Clarksville, and saw him on several occasions. (Quincey, PageID# 6006.) Quincey, like Rice, was encouraged by Montgomery to form an LLC for the cream marketing efforts. (*Id.* at 6007.) In fact, Montgomery helped Quincey navigate the LLC formation process online, and paid the fees associated with doing so. (*Id.* at 6007.) Ultimately, Quincey backed out, choosing not go through with the LLC because "it didn't feel right," and made him uncomfortable. (*Id.* at 6008.)

Quincey does not recall ever meeting Billy Hindmon, but knows that there was an individual named Billy who worked with Jayson, and that their boss was someone named Wayne. (*Id.* at 6008.) Ultimately, Tricare paid $71,192.37 for the prescriptions ordered in Quincey's name. (Exhibit 215.)

Bradley Wurster

Bradley Wurster, currently a civilian living in Palm Bay, Florida, served under Staff Sergeant Zac Rice at Fort Campbell in 2014. (Wurster, PageID# 5035-5036.) He has since been honorably discharged. (*Id.* at 5036.) In 2014, Wurster was approached by Rice, his immediate supervisor, about signing up to receive creams. (*Id.* at 5036-5037.) Having the same type of general aches and pains in his back that "everybody else has," Wurster agreed to order a pain cream. (*Id.* at 5037.) Since he was told that Tricare was paying for everything, he signed up for the product out of "curiosity more than anything else." (*Id.* at 5037.)

Wurster never received a call from a doctor or a nurse practitioner about his prescription, but received the pain cream anyway. (*Id.* at 5043-5044.) Even though his prescription stated he was to receive six automatic refills, Wurster did not ask for the refills when he signed up, and

was unaware of them. (*Id.* at 5043, Exhibit 1314.) Also, Wurster did not ask for stretch mark cream or for wellness tablets, but he also received those as well. (*Id.* at 5038, Exhibit 1314.) In fact, the signature on Wurster's product order form requesting those products was not his signature. (*Id.* at 5040-5042, Exhibits 1907, 2703.) Likewise, the signatures purporting to be his on his product use form and on his evaluation agreement were not his either, and neither was the handwriting on the form requesting the wellness capsules. (*Id.* at 5040-5042, Exhibit 2703.) Wurster never said anything about wanting general wellness capsules and did not even know what they were. (*Id.* at 5038, 5042.)

He tried the pain cream when he got it, but "it didn't do anything," so he quit using it. (*Id.* at 5043.) Since he did not request the scar cream or the wellness tablets, he never touched them. (*Id.* at 5043-5044.) He recalled receiving the products two or three times before he deployed. (*Id.* at 5042-5043.)

At the time he agreed to try the pain cream, he was given no information about how much Tricare would be required to pay. (Wurster, PageID# 5042.) Ultimately, Tricare paid in excess of $75,000.00 for the pain cream, and the scar cream, and wellness capsules that he did not request. (*Id.* at 5044, Exhibit 217.) Wurster would not have agreed to the order had he known the amount of money involved. (*Id.* at 5044.)

<u>Katherine Callaway</u>

Katie Callaway is originally from Brentwood, Tennessee, but now lives in Los Angeles and is an aspiring actress. (Callaway, PageID# 5746-47.) She was still living in Tennessee in 2014, and knew Jayson Montgomery through the man she was dating at the time. (*Id.* at 5747.) As she described her relationship with Montgomery, they were "more than acquaintances but not great friends." (*Id.* at 5747.)

The first time she heard about the compounded creams marketed by Montgomery was at a restaurant called Virago in Nashville in 2014. (*Id*. at 5747.)  She was there with a group of friends, including Montgomery, and mentioned a scar on her hip in the context of a conversation about car accidents. (*Id.*)  Montgomery then told her that he worked for a company that produced a topical solution to treat scars, and he offered her a "free sample." (*Id.*)

Callaway, having just obtained health insurance on her own for the first time, allowed Montgomery to take a picture of her Cigna card, and thought nothing else of it at the time. (*Id*. at 5748.).  She thought she would be receiving a small sample of scar lotion, and also recalls that Montgomery mentioned something about "antiaging." (*Id.*)  She definitely was not looking for a new scar cream, and, at 24 years of age, was certainly not looking for an antiaging cream. (*Id.* at 5748-49.)  She was unaware that the items Montgomery was discussing with her were prescription medications. (*Id.* at 5751.)

