# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **1:18-cr-11** |
| v. | ) | |
| | ) | **Judge Mattice/Steger** |
| JERRY WAYNE WILKERSON, | ) | |
| MICHAEL CHATFIELD, | ) | |
| KASEY NICHOLSON, | ) | |
| BILLY HINDMON, and | ) | |
| JAYSON MONTGOMERY | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and hereby offer this response to the defendants' findings of fact and conclusions of law. The government previously filed an initial brief regarding this matter. (R. 390, United States Findings of Fact and Conclusions of Law.) The defendants have all filed responsive briefs. (R. 396, Wilkerson Amended; R. 392, Chatfield; R. 393, Nicholson; R. 395, Hindmon; R. 391, Montgomery.) The government will respond to each of the defendant's claims.

### I.    Wayne Wilkerson

Mr. Wilkerson raises a number of issues in his post-trial briefing. The United States will attempt to address all of them. However, because of page limit concerns, the government may be required to address some of the issues at the closing/oral argument to be held on February 4, 2020.

Just as he argued in his motion to dismiss, Wilkerson again raises, among other things, that the case is civil in nature, that he had "no duty" to perform (or refrain from performing) certain acts, that other actors (pharmacists, doctors, insurance companies) provided the

culpability for various aspects of the conspiracy, or that any deviations from lawful behavior were "de minimus." (R. 394, Wilkerson, PageID# 7910-16.) Addressing those allegations, the Court stated

> In sum, Defendants point out that the indictment alleges that it was "healthcare professionals," not them, who prescribed Defendants' customers the medications they sold, that pharmacies dispensed those medications pursuant [to] prescriptions and billed insurance companies accordingly, and that the billing pharmacies were responsible for ensuring compliance with insurance deductibles, co-insurance, and the collection co-payments upon submitting a claim. Defendants assert not only that the indictment alleges that these actions or omissions were committed by others, but that they actually lacked the *de jure* authority to take those actions. In other words, they claim "there is no showing that the defendants were in legal control of the circumstances." [*Id*. ¶ 7]. As a result, Defendants argue the Third Superseding Indictment fails to allege they committed the offense of health care fraud.

R. 242, Order (on Outstanding Motions), PageID# 1282. Continuing, the Court noted

> In their focus on the alleged actions of healthcare professionals, Defendants skip over a host of allegedly dishonest acts they allegedly performed as part of the "scheme." The indictment alleges, for instance, that Defendants told customers that they were being prescribed marketed medications as part of "an evaluation, trial or study," allegedly as a cover for why the customers would receive compensation "as an inducement" for signing up. [Doc. 131 ¶¶ 2, 11]. Defendants also allegedly misrepresented to customers that they would be not be subject to a co-payment upon receiving the medications. [*Id*. ¶ 2]. More troubling, Defendants would "occasionally" skip this whole charade and allegedly use a customer's identification "to obtain prescriptions without the customer's authorization or knowledge." [Doc. 131 ¶ 10].

*Id*. at 1283. The proof at trial removes this case from the "allegedly" realm. The proof showed the facts the Court relied on in this preceding paragraph, i.e., there was no evaluation, there was an inducement, customers were told there would be no co-pay, and in the case of Chatfield, prescriptions were obtained without the authorization from the customer (Bowlings, Fosters, Matt Chatfield, Striker's children and stepchildren). The proof also showed that nurse practitioner Candace Michele Craven was being paid by Wilkerson to sign prescriptions without contacting the patients and that others used

2

Craven's signature stamp to affix her name to prescriptions without her knowledge. The Court continued in its previous order:

> Despite the aforementioned allegations, Defendants assert, "[t]he Indictment fails to allege in any manner how the defendants misrepresented anything or misled anyone in order to deceive." [Doc. 175 at ¶ 17 (emphasis in original)]. The Court disagrees. As the referenced allegations show, that assertion is patently wrong. The aforementioned actions were allegedly fraudulent as well as "knowingly and intentionally" committed to defraud or otherwise obtain money from a "health care benefits program."

*Id*. at 1284. Again, the proof at trial showed that Wilkerson, and all defendants, were "committed to defraud or otherwise obtain money from a 'health care benefits program.'" Just as the indictment alleged health care fraud, the proof at trial showed, beyond a reasonable doubt, that Wilkerson and the others conspired to commit health care fraud, and engaged in a scheme to commit other types of fraud (mail, wire and substantive health care).

As the government has noted in other filings, all of the defendants misapprehend the nature of a scheme to defraud. Federal law makes it a crime for individuals, "in connection with the delivery of or payment for health care benefits, items, or services," to "knowingly and willfully execute[ ] ... a scheme or artifice" "to defraud any health care benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises" money or property from such program. *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 852 (2019)(citing 18 U.S.C. § 1347). Accordingly, the government must "prove that the [] defendants: (1) created 'a scheme or artifice to defraud' a health care program, (2) implemented the plan, and (3) acted with 'intent to defraud.'" *Id*. (citing *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009)). The same can be said for mail and wire fraud. The defendants only need "participate" in a wire or mail fraud scheme in order to be found

guilty. (See, Sixth Circuit Pattern Instruction, 10.01(1)(A), referencing "knowingly participated in.") They need not be in control of the "patient stream" in order to be found guilty as they suggest.

The defendants also argue that they, as marketers, had no duty to disclose certain facts to the PBMs or insurance companies, therefore an "omission" or "concealment" by them cannot form the basis for any fraud counts. (See, Chatfield, R. 392 PageID# 7864; Wilkerson Amended, 7984.) In making this claim, the defendants rely (and have relied in the past) on *United States v. Maddux*, 917 F.3d 437, 443-446 (6th Cir. 2019). The acts by the defendants are more than just "omissions," they took affirmative steps to commit the fraud. As noted repeatedly, the defendants paid co-pays, paid inducements, and took numerous other affirmative acts to ensure the success of the fraudulent scheme and conspiracy. Classifying these steps as *omissions* is inaccurate.

Continuing with the defendants' pre-trial motion to dismiss, the Court noted, citing *United States v. Superior Growers*, 982 F.2d 173, 176 (6th Cir. 1992), "an indictment for conspiring to commit an offense' [need not] 'allege with technical precision the elements essential to the commission of the offense which is the object of the conspiracy" because "the essence of conspiracy is an agreement to commit an illegal act, not its accomplishment." *Id*. at 1285. The proof showed an agreement to commit health care fraud. For example, Wilkerson agreed to meet Ryan McGowan at the Red Bank Post Office after Michael Chatfield called McGowan, informed him that there we co-pays due on McGowan's creams, and that Wilkerson would meet him at the Post Office to provide him with the money for his co-pays. Likewise, Matthew Perkins established that Kasey Nicholson was downlinked from Wilkerson and that he was the head of the scheme. Josh Linz explained that Wilkerson originally recruited him to order creams, then Hindmon took over for Wilkerson, then Wilkerson replaced Hindmon at the

4

end. The downlinks from Jayson Montgomery knew that "Wayne" was at the top of the pyramid (Dawn Montgomery, for example). The documentary proof leaves no doubt that a conspiracy was formed. For example, in June 2014, Wilkerson received a $2,953,985.20 payment from Willow. (Exhibit 303.) From that payment, Wilkerson paid Chatfield ($740,518.00, Exhibit 304), Nicholson ($133,018.00, Exhibit 305) and Hindmon ($109.066.00, Exhibit 319). Hindmon then paid Montgomery ($38,148.90, Exhibit 320.) Wilkerson also paid $93,649.00 to Terry Transport in June 2014 from that payment by Willow. (Exhibit 306.) All of these payments occurred within the span of four days, and they are all from May 2014 commissions. (Exhibits 303-05, 319-20, 402-03, 412.) As the Court noted many times at trial, in a conspiracy the government need not prove that the defendants committed each act, but rather, that the defendants *agreed* to commit health care fraud and took actions necessary to do so. The "essence" of conspiracy is the agreement to commit the act. (R. 242, Order, PageID# 1284) (citing *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985)).

Even though Wilkerson alleges he took no affirmative steps in the conspiracy or the scheme, the proof showed otherwise. After initially individually paying Craven (when she worked at Balanced Life) to sign prescriptions for individuals recruited by him and the co-defendants, he further developed the scheme by hiring Craven to write prescriptions for the creams, thereby bypassing the difficulty of securing prescriptions through an independent doctor who was not beholden to Wilkerson. (Staten, PageID# 4079, 4081-82, 4172.) He paid Craven to write scripts, frequently for people she never had any communication with.[1] (Craven, PageID#

---

[1] Wilkerson argues that he was paying Craven for her expertise in assisting the set up for Karma Wellness, Wilkerson's new spa. If that were the case, it seems strange that Wilkerson would have charged his four downlinks from Top Tier in the cream business—Green, Chatfield, Nicholson and Hindmon--$4,000 each for payment to Craven and Schwab. The four downlinks had nothing to do with the opening or running of Karma. That business belonged to Wilkerson and Kurtz. The proof at trial showed that the legitimate purpose of Karma was not to sell creams; rather, it was a beauty spa. However, the medical professionals who worked there used their medical licenses to prescribe medications for Wilkerson and others in order to further the scheme.

5

at 2794-96, 2799-2800.)  He paid people to order their own scripts: Josh Linz was paid by

Wilkerson and Hindmon approximately $100,000 to order scripts for himself through Tricare;

Linz's commission was based upon $770,000 in claims paid by Tricare for Linz and his

roommate, Wes Daniel.  (Linz, PageID# 5705-10, 5720, 5733-34; Exhibits 213, 227, 229, 346,

351, 352 and 1904.)  Of that $100K paid to Linz, some of it was paid by Wilkerson and some of

it by Hindmon. (Linz, PageID# 5710, 5715-16.)   However, Wilkerson, as the leader of the

conspiracy, still received his top-level cut on any commissions paid to Linz through Hindmon.

He paid Jared Schwab, a pharmacist at Willow, for "consulting," work which amounted to

Schwab giving tips on how to increase the cost of drugs and for shuttling through scripts after

certain deadlines.  (Kriplean, PageID# 6422; Exhibit 515, discussing "Jared" advising Chatfield

to move the fluticasone to ".05" in order to increase the cost of the cream to $7,000.00.)

Wilkerson offers a new tack with respect to the anti-kickback statute, urging the Court to

employ standards found in an HHS OIG website.  The Court should use the instruction proffered

by the Court some months ago.  This instruction is for the payment of a kickback (the receipt

instruction is similar):

> 1. The defendant knowingly and willfully offered or paid remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash
> or in kind to induce a person to:
>> a. Refer an individual to a person for the furnishing or arranging for the
>> furnishing of any item or service for which payment may be made in
>> whole or part under a Federal health care program, or
>> b. Purchase, lease, order, or arrange or recommend such for any good,
>> facility, service, or item for which payment may be made in whole or part
>> under a Federal health care program.

See, R. 390, PageID# 7821-22.  Indeed, this instruction essentially tracks the elements and

language of Wilkerson's proffered instruction from the Eighth Circuit.  (R. 373, PageID#: 6166-

67.)  Further delineation from the elements found in an HHS website is unwarranted, especially

since Wilkerson did not put this document into evidence at trial, nor did he seek testimony regarding it. Wilkerson suggests, through the HHS website, regarding the anti-kickback statute

> [d]eterminations of whether any specific arrangement is violative of federal anti-kickback law should be based upon a totality of the circumstances, and sales commissions based on sales volume is but 1 of 6 applicable criteria. See e.g., Opinion of the Department of Health and Human Services, Office of the Inspector General, No. 98-10, available at: http://oig.hhs.gov/fraud/docs/advisoryopinions/1998/ao98_10.htm.

Wilkerson, Amended Brief, PageID# 8005 (¶ 118). This proof, or the proffered factors to be considered, was not introduced through any witness at trial, either through Srock or James Gogue, or through any of the defense witnesses. Wilkerson should not be allowed after the close of proof to introduce new evidence regarding HHS OIG's criteria.

In the event the Court allows this new evidence, the evidence supports the government's case under the "totality of the circumstances" test (shown in the website accessed through the hyperlink). The proof showed that the violations in this case mirrored many of the criteria listed—and it is a non-exhaustive list—revealing the illegality of the kickback scheme:

> * compensation based on percentage of sales (well established through numerous commission reports and conceded by the defendants);
> * direct billing of a Federal health care program by the Seller for the item or service sold by the sales agent (the seller is the pharmacy; the sales agent would be the defendants/marketers);
> * direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program (Wilkerson employed medical professionals to sign scripts and his down-linked conspirators Chatfield and Green had direct access to them);
> * direct contact between the sales agent and Federal health care program beneficiaries (i.e., direct-to-patient recruiting for prescriptions);
> * use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients (marketers were exerting undue influence by paying a fee or other inducements to service members for ordering; Wilkerson also had a health care background prior to the scheme).

