# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 1:18-cr-11 |
| v. ) | |
| ) | Judge Mattice/Steger |
| JERRY WAYNE WILKERSON, ) | |
| MICHAEL CHATFIELD, ) | |
| KASEY NICHOLSON, ) | |
| BILLY HINDMON, and ) | |
| JAYSON MONTGOMERY ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR RELEASE PENDING APPEAL

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Perry H. Piper and Franklin P. Clark, Assistant United States Attorneys, and hereby offer this response to the defendants' Joint Motion for Bond Pending Appeal. (R. 557.) The government opposes the motion.

After a lengthy bench trial, the Court issued guilty verdicts against all defendants on March 4, 2020. The defendants were sentenced on separate days in July 2020. The sentences imposed were as follows: Jayson Montgomery, 24 months; Billy Hindmon, 51 months; Michael Chatfield, 108 months; Kasey Nicholson, 30 months; and Wayne Wilkerson, 165 months. The Court allowed all defendants to remain on bond pending designation to a facility by the Bureau of Prisons; all defendants have requested to remain on bond pending appeal. The United States opposes the requests.

## Law and Argument

This Court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal . . . , be detained" unless the Court finds (i) clear and convincing evidence the defendant is not likely to flee or pose a danger

to the safety of another person or the community and (ii) the appeal is not for the purpose of delay and "raises a substantial question of law or fact" likely to result in a reversal, a new trial, or a sentence less than the expected duration of the appeal process. 18 U.S.C. § 3143(b)(1)(B). The statute "creates a presumption against release pending appeal," *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002), and a defendant seeking to overcome that presumption bears the burden of proof. *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985). The defendants have not satisfied their burden. The government agrees that the defendants are not a risk of flight. However, the government does not agree that the defendants have identified any "substantial question or law or fact," much less one "likely" to result in reversal, a new trial, or a sentence less than the expected duration of the appeal. 18 U.S.C. § 3143(b)(1)(B).

I. **The defendants have not shown that their motion for bond pending appeal is not for purposes of delay.**

The defendants have not proven that the purpose of the motion for bond pending appeal is not to delay the commencement of a custodial sentence. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1242 (D. Colo. 2009) ("Even without an express argument by the Government, the Defendant has the burden of proof on this issue [and] must show that it is more likely than not that his appeal . . . is not for purposes of delay."). The Court could thus deny the joint motion on that basis.

II. **The defendants have not shown that their appeals raise a substantial question of law or fact likely to result in reversal, a new trial, or a non-custodial or brief sentence.**

"[A]n appeal raises a substantial question when [it] presents a 'close question or one that could go either way.'" *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985) (quoting *United States v. Powell*, 761 F.2d 1227, 1233-34 (8th Cir. 1985) (*en banc*)); *see also United States v. Smith*, 793 F.2d 85, 88 (3d Cir. 1986) ("Our definition of a substantial question requires

that the issue on appeal be *significant* in addition to being novel, not governed by controlling precedent or fairly doubtful." (emphasis in original)). If the question is substantial, this Court must then determine whether it "is so integral to the merits of the conviction that it is more probable than not that reversal . . . will occur if the question is decided in the defendant's favor." *Pollard*, 778 F.2d at 1182 (quoting *Powell*, 761 F.2d at 1233-34). Where, as here, all the defendants were convicted of multiple counts,[1] the defendants must also show that the resolution of their substantial question is "likely to result in reversal [or] . . . a new trial of *all counts* on which imprisonment has been imposed." *United States v. Zackert*, Nos. 85-5547, 85-5605, 1985 WL 14024, at *1 (6th Cir. Nov. 7, 1985) (collecting cases) (emphasis added).

First, the defendants argue that the purpose of the "appeal will ask the [Sixth Circuit] to determine whether this Court used the proper statutory framework when it convicted all of the defendants of violations of the anti-kickback statute." (R. 557, PageID# 11708.) The defendants, relying on *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1072 (6th Cir. 1978), suggest a standard of review for reflection upon this Court's findings of fact and conclusions of law. However, there were no real findings of fact or conclusions of law announced by the Court upon which the defendants can contest. Under Rule 23(c) of the Federal Rules of Criminal Procedure, in "a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." All parties were given the

---

[1] Defendant Montgomery was convicted on two anti-kickback counts. Defendant Nicholson was acquitted of the conspiracy to commit health care fraud, but she was convicted of substantive health care fraud, numerous wire and mail fraud counts, and several anti-kickback counts. The three remaining defendants, Wilkerson, Chatfield and Hindmon, were all convicted of the conspiracy to commit health care fraud, substantive health care fraud, numerous counts of wire and/or mail fraud, and multiple anti-kickback counts. Additionally, Wilkerson and Chatfield were convicted of money laundering counts.