Before receiving the products, she never saw or spoke with a doctor or nurse practitioner, and does not know who Candace Michele Craven, the prescriber of her creams, was. (*Id.* at 5751-52, Exhibit 154.)  She knew nothing of the 12 months' worth of automatic refills authorized by her prescription. (*Id.* at 5751, Exhibit 154.)  She neither had stretch marks nor needed a stretch mark cream at the time, and did not know that a stretch mark cream was being prescribed for her in addition to the scar and anti-aging creams she was expecting. (*Id.* at 5751, Exhibit 154.)

When she received the creams, she immediately threw them away because of the "suspect" nature of the packaging, which seemed "very wholesale and potentially unsafe" to her. (*Id.* at 5753.)  She did not know that her insurance company was billed for the creams, and did not see an EOB. (*Id.* at 5754.)  She had no idea how expensive the creams were and what Cigna

would be required to pay for them, having been led by Montgomery to believe they were free samples. (*Id.* at 5765.) She never would have agreed to receive the items had she been informed of their true nature and cost. (*Id.* at 5765.)

A year later, she was contacted regarding the creams by Kriplean, agreeing to meet with him and discuss the matter. (*Id*. at 5754-55.) Prior to meeting with Kriplean, she reached out to Montgomery in an attempt to determine what was happening. (*Id.* at 5755.) Rather than providing her an explanation, Montgomery instructed her not to meet with Kriplean, and to not speak with anyone without a lawyer. (*Id.*) Concerned for her own safety, Callaway ignored Montgomery, and met with Kriplean anyway. (*Id.*)

During the meeting with Kriplean, Callaway texted Montgomery, informing him of the nature of the FDA's concerns, and pointing out to him that she never saw a doctor. (*Id.* at 5759-63, Exhibit 3.) Montgomery replied, attempting to convince her that she did, in fact, speak with a doctor over the telephone, referring to it as "telemedicine," which he claimed was legal since there was no controlled substance in the compound. (*Id.* at 5763, Exhibit 3.) Callaway had no idea whether there were controlled substances in the creams. (*Id.*) However, she knew she never spoke to a doctor, so she told him as much, replying "I didn't ever speak to a doctor." (*Id.*, Exhibit 3.) Montgomery never replied to this text, and Callaway has not spoken with him since. (*Id.*)

## CONCLUSIONS OF LAW

### I.   Conspiracy to Commit Health Care Fraud

The proof showed beyond a reasonable doubt that all defendants were engaged in a Health Care Fraud conspiracy under 18 U.S.C. § 1349. As the Court has noted, and as all parties have agreed, the Government must prove beyond a reasonable doubt that:

1. Two or more persons conspired, or agreed, to commit the crime of healthcare fraud;

2. The defendant knowingly and voluntarily joined the conspiracy.

There is no doubt that the defendants acted in concert: the proof at trial showed that all defendants were members and that all profited from the conspiracy. Indeed, the defendants have embraced, through their questioning of government witnesses, and the proof they presented, that they were marketing these medications in concert with each other. Briefly, the proof showed that Wilkerson was at the top of the chain; Chatfield, Nicholson and Hindmon were on the next rung; and then Montgomery was another level down. As many witnesses noted, this was a "pyramid scheme" with Wilkerson at the top. That the others may have made less money, or had less control over the conspiracy, does not mitigate their guilt. In a 'chain' conspiracy, it is enough to show that "each member of the conspiracy realized that he [or she] was participating in a joint venture, even if he [or she] did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008). Even though *Robinson* is a drug distribution chain, the analogy still holds.

Individuals other than marketers were a part of the conspiracy. Notably, Michele Craven was an essential player in the fraud. She in effect "sold her license" to Wilkerson and the others. She signed prescriptions for people she never saw. She almost never saw any of the cream customers in person, and the times she did speak with a customer by phone, she was merely a rubber stamp for creams and medications that had already been selected. As the proof at trial showed, it was the defendants/marketers who were selling directly to the patients; the use of Craven's name and her license, without the exercise of her professional judgment, was the essence of her participation. There was no doctor/patient relationship, Craven was "just writing

scripts," based on "maybe a two-minute conversation." (Craven, PageID# 2816-17.) The pre-printed prescription pads had the formula in place: the health care provider did not tinker with that formula. Compounded medications, allegedly tailored to the patient's needs, cannot be tailored if the medicine is the same for everyone. As the government's materiality witnesses established, the PBMs or insurance companies would not have paid the claims had they known that patients were being given an inducement to order the creams. The fact that the inducement was couched as a bogus study only aggravates the situation for the defendants.