The next paragraph from the HHS website states, "[t]his list is illustrative, not exhaustive, and the absence of any of these factors certainly does not mean that a sales arrangement is permissible under the anti-kickback statute. However, the more factors that are present, the greater the scrutiny we ordinarily will give an arrangement. Of course, in all cases the statute is not violated unless the parties have the requisite intent to induce referrals." The proof showed the marketers had the intent to induce referrals through the following proof: the pharmacy, by paying Wilkerson, induced him to refer prescriptions to the pharmacy; and Wilkerson, by paying his down-links, induced them to refer the prescriptions to him/the pharmacy. If the Court is to consider the factors from the website, those factors support the government, the proof offered at trial, and the elements the Court has set forth with respect to the anti-kickback counts. The factors referenced by Wilkerson only aggravate his position and that of the other defendants.

Wilkerson suggests that whether patients were paid to accept medications and/or participate in a patient study is not a violation of any law and therefore the government has failed to show that Wilkerson has committed any crime. (R. 396, PageID# 7972.) Such a statement is indicative of Wilkerson's defense: patients were paid an inducement to order and/or they were paid for a study, these are not "illegal acts," therefore the government cannot prove a crime. First, Wilkerson is suggesting, as the proof showed, that patients were paid to order the creams; second, he's also agreeing that the patients were paid for a non-existent study. Paying a patient/customer to order medication is an inducement. As the government has suggested before, paying a Tricare patient to order a cream is an inducement and a direct violation of the AKS. Such a payment is a crime in itself. Additionally, paying an inducement for a non-existent study to a Tricare recipient is material (even were it not a crime), is evidence of fraud, and would have made the claim a non-covered benefit. (Gogue, PageID # 5553-54.) Tricare relies "on the

8

integrity of the prescriber to professionally make, on their own cognizance, those diagnoses and evaluations which would reach a conclusion that a prescription was medically necessary." (Gogue, PageID # 5555.)

Likewise, paying a patient with civilian insurance to order a cream is not a direct violation under Title 42 (the AKS provisions); however, the payment of the inducements is evidence of fraud. (McCall, PageID # 6047.) If the patient is being paid to order a medicine, or if the marketer or pharmacy is paying or waiving the co-payment, then the patient does not have "skin in the game" and there is no downside to the patient ordering the medications. (McCall, PageID # 6044-46; addressing the Court's question contrasting co-payments for exorbitant compounds vs. medications with societal value such as statins.)

Wilkerson makes a similar claim with respect to the issue of whether he "employed some of the prescribing physicians." He argues that such actions "do not violate any law," and cites 42 USC § 1320a-7b(b)(3)(B); 42 CFR § 1001.952(i); and *Joint Technology, Inc. v. Weaver*, Case No. CIV-11-846, 2013 U.S. Dist. LEXIS 8763 (W.D. Okla. 2013). An examination of *Joint Technology* is illustrative. In that civil case involving durable medical equipment, the court was presented with the issue of whether a doctor, who was a 1099 employee, would be considered a full employee under the law of Oklahoma. Slip Op. at 4. The court found that the 1099 doctor was *not* an employee. *Id*. at 5-7. Wilkerson's citation to *Joint Technology* is technically correct, but the result in the case is not what Wilkerson seeks to rely upon. Raising a bigger issue, it is not important whether Craven (and the others) were employees of Wilkerson; the salient point is whether Wilkerson hired them to further the scheme. The government did not allege that the payments to Craven were violations of the AKS (although they may have in fact been); what the proof showed is that Wilkerson paid, and later hired, Craven to circumvent the problem of

9

finding a prescriber who would do his bidding. (Staten, PageID# 4081-82.) There can be no doubt that the purpose in initially paying, and ultimately hiring, Craven, who was an integral part of the conspiracy, was to further the scheme to defraud and the AKS violations.

Wilkerson also suggests that he "was not placed on reasonable notice of such criminality at the time [he committed the acts] (because such acts or omissions were not and are not violative of any published civil law)." (R. 396, Wilkerson Amended, PageID# 7974.) Wilkerson cites no authority for the assertion that notice of criminality is required by referencing a violation of civil law, nor has the government been able to locate any such authority. It would be a strange theory that the government must prove a violation of a civil statute in order to prove criminal behavior. Such a policy would have as an end result prosecutions which could only be founded upon violations of civil law.

Wilkerson claims that none of his actions "compromised the 'gatekeeping' functions of the licensed Providers[]—the prescribers and the dispensing pharmacies." (R. 396, Wilkerson Amended, PageID# 7975.) The proof showed otherwise. Many of the individuals who testified never even spoke to a prescriber; if they did, the conversation was virtually always over the phone with a prescriber hired by Wilkerson, and the conversation was cursory. The patients' need was slight, if they had any need at all, for the creams. The proof showed that it was the defendants, including Wilkerson, who created the "demand" for the medications; it was the defendants who suggested that the patients order the medications, and sometimes the defendants even suggested which medications to order based upon the reimbursement rate. (See, Perkins, PageID# 2680.) The prescriptions were fraudulent: the purpose of recruiting patients was to mine their insurance for the purpose of receiving an exorbitant commission. Craven testified that she signed numerous scripts, at Wilkerson's direction, without seeing the patients. (Craven,

10

PageID# 2794-2797.)  Yet, Wilkerson claims "the government failed to show even a single prescription was fraudulent or false due to any act or failure to act of Wilkerson."  (R. 396, PageID# 7975.)  Paying a prescriber to sign prescriptions without any communication is not just fraud, it is rank fraud.[2]  This action alone by Wilkerson establishes a conspiracy to commit health care fraud and also establishes that Wilkerson *devised* a scheme to defraud under the mail, wire and health care fraud statutes.

Other proof corroborated Craven's testimony.  Indeed, other proof showed that members of the conspiracy were using Craven's signature stamp to validate prescriptions and that Wilkerson knew of and encouraged that practice.  (Craven, Page ID# 2794-2797, 2800-04.)  Nor were the actions "random, inconsistent and isolated aberrations" as Wilkerson claims.  (R. 396, PageID# 7976.)  The entire scheme was based upon the defendants marketing expensive and unneeded creams directly to customers, all the while bypassing the gatekeeping function of a neutral and objective prescriber.  All defendants objected to evidence regarding the cost of the creams, arguing that such testimony was "immaterial."  The proof, and common sense, reveal the materiality: if a customer/patient genuinely needed a cream, the patient would not care what it cost (either for them or their insurance provider).  But when the patients learned that their insurance providers were paying tens of thousands of dollars for the medications, they agreed they would not have signed up to receive the creams had they known cost.  Also, at the very least, the pharmacies were making as much, or more, as the defendants in the scheme.  Contrary to Wilkerson's and the other defendants' repeated suggestions, the motivation to sell the creams were not driven by the needs of "the patient."  Wilkerson claims that there "were approximately

---

[2] Likewise, Wilkerson claims "the government failed to show even a single act or failure to act of Wilkerson that caused a prescriber to write a prescription for a medication the prescriber would not otherwise have written" and that Craven was responsible for the determination medical necessity.  (PageID# 7975.)  Again, there can be no medical judgment when the prescriber is not communicating with the patient.  (Craven, PageID# 2815,

11

500 patients and 3,500 prescriptions involved in the case, and the government was able to show a *de minimus* error rate of approximately 1% of that total." (R. 396, PageID # 7976.) This assertion misses the mark. Of the numerous patients who were called at trial, not one testified as to any real need for the creams. The "error rate," if such there be, would have been virtually everyone who ordered a cream. Likewise, the proof did not show that incentives were "limited to approximately 20 out of 500 patients," most patients received an incentive in some form of kickback, generally through the guise of being paid for the non-existent study. Even those who did not receive an inducement (e.g., Heather Burnette, Katie Calloway) were told that there would be "no cost to them" for the medications. (Burnette, PageID# 5945; Callaway, PageID # 5747-5748.)

Wilkerson claims "there was no testimony that Wilkerson knew of or authorized anyone to pay any patients for anything or to offer any patient benefits." (R. 396, PageID# 7976.) That assertion is simply not true. The evaluation form, which the defendants have embraced, stated that the patients would be paid for participation in a study. Wilkerson paid his cousin, Rich Terry, and his cousin's wife, Kim Terry, over $100,000 for ordering creams. Wilkerson paid Josh Linz just for Linz ordering creams on his Tricare. It is now undisputed that Wilkerson paid $2,000 in cash to Ryan McGowan (at the Red Bank Post Office) in order for McGowan to pay his co-payments. Admittedly, this payment to Wilkerson was arranged through Chatfield (who had contacted McGowan), but the proof on the conspiracy and the scheme showed that Chatfield was downlinked from Wilkerson.[3]

---

[3] It is perhaps mildly ironic that Wilkerson would be the errand person to deliver the $2,000 in cash to McGowan as Wilkerson was the lead person; however, as the proof showed and the Court noted, there really wasn't much time expended or work involved in the conspiracy. What little work that was required, the marketers under Wilkerson were doing it. Wilkerson just set the conspiracy and scheme into motion and reaped its benefits. He occasionally would send an email or otherwise communicate with his conspirators. Undoubtedly, Wilkerson had time on his hands to run these kinds of errands.

12

Wilkerson suggests that numerous prescribers were involved other than Craven, arguing that "many of the prescriptions were written by…Craven, but 73 other physicians or nurse practitioners also wrote prescriptions for which Top Tier Medical earned sales commissions."  ." (R. 396, PageID# 7976.)  Here are the numbers introduced at trial: Exhibit 501 reflects that there was only a total of 18 prescribers at Willow under the Top Tier "salesman" column for a total of 8,569,156 million in sales for May 2014. (In Exhibit 501, there are other prescribers listed for Willow, but those were not related to Top Tier.)  Of the $8.5 million in claims, Craven is listed as the prescriber on $7.2 million, or 84% of the prescriptions adjudicated in May 2014.  Dr. Cheryl Haag from Ooltewah is listed as the prescriber on 978,097.68, or 11%.  That leaves the remaining 16 prescribers responsible for only $391,000 or 4% of the 8.5 million in sales for May 2014.  Furthermore, the overwhelming majority of these 16 prescribers prescribed less than 5 prescriptions each in May 2014, as compared to Craven who prescribed over 500 prescriptions in May 2014, all while working at Balanced Life and being compensated on the side by Wilkerson. During the cross-examination of Kriplean, Wilkerson suggests there were 77 prescribers. (Kriplean, PageID# 6644.)  Kriplean didn't agree that there were 77 prescribers, noted that there were really only three prescribers, and Craven was by far the most prolific of those.  (Kriplean, PageID# 6644-46.)  To the extent that Kriplean even agreed with Wilkerson's assertion that there were 77 providers, his agreement would have been the result of answering a question posed about the frequency of Craven's prescriptions, not that there were 77 individuals writing prescriptions for Top Tier, Wilkerson, or the other defendants.

Wilkerson concedes that he was paid a sales "commission on 2 of his own prescriptions, out of a total of 3,500 prescriptions."  (R. 396, PageID# 7976.)  It does not matter that Wilkerson only received commissions for two of the creams BCBS paid for; what matters is whether such

actions are fraudulent. Such actions are fraudulent. (McCall, PageID# 6051—such actions show "financial incentive versus a doctor/patient relationship.) It is beyond dispute, and in fact it has been embraced by the defendants, that it was the insurance companies who were paying for the commissions, and if insurance did not cover the cost of the cream, there would be no compensation for the defendants. (Staten, PageID# 4137-38; Exhibit 2614.) Even Wilkerson's expert witness suggested that being paid a commission on one's own creams was questionable. (Newkirk, PageID# 7545.) Newkirk stated that he would not advise a pharmacy to pay a marketer a commission on his own cream. (*Id*.) The Court noted that the paying of a commission for a defendant's own creams "provides a financial incentive for that individual to receive that prescription as opposed to a medical incentive." (Newkirk, PageID# 7462-63.) Newkirk agreed, but stated that as long as there was a physician's signature "on the script" the pharmacy would fill it. (Newkirk, PageID# 7463.) Of course, the "physician's signature" was also tainted as the prescribers were being compensated for what Wilkerson instructed them to do. Wilkerson also received a sales commission on ever prescription that went through Top Tier or any of the downlink defendants and their companies.