3

opportunity to ask for written findings of fact and conclusions of law by the Court; all declined to avail themselves of that opportunity. The defendants cite *In re Fordu*, 201 F.3d 693, 710 (6th Cir. 1999) for the proposition that this Court's "findings are to be liberally construed in support of a judgment, even if the findings are not as explicit or detailed as might be desired." In *Fordu*, the bankruptcy court failed, pursuant to Rule 52 of the Federal Rules of Civil Procedure, to "specially [] state separately its conclusions of law...." *In re Fordu*, 201 F.3d at 710. Rule 52 states

> (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

Fed. R. Civ. P. 52

Inasmuch as the standard under the civil rules appears to be mandatory, but the standard under the criminal rules requires the parties to request explicit findings of fact, the defendants cannot now complain of the Court's lack of specific findings. Accordingly, the defendants should be limited to making their arguments under the Court's "Notice of Applicable Legal Standards" (R. 355, which the Court sometimes equated to jury instructions), in arguing that the Court erred in its findings of guilt.

### Anti-Kickback Analysis

Regarding the anti-kickback counts 42 U.S.C. § 1320a-7b(b)(1) and (2), the Court's legal standard (agreed to by all parties) for payment of illegal remuneration was as follows

> 1. The defendant knowingly and willfully offered or paid remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce a person to:
> a. Refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, or

4

b. Purchase, lease, order, or arrange or recommend such for any good, facility, service, or item for which payment may be made in whole or part under a Federal health care program.

For receipt, the Court used the following standard

　　　1. The defendant knowingly and willfully solicited or received any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind:
　　　　a. In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be in whole or part under a Federal health care program, or
　　　　b. In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or part under a Federal health care program.

With respect to the AKS counts of conviction, the defendants now argue that the Court used "an erroneous legal standard." (R. 557, PageID# 11711.) Nothing in the record suggests that the Court used any standards but those that were found in the "Legal Standards" announced by the Court.

Regarding Montgomery, the motion for bond recites the Court's statement at sentencing that "at some point [Montgomery] became familiar enough with what was going on here that he beyond a reasonable doubt in my opinion knew or at least should have known that what was going on here was fraudulent." (R. 557, PageID# 11711.) Montgomery now complains that the Court has "require[d] a finding of fraud" for his AKS convictions and that the Court lessened the mens rea by suggesting that Montgomery knew "or should have known" that his conduct was illegal. Montgomery misapprehends the Court's statements. First, if the Court had determined that the AKS required fraudulent intent, then the Court's statement would have suggested that it held the government to a higher standard than that which was required. Secondly, the Court's statement regarding Montgomery's knowledge was contextual with respect to his counts of conviction. The Court, only found Montgomery guilty of two of the 32 counts in which he was

5

named. The Court's statement "that he knew or should have known" was a reference to Montgomery's continued involvement in the crime, not his ultimate mens rea. Of course, Montgomery knew he was receiving (and paying) kickbacks. The proof overwhelmingly supported the conviction for the two counts of receipt of kickbacks on Montgomery.

With respect to the other defendants, the Court correctly found that the elements set forth in the Court's standards were met. All four other defendants paid and received kickbacks. The standard/jury charge is clear: the defendants were violating the law when they paid and received the kickbacks. The defendants now argue that the Court ignored the "willful" requirement found in the statute. (R. 557, PageID# 11712.) The defendants have pointed to nothing in the record, and the government has been unable to locate any statements, that suggests the Court ignored its own legal standards.

## Fraud Analysis

The defendants argue that the Court did "not apply the correct elements of health care fraud" in reaching guilty verdicts for the fraud counts. (R. 557, PageID# 11712.) Again, the Court issued legal standards for evaluating whether the evidence presented met the elements of the crimes. The review of these standards reveal that the proof at trial established the guilt of all four defendants convicted of fraud. The defendants argued at trial, and continue to argue today, that they, as marketers, had no duty to disclose to the PBMs or insurance companies, therefore an "omission" or "concealment" by them cannot form the basis for any fraud counts. (See, R. 358, PageID# 4006.) Even the defendants admitted that the "duty to disclose" requirement attached only to omissions, not to material misrepresentations. (R. 351, PageID# 3975: "*Unlike* an affirmative misrepresentation that is material, the Sixth Circuit has held that fraudulent pretenses or representations can include omissions, or concealment, 'where one says nothing but has a duty

6

to speak'"; emphasis added.) In making this claim, the defendants relied on *United States v. Maddux*, 917 F.3d 437, 443-446 (6th Cir. 2019), the "fair reading" of the cases in the notes to the Sixth Circuit Pattern Jury Instructions, and the Third Circuit's pattern instructions.