The conspiracy involved deceit: the customers were given an inducement under the guise of "a study" or "an evaluation." The proof showed that not one person ever participated in any kind of study. Indeed, Chatfield admitted, on a recording, that there was never a study. Virtually none of the patients stated that they had a real medical need for the medications. The customers did not seek the medications; the defendants sought out the customers. The customers were sought based upon the type of insurance they had. Indeed, if an insurance company did not pay what the defendants believed to be a worthwhile amount, the defendants would not bother filling those prescriptions.

Even though no overt act is required for a Health Care Fraud conspiracy, *United States v. Rogers*, 769 F.3d 372, 379-82 (6th Cir. 2014) (conspiracies under § 1349 do not require an overt act), there were numerous acts, outlined above, committed.

All of the defendants profited handsomely from the scheme; the numbers are recounted above. Approximately $13 million in commissions was paid by private insurance and Tricare to Wilkerson through Top Tier. From that $13 million, Wilkerson paid himself individually, then split the proceeds on the sales from the other marketers. Wilkerson, through Saige Medical,

49

LLC, was paid another $411,000 for the Hamilton County School employees or dependents who ordered creams.

Chatfield benefited the most, reaping over $5 million in commissions and other proceeds. Ironically, Chatfield made more than Wilkerson, possibly because Wilkerson split his proceeds with Brian Kurtz, his "business partner." See, Exhibit 716, p. 1 (showing Kurtz making $2.8 million and Wilkerson drawing $2.3 million). Part of Chatfield's take was based upon the $1.5 million he was paid by Jimmy Collins in early 2015 for his business. Nicholson's commissions were $938,740, from which she made roughly $550,000. Exhibit 716, p. 3. Over $1 million in commissions flowed to Hindmon; approximately $337,000 of that amount was paid to Montgomery. This $337,000 was the only money that Montgomery made in the conspiracy.

Facts which show intent

All of the defendants have suggested, either through written submissions, questions at trial, or through their witnesses, that the venture was legitimate. At times their insinuation has been more subtle: if any portions of the scheme were illegal, the illegality of it arose from someone else not fulfilling his or her duty. In brief response to this theory, the proof showed that all defendants possessed the necessary intent to join the conspiracy and to violate the law. Wilkerson paid Craven to sign prescriptions for people he knew she did not see or communicate with. Wilkerson was also aware that Craven's stamp was being used on prescriptions without her knowledge. Wilkerson was paying Jared Schwab a "consulting fee"; Schwab was working for Willow, the pharmacy Wilkerson and others were using to fill the prescriptions. Wilkerson paid Rich and Kim Terry (his cousin and the cousin's wife) approximately $130,000 to order their own creams and creams for their family members (Dawn and Nelson Steele). Wilkerson commanded Heather Wyatt Fryar to apply Craven's name using a signature stamp on

50

prescriptions. PageID# 4599-4601. Wilkerson delivered $2,000 in cash to Ryan McGowan at the Red Bank Post Office in order for McGowan to pay approximately $1900 in co-pays owed to Willow. McGowan had been told there would be no cost to him: indeed, there wasn't. In addition to the $36,000 McGowan made on the scheme, he made an additional $89 for his trip to the Post Office. Wilkerson told him to "keep the change" from the $2,000 he had given McGowan. Wilkerson and Chatfield arranged to pay McGowan, who would in turn pay co-pays through money orders, to deceive the insurance companies as to the true source of the co-payments.

Chatfield's intent was proven through witnesses and documentary evidence. Noah Bowling testified that Chatfield encouraged him to enroll his parents and sister for creams even though his parents were not present (this is the incident that occurred at Finley Stadium). George and Debbie Foster also had creams ordered in their names. Neither of the Fosters, or the three Bowlings, knew anything about creams being ordered for them. Chatfield and his wife each admitted to completing the forms and using the names of the Fosters. They used Natalie's cell phone as a point of contact and the creams were shipped to Chatfield's residence, not the Foster's. During a trip to Cherokee, North Carolina, Chatfield ordered creams for his cousin, Matt Chatfield, who was not even present.