Wilkerson asserts that neither "Schwab nor any other pharmacist testified in the case, so the government leaves the Court to speculate as to the pharmacies' knowledge and intent (and speculation is not authorized under federal law)." (R. 396, PageID# 7977.) Again, the proof at trial showed through text messages that Schwab was instrumental in manipulating the formulas to maximize recovery and that he assisted in circumventing the BC/BS deadline in June 2014. (*See, e.g.*, Kriplean, PageID# 6422, 6437; Exhibit 515, 520.) Such testimony provides more than just speculation, it provided unrebutted proof.

Also, Wilkerson argues that "the only insurance plan audit involved, that of Blue Cross of Tennessee, was closed with no findings of irregularities." (R. 396, PageID# 7977.) Of course, BC/BS was unaware of the many fraudulent actions taken by Wilkerson and the others. Had BC/BS known that Craven was signing prescriptions with no patient contact, or that Wilkerson and others were paying co-pays for the patients, or that the patients were being induced to order the creams for a non-existent study, undoubtedly the results of the "audit" would have been different. There is no "discrepancy code" for fraud. (Newkirk, PageID# 7518-19.)

Contrary to Wilkerson's assertions, two prescribers have been charged. Both were charged in San Diego: Craven and Dr. Suzy Vergot have each pleaded guilty to a health care fraud conspiracy. Vergot did not testify. Craven's plea agreement, Exhibit 42, noted that the agreement "is limited to the United States Attorney's Office for the Southern District of California, the Eastern District of Tennessee, and the Southern District of Mississippi." (Page 9 of Exhibit 42.)[4]

Wilkerson insists that it was not improper for him to pay the prescribers who were prescribing the medications, citing 42 USC § 1320a-7b(b)(3)(B) and 42 CFR § 1001.952(i). The citation to § 1320a-7b(b)(3)(B) is not on point. That subsection addresses the "amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." This is not the safe harbor provision Wilkerson claims. Wilkerson was paying Craven and others for their medical license; the prescribers were not exercising their independent judgment in signing the prescriptions. Indeed, Craven could not have exercised any judgment when she was signing

---

[4] The amount of loss in the San Diego was roughly $65 million; the amount of loss here is roughly $35 million. While no jurisdiction has an exclusive right to prosecute any particular wrongdoer, the USAO EDTN deferred to the SDCA for the prosecution of Craven and Vergot.

15

prescriptions without consulting with the patients or when her stamp was being used by others without her authorization. (Craven, PageID# 2803-04.) Again, it is not a question of whether Craven was an employee of Wilkerson, it is a question of whether Wilkerson paid Craven to further the fraud by circumventing the problem of obtaining a valid prescription through a neutral and objective prescriber.

Wilkerson cites testimony of Brian Tabor regarding the use of the "computer application called MMIT." (R. 396, PageID# 7986.) Wilkerson suggests the procedure of targeting insurance companies is "so commonplace" that "MMIT" does exactly that. (*Id.*) This is not true. Wilkerson is conflating issues by suggesting that compounds are on a pre-approved list for the pharmacies, the same as "formulary drugs." On cross-examination, Tabor admitted that MMIT had no application to compounding pharmacies and the testimony regarding that computer program was irrelevant. Compounding drugs, according to Tabor, are not on a "formulary." The bulk ingredients used in a compounding drug might be, but the unique recipe itself is not. (Tabor, PageID# 7043-46.)

Wilkerson argues that as "a threshold matter, the government must show Wilkerson was on notice that his acts or failures to act constituted wrongdoing." (R. 396, PageID# 7994) (citing *United States v. Starks*, 157 F.3d 833, 838-39 (11th Cir. 1998).) This is what the court in *Starks* found:

> Analogously, the Anti–Kickback statute does not constitute a special exception. Section 1320a–7b is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct. Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal; compared to the licensing provisions that the *Bryan* Court considered, such kickbacks are more clearly *malum in se*, rather than *malum prohibitum*.

*Starks*, 157 F.3d at 838. Indeed, the actions by Wilkerson are "hardly the sort of activity a person might expect to be legal"; they are the actions that an ordinary person would expect to amount to fraud. Wilkerson suggests that the legal standard at issue requires a showing the defendant actually knew the claims at issue were fraudulent. (R. 396, PageID# 7994) (citing *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).) *Gonzalez* is a health care fraud case, not an AKS case. Regardless, the proof showed that Wilkerson knew the claims were fraudulent and he was the main instigator of the fraud.

Wilkerson posits that it "is black-letter law the Top Tier Medical sales representative contracts with the 5 pharmacies would have been effectively safe harbored from kickback liability under 42 USC § 1320a-7b(b)(1) had the agreements been directly with Wilkerson as a W2 employee of the pharmacies" (citing 42 USC § 1320a-7b(b)(3)(B); 42 CFR § 1001.952(i)). (R. 396, PageID# 7995-96.) Regardless of the merits of this argument, the sad truth for Wilkerson is that he was not an employee of any particular pharmacy: he was an independent "sales representative" dealing with numerous pharmacies. He has offered no other proof, other than this suggestion that if he had been an employee of the pharmacies, that he would come within the safe harbor exception. Wilkerson's status as an independent sales representative offers him no safe harbor immunity. Nor would the "downstream sales representatives" be insulated from criminal liability "had the downstream reps been W2 employees of Top Tier Medical." Whether they were 1099 contractors or W2 employees of Top Tier, they would still not be afforded safe harbor protection through Top Tier. The safe harbor provisions would apply to *pharmacy employees* when the pharmacy offered Tricare services and goods, not to the marketing companies. The Court's proposed jury instructions regarding the AKS address this issue, and when applied, show the defendants' guilt regarding the kickbacks.

17

Wilkerson and the other defendants cannot avoid liability merely by claiming some tangential relationship to the pharmacies which Wilkerson claims is a substitute for employment, thereby bringing them within the safe harbor provisions. Ultimately, Wilkerson agrees, tacitly, that the defendants do not meet the safe harbor provision, but the safe harbor *could have* been applied had they been employees of the pharmacies. (R. 396, PageID# 7996, ¶ 88.)

With respect to mens rea, Wilkerson cites a case which does not further his cause, *United States v. Center for Diagnostic Imaging, Inc*., 787 F.Supp.2d 1213, 1218 (the federal anti-kickback statute "does not criminalize referrals for services paid for by Medicare or Medicaid – it criminalizes knowing and willful acceptance of remuneration in return for such referrals."). There is no doubt that Wilkerson knowingly and willfully accepted remuneration for the referrals. The very next line in *Diagnostic Imaging* (after the quoted material by Wilkerson) states "[t]he AKS covers arrangements if even one purpose of remuneration was to obtain referrals or induce further referrals of Medicare patients." *Id*. at 1218. Indeed, in that qui tam civil case, the court found that the referrals from the defendant physicians group amounted to a violation of the AKS. *Id*. at 1220. And, as noted above in *Starks*, the giving or taking of kickbacks for medical referrals is "hardly the sort of activity a person might expect to be legal." *Starks*, 157 F.3d at 838.

Wilkerson next suggests regarding the AKS, "there is not even a loss to the government under the plain language of the Federal Sentencing Guidelines, § 2B1.13(E)(I), in the event that kickback liability is found under 42 USC § 1320a-7b(b)." (R. 396, PageID# 7997.) The government will eagerly address this argument when (and if) this case reaches the sentencing stage.

18

With respect to the money laundering charges, Wilkerson argues that the government has not proven an underlying predicate offense required for money laundering, therefore the Court must acquit Wilkerson of those counts. (R. 396, PageID# 7998.) The government submits that it has proved Wilkerson guilty of conspiracy and the mail, wire and health care fraud schemes. Only one of those need be found as a predicate to establish criminal culpability under the money laundering statute. Whether the government has proven Wilkerson guilty is obviously a question this Court must decide. If the Court finds that it has, then the government submits that the elements of money laundering have been met.

Finally, Wilkerson devotes the remainder of his brief to rebutting various arguments made by the government in its initial brief. Because of concerns for brevity, the government will rely on its initial brief and hopefully address some of these issues at the closing/oral argument. However, one of the issues merits mentioning. Wilkerson argues that the "government concludes the $2,000 in money orders provided to Ryan McGowan were unrelated to McGowan's $1,911 copayment, while concurrently arguing that the excess $89.00 retained by McGowan was a payment in excess of the applicable copayment. These arguments are non-sensical and contradict one another." (R. 396, PageID# 8003.) If Wilkerson misapprehended the import of McGowan's testimony, and the government's recitation of it, the government apologizes. However, the Court should recall the testimony of McGowan: after a phone call to McGowan from Chatfield, McGowan met Wilkerson at the Red Bank Post Office. (McGowan, PageID# 5910-13.) Wilkerson gave him $2000 in cash to *purchase* money orders for co-payments owed by McGowan; he did not give McGowan the money orders. (McGowan, PageID# 5915.) At no time has the government ever suggested that the $2,000 was unrelated to the money orders for the co-payments. The total amount, which included money for stamps and

envelopes, was $1911. (McGowan, PageID# 5916). McGowan testified that Wilkerson told him to "keep the change." (*Id*.) Instead of addressing head-on one of the most damning pieces of testimony in the trial, Wilkerson instead chooses to disparage the presentation of the proof, calling it "nonsensical." There was no nonsense in this episode, or during all of the fraud committed by Wilkerson. This encounter with McGowan shows the blatant and rank fraud committed by Wilkerson (and Chatfield) by concealing the fraud from the PBMs, the insurance companies, and ultimately federal law enforcement.

## II. Michael Chatfield

Chatfield suggests that the comment by him, to George Striker and Jimmy Collins, regarding "that's where the fraud happened," relates solely to Kirtis Green and his actions with Willow Pharmacy. (R. 392, PageID #7867-68.) There is no proof in the record, and indeed there is no proof anywhere, that the fraud was limited to Willow Pharmacy and that it was limited to Kirtis Green. The questioning of Striker on cross-examination (by Chatfield) regarding this issue is instructive.

> Q: Okay. Did you know that Kirtis Green was ultimately prosecuted for using a Dr. Haag's signature stamp without her permission. Did you know that?[5]
> A I heard there was an individual that did that, just, yes, sir.
> Q Exactly. And did you know that those prescriptions that Mr. Green essentially forged without Dr. Haag's permission were faxed to Willow Pharmacy?
> A I didn't know. I didn't know that.
> ….
> Q And do you know from the context of this conversation with Mr. Collins that the fraud that Mr. Chatfield is referring to at Willow relates to Mr. Green and his activities?
> A To be honest, I didn't keep up with the ongoings of anything else that anybody else was doing. So, when they were talking about this in this case, or in this conversation, I'm more or less agreeing, just a person who's just sitting there agreeing with it. I didn't know the whole in this context what he was talking to, or in reference to.

---

[5] Green did not use a "signature stamp" for Dr. Haag. Rather, Haag's signature was forged by either Green or Haag's administrative assistant at Green's urging.

(Striker, PageID# 5416, 5418.)

What Striker established, as the government has already noted, is that Striker lied to Kriplean during his initial interview; Striker told Chatfield and Jimmy Collins that he lied; and Chatfield encouraged him to persist in that lie. (Striker, PageID# 5392; Exhibit 2112F.) Other aspects of the conversation show Chatfield's guilty state of mind. (Striker, PageID# 5391-96, particularly Chatfield coaching Striker on how to conceal that the co-pays were being made by Chatfield and Striker, and covering on the payments for the non-existent evaluation.)

Chatfield suggests, relying on the testimony of Josh Morgan and Amanda Morgan Booker, that he counseled his marketers that they should market the creams only to patients who needed them, and to do things "the right way." (R. 392, PageID# 7860, 7879.) The Court has heard overwhelming proof that none of the patients *needed* the creams. Some may have had skin conditions or pain for which they might have used the creams, but not one witness testified that they sought out the medications. It was always the marketers, like Chatfield, who suggested the need for the medications. The most likely scenario revealed that the patients either did not use the creams, if they did use the creams they didn't like them, or if they used them they noticed no real difference. Of course, witnesses called by Chatfield (Brandon) said the creams worked very well (although he was confused as to which creams he ordered and which creams he used).