First, it is undisputed that the pharmacies would have had a duty to disclose to the PBMs and/or insurance companies that the defendants were making co-pays and were inducing patients by paying them for a non-existent study. These were not just omissions; they were material misrepresentations. Even if the actions were characterized as "omissions," the defendants, by committing these actions, were causing the pharmacies not to disclose the fraud to the victims. Second, the act of paying the co-pays and the inducement fee through a non-existent study are not merely "omissions"; they are affirmative acts committed by the defendants that constitute fraud. The defendants seek to avoid culpability by mischaracterizing their acts as "omissions" or "concealments." These actions are neither: they are affirmative misrepresentations designed to deceive the victim insurance companies and the federal government.

In *United States v. Crossley*, 224 F.3d 847 (6th Cir. 2000), the defendants were approached by an insider, an insurance adjuster, in a strategy that involved filing false claims in the name of false clients and then sharing the profits after the false client cashed the insurance check. *Crossley*, 224 F.3d at 857. The only involvement by the defendants was to give the insider their names and mailing addresses and then to cash the checks. In analyzing the sufficiency of the evidence presented on the mail fraud count, the Sixth Circuit found that a rational juror examining the evidence presented at trial could have concluded that a defendant knowingly participated in a scheme to defraud when it would have been obvious to the defendant that she was not entitled to money. *Crossley*, 224 F.3d at 857.

7

If the actions by the defendants are omissions, the omission of a material fact with the intent to get the victim to take an action the victim would not otherwise have taken establishes intent to defraud under the wire fraud statute. *United States v. Bertram*, 900 F.3d 743, 748–49 (6th Cir. 2018), cert. denied, 139 S. Ct. 852, 202 L. Ed. 2d 582 (2019) (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)). As noted previously, the indictment charges the defendants with substantive fraud counts and with aiding and abetting such violations—which allows for punishment as a principal. See 18 U.S.C. § 2. The defendants' actions violate the fraud statutes "if some other party has committed [fraud], if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *United States v. Faulkenberry*, 614 F.3d 573, 583–84 (6th Cir. 2010). The defendants either had the assistance of the pharmacies in committing the fraud, or the defendants were deceiving the pharmacies by failing to inform them that they were paying co-pays for the patients and were giving an inducement to order the compounded medications through the guise of a non-existent study. Even if the defendants want to couch their actions as "omissions" or "concealments," they either deceived the pharmacies who in turn, based upon the defendants' misrepresentations, deceived the PBMs, or the defendants had the assistance of the pharmacies who were deceiving the PBMs. Couched in terms of "duty" to disclose, the defendants would have had the duty to disclose their actions to the pharmacies, or they caused the pharmacies to fail to disclose the material facts to the PBMs (with whom the pharmacies would have had a duty).

Any contention that the defendants cannot be held culpable for their actions in deceiving the insurance companies would lead to absurd results. For example, Matthew Perkins (the yeoman aboard the U.S.S. George H. W. Bush) testified that defendant Nicholson boasted to him

8
Case 1:18-cr-00011-HSM-CHS   Document 561   Filed 09/25/20   Page 8 of 15   PageID #: 11735

that she had paid $10,000 and a year's worth of insurance premiums for a friend because she could make more than that off of creams ordered for the friend. If the defendants' theory is correct, these actions by Nicholson would be "omissions" or "concealments" which she would not have any obligation or duty to disclose. Therefore, Nicholson (or any of the defendants) could have paid the insurance premiums and given a $10,000 inducement to any unscrupulous individual, but no criminal liability would attach to such actions because Nicholson would not have had a "duty" to report to the insurance companies that she was taking these actions.

In *United States v. Cotton*, 231 F.3d 890, 898 (4th Cir. 2000), the court held that "even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to 'prevent[] the other [party] from acquiring material information.'" (quoting Restatement (Second) of Torts § 550 (1977)). This language mirrors the Sixth Circuit's admonition that a "scheme to defraud" is not constrained by a technical definition, but, instead, the "standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) (quoting *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973)); *see also*, *United States v. Frost*, 125 F.3d 346, 371 (6th Cir. 1997) (approving jury instruction that "a scheme or artifice to defraud may describe a departure from fundamental honesty, moral uprightness, or fair play and candid business dealings in the general life of the community. There must be proof of either a misrepresentation, false statement, or omission calculated to deceive a person of ordinary prudence and comprehension. A scheme to defraud may occur even absent a false statement or false

9

representation, and may be based on fraudulent omissions. A scheme to defraud includes the knowing concealment of facts and information done with the intent to defraud.")