In a recorded conversation with George Striker, Chatfield admitted that Willow Pharmacy was "where the fraud happened." PageID# 5392; Exhibit 2112F. Chatfield was right about that, although he should not have limited the fraud to just the transactions involving Willow. Chatfield also admitted that the inducement being paid for the "study" was a fiction: there was no study. Chatfield encouraged Striker to stick with his original "story" given to law enforcement, even though that story was not true. Chatfield admitted that they were paying co-

pays for the customers, but stated "that's not how you word it." Chatfield, in text messages with Kirtis Green, discussed manipulating the formula for the creams in order to receive higher compensation, to order more creams for himself, and to Jared Schwab assisting them in circumventing BC/BS's June 2014 cutoff date. In text messages with Striker, Chatfield explained the creams they would order for Striker's wife and minor children in order for Striker to receive a handsome payday. Chatfield told Morgan to pay his downlinks (all Marines and Sailors) $300 as an inducement to order creams. 5641-42, Exhibit 41. Through Morgan, Chatfield only wanted to target Tricare, not other insurance companies. 5643.

Nicholson contacted Sydney Patterson and encouraged her to order more creams before the June 2014 BC/BS cutoff, even though Patterson did not use the creams, did not like the creams, and did not want more creams. Nicholson paid Matthew Perkins a direct kickback for the creams that he ordered under Tricare. She also encouraged him to recruit his shipmates into the scheme and told him to do "whatever it takes" to get them to sign up. Nicholson told Perkins not to speak with law enforcement. She also boasted to him that she had paid a friend $10,000 in cash, and had paid the friend's health insurance premiums, because she would make money on the friend's prescriptions.

Hindmon and Montgomery arranged for the co-payments for Maria Valadez after she complained to Dawn Montgomery that she was being billed by the pharmacy for co-payments. (According to both Dawn Montgomery and Maria Valadez, Hindmon was more in charge of the situation than Jayson Montgomery.) Hindmon and Montgomery came to Valadez's place of employment, got the co-pay amounts, left to go get money orders, then returned for Valadez to sign the money orders. Hindmon then took the money orders from Valadez. Valadez later confirmed through Willow that the co-payments had been paid. On that same date, in addition to

providing the money orders, Hindmon also gave Valadez $700 in cash for ordering the creams for herself and her family. When Rachel Franklin's Health Savings Account was drained by a pharmacy for the co-payments, Franklin called both Adam Staten and Hindmon. Staten told her that he would reach out to Hindmon. After contact him, Hindmon told Staten that he would contact Wilkerson to resolve the issue. Ms. Franklin called Hindmon herself. Even though he was "short and abrupt," he told her he would either have the money returned to her HSA, or he would pay her in cash. The money was eventually placed back in Franklin's HSA. When Staten had questions about whether Tricare would cover creams for young children, Hindmon told him to submit the prescriptions to see if they would be covered.

Jayson Montgomery paid his mother, Dawn Montgomery, for her ordering creams for herself and her grandchildren (Jayson's nieces and nephews). When Dawn complained that she was being billed a co-pay, Montgomery simply told her not to pay it. Katie Calloway ordered creams through Montgomery; he told her that they were samples and there would be no cost to her. When Ms. Calloway was contacted by Kriplean, she in turn contacted Montgomery. He instructed her not to speak to Kriplean. Montgomery also targeted active duty military personnel in order to secure Tricare prescriptions. Zac Rice met Montgomery at a bar in Nashville; Montgomery immediately signed him up and encouraged him to recruit his fellow soldiers. Nick Quincey, also a soldier, was introduced to Montgomery through Rice. Montgomery recruited him to market creams; he also encouraged Quincey to create an LLC for the purpose of receiving payment. Quincey went to the last step in creating the LLC but then backed out because he had concerns about the legitimacy of the scheme.