Relying on the testimony of Amanda Morgan Booker for the concept that the patients must have had a "need" for the creams is also perplexing. She was not a marketer. Her husband, Keitha Booker, arranged for the prescribing of $954,000 in creams through Hamilton County Schools, for which Amanda was paid over $100,000 by

Wilkerson. Amanda also signed up her cousin, Josh Morgan (a Marine), for which she was paid roughly $40,000 by Chatfield for thirty minutes of effort. (Amanda Morgan, PageID# 5804-07.) Even though Chatfield never told Josh Morgan "to lie," he did tell Josh Morgan to pay his people $300 for ordering the creams, and he even sent money to Josh for those payments (over and above Josh's commission payments). (Josh Morgan, PageID# 5648-49, 5682.) Josh Morgan was paid $333,000 by Chatfield for his own creams and for recruiting Marines and Sailors to get creams under Tricare. (J. Morgan, PageID# 5661, 5659, 5697.) Josh also knew that Chatfield was working under "Wayne," and Wayne reached out to Morgan a few times but Morgan did not return the communications. (J. Morgan, PageID# 5662.) Josh was asked on cross-examination when he "first started this work, it would have been important for you to have some experience with the creams yourself in order to talk to others about them. Is that right?" He replied that experience with the creams was not important because of "the incentive [it] was pretty easy to get people to sign up." (J. Morgan, PageID# 5684.) Morgan also explained that because of the $300 per month incentive for the fellow Marines and Soldiers, there was "very little" work involved for him. (J. Morgan, PageID# 5695-97.) In fact, Josh Morgan was not marketing the creams, he was marketing the "free $300 per month." (J. Morgan, PageID# 5697.) In spite of Chatfield's assertion that Josh Morgan vouched for him and his method being the "right way," the testimony of Morgan shows differently.

Oddly, after relying on Josh Morgan to establish that Chatfield did things the "right way," Chatfield then attacks Josh's credibility. (R. 392, PageID# 7866.) Chatfield claims that "[n]o other witness [other than Josh Morgan] testified that Chatfield told him

to pay patients to sign up for creams, nor did anyone state that Chatfield told them to pay amounts as large as $300." (*Id.*) Of course, patients were paid all the time for the non-existent study as an inducement to order the creams. Chatfield even admitted that in the recorded conversation with George Striker. (Striker, PageID# 5382-83.) Those inducements were $100, not $300, but the point still holds. Chatfield suggests that rather than lying, a "more obvious explanation would be that Mr. Morgan has confused Mr. Chatfield's business model with Mr. Jimmy Collins' business model." (R. 392, PageID# 7866.) The problem with this assertion is that when counsel for Wilkerson, on cross-examination of Josh, suggested that the $314,000 payment from Chatfield to Josh was in reality from Jimmy Collins, Josh disagreed and said the $314,000.00 "was from Michael Chatfield." (J. Morgan, PageID# 5694.) Of course, the documentary proof showed that the $314,000 was from Chatfield and Top Shelf. (Exhibit 8.) After the $333,000 total was paid from Chatfield, the *rest* of the payments came from Collins. (J. Morgan, PageID# 5694-95.)

Chatfield, taking exception to many witnesses who testified that the creams were "suspect" or "shady," claims that "[t]he reality is, there was nothing wrong with the products." (R. 392, PageID# 7866.) There is no proof in the record to support this assertion by Chatfield; he is merely suggesting the creams were effective or good. What Chatfield suggests is a "red herring" offered by the government as to the efficacy of the creams is indeed a red herring, but not one offered by the government. Numerous witnesses testified that the packaging was "sketchy," many testified the creams were not effective, and a few testified that the creams caused harm. Indeed, Chatfield told Green in a text exchange that "[t]he imquimod isn't safe for 3 to 4 times use; One of my patients

kids got a burn from it. Luckily I knew him." (Kriplean, PageID# 6402; Exhibit 508, p. 646.) After Green noted "Gotcha. LOL. No more 8K haha," Chatfield responded, "lol, even Jared admitted he shouldn't have done that." (Kriplean, PageID# 6402; Exhibit 508.) Maria Valadez stated that one of the creams made her nephew's face "break out." (Valadez, PageID# 4961.) Heather Burnette stated that one of her friends used a cream and it "turned her legs like orange and streaky." (Burnette, PageID# 5949.)

Chatfield argues that the government mischaracterizes the role of Jared Schwab, the pharmacist at Willow. On May 29, 2014, a time when by Chatfield's admission the prescriptions were being filled at Willow, Chatfield texted with Kirtis Green and said, "And if antiaging bills out 2,000 and age spots 2500 or 7,000, I'll take the second all day." Green answered, "No shit I would prefer the larger number every time." Chatfield went on, "Yeah. It was billing out 4800 with .025 then when Billy changed it, it went down to 2000[,] now *Jared* said to go to .05 so it should be around 7,000. I have too many people getting those creams for them to be billing out at 2,000." (Kriplean, PageID# 6422; Exhibit 515.) (Italics added.) It is difficult to read this text in any way other than Jared suggesting the change in the formula in order to get greater payment. This text is especially aggravating given that the defendants continuously suggested that it was the prescriber, not the pharmacist, who should have determined the formula. Of course, as Craven testified, the formula was determined not by the prescriber (Craven, PageID# 2822, 2824-25), but on a pre-printed pad manufactured by Chatfield and his father's printing company.[6] As far as suggesting that Jared Schwab's involvement after

---

[6] The defendants' expert, Mark Newkirk, stated that a pharmacy could change a prescription once it had been sent in, but _only_ in consultation with "the prescriber," meaning the doctor or nurse practitioner. (Newkirk, PageID# 7520.)

the defendants stopped using Willow was innocuous, the most likely reason Schwab was still being paid was to give inside information to continue the bilking of insurance companies and Tricare.

Chatfield argues that he "is being prosecuted because he marketed an expensive product and made money," and that the government is seeking to "criminalize profit." (R. 392, PageID# 7869.)   While the government does admit that making $5.5 million on very little work and effort in roughly a 12 month period may shock the conscience, that is not the reason the government brought the charges.  The government prosecuted this case because Chatfield and the other defendants committed fraud.  Not subtle fraud, where the defendants may have been "looking for loopholes," but rank fraud, where Chatfield and others paid people to order outrageously priced medications for which they had no need. No amount of suggestion that Chatfield was of tender years, or inexperienced, or was relying on others, can explain the outright fraud that he perpetrated.

Regarding the fraud schemes (as opposed to the conspiracy), Chatfield suggests that the government has "failed to describe any affirmative misrepresentation made by Mr. Chatfield that was 'material' to the PBMs, which paid the insurance claims."  (R. 392, PageID# 7870.)  Chatfield and Wilkerson paying the co-pay for McGowan was material; in fact, it was fraudulent.  Chatfield and Striker paying the co-pays and the fees for the non-existent study was material, in fact, those actions were fraudulent.  Chatfield telling Josh Morgan to pay his fellow enlisted personnel $300 to order creams was material, it was also fraudulent.  Chatfield suggests, without citation to any authority, that "the substantive fraud counts should be considered solely based on Michael Chatfield's actions—not the actions of others. He is charged substantively, and only his conduct and

intent are relevant to determining his guilt or innocence as to these counts." (*Id*.) That assertion is not true; Chatfield is charged with the scheme to defraud and aiding and abetting the scheme to defraud. The government only need prove that Chatfield has *participated* in a scheme to defraud, not that he devised it. The "evidence need only show that each defendant participated in a scheme to defraud that involved a misrepresentation of material fact." *United States v. Birnie*, 193 F. App'x 528, 536 (6th Cir. 2006). In *Birnie*, the defendants argued that co-defendant Hanson was the individual who made the misrepresentation and therefore such fraud could not be attributed to them. *Id*. The court stated, "We … disagree with defendants' argument that an element of the crime is that each defendant must have made a material misrepresentation." *Id*. (See also, Court's Notice of Applicable Legal Standards, p.1.) Or, the government only need to prove that he aided and abetted, or was aided and abetted, others. (R. 372, Government's Proposed Legal Standards, PageID# 6152-54.) Therefore, as part of the scheme, the Court can and should consider more than just Chatfield's conduct in making a determination on the substantive fraud counts. The government has proven beyond a reasonable doubt that Chatfield participated in a scheme to defraud, aided and abetted by others.

Chatfield claims that he did not possess the "requisite intent to commit a fraud— in part because he did not commit the actus reus of fraud." (R. 392, PageID# 7870.) The defendant has committed numerous acts in furtherance of the fraud. As noted above, he has paid people to order creams. He paid their co-pays. He ordered creams for himself and his family members on which he made handsome commissions. He told George Striker to persist in a lie to law enforcement. He told Striker that they could blame the

employees at Charter Communications for their failure to complete the "survey."  He

chose creams for Striker's minor children.  He bragged to Kirtis Green that the creams

were so lucrative he was going to order more for himself.  He signed up people for

creams who had no knowledge they were being signed up and billed for creams.  These

are not the actions of a person who did not commit an act in furtherance of the fraud, nor

are they the actions of a person who lacked the intent to commit fraud.

All of the defendants, including Chatfield, argue that they had no "duty" to report

omissions to the PBMs or the insurance companies.  Paying a customer's co-pays or

paying a customer an inducement for a non-existent study are not merely omissions: they

are affirmative fraudulent acts.  Chatfield and the other defendants conflate omissions

and concealments with affirmative misrepresentations.  The proof showed that the

defendants were paying inducements and paying co-payments.  These are not passive

omissions for which they had a duty to report. *United States v. Maddux*, 917 F.3d 437,

443 (6th Cir. 2019).  In *Maddux*, the defendants failed to reveal sales of untaxed

cigarettes which they had a duty to report to local authorities.  *Maddux*, 917 F.3d at 443.

In finding there was fraud, the Sixth Circuit relied upon *Pasquantino v. United States*,

544 U.S. 349, 357, 125 S.Ct. 1766 (2005).  In *Pasquantino*, the Court noted that the

defendants failed to declare imported liquor on customs forms.  *Maddux*, at 444.  Again,

these facts are far different, and far less egregious, than the fraud committed by the

defendants.  The material misrepresentation here is that Chatfield and other defendants

were paying the co-pays for patients, and they were paying an inducement to order the

creams.  The defendants claimed there was a "study" being performed; there was no

study.  Paying a prescriber to write prescriptions is not an "omission" or "concealment." All of these are affirmative fraudulent acts, not "omissions."

Chatfield argues it is the government's "theory" (through the cross-examination of Kriplean) that Chatfield "should have picked up the phone" and called the PBMs.  (R. 392, PageID# 7870.)  This was not a "theory of the government."  In reality, when Kriplean was being cross-examined on this issue, "there is no line of communication for Mr. Chatfield to that PBM, is there?," Kriplean responded, "Could he have picked up the phone and called them? There is nothing preventing him from doing that. I don't think it was in his financial interest to do so."  (Kriplean, PageID# 6736.)  Kriplean was merely responding to the "duty" argument that all defendants constantly proposed—fraud may have been committed, but the defendants had no duty to do anything about it.  Kriplean wisely noted that it was not in Chatfield's, or anyone's, interest to call the PBMs or insurance company.  Of course the defendants were not going to inform the PBMs or the insurance companies, they were defrauding them.

Chatfield's state of mind is revealed in a text exchange with Kirtis Green.  On June 17, 2014, Green texted "Just a heads up if you have any for kids under 13 no Fluticasone scripts." Chatfield replied, "Even wound?" Green stated, "Yes, put wound on one of the parents. Eczema is okay though it has Fluticasone." Chatfield answered, "So max is four per person over 13. And must be two on two scripts, two Fluticasone scripts max." Green then stated "Yeah. And make sure to switch it up. Don't just use top four. I'm doing pain 2 for a lot of people at 18k scrip. I threw some nail, shingles, and acnes too. He just wants it to be more random. Do you know what everything bills out for approx[?]" After Green asked what the various creams were billing for, Chatfield replied,

"Stretch 10, Scar 11, Wound 12-14, Acne –6500, Psoriasis 5500, Wrinkle and age spots 4800." (Kriplean, PageID# 6437; Exhibit 520.)  Chatfield then added "Wrinkle and age spots should be more if he increases the fluticasone up to .05 as it is on the script." (Id. at 6437; Exhibit 520.)  This exchange proves that the patients did not "need" the creams as Chatfield repeatedly suggests.  It proves the opposite: that Chatfield and others were manipulating the system to reap the benefit of a commission on an overpriced and unneeded medication.  Wound management gel would not be assigned to a child; instead, it would be "put on one of the parent's" prescriptions.  The exchange also shows Jared's involvement: "*he* just wants it to be more random," and "Wrinkle and age spots should be more if *he* increases the fluticasone up to .05…"

Regarding Craven, Chatfield argues that he had no control over her, nor was he aware that his money was being used to pay her.  (R. 392, PageID# 7863.)  In a text exchange with Green, Chatfield forwarded a text to Green from Craven, "Fwd: Good morning sorry so early just wanted to get a start on those patients Humana is auditing I need as soon as possible the questionnaire on each one filled out. I have charts on those two people but it is impossible for me to fill any others out. This has gotten out of hand and I may even be out of a job."  (Exhibit 521.)  Craven felt sufficiently comfortable with Chatfield to discuss her concerns over an audit which she was worried about.  Chatfield also had $4,000 withheld from his June 2014 commission to cover payments to Craven and Schwab.