The "duty," if such there be, for the defendants flows to the pharmacy, then from the pharmacy to the PBM. Each of the fraud counts contains some variation of the following language: the defendant, aided and abetted by others, participated in a scheme to defraud and obtain money by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing the scheme.

The defendants also suggest that the "duty to disclose" attached to the health care fraud counts of conviction. This was the Court's standards for health care fraud:

> 1. The defendant knowingly and willfully executed or attempted to execute a scheme
>    a. to defraud any health care benefit program, or
>    b. to obtain by false or fraudulent pretenses, representations, or promises any of the money or property owned by or in the control of a health care benefit program, in connection with the payment for health care benefits, items, or services;
> 2. The scheme related to a material fact and/or included a material misrepresentation or concealment of a material fact;
> 3. The defendant had the intent to defraud.

(R. 355, PageID#: 3983-84.)

There is no substantial issue with respect to the health care fraud counts of conviction. Merely disagreeing with the Court's conclusion does not satisfy the defendants' burden to prove that the Sixth Circuit is likely to reverse the defendants' convictions on the health care fraud substantive counts of conviction (for all defendants except Montgomery) or on the conspiracy to commit health care fraud (for all defendants except Nicholson and Montgomery). It was the aim of the health care fraud scheme to deceive the insurance companies/government in paying for the creams. The health care fraud scheme at least "related to a material fact" and included material misrepresentations and concealment.

10

Furthermore, the cost of the creams was inherent in the nature of the fraud, contrary to what the defendants have consistently argued. (R. 557, PageID# 11713.) As will be addressed in the next section, the exorbitant cost, coupled with the lack of need and questionable efficacy, provided a recipe for unjust and fraudulent enrichment on behalf of the defendants.

**The Court did not err in admitting testimony regarding the cost or the efficacy of the creams**

The admissibility of evidence is a matter on which a trial court is afforded great discretion. *E.g.*, *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997)). The cost and the efficacy of the creams was wrapped up in the fraudulent motive of the defendants. The exorbitant price for the creams is highly probative of the defendants' motives. Time and again, witnesses testified that one of the defendants would instruct customers to order certain creams because those creams "paid out the most." No better example of fraudulent intent can be found than a defendant telling his customer to order a medication based upon the cost of the medication, not the need for the medications. Even without such an instruction by a defendant to order the most expensive creams, the cost of the cream was relevant and probative to the defendants' state of mind. Admitting the cost of a fraudulently peddled item does not seem to the government to be controversial, yet the defendants suggest that the Court should not have heard or considered such evidence. All of the fraud instructions require the government to prove, beyond a reasonable doubt, the defendants' intent, and require the government to prove that the object of the fraud was to obtain "money or property." (See, R. 355, PageID# 3983-84, relating to health care fraud; other fraud instructions have similar language regarding the object of the crime.) The exorbitant cost of the creams was relevant evidence in establishing that element.

11

Case 1:18-cr-00011-HSM-CHS   Document 561   Filed 09/25/20   Page 11 of 15   PageID #: 11738

Likewise, the efficacy, or lack thereof, was a relevant part of the scheme to defraud. Pre-formulated compounded creams, for which there was little if any need, and for which the effectiveness was questionable, was a relevant consideration for the trier of fact. At least outwardly, the defendants marketed the creams as cure-alls for a number of ailments. That they were not effective, or necessary, or compounded for an individual's specific needs, seems relevant and probative of the defendants' intent and relevant to the overall scheme to defraud. It is true, as the defendants suggest, that Rule 403 prohibits the introduction of evidence that is unduly prejudicial. That the creams, costing thousands of dollars and were supposedly compounded for an individual's specific needs, were not effective is prejudicial, but such proof was not unnecessarily so. In the case of a Rule 403 unfairness analysis, the Sixth Circuit grants this Court "very broad" discretion in making its determinations on the admissibility of evidence. *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006) (citing *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989)). Under this standard, the Sixth Circuit "takes a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect, and will hold that the district court erred only if the latter outweighs the former." *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997) (citing *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996)).