With respect to the state of mind issue, the Sixth Circuit's pattern instructions provide:

> 2.08 INFERRING REQUIRED MENTAL STATE
> ....
> (2) Ordinarily, there is no way that a defendant's state of mind can be proved directly, because no one can read another person's mind and tell what that person is thinking.
> (3) But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind.
> (4) You may also consider the natural and probable results of any acts that the defendant knowingly did [or did not do], and whether it is reasonable to conclude that the defendant intended those results.

Based upon the facts above, the Court can, and should, infer that the defendants possessed the requisite mens rea for the crimes. This is not a case where the perpetrators were attempting to "thread the needle" in a legitimate enterprise (as all defendants have suggested). Rather, the defendants have committed outright fraudulent acts and they have attempted to conceal the fraud through a variety of means.

The Sixth Circuit has frowned on categorizing crimes, and the mens rea required to commit them, into "specific" or "general" intent categories. See, Sixth Circuit Pattern Instructions, Committee Commentary § 2.07 (current through July 1, 2019). Quoting *Liparota v. United States*, 471 U.S. 419, 433 n.16 (1985), the Sixth Circuit noted a specific intent instruction had been criticized as "too general and potentially misleading." Quoting *Liparota*, "[a] more useful instruction might relate specifically to the mental state required [for the particular offense] and eschew use of difficult legal concepts like 'specific intent' and 'general intent'." For the underlying offense of Health Care Fraud, the elements provide that the defendants must have "knowingly and willfully executed or attempted to execute a scheme…to defraud any health care benefit program." The facts above show that the defendants "knowingly and willfully" executed a scheme to defraud. The mens rea element is satisfied.

54

Based upon the evidence, all of the defendants have been proven guilty, beyond a reasonable doubt, of a conspiracy to commit Health Care Fraud.

## II.    Substantive Fraud Counts

Each of the wire and mail fraud counts (2-108; 109-134), include either a mailing or wiring in "furtherance of the scheme" to defraud.  See, Sixth Circuit Pattern Instructions, § 10.01 (Mail) and § 10.02 (Wire).  It is not necessary that the government prove that the material transmitted by mail or wire "was itself false or fraudulent," or that the use of the mail or wire "was intended as the specific or exclusive means of accomplishing the alleged fraud."  See, § 10.01(3) and § 10.02(3).  It is well settled that the essence of the mail fraud statute is the use of the mails to facilitate a fraudulent scheme.  *United States v. Stull*, 743 F.2d 439, 444 (6th Cir. 1984).

A "scheme to defraud" is not constrained by a technical definition, but, instead, the "standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'"  *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) (quoting *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973)); see also, *United States v. Frost*, 125 F.3d 346, 371 (6th Cir. 1997) (approving jury instruction that "a scheme or artifice to defraud may describe a departure from fundamental honesty, moral uprightness, or fair play and candid business dealings in the general life of the community.")  The fraudulent actions committed by the defendants, as outlined above, were not a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing."  The entire scheme was developed to deceive insurance companies and Tricare, and to unjustly enrich the defendants.

The fact that the mailing or wiring itself need not include deceit, but rather only need further the scheme to defraud, is underscored in the mail fraud charges naming Wilkerson and Chatfield—the charges regarding the co-pay incident, Ryan McGowan and the Red Bank Post Office. It was not the mailing *itself*, including the money orders in McGowan's name, that was deceitful. Indeed, McGowan had purchased the money orders, completed them, prepared the envelopes, and then mailed them. All of that was technically true. However, those acts, including the mailings, furthered the scheme.

What is not apparent from those actions are the following: Chatfield told McGowan there would be no cost to him for the creams; Chatfield discovered that Willow was requiring a co-pay; Chatfield called McGowan and told him to meet "Wayne" so that Wayne could give him the money for the co-pay; McGowan met Wilkerson at the Red Bank Post Office where Wilkerson gave McGowan the $2,000 for the co-pays. The mailing itself was not the fraud, the fraud was the scheme that led up to the mailing. The mailing was merely the execution and the culmination of the scheme. Furthermore, the mailing in this case occurred after the creams had been ordered. "Mailings occurring after receipt of the goods obtained by fraud are within the statute if they were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Faulkenberry*, 614 F.3d 573, 582 (6th Cir. 2010) (quoting *United States v. Lane*, 474 U.S. 438, 451–52 (1986)). The insurance company in McGowan's case, believing that the pharmacy had actually collected a co-pay, would have had little reason to further investigate or contact law enforcement.