Chatfield argues that "[a]t this point, it is unclear why anyone, such as George Striker, believes that this conduct may have been illegal other than because prosecutors have told them so after the fact."  (R. 392, PageID# 7870.)  Perhaps Striker, after

consultation with his lawyer, understood that signing up one's 12 and 14 year old step-children for outrageously priced medications (which they did not need), and receiving a big commission on those, was fraudulent. Or, perhaps Striker's lawyer informed him that paying customers co-pays or giving customers an inducement payment under the guise of a non-existent study, all the while billing insurance companies over $7,000,000 (for Charter employees), was fraudulent. (Striker, PageID# 5344.) On questioning from the Court regarding Chatfield and Striker paying co-pays, Striker explained: "It would be if I had signed you up, sir, and you came to me and said, hey, George, I've got this copay. I would go to Michael and we would reimburse you that copay so you would not -- because we initially approached people and said this would be no cost to you at all." (Striker, PageID# 5344-45.) Striker confirmed, on further questioning by the Court, that Chatfield was paying him extra to give to the customers the co-pay amounts. (Striker, PageID# 5345-46.) Striker, in a text message, expressed concern that his cousin, who was a teacher, would be cut off of her income from the creams. "She's my cousin and they have a lot of bills on a teacher salary so I was just updating her. Nothing more. She is just one of the ones I hope keeps going thru for her purposes along with our income." (Striker, PageID# 5334-35; Exhibit 2103, p. 5.) Chatfield, replied, "Gotcha, do you think she would be able to get another person or two from her work[?]" (*Id*.) Chatfield's and Striker's statements are indicative of fraud; recruiting teachers, and paying them an incentive, to spread the scheme through the school system is fraught with peril as the Court observed in Wilkerson's case and the Hamilton County Schools.

Chatfield claims he could not and did not "order" creams. This text exchange with Striker reveals the opposite (from Chatfield to Striker): "So, Baylee and Skylar are

11 so pharmacy won't let us use more than one cream of the Fluticasone because it's too much for a child. *So I'll add* Skylar, Baylee and Avery a wellness tab (19,000 in revenue) and Valerie a wound and something else she wants which will be around 22,000 total for those two. So, a total of 40 to 42,000, 42K revenue from your family at Central." (Striker, PageID# 5349-50; emphasis added.) Not only does this text reveal that Chatfield is *ordering* medications, it shows that he's ordering $6,000 per bottle wellness pills for three children.

      Chatfield assured Striker that the business was legitimate. Of course, it wasn't. It is not unusual for a person committing fraud to gain the confidence of his mark. It's unfortunate for Striker that he left the realm of being the mark and instead became one of the fraudsters himself. Had he not continued with the scheme for as long as he did, perhaps the result for him would have been different.[7] The government is not "criminalizing profit," or "mischaracterizing testimony," or advancing a "theory." The government presented evidence: contained within that evidence was proof that showed, beyond a reasonable doubt, that Chatfield and the others committed fraud.

      The proof showed that Chatfield has committed Aggravated Identity Theft. Chatfield makes a number of arguments in support of his position. In order to further Chatfield's argument, he must convince the Court that Debra Foster and Noah Bowling perjured themselves. Additionally, Chatfield is suggesting that George Foster committed perjury, too.

---

[7] At various times the defense has criticized the government for "picking and choosing" who to prosecute. Rightly so. Several others in this scheme made large sums for no real time or work expenditure: Amanda Morgan Booker (over $100K from Wilkerson and Chatfield); Matthew Perkins (over $200K from Nicholson and Wilkerson); Josh Linz ($100K from Hindmon and Wilkerson); Kim and Rich Terry (over $100K from Wilkerson); Zac Rice ($80K from Montgomery and Hindmon). The court heard testimony that others made in the $30 to $40K range (Heather Wyatt Fryar and Ryan McGowan). The government drew a line, which evolved unintentionally, at around the $300,000 mark. There were other factors regarding culpability which also were considered.

The proof regarding the ID theft is straight forward. Michael and Natalie completed forms for her parents, George and Debra Foster, on those forms they included the Chatfield's address for the shipping of the creams, and they included Natalie's cell number for contact. (N. Chatfield, PageID# 7318-21.) Noah Bowling testified that he and his brother completed forms for themselves, then they forged their parents' and sixteen-year-old sister's names for three other forms (and 15 prescriptions total), in Chatfield's presence (at Finley Stadium), and then gave the forged order forms to Chatfield or his brother at that time. The amount of money billed to BC/BS for the Fosters and for the three Bowlings was approximately $400,000.00, of which Chatfield would have received a commission in the neighborhood of $70,000 (17.5% of $400,000). (See, Exhibit 727.)

Debra Foster did not order creams, nor did she give her daughter permission to order creams for her, nor did she receive them. (D. Foster, PageID# 4249, 4254-55, 4272.) She also never spoke to Craven. (D. Foster, PageID# 4250.) Debra had no needs for the creams which were ordered for her. (D. Foster, PageID# 4254-55.) She initially lied to Kriplean when he came to talk to her in order to protect her daughter. (D. Foster, PageID# 4256.) However, immediately after she lied to Kriplean, she then told the truth. (D. Foster, PageID# 4258-59, 4268, 4270.) Debra was told by Natalie that they had ordered creams for her and George *after* they had been ordered. (D. Foster, PageID# 4266.)

Chatfield in his brief suggests that "[t]he assertions by Mr. Foster and Mrs. Foster that Natalie Chatfield used their health insurance without permission are nonsensical." (R. 392, PageID# 7872.) The defendant is conflating the issue. Debra and George both admitted that Natalie was on their insurance plan, what Debra stated (on cross-examination by Chatfield) was that Natalie used their "insurance information … without her permission" regarding the creams

ordered for George and Debra. (D. Foster, PageID# 4272.) The context is made abundantly clear one question later: "Q: Is it your testimony that your daughter sent in requests for prescriptions without your permission? A: Yes. Q: And your testimony is that she did all of this without you knowing anything about it? A: Yes." (PageID# 4272.)

> Next, Chatfield argues that
>
> even if Mr. Foster is to be believed, the government has failed to show that Mr. Chatfield had any knowledge or intent to cause creams to be prescribed without Mr. Foster's knowledge. Mrs. Chatfield specifically testified that she communicated to Mr. Chatfield that she had obtained her parents' consent to fill out the forms.

(R. 392, PageID# 7872.) In essence, what Chatfield is arguing is that Natalie has committed the fraud, not Michael. Of course, Michael Chatfield admitted to completing forms for his in-laws. (Kriplean, PageID# 6529-30; 6566-67.)

On questioning from the Court, Natalie claimed that the reason her mother would have lied under oath regarding the ordering of the creams in her and George's name was because her dad was "very controlling" and that her mother was frightened of her father. (N. Chatfield, PageID# 7330-31.) Chatfield ignores the obvious. Debra and George Foster did not order creams, nor did they perjure themselves because George is "very controlling." Chatfield, who stood to gain financially from ordering the creams, ordered the creams. Chatfield, who now stands to lose if he is convicted, has suborned perjury through his wife.

Regarding the Bowlings, Noah stated that Chatfield explained "if we signed up more people in our family that we would receive a larger sum of money." (N. Bowling, PageID# 4453-54.) Contrary to Chatfield's assertion in his brief, Noah did not deny forging the signatures—he stated that he forged his father's and that his brother Luke may have done the others—but he wasn't quite sure. (N. Bowling, PageID# 4455, 57-59, 72.) When Noah and

Luke completed the forms for their parents and sister, they then handed the forms to either Michael or Brandon Chatfield.  (N. Bowling, PageID# 4460.)  Noah testified that there was no "question that Michael knew" the Bowling brothers were "signing up" their family members in the parking lot of Finley Stadium.  (N. Bowling, PageID# 4461.)  Noah reiterates this on cross-examination, stating "the more people in my family I signed up" the more money he would make.  (N. Bowling, PageID# 4465-66, 70.)  On cross-examination, Noah admitted that he forged the information at Finley Stadium with Chatfield present.  (N. Bowling, PageID# 4474-79.)  Noah specifically stated, when challenged regarding Chatfield's knowledge of the forgery in Chatfield's presence, "[h]e knew that we filled out the forms." (N. Bowling, PageID# 4478-79.)  And for added measure, when challenged again that Chatfield did not know the Bowling brothers had filled out the forms for others in their family, Noah stated "[w]e filled out the forms in Michael Chatfield's presence."  (N. Bowling, PageID# 4479, 4485.)  Again, Chatfield gained from the fraudulent prescriptions; now, in front of this Court, he stands to lose if the Court finds that Noah Bowling was truthful.

Chatfield claims that George Foster's testimony is unbelievable because George helped Chatfield set up a number of LLCs, did his taxes, and didn't check his EOB.  (R. 392, PageID# 7871.)  First and foremost, many individuals with private insurance never received EOBs (those with Tricare did).  In fact, when asked about health care and insurance costs, Foster stated "I've been very fortunate never had any."  (G. Foster, PageID# 4300.)  Chatfield suggests that George's not looking "at an Explanation of Benefits from his medical insurance" "stretches [his] credibility beyond recognition." Respectfully, it is the defendant's interpretation that is being stretched.  Foster admitted that he didn't know much about Chatfield's business, just that it was "like a multi-level deal."  (G. Foster, PageID# 4299.)  Once again, Chatfield takes him to task for

that.  (G. Foster, PageID# 4299.)  Chatfield now argues that one of the $5,000 checks George received from Chatfield was for commissions on creams.  This assertion is curious for two reasons: one, Chatfield would be admitting that he paid his in-laws $5,000 as a commission to order their own creams.  Again, it seems unusual that one would get a commission for merely ordering one's own creams, although the defendants have fully embraced that concept.  Second, when vigorously crossed on this point, that the second $5,000 check was for commissions on creams, George Foster responded "that's ridiculous."  (George Foster, PageID# 4299.)

Chatfield asserts that "the government misrepresents evidence with the assertion that Natalie Chatfield's phone number on a prescription was meant to bypass Debra Foster" and that the form introduced into evidence was "the form Ms. Craven signed and sent—it was never asserted that this is the only form that Ms. Craven received. There is no evidence that this was the form that Ms. Craven used to glean contact information from patients. Mrs. Chatfield's address and phone number were used for shipping purposes only—and there is nothing fraudulent about that."  (R. 392, PageID# 7868.)  The government introduced two prescriptions each for George and Debra Foster:  Exhibits 110 and 113 for George, 168 and 169 for Debra. These are the prescription records produced by Willow and the only prescription records introduced at trial for them.  During trial, Chatfield never produced any records related to the Fosters' prescriptions showing a different phone number given to Craven.  The government was unaware of this line of Chatfield's defense when Craven was on the stand, accordingly, the government never asked Craven about.  Neither did Chatfield.  Michael and Natalie Chatfield each admitted to completing portions of the prescriptions for George and Debra.  Natalie Chatfield, called by Michael, testified that when she was filling out her mother's order form, she did not include her mother's phone number, but rather her own.  (N. Chatfield, PageID# 7320.)

35

Natalie also claimed that she "just told" Craven her mother's number rather than writing it down. (N. Chatfield, PageID# 7320-21.) On re-direct, Natalie was asked "And I don't think you were ever asked why your phone number was placed on that form. Would you tell the Court why that was?" Natalie replied, "Yes. So, actually, my mom would rarely answer her numbers kind of out of the ordinary or anything, and so I said, you know, Michelle will call you on this so-and-so number. And then that's why I gave her the number." (N. Chatfield, PageID# 7328.) The government is confused as to why Natalie would give Craven her mother's number and how that would affect *Debra* in answering an unknown number. Natalie is then led into the answer Chatfield was seeking, that Natalie put her phone number on the form "for the shipping and refills as well." (N. Chatfield, PageID# 7329.) It is also curious that Natalie would put down her own number for "refills." Logic dictates that the pharmacy would want to contact Debra for Debra's refills, not Natalie.

The proof showed that Chatfield, aided and abetted by others, committed aggravated identity theft. Again, he is claiming that Noah Bowling, Debra Foster, and George Foster committed perjury. While it was not dwelled on much at trial, Chatfield signed up his cousin, Matt Chatfield, in Cherokee, North Carolina, when Matt was not present. (J. Chatfield, PageID# 4854-55.) Also, Chatfield arranged the order for Striker's child, step-children, and wife (via text message with Striker), showing the Chatfield had no qualms about ordering medications for people without their knowledge.