Even if the Court had erred in admitting the evidence of the cost or efficacy—it did not—the Sixth Circuit is not likely to vacate all the defendants' convictions on that basis. Rather, the Sixth Circuit would likely find harmless any error in the admission of that evidence. On numerous occasions, counsel for the defendants asked government's witnesses, as well as their own witnesses, questions regarding the efficacy of the creams. Chatfield, asked his brother and sister-in-law questions regarding the efficacy of the creams. While Chatfield's brother, Brandon

12

Chatfield, could not remember which creams he ordered, he proclaimed that they worked very well. (R. 378, PageID# 7235.) Similar questions were asked of Candace Michele Craven and the defendants received favorable answers. The defendants should not be allowed to selectively inquire about the efficacy, then later complain that efficacy evidence was unfairly prejudicial.

### III. COVID-19 does not mandate that the Court grant bond pending appeal

The defendants all seek to remain on bond pending appeal because of the COVID-19 pandemic. It is undisputed that COVID-19 has, in a short period, infected large numbers of people and caused many deaths. According to the Centers for Disease Control Data Tracker (https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days), the United States has almost 7,000,000 confirmed cases of COVID-19, and just over 200,000 people have died as a result of the virus.

Since January 2020, the Bureau of Prisons has taken significant preventive and mitigation measures in an effort to safeguard the health of the individuals in its custody. Despite those measures, there are 1,995 federal inmates and 703 BOP staff who have currently confirmed positive test results for COVID-19 nationwide. Additionally, 12,505 inmates and 1,118 staff have recovered. There have been 124 federal inmate deaths and two BOP staff member deaths attributed to COVID-19. Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed September 25, 2020).

In addition to the cases cited by the defendants in their motion (R. 557, PageID# 11718-19), at least one other court has granted release pending appeal because of COVID-19. *See United States v. French*, No. 1:12-cr-160-JAW, 2020 WL 1539926 (D. Me. Mar. 31, 2020). French had petitioned the United States Court of Appeals for the First Circuit, before whom his appeal was pending, for immediate release. *Id*. at *2. The First Circuit stated that the appeal,

which alleged juror misconduct, raised "a substantial question within the meaning of 18 U.S.C. § 3143(b)(1)(B)" and that the United States had not alleged that French was a danger or a risk of flight. *Id*. But because French had not yet shown "exceptional reasons why his continued detention would not be appropriate," the First Circuit denied his motion without prejudice to his ability to refile in the district court. *Id*. French did so, stressing his age, asthma, and other medical conditions, and seeking release to his home in rural Maine. *Id*. at *3. The district court made specific findings regarding French's health conditions, relevant guidance from the Centers for Disease Control, and Bureau of Prison protocols, as requested by the First Circuit, then released French (and a similarly-situated co-defendant) pending appeal. *Id*. at *5-9. That court deemed it especially significant that the First Circuit had determined that the appeal raised a substantial question. *Id*. at *6 ("The Court interprets the First Circuit order as suggesting that [defendants] will be victorious on appeal, and this is a strong incentive to place [them] in the same situation they would be in if the appeal could be decided expeditiously—namely, released on bail pending trial.").

These defendants, however, are not similarly situated to French. As argued above, the appeals do not pose any substantial question likely to result in reversal. Generally, the Sixth Circuit holds that if a defendant seeks to obtain a downward variance in sentence regarding health conditions, he or she should present the court with more than personal statements regarding medical condition; rather, the defendants should present statements from physicians explaining why the Bureau of Prisons cannot properly handle the particular defendant's medical conditions. *United States v. Goins*, 113 Fed.Appx. 131 (6th Cir. 2004); *see also, United States v. Charles*, 531 F.3d 637 (8th Cir. 2008). None of the defendants have offered such evidence here. Mere allegations that the risk of contracting COVID-19 may increase when the defendants are

14

incarcerated do not suffice to support a departure; such allegations should not suffice for a bond pending appeal. The COVID-19 pandemic should not be the deciding factor in the Court's consideration for bond pending appeal.

Although the government is sympathetic to the defendants' concerns about COVID-19, the United States submits that they have not satisfied the legal standard for release pending appeal. As a result, the defendants' request for release pending appeal should be denied on this ground.

## Conclusion

For the foregoing reasons, the Court should deny the defendants' motion for release pending appeal.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By: *s/Perry H. Piper*
PERRY H. PIPER, BPR #013384
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Perry.Piper@usdoj.gov

*s/Franklin P. Clark*
FRANKLIN P. CLARK
BPR #034112
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 752-5140
Frank.Clark@usdoj.gov