The same is true with many of the other mail and wire executions. Some of them include the wire transfer of commission payments. Wilkerson frequently received his commission

payments from the pharmacies. Within days he would wire transfer to his downlinks their payments. Chatfield's second payment to Josh Morgan was a $300,000 wire transfer. Again, there is nothing inherently illegal about wiring money. Such wiring was just part of the execution of the scheme. Admittedly, some of the wirings, particularly texts between Chatfield and Striker, are more nefarious (where Chatfield informs Striker what creams Chatfield will be ordering for Striker's family). However, there is no requirement that the wires or mailings themselves be illegal.

The government concedes that the 133 charged counts of wire and mail fraud grew out of concern about the introduction of evidence in this case. That concern proved to be well-founded as the defendants objected at every turn to the introduction of testimony and documentary evidence. Counsel for the government is not faulting defense counsel for their collective excellent and aggressive advocacy; however, the government should also not be faulted for anticipating that strategy and taking measures designed to illuminate the proof of the wrongdoing. Each of the charged mail and wire fraud counts furthered the scheme.

Finally, each of the mail and wire fraud counts (as well as all Counts from 2 through 177) include an "aiding and abetting" reference. As an alternative to finding any defendant guilty of a mail or wire fraud crime, the Court can find that the defendants aided and abetted the crimes. To prove aiding and abetting, the government must first prove that the substantive crime was in fact committed, then second, that the defendant named in the respective count helped to commit the crime or encouraged someone else to commit the crime, and third, that the defendant intended to help commit or encourage the crime. Those factors are met in each of the counts as well.

The government urges the Court to find each defendant guilty of the respective counts of mail and wire fraud in which they are named.

### III.    Health Care Fraud Counts

Counts 135 through 140 allege substantive Health Care Fraud counts.  Wilkerson is named in 135 and 136, the rest of the defendants are named in one count each (137 through 140).

The elements of substantive Health Care Fraud are:

1.  The defendant knowingly and willfully executed or attempted to execute a scheme
    a. to defraud any health care benefit program, or
    b. to obtain by false or fraudulent pretenses, representations, or promises any of the money or property owned by or in the control of a health care benefit program, in connection with the payment for health care benefits, items, or services;
2.  The scheme related to a material fact and/or included a material misrepresentation or concealment of a material fact;
3.  The defendant had the intent to defraud.

*United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 852 (2019)(citing 18 U.S.C. § 1347).  Accordingly, the government must "prove that the [] defendants: (1) created 'a scheme or artifice to defraud' a health care program, (2) implemented the plan, and (3) acted with 'intent to defraud.'" *Id.* (citing *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009)).

The government has proven beyond a reasonable doubt that each defendant has executed a scheme to defraud a health care benefit program, the scheme related to a material fact and included material misrepresentations and/or concealment of material facts, and each defendant had the intent to defraud.  In making this argument, the government will rely on the facts and the arguments contained above.

Prior to trial, the Court raised the issue of duplicity and the HCF counts.  (R. 200, Order.) The government filed a memorandum responding to this issue.  (R. 207.)  During the Rule 29 motions, the Court reserved ruling on the HCF duplicity issue.  See, e.g., PageID# 6830.  During trial, the government linked, for each defendant, one private insurance transaction and one

58

Tricare transaction, tracing the process all the way through from the issuance of the individual prescription to the payment of money to the defendant. See, Srock, for Tricare, Page ID# 6247-6253; Kriplean, for private insurance, Page ID# 6589 through Page ID# 6598. This tracing of individual transactions from each defendant through the PBM satisfies the duplicity concerns. While the government chose to charge the HCF counts as an overarching scheme without charging a discreet execution, the government proved at trial a discreet execution as to each defendant. The government submits this proof at trial cures the duplicity problem. Again, during the Rule 29 hearing, the Court noted (regarding general duplicity concerns) "that the cure for duplicity and multiplicity was not to dismiss the indictment, rather manage the verdict on the back end of the case. Ordinarily, this would mean taking a very careful approach to the jury instructions or else entering guilty verdicts in a non-duplicitous, non-multiplicitous manner." PageID# 6769. The Court is now in a position to closely review the proof addressing the duplicity concerns and to, respectfully, find that the government has alleviated those concerns. The government urges the Court to find the defendants guilty of the substantive Health Care Fraud charges.