When the government attempted to introduce the agent's reports and Grand Jury testimony of Debra Foster, Chatfield objected. The Court observed:

> I can make a reasonable inference from what's been testified here today that Natalie told her mother, you got to say this to keep, to protect me, and so, therefore, that's what prompted the lie to agent, the initial lie to Agent Kriplean. I mean, there is no lay juror in the world who would not draw that reasonable

36

> inference from what's been said here in the courtroom. I'm just wondering why
> we're cluttering the record.

(PageID# 4280.)  Natalie told her mother to lie to Kriplean.  Debra lied to Kriplean, then immediately came clean.

Contrast this testimony with the testimony proffered by Chatfield.  Natalie testified that her mother ordered the creams.  Natalie and Michael completed the forms, used their address (not the Foster's), and used Natalie's cell number.  Either Natalie was lying, or Debra was lying. Natalie has the greater motivation to lie, and her story was implausible.  Brandon Chatfield and his wife, Grayson, testified that they met Luke Bowling at Hamilton Place Mall the day after the incident at Finley Stadium in order to retrieve the order forms for the Bowlings' parents and sister.  This testimony directly contradicts Noah Bowling.  Again, either Chatfield's witnesses were lying, or Noah Bowling perjured himself.  Brandon was paid $78,000 by his brother during the scheme; Grayson was paid $19,000.  (B. Chatfield, PageID# 7245, 7250.)  Brandon's testimony in other areas was not believable.  When asked what problems he needed to address with the creams, he stated he needed them for pain and stretch marks.  (B. Chatfield, PageID# 7235-36.)  He did not receive pain or stretch mark cream, instead he received wart, scar and other creams.  (B. Chatfield, PageID# 7245, 7258-59.)  Brandon received numerous commission checks in late 2014.  He claimed that these were "gifts" from Michael, even though they were included in a 1099 given to him by Top Shelf.  (B. Chatfield, PageID# 7249-50.)

Chatfield argues that the scheme did not extend to his uncle, Jim Chatfield.  Jim never spoke to a prescriber, and although he was not quite certain, he remembered speaking with someone, probably from the pharmacy.  (J. Chatfield, PageID# 4858-59, 4875, 4888-89.)  Dena did not receive a call from a prescriber for the creams that were ordered for her.  (D. Chatfield, PageID# 4895.)  Jim received creams for eczema, wound, scar and stretch marks; he had no need

37

for those creams. (J. Chatfield, PageID# 4857-58.) Jim used one of the creams a couple of times on his elbow, he saw no "noticeable difference," so he threw the creams away. (J. Chatfield, PageID# 4859.) The creams ordered in Matt's name (Jim's son and Michael's cousin), were delivered to Jim's house. Jim did not send them to Matt (who was at college at the time); after a few weeks he threw Matt's creams away too. (J. Chatfield, PageID# 4859.) Jim stated that the only thing he had done to receive the $6200 check from Michael was to give Michael "the insurance cards for my family." (J. Chatfield, PageID# 4864.) He also agreed with the Court that this was "too much money for too little work." (J. Chatfield, PageID# 4887-88.) All three members of Jim's family had the same four creams ordered for them: scar, eczema, stretch mark and wound management gel. (J. Chatfield, PageID# 4886.)

Chatfield argues that all of the wires and mailings (Josh Morgan, Ryan McGowan, text messages involving Kirtis Green and George Striker) were not fraud. The government will rely on previous arguments and ask to be heard at oral argument on this.

Chatfield argues that he did not possess the specific mens rea to be convicted under the AKS. First and foremost, Chatfield instructed Josh Morgan to pay his fellow active duty military personnel $300 to sign up for the creams. The government is not seeking to hold Chatfield to a higher standard than the pharmacies. Indeed, it is the same standard. Chatfield paid Josh Morgan, and he instructed him to pay his fellow Marines and Sailors, to order the creams. This was not real medicine. If the patients were contacted by a doctor, it was always a doctor working in conjunction with Wilkerson and Chatfield. The government will rely on the Court's "Legal Standards" and the argument set forth regarding the response to Wilkerson for this issue. (See, *United States v. Center for Diagnostic Imaging, Inc.*, 787 F.Supp.2d 1213, 1218 (the federal anti-

38

kickback statute "does not criminalize referrals for services paid for by Medicare or Medicaid – it criminalizes knowing and willful acceptance of remuneration in return for such referrals.")).

With respect to money laundering, Chatfield argues that there is no underlying offense. The Court must make that determination. Also, Chatfield argues that "the government must prove that Mr. Chatfield knew that the transaction was in criminally derived property." The Committee Commentary to 11.06, Money Laundering – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957), states that

> In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." Thus, although the property must in fact be derived from the certain listed crimes constituting specified unlawful activity, the defendant need not know this. The government does not have to prove that the defendant knew the property was derived from a particular type of unlawful activity as long as the government proves that defendant knew it was criminally derived.

The government submits that there has been overwhelming proof of Chatfield's criminal acts and, as outlined above and in the initial brief, that Chatfield knew the proceeds he kept in his accounts were "criminally derived."

Finally, Chatfield raises a good faith defense. Good faith is available for the fraud offenses, but the government submits that the good faith defense is not available for the AKS violations. (R. 372, Government's Proposed Standards, PageID#: 6156-58.) Sixth Circuit Pattern Instruction 10.04 provides in pertinent part:

> (3) A defendant does not act in good faith if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent pretenses, representations, or promises to others.
> (4) While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

39

The proof has shown that the defendant has made false and fraudulent pretenses and representations. Also, the proof has shown a propensity on Chatfield's part to take unfair advantage of the victims in this case. Chatfield, other than the assertion in his brief he was young (23) and that he relied on others, has not presented any proof for the good faith standard. He offers the character testimony of Ryan McGowan, who stated that he believed Chatfield was "an honest person." Ryan McGowan was paid $36,000 by Chatfield for a few hours work (ordering his own creams and signing up family members and a few friends). McGowan also received his co-payments from Chatfield (via Wilkerson) for the money he owed Willow Pharmacy. The government has overcome the good faith presumption: Chatfield's continuous deception throughout the course of the scheme and conspiracy suggests he is not entitled to good faith. There is some case law to suggest that the good faith defense is not available for a conspiracy to commit fraud. (See, R. 372, Government's Proposed Standards, PageID#: 6156.) And, as the government has argued previously, the good faith defense is not available for the other offenses. (See, R. 372, Government's Proposed Standards, PageID#: 6156-58.)

III.    Kasey Nicholson

In her brief, Nicholson recounts the testimony of Matthew Perkins and Sydney Patterson. (R. 393 PageID# 7892-98.) In attempting to discredit Perkins, Nicholson makes numerous claims regarding his testimony: Perkins was "confused"; Perkins initially believed what he was doing was legal; Perkins lied regarding the number of times he met with the government; Perkins' testimony was inconsistent regarding his LLC; Perkins admitted that he was involved in an illegal (by Navy standards) pyramid scheme; and Perkins claimed that he "suddenly recalled" the name of Wilkerson's business.

40

As noted previously, Perkins initially had no qualms about the scheme. However, when he received his EOB in December 2014 (some 2 months after he first ordered creams) for over $60,000, he knew something was amiss. Defense counsel attempted to get Perkins to agree that what he was doing was, in his mind, legal; however, he did not agree to that. Perkins agreed that very quickly after his participation started in the scheme he understood it to be fraudulent. (Perkins, PageID# 2739-40, 2749-50.) When asked whether he wanted "to make sure that everything was being done correctly when the stuff was shipped" to his people, Perkins replied, "no." (*Id*. at 2745.) Perkins admitted that the venture was a fraud and he was in it to make money. (*Id*. at 2740.) Nicholson told Perkins "to do whatever [he] had to…to get people to sign up." (Perkins, PageID# 2742.) Perkins recruited 12 people, and ultimately had 30 people signed up under him. Perkins made $200,000 on the scheme. (Perkins, PageID# 2769.) Nicholson instructed Perkins to have his fellow Sailors sign up for "scar, pain and wellness" medications because they "paid the most." (*Id*. at 2680.) Nicholson suggested to Perkins that he needed to form "an LLC because the bank wires were going to be so large and I was banking with Navy Federal, so it just wouldn't look good for, I guess, that large amount of money coming into an E4's bank account." (*Id*. at 2703.) Regarding the alleged inconsistencies as to Nicholson's involvement in the LLC (Matthews Consulting), there were none. Nicholson persuaded Perkins to form it; after that, Nicholson had no involvement in the LLC. The purpose of the LLC was to receive money and to hide the fact that an E-4 in the Navy was making $200,000 hawking creams.

Nicholson takes Perkins to task for the number of times he met with the government. Perkins claimed four; Nicholson says seven. A cursory examination of this issue reveals its folly: Nicholson counts as three meetings the night of April 23rd, the morning of April 24th, and

then in the Grand Jury on April 24th!  Nicholson claims that Perkins is a liar, and not worthy of belief, because he counted the one meeting in Chattanooga, starting on the evening of the 23rd and continuing until the morning of the 24th, as one meeting.  Perkins is indeed correct: he met with Srock in Philadelphia, met in Chattanooga for Grand Jury, then had one phone call, and one in person trial prep meeting (which was the same morning he testified).  (Perkins, PageID# 2723-24.)  Whether the Court counts this as four meetings, or seven meetings, or somewhere in between, the answer hardly merits the conclusion that Perkins was lying.

Nicholson's claim that Perkins lied regarding the form completion are also instructive.  Perkins ordered migraine creams.  He was asked (on cross), "Did you have migraines?"  "No."  "So you lied when you were filling out the form?"  "Yes."  (Perkins, PageID# 2728.)  The government agrees that Perkins lied regarding the migraine cream.  In fact, the government would go one step further: as far as ordering the creams were concerned, it was all a lie.  Perkins admitted that.  Perkins did not need the creams; he ordered them because he was promised by Nicholson that he would make money by doing so.  Others took the same action.  The statement by Perkins does not diminish his credibility, it adds to it.

The same can be said regarding the illegal "pyramid scheme."  Perkins admitted that pyramid schemes were banned in the Navy; the defendant agreed with the Court that "nobody in the Navy can sell Amway products."  (Perkins, PageID# 2730-31.)  As Perkins already admitted that the scheme itself was fraud, he was in it to make money, and he told the truth that he was not supposed to partake in pyramid schemes in the Navy, the government is not certain how this line of attack diminishes Perkins' credibility.

The name of Karma Wellness Spa, and Perkins' knowledge of it, is another issue that Nicholson raises.  She claims that Perkins was lying because he remembered the name of

Wilkerson's business, Karma Wellness Spa, at trial, yet couldn't recall that name in the Grand Jury. First, when questioned regarding his recall in the Grand Jury as to the name of the spa, Perkins never answered. (Perkins, PageID# 2725.)[8] The context of the exchange between Nicholson's attorney and Perkins is that Perkins knew that Wilkerson had started a spa and that he had an office there. Again, this answer is not indicative of deception.

Nicholson boasted to Perkins that she had paid for a friend's health insurance, and paid cash to that friend, in exchange for the friend ordering creams. (Perkins, PageID# 2719, 2722) She also urged him, via Snapchat (a self-erasing form of social media), not to talk to law enforcement. (Perkins, PageID# 2720-22.) She also instructed him to hire a lawyer. (Perkins, PageID# 2723.) What is undisputed is that Nicholson paid Perkins, who she knew to be enlisted in the Navy, over $200,000 to order creams for himself and to recruit others in the Navy to do so. Of course, it will be the Court's determination whether Perkins was credible.

With respect to Sydney Patterson, the government does not disagree with much that Nicholson writes. It appears that Nicholson is agreeing that she urged Patterson to order more creams before the June 2014 BC/BS cutoff. (R. 393, PageID#: 7899-90.) Nicholson argues "this is no indication of conspiracy." Of course, Nicholson omits that Patterson testified she did not want to order "more creams," she did not need the creams, but Nicholson told her "that if I got more creams I could receive my money commission and that she needed to get it in before the end of the month because my insurance would stop covering it." (Patterson, PageID# 2764-66.) Patterson's insurance was billed roughly $23,000 for these late May prescriptions that Patterson did not want or need. (Exhibits 135, 211.) May 2014 was Nicholson's most lucrative month;

[8] This is the difficulty, revealed a number of times during the trial, with cross-examining a witness from parts of Grand Jury transcript or report of investigation. The government was eager at trial to introduce transcripts and reports of investigation to show the complete picture. The government is eager to offer Perkins' Grand Jury transcript, even after the proof is closed, and allow the Court to determine whether Perkins lied about this issue.