**IV.    Illegal Remuneration Counts**

Counts 141 through 167 (with the exception of 142 and 160) address the payment or receipt of illegal remunerations under Title 42, United States Code, Section 1320a-7b(b)(1) and (2). The Court has stated the following are the elements with respect to *payment* of illegal remuneration:

> 1. The defendant knowingly and willfully offered or paid remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce a person to:
> a. Refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, or

59

      b. Purchase, lease, order, or arrange or recommend such for any good, facility, service, or item for which payment may be made in whole or part under a Federal health care program.

And these are the elements with respect to *receipt* of illegal remuneration:

      1. The defendant knowingly and willfully solicited or received any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind:
      a. In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be in whole or part under a Federal health care program, or
      b. In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or part under a Federal health care program.

The proof has shown, beyond a reasonable doubt, that all defendants (with the exception of Montgomery) have paid illegal remunerations. Montgomery was located in the Middle District of Tennessee; he paid illegal remunerations (see Zac Rice), but the government did not have venue for those charges in the Eastern District of Tennessee. The proof has shown that all defendants received illegal remunerations regarding Tricare kickbacks (Montgomery's venue was appropriate for the receipt because his payment was sent by Hindmon who maintained his bank account in Hamilton County). Testimony at trial was replete with examples of active duty military personnel being recruited for the purpose of ordering creams, being given cash inducements to do so, and frequently those active duty personnel were then brought on board as "marketing reps" for the purpose of signing up their colleagues. The three active duty personnel most involved were Zac Rice (downlinked from Montgomery and Hindmon), Matthew Perkins (Nicholson and Wilkerson), and Josh Morgan (Chatfield). Other active duty personnel, all in the Army and all related to Rice, Montgomery and Hindmon, testified. Documentary evidence and live testimony established from the three of them that the defendants were involved in paying and receiving kickbacks. The transactions from the PBMs, to the pharmacies, to Wilkerson, then

60

to the other marketers, show that the defendants were receiving payment for the purpose of furnishing an item (compounded medications) from which payment was made in whole or in part by Tricare, a Federal Health Care program. The commission reports from the pharmacies showed that the defendants were being compensated for Tricare reimbursed prescriptions. (At times during the trial, the defendants seemed to embrace that they were being reimbursed for Tricare products, but suggested that Tricare was not a "government program" within the meaning of the statute.)

## V.     Aggravated Identity Theft

Counts 168 through 171 charge Chatfield with Aggravated Identity Theft, aided and abetted by others, under Title 18, United States Code, Sections 1028A and 2. These counts relate to the testimony of Noah Bowling and George and Debbie Foster (Debbie Foster was not a named victim in the Agg ID Theft counts. Only George and the three Bowlings were named as victims). A synopsis of their testimony is given above.

These are the elements:

    1. The defendant committed mail fraud, wire fraud, health care fraud, and conspiracy as charged above, and those violations are violations listed in the statute;
    2. The defendant knowingly used a means of identification of another person without lawful authority;
    3. The defendant knew the means of identification belonged to another person;
    4. The use was during and in relation to the crimes listed above.

Chatfield has committed a qualifying predicate offense (conspiracy to commit HCF, for example). Aided and abetted by others (Noah and Luke Bowling, Natalie Chatfield), he used the means of identification, without authority, of George Foster and the three Bowlings (Hal, Susanne and Emma) to order hundreds of thousands of dollars in compounded medications. All testified that they had creams ordered in their names

without their permission. None of them knew that Chatfield, or anyone else, had ordered creams for them. Debra Foster testified that she did not give her permission to anyone—either her daughter Natalie, or to Michael Chatfield—to order creams in George's name. Noah testified that he ordered the creams for his parents, in Chatfield's presence and at his urging, at halftime of the Chattanooga Football Club game in the parking lot at Finley stadium. It is beyond dispute that Chatfield would have known that the three Bowlings and George Foster (his father-in-law) were real people and that the means of identification belonged to them. The use of one's name qualifies as a "means of identification" under 18 U.S.C. § 1028(d)(7).

The proof has shown, beyond a reasonable doubt, that Chatfield is guilty of the four Aggravated Identity Theft counts.