43

she earned $138,514 in commissions, including commissions on Patterson's creams. (Exhibits 403, 1201.) Contrary to Nicholson's assertion, this action alone is evidence of a conspiracy and a scheme to defraud. Nicholson claims that she and Patterson did not form an agreement to commit fraud. The government disagrees: when Nicholson offered a commission to Patterson to order outrageously priced creams, which she neither needed nor wanted, and Patterson agreed to do it, that is evidence of a conspiracy in itself. The main conspiracy in this case is not between Patterson and Nicholson, it is between Nicholson and others. Evidence of the conspiracy was much more pronounced, and longer lasting, in Nicholson's dealings with Perkins. Of course, Nicholson's involvement in the conspiracy was not limited to Patterson and Perkins. By her own admission, she was downlinked from Wilkerson.

Nicholson, like all other defendants, argues that there was no fraud because Patterson and Perkins did not believe they "had done anything wrong." As Nicholson qualifies it, those were their beliefs in the beginning. (R. 393, PageID# 7901.) The Court opined at trial that it was not whether Patterson, Perkins, or any other downlinks believed that what they were doing was wrong, the question to be answered is whether Nicholson and the other defendants were committing fraud. That question is not answered by what the downlinks believed, although if the Court were to accept Matthew Perkins' understanding revealed in his testimony, then Kasey Nicholson is guilty. Also, Nicholson argues that no statement of Patterson or Perkins reveals an intent to defraud on Nicholson's part. (R. 393, PageID #7903.) That assertion is simply not true. As noted above, Nicholson's intent is shown through her late May actions with Patterson (asking Patterson to order creams she did not want or need to get them in before the deadline), but more through her transactions and comments to Perkins. Boasting that she paid someone to order creams by covering the person's premiums (and paying a cash bonus of $10,000), telling Perkins

44

to order the most expensive creams, and instructing Perkins not to speak with law enforcement: all of these actions show an intent to defraud. None of these were "100% transparent transactions" as Nicholson alleges. Nicholson claims she was never in a position to defraud insurance companies. The over $900,000 Nicholson made in commissions shows the opposite. (Exhibit 716, p. 3.) As detailed above and in the initial brief, the proof other than the commissions showed differently.

Nicholson also argues that she did not willfully pay or receive commissions for Tricare payments. (R. 393, PageID# 7906.) This is a factual determination which the Court must make. The proof offered by Perkins is overwhelming. Nicholson recruited him because he had Tricare insurance. Indeed, on the meeting in Las Vegas with Perkins and his wife, Nicholson did not try to sign up Perkins. It was only after the scheme focused on Tricare, and away from private insurance, did Nicholson again reach out to Perkins. She argues that there is no evidence that she knew receiving or paying such commissions was illegal. That is not the standard (and the government does not agree with this assertion). Nicholson argues that the pharmacies would have had familiarity with the law on kickbacks and that she, in good faith, would have relied on that. (R. 393, PageID# 7907.)[9]  As noted above, the government suggests that "good faith" is not a defense to Tricare and the AKS. The AKS does not require fraud or deception. Even though Nicholson committed fraud with the Tricare prescriptions, the AKS statutes do not require a showing of it. The government has argued that good faith is not applicable to the AKS and will rely on those previous arguments here. (R. 372, PageID# 6156-57.)

---

[9] All defendants have argued that they had no arrangements, contracts or communications with the pharmacies so it is difficult to discern how Nicholson would have relied on the pharmacies' and their expertise. All Nicholson knew, according to the arguments of her counsel, was that she was arranging for high priced prescriptions to be filled, they were filled, and she was collecting her commissions.

45

Finally, Nicholson, like the other defendants, argues that the cost of the creams was irrelevant, that she didn't set the cost (the pharmacies and PBMs did), and that even discussing the "outrageous" cost is prejudicial. (R. 393, PageID# 7895.) The government agrees: discussing the cost is prejudicial. It is just not unfairly so. (See, Rule 403, Federal Rules of Evidence.) The cost of the creams was probative; eliciting testimony on that issue does not reveal an unfair prejudice that outweighs its probative value. *Mann v. Jones*, 341 F. App'x 158, 166-67 (6th Cir. 2009) ("All evidence against a defendant is 'prejudicial.' The proper question is whether evidence is unfairly prejudicial.") During the testimony of Maria Valadez, the Court expressed incredulity at the defense argument that the cost of the creams was irrelevant. (Valadez, PageID# 4973-76.) (The Court agreed that Valadez's insurance paying $230,000 for her family's creams was relevant, especially since the cost of treatment for her daughter's pancreatitis was less.) Nicholson made over $900,000 in commissions during the scheme. She made commissions on creams she ordered for herself. If the defendants had been selling the numbing cream Salonpas (which is similar to the pain cream in this case) for $20 a tube, instead of its normal $10 price (Craven, PageID# 2820-21), the government would not be prosecuting the case. However, the defendant's argument that labeling the cost of the creams exorbitant or outrageous is "subjective" does not track the proof. Again, no witness said that they would have ordered the creams if they had known what the creams cost. Perkins testified that Nicholson and Wilkerson informed him that he should encourage others to sign up for the high priced medications. The only two witnesses who "gushed" about the creams were Natalie and Brandon Chatfield, Michael Chatfield's wife and brother. Of course the cost of the creams is relevant. The defendants participated in the fraudulent scheme to make money, the more the better.

IV.     Billy Hindmon

Hindmon spends much time arguing in his brief that he was unaware of Michele Craven's actions, and that his ignorance of them demands his acquittal. (R. 395.)  However, Hindmon's contention (unsupported by any evidence) that he "had every reason to believe Craven was signing off on the prescriptions in a disinterested manner" (R. 395, Page ID# 7951) is belied by the fact that Craven was working for Wilkerson.  Contrary to what he now argues, Hindmon was aware of this.  Wilkerson made it clear to Green in May 2014 that he was withholding $4,000 from commissions (on Green and Chatfield) to cover the cost of paying both Craven and Jared Schwab.  (Exhibit 504.)[10]  The very next month, Hindmon, along with the other marketers, had $4,000 withheld from his commission payment. (Kriplean, Page ID# 6723.)  This is more than just coincidence; it is also contrary to Hindmon's assertion that "the Government did not produce any evidence Mr. Hindmon paid a dime to Ms. Craven." (R. 395, Page ID# 7954.)  Hindmon's similar contention that he did not pay for part of Jared Schwab's consulting services is likewise negated in a text thread in October 2014 he is on with Wilkerson, Green and others, in which Wilkerson stated, "I am withholding $1K from everyone to pay Jared for his consulting services." (Exhibit 527.)

Hindmon's knowledge that Craven was not operating as an independent nurse practitioner is further highlighted by the e-mail Hindmon sent to the individuals operating below him in the scheme, referring to "*our* medical professionals." (Exhibit 2613 – emphasis added.)  Adam Staten provided the best light on Hindmon's knowledge of Craven's status.  He testified that, "Billy had said that Wayne had hired on a nurse so if I had any friends or family members

---

[10] The government does not have text exchanges between Hindmon and any other defendants in this case.  The government only received text messages from Green and George Striker.  The few text exchanges involving Hindmon were captured when Hindmon was on a group exchange with Green.

that would want to get creams that there was a nurse on staff now." (Staten, Page ID# 4079.) And while this particular nurse was Craven (Staten, Page ID# 4081), Hindmon and Staten attempted to bring on even more nurse practitioners, meeting with one, Ashley Moore, outside of Nashville and attempting to identify others who might be interested. (Staten, Page ID# 4190.) That Hindmon and Staten wanted to hire a nurse practitioner in Nashville to write scripts for the creams was corroborated by Rachel Franklin. (Franklin, PageID# 4775-82.) In fact, Franklin stated that Hindmon and Staten "wanted to meet with Ms. Moore who was a nurse practitioner to see if she would be willing to write these prescriptions and for every prescription she would be given compensation." (Franklin, PageID# 4782.)

While Hindmon points to a few instances in which Craven claims she declined to sign prescriptions,[11] he does not mention her testimony that she blindly signed prescription stacks for cream customers she never saw, at Wilkerson's request. (Craven, Page ID# 2794-2797.) Ms. Craven's testimony confirms what is obvious, even in its absence – that she was not signing the prescriptions in a disinterested manner. Rather, she was signing them at the direction of the person signing her checks: Wayne Wilkerson. And while Hindmon claims he was unaware that Craven was signing prescriptions without seeing the cream customers, it is interesting that his own prescription for three different creams was stamped - and not signed - by Michelle Craven. (Exhibit 1331; Craven, Page ID# 2800.) To that point, while Hindmon highlights Craven's testimony that she did not interact with Hindmon at Balanced Life (R. 395, Page ID# 7951), his

---

[11] In reality, Craven was asked whether she ever declined "to write a script or sign a script." She replied, "*I don't think I did* unless it was somebody that was pregnant and I was concerned about the – what was in the compounded creams, but it was very rarely." (Craven, PageID# 2807; emphasis added.)

own prescription from Craven was stamped on July 14, 2014, while she was still at Balanced Life.  (Exhibit 1331; Craven, Page ID# 2802.)[12]

Hindmon also misconstrues the testimony of James Gogue and Steve McCall with respect to the materiality of certain actions taken by Hindmon and the other defendants.  Both testified that marketers initiating direct communications with potential patients and soliciting prescription orders would create materiality concerns. (Gogue, Page ID# 5559-5560; McCall, Page ID# 6055.)  Both also testified that the fact that a marketer was being paid a commission for his own prescription would be material to the claims approval process. (Gogue, Page ID# 5557-5558; McCall, Page ID# 6051.) Nevertheless, Hindmon takes issue with their testimony, and insinuates that these facts have no bearing on the decision because no one was required to affirmatively disclose them on the front end of the reimbursement process.  However, common sense dictates that it is not possible to inquire as to every single material fact on an initial submission form.  In fact, the Inspector General document cited by Wilkerson in his post-trial brief makes clear that the existence of direct-to-patient marketing is not an irrelevant factor, and should be considered for anti-kickback statute implications.  The same IG document also states that a commission structure involving the receipt of commissions by a marketer based on percentage of sales is indicative of a violation of the federal anti-kickback law.

McCall and Gogue testified about numerous other factors that are material to the claims approval process which are also not included as data fields.  Nevertheless, they are still material.  In short, not requiring the disclosure of a particular fact does not necessitate a conclusion that the fact is not material.  The PBM system is dependent upon the integrity of those operating in the

---

[12] As far as the government is aware, Hindmon's prescriptions were not processed, or at least there were not claims submitted for them to the PBM.  That fact does not negate Hindmon's knowledge of the situation being discussed.

49

system, and it is not possible to require enough data elements on the front end to weed out all aspects of potential fraud.

In this same regard, Hindmon argues that his reimbursement of Rachel Franklin's health savings account money was not improper. (R. 395, Page ID# 7959.) Ms. Franklin testified that Hindmon initially offered to pay her cash to cover the HSA charge. (Franklin, Page ID# 4774.) Instead of being paid in cash, her HSA charge was somehow reversed after speaking with Hindmon. (Staten, PageID# 4128-29; Franklin, PageID# 4774.) As this testimony is uncontradicted, Hindmon is forced to argue that the testimony does not matter, stating that it "in no way indicates an intent to defraud." (R. 395, Page ID# 7960.) Of course withholding information regarding copayment from potential consumers is improper. It is yet another example of Hindmon (and other defendants) taking affirmative steps to conceal from the PBMs and insurance companies the fraudulent nature of the transaction. It is also an example of Hindmon withholding information from a patient that might otherwise affect her decision to order the product. While Hindmon, in his brief, now asserts that he was "in no way attempting to remove any so-called 'skin in the game' associated with co-pays," (R. 395, Page ID# 7961) there is no other way to reasonably classify this behavior. Paying Rachel Franklin's co-payment completely removes her skin from the game. Moreover, had she known about the co-payment in the first place, she would have never agreed to receive the creams. (Franklin, Page ID# 4763, 4788.) Also, Hindmon's ability, through Wilkerson, to reverse the removal of the funds from Franklin's HSA reveals a deeper connection to the scheme: Franklin testified that the insurance company told her that *she* could not put the money back into her HSA. (Franklin, PageID# 4774-75.) Yet somehow Hindmon and Wilkerson were able to have her HSA money restored. Hindmon's affirmative acts perpetuated the fraud.

Hindmon also omits important information in his attempt to minimize the impact of various testimony against him. For instance, while he states Craven "conducted a physical examination and prescribed compounded creams for" Josh Linz, he neglects to point out that Linz admittedly received products he did not need. For example, he received a psoriasis cream even though he did not have psoriasis. (Linz, Page ID# 5707.) Hindmon also claims, "No witness said Mr. Hindmon paid them to order a prescription." (R. 395, Page ID# 7969.) Again, Josh Linz testified to exactly that. (Linz, Page ID# 5731-5734.) He was asked what the money he received was for, and he stated it was for ordering creams. (Linz, Page ID# 5732.) He was paid by both Wilkerson and Hindmon. (Linz, PageID# 5705, 5709-11, 5715-16, 5732.)