## VI.     Money Laundering

Counts 172 (Wilkerson) and 173 through 177 (Chatfield) charge money laundering offenses in violation of Title 18, United States Code, § 1957. These are the elements:

> 1. The defendant knowingly engaged in a monetary transaction;
> 2. The monetary transaction was in property derived from specified unlawful activity;
> 3. The property had a value greater than $10,000;
> 4. The defendant knew that the transaction was in criminally derived property;
> 5. The monetary transaction took place within the United States.

These counts relate to the wire transfer (from Wilkerson to "Terry Transport") in Count 172 and the checks written by Chatfield on Top Shelf's account in Counts 173-177. All five elements have been satisfied beyond a reasonable doubt. The writing of a check or a wire transfer is a money transaction within the meaning of the statute. (See 18

62

U.S.C. § 1957(f)(1): the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution.) The money was derived from specified unlawful activity, that is, the conspiracy and scheme to defraud. All of the transactions had a value greater than $10,000. Wilkerson and Chatfield knew that the respective transactions were in criminally derived property, that is, proceeds from the scheme. Finally, the transactions took place in the United States. The Court should find Wilkerson and Chatfield guilty of these money laundering offenses.

## VII. Conspiracy to Commit Money Laundering

Count 178 charges Hindmon and Montgomery with a conspiracy to commit money laundering (promotion and concealment) under Title 18, United States Code, Section 371. These are the elements:

> 1. Two or more persons conspired, or agreed, to commit the crime of conducting financial transactions made illegal under 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) because the transactions involved and were designed to conceal the nature of proceeds relating [to] unlawful mail fraud, wire fraud, and health care fraud under 18 U.S.C. §§ 1341, 1343, and 1347, respectively;
> 2. The defendants knowingly and voluntarily joined the conspiracy;
> 3. A member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

The facts surrounding this count are contained in the testimony of Dawn Montgomery and Maria Valadez. In a nutshell, Valadez had ordered creams through Dawn Montgomery and Jayson Montgomery. When she was notified that she owed a co-pay, after being told that she would incur no cost for the creams, she contacted Dawn, who in turn contacted Jayson Montgomery. Shortly thereafter, Montgomery and

63

Hindmon came to Valadez's place of employment, left to get money orders, then came back and had her complete them. Hindmon then took the completed money orders; Valadez confirmed that Willow Pharmacy later received them.

This transaction was designed to conceal the nature of the proceeds in that it was structured in an attempt to make it appear that Valadez, the person who ordered the creams, was paying the co-payment. This, of course, was not true. Hindmon, aided by Montgomery, was conducting the transaction to conceal its true nature. (The indictment also contains "promotion" language, and the payments did serve to promote the scheme, but the concealment prong is much stronger and more obvious.) As noted in the indictment, the overt acts would have included the sending of the prescriptions for Valadez and her family to Chattanooga; the faxing of those prescriptions from Chattanooga to Willow Pharmacy in Louisiana; the purchasing of the money orders; and the sending of the money orders to Willow. Hindmon also received his commission payment for Valadez in the EDTN. The purpose of this transaction was to conceal from either the PBM or the insurance company that Hindmon was making the co-payment for Valadez's compounded creams. Stated another way, Hindmon and Montgomery were attempting to legitimize the transaction by showing that Valadez was paying a co-pay when in fact she was not. In *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), the Sixth Circuit listed some factors indicative of concealment:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

64

*McGahee*, at 527-28 (citing *United States v. Garcia–Emanuel*, 14 F.3d 1469, 1475–76 (10th Cir. 1994)). This transaction was "designed to conceal" the payor of the co-payments. If concealment were not the purpose, there would have been no value in bringing the money orders to Valadez for her signature: Hindmon or Montgomery could have just sent the money orders in themselves.

The elements for the crime charged in Count 178 have been shown beyond a reasonable doubt. The Court should convict Hindmon and Montgomery of this charge.

## CONCLUSION

Based upon the foregoing, the United States respectfully suggests that the defendants should all be convicted of the counts in which they are named.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By: *s/Perry H. Piper*
PERRY H. PIPER, BPR #013384
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Perry.Piper@usdoj.gov

*s/Franklin P. Clark*
FRANKLIN P. CLARK
BPR #034112
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Frank.Clark@usdoj.gov