Hindmon also asserts "the Government failed to present any direct evidence that Mr. Hindmon gave Ms. Valadez money orders or cash in June, 2014."[13] (R. 395, Page ID# 7969.) In so claiming, Hindmon overlooks the testimony of both Maria Valadez and Dawn Montgomery. Presumably Hindmon is basing his contention on the fact that Valadez did not identify Hindmon in court. (R. 395, Page ID# 7969). However, Valadez testified that someone "introduced as Billy" came to her workplace with Jayson Montgomery and gave her money orders and cash. (Valadez, Page ID# 4967, 4977.) While she may have only known Hindmon to be "Billy," Dawn Mongtomery certainly knew him. (D. Montgomery, Page ID# 5070.) And after identifying Hindmon in court, Dawn stated that he was the individual who, along with her son, handed money orders to Valadez and Araceli Quezada. (D. Montgomery, 5084.) Dawn also made it clear that Jayson worked for "Billy." (D. Montgomery, PageID# 5070, 5087.) Valadez made it clear that she completed the money orders that Hindmon brought to her and then gave them back to him. (Valadez, Page ID# 4971-72.)

---

[13] In an objection, counsel for Hindmon objected on relevance grounds to evidence that Hindmon had a "wad of money," arguing that Valadez "already testified that Mr. Hindmon paid her in cash." (Valadez, PageID# 4977-78.)

V.     Jayson Montgomery

"*Mr. Montgomery asserts that his actions were taken in good faith.*" (R. 391,
Montgomery Proposed Findings of Fact and Conclusions of Law, Page ID# 7839.)  Jayson
Montgomery knowingly paid his own mother for ordering creams for herself and her
grandchildren. (D. Montgomery, Page Id# 5073-5074.) He instructed his mother to ignore
pharmacy bills and co-pays. (D. Montgomery, Page ID# 5076).  He witnessed cash payments
being made in exchange for placing orders, as well as money orders being issued to
surreptitiously cover the cost of customers' copayments. (D. Montgomery, Page ID# 5078;
Valadez, Page ID# 4977.)  He signed up strangers in a bar to order prescription medications
under Tricare. (Rice, Page ID# 4656-4660.) He misrepresented the true nature of the scheme,
portraying the creams as free samples. (Callaway, Page ID# 5747.)  He instructed people not to
speak with law enforcement, and even encouraged individuals who received creams to obtain
legal representation. (Callaway, Page ID# 5755.)  He attempted to spoon feed false narratives to
those being questioned by investigators, and he profited handsomely from the entire enterprise.
(Exhibit 3, Callaway, Page ID# 5784.)  Yet he claims that his actions were *taken in good faith*…

     In attempting to conceal the true nature of his activities, Montgomery selectively points
to portions of witnesses' testimony, misconstruing the true lessons to be derived from the
evidence.

**Dawn Montgomery**

     With respect to his mother, Dawn Montgomery, he now argues that he "mistakenly" paid
her in exchange for ordering the creams. (R. 391, Page ID# 7842.)  There is *zero* evidence that
the payments Montgomery made to his mother for ordering creams for herself and her
grandchildren were "mistakes."  Unfortunately for Montgomery, the unsworn factual assertions

in his post-trial brief are not subject to cross examination, and therefore may not be considered as evidence. Jayson told Dawn she could get $200 or $300 for each cream she ordered for herself and for her grandchildren. (D. Montgomery, PageID# 5073-74.) Ms. Montgomery was paid by Jayson for ordering the creams. (D. Montgomery, PageID# 5104.) Likewise, the statement "Mr. Montgomery certainly did not think it was illegal for him to compensate her" (R. 391, Page ID# 7842) is *not* supported by any evidence admitted during the trial.

Equally unsupported by the evidence is Montgomery's contention that Dawn Montgomery solicited Maria Valadez's cream orders "with no compulsion" from him. (R. 391, Page ID# 7830.) The entire cream scheme was introduced to Ms. Montgomery by her son, and to now suggest that he was wholly in the dark about her gauging the interest of others in participating is ludicrous. (D. Montgomery, Page ID# 5073.) Montgomery may not have known that Maria Valadez specifically would be targeted, but *of course* he was aware that his mother would be offering Montgomery's promise of free money to others. As Dawn testified, Montgomery told her, "If you can get somebody to test them or do a trial, they would receive $100." (D. Montgomery, PageID# 5073, 5118.) When Maria called Dawn to complain about Maria's co-pays, Dawn called her son to remedy it. (D. Montgomery, PageID# 5116.) When Dawn, a bill collector, received co-payment notices from the pharmacy, her son told her not to pay them. (D. Montgomery, PageID# 5076.) She did not. (*Id.*) This small and subtle fact also reveals that Jayson was aware that no repercussions would come to his mother for her failure to pay her required co-pays. In spite of Montgomery's claims that he was in the dark about the scheme, facts like this reveal that he was not.

Finally, Montgomery's claim that Dawn had no belief that the scheme involved anything untoward is inconsistent with her testimony. Montgomery offered her the opportunity to join his

scheme, and she refused, saying she had a bad feeling about it. (D. Montgomery, Page ID#
5086.)  In fact, she expressed concern to him regarding his efforts in targeting Tricare, telling
him she believed his actions were illegal.  (D. Montgomery, PageID# 5088.)

**Maria Valadez**

Montgomery attacks Valadez's testimony by attempting to make much of the fact that in
2015 she recalled briefly using the creams, resulting in an irritation, while she did not recall that
at trial. (R. 391, Page ID# 7831.)  Her recollection at trial was that it was actually her nephew
who had the adverse reaction to the creams. (Valadez, Page ID# 4961-4962.)  Montgomery
overlooks the thrust of Maria Valadez's testimony – that he and Billy Hindmon gave her money
orders to conceal the source of her co-payments, and handed her cash for placing her orders in
the first place. (Valadez, Page ID# 4969-4970, 4977, Exhibit 5.)  This testimony remains
undisputed, and is even corroborated by Dawn Montgomery, who observed the meeting between
Valadez, Hindmon, and Montgomery, and saw Montgomery and Hindmon with the money
orders.

**Katherine Callaway**

Montgomery spends much time in his post-trial brief attempting to attack the testimony
of Katherine Callaway, who Montgomery could only attack at trial via insinuations related to her
chosen profession as an actress.  This is not surprising, as Callaway's testimony alone is
sufficient to convict Montgomery.  Ms. Callaway gave undisputed testimony that Montgomery
pitched the creams to her as free samples, and the best argument Montgomery can now make to
rebut that fact is that "no other witness made a reference to 'samples' or over the counter
products." (Callaway, Page ID# 5747; R. 391, Page ID# 7842.)  (Oddly, even Dawn
Montgomery said that Jayson's sales pitch included "testing" the products or participating in a

trial. (D. Montgomery, PageID# 5073.) Such a pitch is not much different than offering "samples.") Therefore, the logic of Montgomery's argument goes, that since Montgomery did not use this particular ruse to con anyone else into ordering creams, Ms. Callaway must be committing perjury.

In an attempt to undercut Ms. Callaway's credibility, Montgomery points to an order form he now purports was signed by Callaway (although it was never shown to Callaway at trial). (R. 391, Page ID# 7832.) As an initial matter, assuming *arguendo* that Ms. Callaway did sign the document, it in no way shows he did not pitch the creams as free samples. The form, containing an unreadable signature, is merely an order form containing Callaway's information – which she freely admitted Montgomery was given. (Montgomery Exhibit 4.) (She allowed him to photograph her insurance card, not realizing the import of same.) (Callaway, Page ID# 5748, 5767.) However, it is interesting that Montgomery, who presumably possessed the document in question the entire trial, waited until *after* Ms. Callaway left the witness stand and returned to California to suggest that she signed it. The fact that he did not show it to her on the stand is telling – and the Court can draw reasonable inferences as to who really signed the document from this not so subtle omission.

Equally telling in this regard is Montgomery's misrepresentation of Kriplean's testimony regarding the signature. Montgomery now argues that Kriplean concedes that the signature "could have been" Callaway's. (R. 391, Page ID# 7842.) To the contrary, Kriplean testified that he had *no reason* to believe Callaway signed the form, even after comparing the signatures. (Kriplean, Page ID# 6698-6703.) Of course an illegible signature *could* have been signed by anybody, which Kriplean conceded, but he in no way suggested it was Callaway's. Equally

telling is the fact that Montgomery chose not to admit the known signature of Callaway so that the Court would have the opportunity to assess the signatures for itself.

Montgomery is now silent on the undisputed facts that Montgomery told Callaway not to meet with the investigative agents, and texted her while she was with Kriplean, trying to encourage her to say she spoke with a doctor. (Callaway, Page ID# 5784). And once Callaway made clear she was not going to be complicit in his cover up story, Montgomery had no further contact with her. (Callaway, Page ID# 5763.) This begs the question, why would someone who acted in good faith worry about someone with knowledge of his activities talking with authorities?

**Zach Rice**

Montgomery met Zach Rice in a bar known as a hangout for active duty military personnel, and wasted no time in signing him up to have his Tricare billed for creams. (Rice, Page ID# 4655-4656.) Rice himself received wellness pills he did not ask or sign up for, and Montgomery brushed it off as "part of the order." (Rice, Page ID# 4660-4661.) In his efforts to now make his interactions with Rice appear benign, Montgomery neglects to mention that he knew Rice was in the military and knew he was a supervisor of soldiers. (Rice, Page ID# 4657.) Montgomery is quick to point out that he never told Rice to target military members, but omits rest of the story – that Montgomery *knew* Rice was specifically targeting Tricare beneficiaries – for which Montgomery subsequently paid Rice over $80,000, costing Tricare more than $1.3 million for unneeded creams. (Rice, Page ID# 4678-4679, 4682, 4749, Exhibit 26.)

**Nicholas Quincey**

Montgomery attempts to minimize the testimony of Quincey, Bradley Wurster, and James Allen, and merely dismiss them as downlinks of Zach Rice. Montgomery fails to

acknowledge that Quincey, like Rice, met personally with Montgomery at bars and restaurants. (Quincey, Page ID# 6006.)  Montgomery also attempted to persuade Quincey to form an LLC, which, upon further reflection, Quincey refused to do, stating, "It didn't feel right." (Quincey, Page ID#6008.)

Montgomery, like other defendants, misconstrues the knowledge requirement related to the anti-kickback statute.  Montgomery claims that the term "willfully" in the anti-kickback statute must be construed to require proof that he and the other defendants actually knew that the claims submitted to Tricare were false. (R. 319, Page ID# 7848).  To the contrary, the *Gonzalez* case cited by Montgomery to support this proposition is a health care fraud case, not a kickback case.  Nothing in the AKS requires the underlying claim to be false or fraudulent at all.

As set forth in preceding portions of this response, the position advanced by Montgomery regarding the kickback counts is directly refuted by the *Starks* case, which several defendants cite.  In *Starks*, the Eleventh Circuit stated the obvious: "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998).  In fact, as the United States has already pointed out, the Court in *Starks* described the paying or receiving of kickbacks as "*malem in se*" (wrong in itself). *Starks*, 838.

Montgomery continues as well to attempt to impose the principles of good faith as a defense to the kickback counts.  Previously, the government has argued that good faith is not a defense to the AKS.  However, as the facts above demonstrate, Montgomery's claim that he acted in good faith is incorrect.  In all, Montgomery was paid over $337,000.00 in commissions (Exhibit 716, p. 5), primarily for targeting Tricare enrollees, and asking those individuals to sign

up other active duty personnel. His actions show that he did *not* act in good faith.  Nevertheless, even if he did, good faith presents no defense to the Tricare kickback counts.

## CONCLUSION

The government respectfully requests that additional argument to the Court be allowed on these issues at the Court's scheduled closing/oral argument.

<div style="margin-left: 50%;">

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By:    *s/Perry H. Piper*
         PERRY H. PIPER, BPR #013384
         Assistant U.S. Attorney
         1110 Market Street, Suite 515
         Chattanooga, Tennessee 37402
         (423) 752-5140
         Perry.Piper@usdoj.gov

         *s/Franklin P. Clark*
         FRANKLIN P. CLARK
         BPR #034112
         Assistant U.S. Attorney
         1110 Market Street, Suite 515
         Chattanooga, Tennessee 37402
         (423) 752-5140
         Frank.Clark@usdoj.gov

</div>

58